| | | |
|---|---|---|
| LaToya K. Benton, Administrator of the | ) | |
| Estate of Xzavier D. Hill, Deceased, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:22-cv-225-HEH |
| | ) | |
| Seth W. Layton, *et al.* | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants, Virginia State Troopers Seth W. Layton and Benjamin I. Bone (collectively, the "Troopers"), by counsel and pursuant to Rule 56, hereby submit their memorandum in support of their Motion for Summary Judgment. They state the following:

## INTRODUCTION

"No citizen can fairly expect to draw a gun on police without risking tragic consequences." *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996). In this case, at approximately 4:30 a.m. on January 9, 2021, Xzavier D. Hill ("Hill") led Defendant State Troopers on a high-speed chase exceeding 120 MPH on Interstate 64 before attempting a U-turn into oncoming highway traffic. After Hill lodged his vehicle in an embankment and continued to spin his wheels, the Troopers calmly and slowly approached Hill's vehicle on foot. Instead of complying with the Troopers' commands to show his hands, Hill reached toward the center console, produced a handgun and pointed it at Defendant-Trooper Layton's face. Both Troopers simultaneously announced the presence of the gun and discharged their state-issued sidearms, killing Hill. The entire incident was captured by the dash camera affixed to the Troopers' marked

state police vehicle. On February 25, 2021, a Multi-Jurisdictional Grand Jury for the Counties of Powhatan, Goochland, Louisa, Amelia, and Prince Edward (the "Grand Jury") unanimously found that the Troopers' actions were justified by the circumstances. Grand Jury Report, attached as Ex. 24.

Not accepting the Grand Jury's conclusions and the clear facts presented in the dash cam footage, Plaintiff, LaToya K. Benton ("Plaintiff"), Hill's mother and the administrator of his estate, brings this action asserting that the Troopers used excessive force.

At the outset, Plaintiff has presented an ever-moving target of allegations in this matter. Plaintiff first claimed that Hill could not have had a handgun. *See* ECF No. 10, ¶ 23; Ex. 18 at 4, "Supplemental Response" (objecting to "any evidence being referred to in argument or evidence regarding the gun"). But based on her answers to requests for admission, Plaintiff has apparently abandoned that theory. Ex. 8 ¶¶ 14-16; Ex. 12 ¶¶ 14-16. Plaintiff has also asserted that even if Hill possessed a handgun, he could not have pointed it at the Troopers. ECF. No. 10 at "Introduction"; Ex. 18 at 2, ¶ 4; Pl.s' Dep. Tr., attached as Ex. 25, at 11-13 (Plaintiff stating that Hill could not have pointed a gun at either Trooper). But Plaintiff offers no evidence supporting this theory other than vague referrals to the dash cam footage itself and the exhibits considered by the Grand Jury. *Id.*, Ex. 25 at 12-13:1-5.[1] Plaintiff has also asserted that the Troopers are lying about seeing the handgun because they may have answered sworn written deposition questions with the aid of an attorney. Ex. 18 at 7, ¶ 7; Ex 25 at 15-16:1-19.

More recently, through a retained purported expert, Plaintiff began asserting a theory that the Troopers created an "exigent circumstance" that "forced the deadly event"; specifically, that the Troopers should not have pursued Hill, and/or that the Troopers' pursuit procedures were

---

[1] *See generally* Grand Jury Exhibits, attached as Ex. 23.

flawed, and/or that the Troopers should have parked their cruiser in a better position, and/or that the Troopers should not have approached Hill's vehicle, and/or that the Troopers should have taken cover next to their vehicle and called for backup. But none of these theories supports a claim for excessive force. At most, these allegations incorrectly infer, utilizing 20/20 hindsight, that there might be a difference of opinion regarding which tactics to employ during a felony pursuit and approach of suspect.

At bottom, the undisputed facts in this case overwhelmingly establish that the Troopers' use of deadly force was objectively reasonable. As stated by the Fourth Circuit, "no court can expect any human being to remain passive in the face of an active threat on his or her life." *Elliott*, 99 F.3d at 644. Finally, even if any of Plaintiff's novel theories outlined above were actionable, the Troopers are entitled to qualified immunity.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  On January 9, 2021, Seth W. Layton and Benjamin I. Bone were employed as state troopers with the Virginia State Police ("VSP"). Decl. of Trooper Benjamin I. Bone, attached as Ex. 2; Decl. of Trooper Seth W. Layton, attached as Ex. 3.

2.  Prior to the events of this case, neither Trooper had ever discharged his firearm in the line of duty. Ex. 2 ¶ 3; Ex. 3 ¶ 3.

3.  At approximately 4:35 a.m. on January 9, 2021, the Troopers were in a stationary marked state police vehicle in the second crossover east of I-288 on I-64 near the 177 mile marker in Henrico County. Both Troopers wore standard issue blue utility uniforms displaying badges of authority and state police patches with fully equipped gun belts. Trooper Layton had a body-worn microphone. Trooper Bone was not wearing a microphone. Dash cam footage, attached as Ex. 1; Ex. 2 ¶¶ 4- 7; Ex. 3 ¶ 4.

4. At this time, Trooper Layton was in the driver's seat of the vehicle. Trooper Bone was sitting in the front passenger seat. *Id.*

5. The Troopers were monitoring westbound traffic using stationary RADAR. *Id.*

6. A silver Mercedes, with one headlight out, passed the Troopers at a high rate of speed, consistent with and confirmed by their RADAR unit indicating it was travelling at 92 MPH and accelerating to 96 MPH. The Troopers pulled out to catch up to the vehicle once it passed them. Ex. 1 at 1:37-1:49; Ex. 2 ¶ 5; Ex. 3 ¶ 5; Trooper Layton Dep. Tr., attached as Ex. 4, at 57; Trooper Bone Dep. Tr., attached as Ex. 5, at 29-31.[2]

7. Trooper Layton overtook several vehicles in traffic to catch up to the suspect vehicle to observe and pace the vehicle without first activating their marked state police vehicle's emergency signals. This was done in attempts to (a) not alert the speeding driver that the Troopers were attempting to effect a stop until the Troopers were in a closer position to him such that he would more strongly consider complying with the Troopers, (b) to observe any further potential pre-stop indicators of DUI, (c) to allow the Troopers time to mentally and tactically gather themselves, (d) to gather as much information as possible about the vehicle in case a pursuit did ensue and the suspect successfully evaded the Troopers, and (e) to prefill the traffic stop into the mobile data terminal including entering the license plate. Ex. 1 at 1:49-2:49, Ex. 2 ¶ 8; Ex. 3 ¶ 6; Ex. 4 at 64-67; Ex. 5 at 42-45.

8. After catching up to the suspect vehicle, Trooper Layton paced the vehicle at 96, 94, 93, 95, 96, and 97 miles per hour. Ex. 1 at 2:49-3:23; Ex. 2 ¶ 8; Ex. 3 ¶ 6; Ex. 4 at 70-72.

9. The suspect vehicle failed to maintain its lane multiple times, crossing over the dotted lane markers. Ex. 1 at 2:50-3:23; Ex. 2 ¶ 10; Ex. 4 at 72:4-9; Ex. 5 at 45:19-20.

---

[2] Due to time constraints, the transcript attached as Ex. 5 is currently pending Trooper Bone's endorsement of its errata sheet.

10.     After Trooper Bone entered the stop location and suspect vehicle tag into the Computer Aided Dispatch system, Trooper Layton activated his emergency lights in an attempt to stop the vehicle. Ex. 1 at 3:25-3:38, Ex. 2 ¶¶ 11-12; Ex. 3 ¶ 7; Ex. 4 at 68-69:1-5, 83:1-7; Ex. 5 at 39:12-14.

11.     Within a few seconds thereafter, the suspect shut his vehicle's lights off and sped up. Ex. 1 at 3:44-3:50; Ex. 2 ¶ 13; Ex. 3 ¶ 7. Ex. 4 at 141:4-7; Ex. 5 at 69-70:1.

12.     Trooper Layton, using his vehicle's calibrated speedometer, paced the suspect's car at approximately 120 MPH. Ex. 3 ¶ 7; Ex. 4 at 69-71. Trooper Bone then took over radio communications and called in that the Troopers would be westbound from the traffic stop he had entered and in pursuit of a suspect vehicle going approximately 120 MPH. Ex. 2 ¶ 13; Ex. 3 ¶ 7. *see also* Ex. 4 at 75:5-14 (Trooper Layton stating that the wind resistance against their police car traveling 120 MPH was exceedingly loud to the point where he could no longer hear Trooper Bone). During this time, the suspect vehicle failed to maintain its lane multiple times. Ex. 1 at 3:50-4:20; Ex. 5 at 69-70:1.

13.     The suspect's vehicle continued on for approximately four miles. Around the 172.6 mile-marker, the suspect vehicle continued forward, pulling into the right lane and then onto the right shoulder, then went back and forth between both while slowing down. Ex. 1 at 3:50-4:32; Ex. 2 ¶ 14; Ex. 3 ¶ 7; Ex. 4 at 83-84; Ex. 5 at 69-70.

14.     At this time, one of suspect's arms is seen exiting his vehicle's window in what appears to be a throwing motion. Ex. 1 at 4:29-4:31; Ex. 4 at 142. What the suspect threw, if anything, is unknown. Ex. 4 at 142.

15.     Instead of coming to a stop, once the Troopers got behind the suspect vehicle fully on the right shoulder, the suspect vehicle abruptly U-turned to the left, across both lanes of

I-64. The vehicle then slid down into the grassy median in the center of the highway where it stopped facing eastbound with the passenger side of the vehicle in contact with the tree line and the driver side parallel with the roadway. Ex. 1 at 4:32-4:40; Ex. 2 ¶ 15; Ex. 3 ¶¶ 7-8; Ex. 4 at 84-85:1-6; Ex. 5 at 70:6-7.

16.     Trooper Layton parked the police vehicle so that it was positioned across the middle of the highway diagonally and facing the suspect vehicle. Ex. 1 at 4:41-4:42; Ex. 2 ¶ 16; Ex. 4 at 84:9-25, 85:1; Ex. 5 at 70:18-19; Photographs, attached as Ex. 6, at Benton 000139, Benton 000137; Decl. of First Sergeant William K. Johnson, attached as Ex. 7.

17.     Trooper Layton positioned the police vehicle perpendicular to the suspect's vehicle in order to (a) block the suspect from traveling eastbound in the westbound lanes of I-64, (b) use the state police vehicle's headlights and flood lamps to illuminate the suspect vehicle without having to resort to manually adjusting his vehicle's spotlight, (c) block oncoming traffic from passing through and interfering with their stop, and (d) position the dash cam such that it would continue to capture and record the entire event. Ex. 3 ¶ 8; Ex. 4 at 100-01.

18.     Trooper Layton then turned off the siren. Ex. 1 at 4:42-4:43. Ex. 2 ¶ 16; Ex. 4 at 87:2-6.

19.     Both Troopers then exited their vehicle, drew their weapons, and slowly approached Hill's vehicle on foot walking in a triangulating manner with their state-issued sidearm pistols pointed toward the suspect vehicle. Trooper Bone approached the suspect vehicle from the rear angle on the driver side of the vehicle and Trooper Layton approached from the front angle on the driver side. Ex. 1 at 4:42-4:55. Ex. 2 ¶ 18; Ex. 3 ¶ 9; Ex. 4 at 109-10; Ex. 5 at 77:6-13, 79:8-12.

20.    Trooper Bone gave three loud verbal commands to the suspect to "get out of the car now." Ex. 1 at 4:47-4:52. Ex. 2 ¶ 17; Ex. 3 ¶ 9; Ex. 4 at 108:13-17; Ex. 5 at 79:22-23.

21.    As the Troopers approached and Trooper Bone was issuing commands, the suspect continued to rev his vehicle's engine and spin his vehicle's wheels for nine seconds in an effort to move the vehicle. Both Troopers observed the suspect still manipulating the steering wheel. Ex. 1 at 4:45-4:54, Ex. 2 ¶ 17; Ex. 3 ¶ 8; Ex. 4 at 143-144; Ex. 5 at 104:1-3. The lights on the rear of the suspect's vehicle illuminate in Ex. 1 at 4:49 and the body of the vehicle can be seen moving in Ex. 1 at 4:50.

22.    Because the driver side window was down, the Troopers could hear the suspect yelling "fuck" in an exasperated manner as he gave up trying to move the vehicle. Both Troopers observed the suspect slamming his hands into the steering wheel. Ex. 2 ¶ 19; Ex. 4 at 111:3-7; Ex. 5 at 103:24-25 through 104:1-3.

23.    Trooper Bone stopped giving verbal commands upon approach after he asked Trooper Layton, "you got him?" (meaning that Trooper Layton should take responsibility for the primary verbal commands) and Trooper Layton replied in the affirmative, stating "I got you." From then on, Trooper Layton gave the primary verbal commands. Ex. 1 at 4:54-4:55. Ex. 2 ¶ 21.

24.    The following verbal exchange can be heard on the video:

> LAYTON: PUT YOUR HANDS UP![3]
>
> LAYTON: LET ME SEE YOUR HANDS![4]
>
> BONE: PUT YOUR HANDS UP![5]
>
> HILL: My door doesn't open.[6]

---

[3] Ex. 1 at 4:57.
[4] Ex. 1 at 4:59.
[5] Ex. 1 at 5:00.
[6] Ex. 1 at 5:01.

> BONE: PUT YOUR HANDS UP![7]

> HILL: My door doesn't open.[8]

25.     At this time, the suspect's hands can be seen in front of his face, inside the vehicle. Trooper Layton then commanded him to put his hands outside the vehicle. Ex. 1 at 5:02. Ex. 2 ¶ 24; Ex. 3 ¶ 9; Ex. 4 at 114-115:1-7.

> LAYTON: PUT YOUR HANDS OUT THE DOOR DO IT NOW![9]

> LAYTON: PUT YOUR HANDS OUT THE DOOR![10]

26.     The suspect then extended his left arm outside the vehicle, but began reaching inside the vehicle with his right hand. Ex 1. at 5:06, Ex. 2 ¶ 29; Ex. 3 ¶ 10; Ex. 4 at 115:8-13; Ex. 5 at 104:9-25.

> LAYTON: HEY PUT YOUR HANDS OUT THE DOOR, STOP MOVING![11]

> LAYTON: PUT YOUR HANDS OUT THE DOOR![12]

> LAYTON: PUT YOUR HANDS OUT THE WINDOW![13]

> LAYTON: PUT YOUR HANDS OUT THE WINDOW![14]

> LAYTON: HEY HE'S REACHING, REACHING, REACHING![15]

> BONE: STOP REACHING, HE'S GOT A GUN![16]

> LAYTON: HE'S GOT A GUN![17]

27.     Both troopers discharged their state-issued firearms. Ex. 1 at 5:16. Trooper Bone shot twice in rapid succession. Trooper Layton fired once, but in attempting to pull the trigger of his firearm a second time, his handgun jammed. He can be heard attempting to clear it on the

---

[7] Ex. 1 at 5:01.
[8] Ex. 1 at 5:02.
[9] Ex. 1 at 5:04.
[10] Ex. 1 at 5:06.
[11] Ex. 1 at 5:08.
[12] Ex. 1 at 5:10.
[13] Ex. 1 at 5:10-12.
[14] Ex. 1 at 5:13.
[15] Ex. 1 at 5:15.
[16] Ex. 1 at 5:16.
[17] Ex. 1 at 5:16.

audio recording. Ex. 1 at 5:18-21; Ex. 2 ¶¶ 36-37; Ex. 3 ¶ 13; Ex. 4 at 128:5-12; Ex. 5 at 98:22-23.

BONE: GUN![18]

28.     Trooper Bone fired a third shot. Ex. 1 at 5:19; Ex. 2 ¶ 37; Ex. 5 at 98:22-23.

BONE: GUN![19]

BONE: He's got the gun in his hands![20]

LAYTON: Yeah I got you. HEY DROP THE GUN![21]

29.     Before attempting to secure the scene and locate the weapon, Trooper Bone immediately called for EMS. Ex. 1 at 5:26-35; Ex. 2 ¶ 38; Ex. 5 at 111:24-25 through 112:1-4.

30.     The Troopers then coordinated to secure the scene and separate the suspect from the weapon. At this point, the Troopers could no longer see the gun. Ex. 1 at 5:36-5:46; Ex. 2 ¶ 38; Ex. 3 ¶ 14; Ex. 4 at 132:4-22; Ex. 5 at 112:19-20.

31.     Trooper Bone made sure Trooper Layton had the suspect covered. Trooper Bone opened the driver's side car door, and peered inside looking for the gun. Trooper Bone still could not see the gun, but could see the suspect was slumped all the way over and was not moving. Ex. 1 at 5:46-6:38. Ex. 2 ¶ 38, Ex. 3 ¶ 14; Ex. 4 at 133:1-17; Ex. 5 at 114:2-9.

32.     Trooper Bone again confirmed that Trooper Layton had the suspect covered, then moved around the rear of the suspect vehicle. Ex.1 at 6:37-6:39; Ex. 2 ¶ 39; Ex. 3 ¶ 14; Ex. 4 at 132:12-17; Ex. 5 at 114:12-14.

---

[18] Ex. 1 at 5:17.
[19] Ex. 1 at 5:19.
[20] Ex. 1 at 5:22-23.
[21] Ex. 1 at 5:24-25.

33.     He shouted "crossfire" to Trooper Layton as he did so they both were of the understanding to have a clear backdrop considering that any rounds they may have had to fire again at the suspect may hit each other. Ex. 1 at 6:40-6:41; Ex. 2 ¶ 39; Ex. 3 ¶ 14.

34.     Trooper Bone moved up to the front passenger door, still monitoring the suspect for movement and peered inside through the closed windows. Trooper Bone could see the gun as he peered in. Ex. 1 at 6:48; Ex. 2 ¶ 39; Ex. 4 at 132-133; Ex. 5 at 114:19-25 through 115:1. The gun was directly underneath the suspect's hands as he lay slumped over the center console and front passenger seat. The suspect's hands were not touching the gun only because his torso and arms were being stopped by the center console.[22] Ex. 2 ¶ 40; Ex. 3 ¶ 14; Ex. 4 at 133:12-17.

35.     The Troopers then moved Hill from the vehicle to both separate the suspect from the handgun and to place him in a modified recovery position to check for vital signs. At this time, Trooper Bone told Trooper Layton to holster his weapon and pull the suspect out. Trooper Bone covered Trooper Layton, stating "if I yell, let him go," meaning that they still perceived that the suspect could be a threat. Despite still perceiving the suspect as a potential threat, once Trooper Layton was unable to remove the suspect from the vehicle, Trooper Bone joined him in pulling the suspect out, forgoing the use of personal protective equipment, such as gloves, and risked possible blood-borne illness. The Troopers then placed the suspect in a modified recovery position and checked for vital signs. Ex. 1 at 6:50-7:50; Ex. 2 ¶ 41; Ex. 3 ¶ 15; Ex. 4 at 133-37. Ex. 5 at 119:15-23. The Troopers quickly determined there was no pulse. Ex. 1 at 7:57-7:58. Trooper Bone asked Trooper Layton, who had medical experience, if they should attempt CPR, but Trooper Layton responded that because of the suspect's neck wound, they should not.

---

[22] Pl.'s Resp. to Defs.' Req. for Admis., attached as Ex. 8, at ¶ 15 (stating that Plaintiff has insufficient information to deny that Hill possessed a handgun during the event).

Trooper Layton determined that if they initiated CPR and there were any vital signs which might have been present on an EKG, the administration of CPR would have built up the suspect's blood pressure and pumped out the remaining blood more quickly. Ex. 1 at 12:36-12-42; Ex. 2 ¶¶ 41-42; Ex. 3. ¶¶ 15-16; Ex. 4 at 136-38. Both Troopers then waited for additional units to arrive. Ex. 1 at 12:43-13:22.

36.     The suspect was later identified as Xzavier Deyonte Hill. Crime Scene Report, attached as Ex. 9, at Benton 000758.

37.     Forensic agents with VSP recovered a Smith & Wesson SD40 Semi-Automatic Pistol .40 caliber, S/N: FCL1110, with cartridge, from the front passenger seat of Hill's vehicle.[23] The handgun was jammed, as a round had been incorrectly fed from the magazine into the chamber, where it became stuck. Ex. 6 at Benton 000120, 000105, 000102, 000182, 000186, 000187, 000121, 000295, 000298; Ex. 9 at Benton 000762.

38.     This handgun was originally purchased by a man named Brandon Ervin Meekins.[24] DOJ Firearms Trace Summary, attached as Ex. 10; Decl. of First Sergeant Justin Cowan, attached as Ex. 11.

39.     In addition to the handgun, forensic agents recovered the following items from Hill's vehicle: two Apple iPhones, counterfeit money, two .40 caliber cartridges from a cup holder in the center console, one .40 caliber cartridge from a black stocking hat behind the passenger seat, $435.00 in U.S. currency, and a Smith & Wesson magazine from the front

---

[23] Ex. 8 ¶ 14, stating that Plaintiff has insufficient information to deny this fact.
[24] Defendants served Plaintiff with their Requests for Admission on December 15, 2022. *See* Defendant's Requests for Admission, attached as Ex. 12, at 13. Plaintiff did not provide any objections to Defendants' Requests for Admissions within the 15 days of service as required by Local Rule 26(C). Instead, she provided objections at the same time she provided her responses on January 13, 2023. Ex. 8 at 13-14. Accordingly, under Federal Rule 36(a)(3), she has waived her objections and failed to answer Defendants' 23rd Request for Admission, resulting in her admission of the same.

passenger floorboard containing eight .40 caliber cartridges.[25] *See generally* photographs, Ex. 6; Ex. 9 at Benton 000763-000768.

40.     The iPhones displayed themselves as owned by "Xzavier Hill." Cell phone examination notes and screens, attached as Ex. 13, at Benton 001000-001003.

41.     On the two Apple iPhones, forensic agents found a variety of materials, including, but not limited to, photographs of Hill holding a pistol in his right hand and internet searches for "ran from police and got away," "ran from police and didn't pursue," "driving with lights off," "Smith and Wesson SD40," "check gun serial number," "stolen guns," and "Smith and Wesson teach you a lesson," all made between January 6 and January 8, 2021.[26] Cell phone data extraction report, attached as Ex. 14.

42.     At the time of Hill's death, Hill had an active warrant for his arrest from the Madison County Sheriff's Office and a pending court date for several criminal charges, including failure to appear, in Stafford County.[27] Court documents, attached as Exhibit 15.

43.     An autopsy report prepared by Dr. Daniel Shapiro, Medical Examiner for Goochland County, stated that Hill was shot in the left face, left hand, and back of his neck, and that the wound to the back of his neck was the cause of his death. Medical Examiner Report, attached as Ex. 16, at Benton 000671. A toxicology report of a sample of Hill's blood revealed the presence of 11-Hydroxy Delta-9 THC – 6.1 ng/mL, Delta 9 Carboxy THC – 120 ng/mL, and Delta-9 THC – 21 ng/mL.[28] *Id.* at Benton 000680-000682.

---

[25] Ex. 8 ¶¶ 17-22, stating that Plaintiff has insufficient information to deny these facts.
[26] Plaintiff failed to timely object to all of these RFAs, Ex. 8 ¶¶ 24-31. In addition, there is no federal or local rule that limits a party to thirty Requests for Admission.
[27] *Id.*, ¶¶ 32-33.
[28] *Id.*, ¶ 34.

## LEGAL STANDARD

A party is entitled to summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party . . . [and] [a] fact is material if it might affect the outcome of the suit under the governing law." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (citations omitted). Material facts are those necessary to establish the elements of a party's cause of action. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. *Id*.

Additionally, the moving party has the burden of showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts admissible as evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); *Id*. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. *Williams* v. *Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). If the non-moving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 249-250. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Furthermore, "in order to successfully defeat a motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, the mere existence of a scintilla of evidence, or the appearance of some metaphysical doubt concerning a material fact." *Jones v. W. Tidewater Reg'l Jail*, 187 F. Supp. 3d 648, 653 (E.D. Va. 2016) (citations and internal quotations omitted). Moreover, a plaintiff cannot rely on a response to a motion for summary judgment to act as an amendment to correct deficiencies in a complaint challenged by a defendant's motion for summary judgment. *Gilmour v. Gates, McDonald & Co*., 382 F.3d 1312, 1315 (11th Cir. 2004). Finally, "[t]he relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Stewart v. MTR Gaming Grp., Inc.,* 581 F. App'x 245, 247 (4th Cir. 2014) (internal quotations omitted) (citing *Anderson*, 477 U.S. at 251-52).

## ARGUMENT

The Troopers are entitled to qualified immunity as Plaintiff cannot demonstrate that Hill's constitutional rights were violated. First, Plaintiff's excessive force claim fails because the undisputed facts establish that the Troopers reasonably feared for their lives when Hill failed to comply with commands to show his hands, reached into the vehicle console, and pointed a gun at Trooper Layton. Plaintiff offers not one scintilla of evidence contrary to the foregoing facts. Thus, lethal force was objectively reasonable under the circumstances. Second, even if Plaintiff's unsupported conclusory allegation that Troopers did not see a gun in Hill's hand were accepted as true, lethal force was still objectively reasonable under the circumstances. Finally, Plaintiff cannot point to any clearly established right that the Troopers violated.

## I.     <u>THERE IS NO DISPUTE OF MATERIAL FACT</u>

Because this is an action claiming excessive force in violation of the Fourth Amendment, the only material facts are those probative on whether the force used was objectively reasonable. *Graham v. Connor*, 490 U.S. 386, 394-97 (1989). Accordingly, the only material facts in this case pertain to (1) the severity of the crime Hill committed, (2) whether Hill posed an immediate threat to the safety of the officers or others, and (3) whether Hill was resisting arrest or attempting to evade arrest by flight. *Id.* at 396; *see also Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1547 (2017) ("The framework for analyzing excessive force claims is set out in *Graham*. If there is no excessive force case under *Graham*, there is no excessive force claim at all.").

In this case, there is no genuine dispute as to any of these elements. First, based on the facts outlined *supra*, the Troopers had probable cause to arrest Hill for felony eluding under Virginia Code § 46.2-817(B). *See* Dep. Tr. of Pl.'s Expert, Kenneth Miller, attached as Ex. 17 at 180:3-16. Second, Hill's behavior was highly dangerous to himself, the public, and the Troopers, and Hill's noncompliance with the Troopers' verbal commands would raise grave suspicions in the mind of any reasonable officer. *Id.* at 64:20-23, 80:7-25, 171:4-7, 180-81:1-10 (Plaintiff's expert agrees that Hill's conduct was dangerous, that Hill was noncompliant, and that said noncompliance would raise suspicions about Hill's intentions). And third, the dash cam shows that Hill was in a state of flight and resisting arrest from the moment the Troopers' first activated their emergency signals until the moment they shot him.

Plaintiff's discovery requests and responses reveal she may attempt to create a question of fact by arguing the Troopers could have used different tactics, up to and including their choice of tactics in approaching Hill with the sidearms drawn. *See, e.g.,* Pl.'s Second Supp. Disc. Resp., attached as Ex. 18, ¶¶ 13-14; *see also* Report of Kenneth Miller, attached as Ex. 19, at 9-10

(under "Conclusion," Mr. Miller writes, "The entire event could have been different with better tactics."). But these claims have no materiality to the *Graham* factors. Here, Plaintiff complains only of lethal force. Amended Compl., ECF No. 10, ¶ 50. Thus, what the officers do prior to deploying that lethal force is immaterial. *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996). Regardless, a fleeing felony suspect, even in an immobilized vehicle, does not have a constitutional right to having pursuing officers not approaching with guns drawn.

Likewise, Plaintiff may point to evidence concerning the Troopers' subjective beliefs about the danger that existed prior to Hill pointing a weapon at Trooper Layton. Ex. 18, ¶ 13. But the Fourth Circuit has consistently held that "[s]ubjective factors involving the officer's motives, intent, or propensities are not relevant" in analyzing excessive force. *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994). *Accord Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003); *Wilson v. Kittoe*, 337 F.3d 392, 402 (4th Cir. 2003).

Finally, Plaintiff represents that she will attempt to dispute the authenticity of the dash cam video described *supra*, upon which all parties and their expert witnesses have relied in conducting discovery. Ex. 18 at 16, ¶ 9 ("Plaintiff will submit affidavits from her relatives concerning what they saw when they viewed the dash cam in the Goochland County Commonwealth Attorney's office."); *see also* Ex. 18 at 19-25 (attaching e-mail correspondence to D. Michael Caudill asking him "why the video was different"); *compare* Ex. 18 *with* Decl. of D. Michael Caudill, attached as Ex. 20 (stating that the dash cam video footage the Troopers have attached as Ex. 1 is the same as the one he exhibited to Hill's family and introduced at the Grand Jury proceedings). Notably, Plaintiff could have obtained any copy of the footage she believes Mr. Caudill may have via subpoena; however, she has chosen not to do so.

Regardless, none of Plaintiff's potential affiants were present during the incident nor did they witness it. Moreover, even if any of these affiants could be considered bystander witnesses, the Fourth Circuit has instructed that offering purported minor discrepancies through bystander witnesses does not create a material question of fact. In *Sigman v. Town of Chapel Hill*, 161 F.3d 782 (4th Cir. 1998) a plaintiff submitted affidavits of three witnesses who were in a crowd across the street from an incident where an officer was alleged to have used excessive force. *Id.* at 786. The affidavits claimed, *inter alia*, that the decedent had his hands raised, that the decedent had nothing in his hands, and that the decedent did not represent a threat of any kind to Officer Riddle. *Id.* In granting the defendants' motion for summary judgment, the district court held that those affidavits were insufficient to create a material fact. *Id.* The court observed that, "at best," the affidavits created "a difference of opinion as to what the three witnesses observed . . . and what Riddle observed and did in reaction to the conduct of Sigman." *Id.*

On appeal, the appellant-plaintiff claimed that the affidavits created factual disputes as to whether the decedent had a knife when he was shot, whether the officer's perception that the decedent had a knife was reasonable, and whether the decedent was a threat to the officers when he was shot. *Id.* The Fourth Circuit rejected this argument and affirmed the district court's holding. "[I]t will nearly always be the case that witnesses . . . differ over what occurred. That inevitable confusion, however, need not signify a difference of triable fact." *Id.* at 787 (citation and internal quotations omitted). Reasoning that because the three witnesses in that case were located across the street amidst a crowd that was cheering the decedent on, the Fourth Circuit found that "[t]heir observations could not effectively impact the credibility of Officer Riddle (or that of all five other officers on the scene) as to his perceptions of what he saw from an entirely different – and closer – vantage point . . ." *Id.* at 788.

The Fourth Circuit and its district courts have repeatedly affirmed this principle: "in a rapidly evolving scenario . . . a witness's account of the event will rarely, if ever, coincide with the officers' perceptions because the witness is typically viewing the event from a different angle than that of the officer." *Anderson v. Russell*, 247 F.3d 125, 130 (4th Cir. 2001) (citing *Sigman*, 161 F.3d at 788). "For that reason, minor discrepancies in testimony do not create a material issue of fact in an excessive force claim, particularly when . . . the witness views the event from a worse vantage point than that of the officers." *Id.* at 131; *accord Gregory v. Zumult*, 294 Fed. Appx. 792, 794 (4th Cir. 2008); *Russell ex rel. Russell v. Wright*, 916 F. Supp. 2d 629, 643 (W.D. Va. 2013).

Here, unlike *Sigman*, none of Plaintiff's proposed witnesses actually witnessed the event—instead, they purportedly either viewed a video they allege is different than the dash cam video attached as Exhibit 1 or have a different interpretation of the dash cam video. Ex. 18 at 25 (attaching an e-mail from Plaintiff to Commonwealth's Attorney D. Michael Caudill, stating, "the video posted to your website is not the same video my family saw Why is that"). In contrast, the Troopers, like the officers in *Sigman*, saw the entire event from the closest and best possible vantage points (for Trooper Layton, down the barrel of Hill's gun). And the facts gained from those vantage points, outlined in the Troopers' sworn declarations (Exhibits 2 and 3), statements made in the Troopers' depositions (Exhibits 4 and 5), and prior statements made to VSP Internal Affairs (Exhibits 21 and 22), are all corroborated fully by the dash cam video footage attached as Exhibit 1.

## II.  THE TROOPERS ARE ENTITELD TO QUALIFIED IMMUNITY

Section 1983 provides a cause of action for the deprivation of federal constitutional and statutory rights under color of state law. *Pink v. Lester*, 52 F.3d 73, 74 (4th Cir. 1995).  To

establish a claim under 42 U.S.C. §1983, Plaintiff must prove two elements: "(1) that the defendant deprived him of a right secured by the Constitution and laws of the United States and (2) that the defendant "deprived [him] of this constitutional right under color of [State] statute, ordinance, regulation, custom, or usage." *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001). Section 1983 does not contain an independent state-of-mind requirement. *Pink*, 52 F.3d at 74. "Rather, the requisite intent in a given case turns upon the standard necessary to establish a violation of the underlying constitutional or statutory right." *Id.* at 74-75 (citing *Daniels v. Williams*, 474 U.S. 327, 330 (1981)).

The doctrine of qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified immunity shields government officials performing discretionary functions from liability for civil damages, insofar as their conduct does not violate clearly established rights of which a reasonable person would have known, in order to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Additionally, qualified immunity is an affirmative defense, and "[i]n resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts . . . show the officer's [or official's] conduct violated a [federal] right[.]" *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014), quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Id.*, at 1867, quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

Whether a defendant can claim qualified immunity is a pure question of law and is properly determined pretrial. *Saucier*, at 200-01 (modified by *Pearson v. Callahan*, 555 U.S. 223

(2009) (permitting lower courts the discretion to determine which qualified immunity prong to analyze first)). "Qualified immunity is an immunity from suit rather than a mere defense to liability. A plaintiff bears the burden to show that a defendant's conduct violated the plaintiff's right." *Bryant v. Muth*, 994 F.2d 1082, 1086 (4th Cir. 1993). However, in regard to the second prong, "a defendant must demonstrate that the right was not clearly established at the time of the incident to receive qualified immunity." *Henry v. Purnell*, 501 F.3d 374, 378 (4th Cir. 2007). In order to be clearly established, "the unlawfulness of the action must be apparent when assessed from the perspective of an objectively reasonable official charged with knowledge of established law." *Lopez v. Robinson*, 914 F.2d 486, 489 (4th Cir. 1990). *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.")

**A. The Troopers did not violate any of Hill's constitutional rights.**

A claim that police used excessive force is examined under the Fourth Amendment to determine whether force used was objectively reasonable. *Graham v. Connor*, 490 U.S. 386, 394-97 (1989). Under *Graham*, a court must focus on the moment that force was used. *Greenidge v. Ruffin*, 927 F.2d 789, 191-92 (4th Cir. 1991). Actions prior to that moment are not relevant in evaluating whether the force used is reasonable, even if the suspect criminal activity is relatively minor. *Anderson*, 247 F.3d at 132; *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996). "An officer's [decision] is 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' allowing for the fact that 'police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and

rapidly evolving." *Milstead v. Kibler*, 243 F.3d 157, 163 (4th Cir. 2001) (quoting *Graham*, 490 U.S. at 396, 397).

This objective, totality of the circumstances test considers (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. However, with regards to deadly force, the affirmative presence of the second factor alone is dispositive because "a police officer may use deadly force when the officer has 'probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others.'" *Anderson*, 247 F.3d at 129 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)); *see also Elliott*, 99 F.3d at 641 (finding that defendant officer's use of deadly force was objectively reasonable based on the fact that a gun was pointed at him without considering the other two *Graham* factors).

### 1.  The Troopers saw Hill point a gun at Trooper Layton.

The undisputed facts establish that in response to commands to show his hands, Hill produced a handgun and pointed it at Trooper Layton. No court in the Fourth Circuit has ever held that under those circumstances, a reasonable officer is unjustified in deploying deadly force.

*Elliott* is particularly instructive when considering the uncontroverted facts of this case. There, a police officer named Jason Leavitt stopped a motorist, Archie Elliott, on suspicion of driving under the influence. *Elliott*, 99 F.3d at 641. Elliott admitted he had been drinking and failed several sobriety tests. *Id.* Officer Leavitt called for backup, handcuffed the suspect, and advised him that he was under arrest for DWI. *Id.* Leavitt searched Elliott, finding no weapon. *Id.* Another officer joined Leavitt on the scene; they then placed the suspect in the front passenger seat of Leavitt's police car with the seatbelt fastened, the door closed, and the window

rolled up. *Id.* The officers were talking by the passenger side of the car when Leavitt noticed a movement and looked to find Elliott with his finger on the trigger of a small handgun pointed at Leavitt and the other officer. *Id.* at 642. Leavitt yelled "Gun!," ordered Elliott to drop it, and when he received no response, Leavitt fired, killing Elliott. *Id.*

Appellees in that case suggested that Elliott did not pose a "real threat" to the officers, noting that his hands were handcuffed behind his back, that he was placed in the front passenger seat with the seatbelt fastened and window up, and that the officers were outside the car at the time of the shooting. The Fourth Circuit rejected these conclusions based on the "uncontroverted evidence that immediately before firing, Leavitt and Cheney confronted an intoxicated individual pointing a gun at them only a few feet away . . ." *Id.* "The critical point . . . is precisely that Elliott was 'threatening,' threatening the lives of Leavitt and Cheney. The Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists." *Id.* at 644. So too here, Trooper Layton was looking down the barrel of a pistol aimed at his face.

In this case, Plaintiff makes similar claims that Hill did not pose a "real threat" to the Troopers. Amended Compl., ECF No. 10 at 23. Among the evidence she uses to support this claim are the dash cam footage referred to in the undisputed statement of facts, *see id.*, and Trooper Bone's deposition testimony that at the time he initially approached Hill's vehicle, and before he saw a weapon, he "didn't believe anything definitive about whether [the suspect] had a weapon or not."[29] Ex. 5 at 86:10-23; Ex. 18 ¶ 13; Ex. 25 at 11-13. Plaintiff argues that this means that Trooper Bone "did not believe Xzavier D. Hill had a weapon when he approached the vehicle Mr. hill [sic] was driving." Ex. 18 at 10, ¶ 13. Even accepting this tortured interpretation

---

[29] In the next sentence, without further prompting, Trooper Bone testified that he believed that "there was an inherent danger given the situation, however." Ex. 5 at 86:22-23.

of the Trooper's words as true, under *Graham*'s objective reasonableness standard, it is completely irrelevant what Trooper Bone actually thought about Hill prior to approaching the vehicle. As the Fourth Circuit stated in Elliott, "[t]he court's focus should be on the moment force was used . . ." *Elliott*, 99 F.3d at 642.

The dash cam footage, corroborated by the Troopers' statements, depicts this precise moment. As the Troopers approached Hill's vehicle, Trooper Bone initially gave three commands to Hill to "get out of the car now." Ex. 1 at 4:47-4:50. At this time, Hill can be heard revving his engine and spinning his wheels as the body of his vehicle is still moving. Ex. 1 at 4:45-4:54. Trooper Layton can be heard saying "show me your hands, do it now" and "put your hands up." Ex. 1 at 4:52-4:55. Hearing this, Trooper Bone allowed Trooper Layton to make the primary commands, asking, "you got him?" Ex. 1 at 4:55; Ex. 2 ¶ 21. Thereafter, the Troopers only issued commands relating to Hill's hands. The Troopers can be heard issuing 5 commands for Hill to show his hands or put them out the window, or some variation thereof. In response to those commands, Hill briefly put his hands up and said that his "door doesn't open." Ex. 1 at 5:00. This demonstrates three things to the Troopers: (1) that Hill had the ability to keep his hands up, (2) that he could understand what the Troopers were saying, and (3) that he could communicate. Given that Hill could do all three of these things, it is strange that Hill chose to answer to commands to keep his hands up with "my door doesn't open."

Regardless, after Hill stated his "door doesn't open," Trooper Layton can be heard issuing 7 clear, loud commands to keep his hands up and out of the vehicle. Ex. 1 at 5:00-5:13. During this time, Hill placed his left arm out of the vehicle and began reaching inside the vehicle with his right hand. Eventually, he removed his left hand from outside the vehicle and reached with his whole body, turning his torso and eventually rounding his back in what appeared to be

an effort to pick something up. Ex. 1 at 5:00-5:16; Ex. 2 ¶ 33; Ex. 3 ¶ 11; Ex. 5 at 104. As Hill

continued to ignore Trooper Layton's clear commands, one can hear the tension in the Troopers'

voices rising. While the gun cannot be seen clearly on the video, in the heat of the tense,

uncertain, and rapidly evolving scenario, both Troopers verbally announced that Hill was

reaching, simultaneously yelled that Hill had a gun, and simultaneously discharged their state-

issued firearms. Ex. 1 at 5:14-5:16. At the point they fired, the tension in their voices climaxed.

Trooper Layton is clearly fearing for his life and Trooper Bone for his. Only moments later,

Trooper Bone found a jammed, bloody handgun on the passenger seat directly underneath Hill's

hands and slumped-over body. Ex. 2 ¶ 40; Ex. 6 at Benton 000182, 000187; Ex. 9 at Benton

000762-000763. Forensic Agent W.K. Johnson additionally found a Smith & Wesson magazine

on the front passenger floorboard, wedged between the passenger seat and the center console,

which is consistent with the Troopers' perception that Hill had dropped something. Ex. 6 at

Benton 000249-000252; Ex. 9 at Benton 000736-000764. Moreover, further examination of

Hill's pistol showed that it was jammed with a round in the chamber. *Id.* at Benton 000762; Ex. 6

at Benton 000187; *see also* Ex. 6 at Benton 000298 ("CAUTION: Capable of firing with

magazine removed").

 Under *Elliott*, the undisputed facts make clear that the Troopers did not deploy excessive

force. At the moment lethal force was applied, from the Troopers' perspective, Hill was in a state

of flight, was actively ignoring commands to show his hands, and produced a handgun and

pointed it at Trooper Layton. The Troopers' testimony is uncontroverted, is corroborated by both

the dash cam video and evidence discovered after Hill was shot (including the jammed handgun

found beneath Hill's hands), and Plaintiff has produced no record evidence that calls into

question their statements. In addition, the fact that during the shooting, the Troopers

simultaneously announced facts consistent with both the events portrayed on the dash cam and their testimony is definitive confirmation that they saw a handgun pointed at Trooper Layton. Given these facts, the Troopers did not have to issue any more warnings, back up or move away from the vehicle, or answer the circumstances any differently than they did, as "[t]he Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists." *Elliott*, 99 F.3d at 643.

> **2. Even if Hill did not point a gun at Trooper Layton, the Troopers' use of deadly force was reasonable under the circumstances.**

Based on the uncontroverted facts discussed *supra*, the Troopers would still be legally justified in deploying lethal force even if Hill did not have a handgun in his vehicle and did not point it at Trooper Layton. Considering the presence of the other *Graham* factors, Hill's noncompliance with basic commands to show his hands would raise grave suspicions in the mind of a reasonable officer, and his continued reaching in the face of said commands would justify the force used.

*Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991) illustrates that a suspect's noncompliance with commands to "show your hands" fundamentally alters the character of police/suspect interactions. In that case, Officer Rizzo attempted to take custody of Slattery, a passenger in a suspect's car during a narcotics investigation. *Id.* at 214-15. Rizzo approached the vehicle, shined a flashlight through the window of the car's front passenger door, but could not see Slattery's hands, although Slattery was sitting directly in front of him. *Id.* at 215. Rizzo identified himself as a police officer, and twice ordered Slattery to raise his hands. *Id.* Slattery failed to respond to Rizzo. *Id.* Rizzo then kicked the car door window. *Id.* Slattery then turned his head slowly and looked at Rizzo. *Id.* The officer opened the car door, and yelled, "police officer . . . get your hands up now." *Id.* At this point Rizzo had drawn his service revolver. *Id.* He could not

see Slattery's left hand clearly, as it was away from the officer. *Id.* Rizzo was able to see, however, that the hand appeared to be partially closed around an object. *Id.* Slattery turned his head slowly towards Rizzo and turned away. *Id.* Slattery turned his entire upper body towards the officer, who could still not see Slattery's left hand. *Id.* Rizzo, believing that Slattery was coming at him with a weapon, shot him once in the face with his revolver. *Id.* The object in Slattery's hand was later determined to be a beer bottle. *Id.* The Fourth Circuit held that under those circumstances, a reasonable officer could have probable cause to believe that Slattery posed a deadly threat and therefore would be authorized to use deadly force. *Id.* at 216-17.

*Slattery* is one of many Fourth Circuit cases holding that a suspect's noncompliance with commands to "show your hands" will increase the perception of danger in a reasonable officer's mind. *Accord Hensley v. Price*, 876 F.3d 573, 585 (4th Cir. 2017) ("If an officer directs a suspect to stop, to show his hands or the like, the suspect's continued movement likely will raise in the officer's mind objectively grave and serious suspicions about the suspect's intentions. Even when those intentions turn out to be harmless in fact . . . the officer can reasonably expect the worst at the split-second when he acts."); *Greenidge v. Ruffin*, 927 F.2d 789 (4th Cir. 1991) (finding the usage of deadly force reasonable where a suspect ignored verbal commands to keep hands in view and instead reached for a long cylindrical object). In fact, the Fourth Circuit has held that, in circumstances involving a suspect who is noncompliant with orders to show his hands, an officer is not required to wait until a gun is pointed at him or even see an object in the suspect's hand before using deadly force. *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994) ("We do not think it wise to require a police officer, in all instances, to actually detect the presence of an object in a suspect's hand before using deadly force."); *see also Sigman v. Town of Chapel Hill*, 161 F.3d 782, 788 ("Notwithstanding the possibility of a dispute about whether a

knife was actually in Sigman's hand at the moment of the shooting, Officer Riddle, and the other officers present, acted on the perception that Sigman had a knife in his hand.").

In this case, from the time the Troopers first encountered Hill until they discharged their firearms, Hill's behavior would raise a reasonable officer's perception of danger to an apex. First, after receiving signals to pull over, Hill turned off his vehicle's lights and increased his vehicle's speed to approximately 120 MPH, swerving across lanes as he was doing so, eventually crashing his vehicle in an attempt to keep fleeing via U-turn into oncoming highway traffic. As the Troopers approached on foot, Hill can be heard revving his engine and spinning his wheels in a continued effort to resist, and his vehicle can be seen moving. Ex. 1 at 4:45-4:54. And it is undisputed that Hill continued to resist arrest after that: after Hill said, "my door doesn't open," the Troopers give him seven clear commands to show his hands. Ex. 1 at 5:00-5:14. After briefly and momentarily showing his hands, Hill failed to comply and began reaching toward the center console to where a bloody handgun was eventually, and indisputably, found. As the case law demonstrates, this series of events would raise "grave suspicions," *Hensley*, 876 F.3d 573 at 585, of Hill's intentions in the mind of any reasonable officer. *See also* Ex. 17 at 180:17-25, 181:1-10 (showing that Plaintiff's expert agrees). Assuming *arguendo* that Hill did not have a gun (which he did), the Troopers still would have been justified in shooting him based just on his reaching movement in response to their clear commands. Here, the fact that Hill actually had a gun serves to confirm the Fourth Circuit's recognition that a suspect's noncompliance with commands to show hands always carries with it a high potential of danger for the arresting officer.

### B. Even if the Trooper's violated Hill's constitutional rights, they were not clearly established.

Even if Plaintiff's rights were violated, the Court must consider the second prong of the qualified immunity analysis, namely, whether the Troopers' conduct violated a constitutional

right that was clearly established at the time the conduct occurred. *Saucier*, 533 U.S. at 201. A right is "clearly established" if it would be clear to a reasonable officer that the alleged conduct is unlawful. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The contours of the right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (alteration in the original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "To determine whether a right is clearly established, we assess whether the law has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state." *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) (citation omitted).

Moreover, "[c]ourts are not to define clearly established law at a high level of generality, and that [s]pecificity is especially important in the Fourth Amendment context." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). "To hold that a right is clearly established the Supreme Court has cautioned that we should do so only in obvious case[s] exhibiting violations of the core of the Fourth Amendment." *Wilson v. Prince George's Cty.,* 893 F.3d 213, 222 (4th Cir. 2018) (internal quotations and cites omitted).

Here, no reasonable official would have understood, based on the information and knowledge the Troopers possessed, that firing upon a noncompliant suspect who is resisting arrest and pointing a handgun at a police officer constituted an unreasonable seizure under the Fourth Amendment. Moreover, even if Hill had not pointed a handgun at Trooper Layton (which he did), not every reasonable officer would have understood that firing upon a suspect was unreasonable when: (1) the officer had probable cause to believe a felony was occurring or had just occurred, (2) the suspect was actively resisting arrest, and (3) the suspect was reaching for what could be a weapon inside the vehicle. Indeed, it was not clearly established law in January

2021 in the United States Supreme Court, the Fourth Circuit, or the Virginia Supreme Court that an officer firing upon a suspect who satisfied all of the *Graham* factors would be engaging in an unconstitutional use of excessive force. *See Wilson v. Prince George's Cty.*, 221-22.

Moreover, regarding Plaintiff's expected immaterial arguments that the Troopers chose inferior tactics, should not have approached the vehicle, should have called for backup, or that they otherwise created "exigent circumstances," it was and is not clearly established law that an officer can create "exigent circumstances" prior to the use of force which can render an otherwise reasonable use of force unreasonable. *See, e.g.,* Ex. 18, ¶¶ 13-14. The Supreme Court has specifically rejected that a reasonable use of force can be made unreasonable simply by virtue of an earlier Fourth Amendment violation or violation of any other law. *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017) (finding that the Ninth Circuit's "provocation rule," which used another constitutional violation to manufacture an excessive force claim where one would otherwise not exist, had no basis in the Fourth Amendment); *see also City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (declining to decide whether "recklessly creating a situation that requires deadly force can itself violate the Fourth Amendment."). Indeed, Fourth Circuit jurisprudence affirms the same: "*Graham* requires [the court] to focus on the moment force was used; *conduct prior to that moment is not relevant* in determining whether an officer used reasonable force." *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996) (citation omitted) (emphasis added). Accordingly, the "suggestion that the officers might have responded differently is exactly the type of judicial second look that the case law prohibits." *Id. See also Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001) (rejecting as irrelevant appellant's argument that the officer should have taken cover); *Greenidge*, 927 F.2d at 791-92 (rejecting as

irrelevant appellant's argument that the officer allegedly violated standard police procedure by not employing proper backup and not using a flashlight).

Put simply, Plaintiff's argument that the Troopers violated the Fourth Amendment by creating a situation requiring deadly force has no merit. The Troopers violated no state laws or VSP policies, and even if they did, not a single case would put them on notice that any such violation could be a violation of the Fourth Amendment's proscription against the usage of excessive force.

## III.    PLAINTIFF'S STATE LAW CLAIMS ARE BARRED

Plaintiff's complaint also includes counts for state law violations including gross negligence, assault and battery, and wrongful death.   In this regard, state-law tort claims will fail or proceed with the federal excessive force violation if the standards of qualified immunity are met or not met respectively. See *Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 111 (4th Cir. 2017).  "State-law claims that arise from the officer's use of force, such as battery, are subsumed within the federal excessive force claim."  *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994).

## <u>CONCLUSION</u>

Wherefore, for the foregoing reasons, this Court should grant the Defendants' Motion for Summary Judgment, dismiss this action with prejudice, and award the Defendants any further such relief the Court deems necessary and appropriate.


Respectfully submitted,

TROOPER SETH W. LAYTON
TROOPER BENJAMIN I. BONE

By: */s/ Robert B. McEntee, III*
Counsel

Jason S. Miyares
Attorney General of Virginia

Steven G. Popps
Deputy Attorney General

Jacqueline C. Hedblom
Senior Assistant Attorney General/
Trial Section Chief

Robert B. McEntee, III (VSB No. 89390)*
Calvin C. Brown (VSB No. 93192)*
Assistant Attorneys General
Office of the Attorney General
202 North 9th Street
Richmond, VA 23219
Telephone: 804-786-8198 (McEntee)
Telephone: 804-786-4933(Brown)
Facsimile: 804-371-2087
rmcenteeiii@oag.state.va.us
cbrown@oag.state.va.us
*Counsel for the Defendants*

## CERTIFCATE OF SERVICE

I hereby certify that on February 6, 2023 I will electronically file the foregoing with the

Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all

counsel of record.

*/s/ Robert B. McEntee*
Robert B. McEntee, III (VSB No. 89390)
Assistant Attorney General
Office of the Attorney General
202 North 9th Street
Richmond, VA 23219