# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| LATOYA K. BENTON, ADMINISTRATOR OF THE ESTATE OF XZAVIER D. HILL, DECEASED, <br><br> Plaintiff, <br><br> v. <br><br> SETH W. LAYTON, *et al.* <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 3:22-cv-225-HEH |

## **DECLARATION**

The Defendants, by counsel, submit this Declaration as Exhibit 2 to their Memorandum in Support of their Motion for Summary Judgment.

Virginia State Trooper Benjamin I. Bone, pursuant to 28 U.S.C. § 1746, states as follows:

1. I am employed by the Virginia Department of State Police ("VSP") as a Trooper. I have served in this role since April 25, 2018. Prior to my employment with VSP, I was employed as a patrol officer with the Virginia Commonwealth University Police Department. I was employed in this position from February 10, 2014 to April 24, 2018.

2. During the course of my career as both a Trooper and patrol officer, I have handled thousands of traffic stops, arrests, and calls for service. During the course of these interactions, I have encountered hundreds of violent, noncompliant suspects.

3. Prior to the events of this case, however, I had never discharged my firearm in the line of duty, nor have I discharged my firearm in the line of duty since the events of this case transpired.

1

4. On January 9, 2021, at approximately 4:35 a.m., Trooper Seth W. Layton (a former Richmond City Police officer that was part of the 133rd basic academy/lateral entry program with VSP, and whom I was training at the time for the 5th week of a six week field training program, as required by VSP) and I were sitting stationary inside a marked police vehicle in the 2nd crossover east of I-288 on I-64 in Henrico county with all of our lights off. We were monitoring westbound traffic using stationary radar at the time.

5. We observed a silver Mercedes sedan, with its passenger-side headlight out, pass us at a high rate of speed. This was consistent with and confirmed by our vehicle's radar unit, which indicated the vehicle was travelling in excess of 90MPH and increasing.

6. We pulled out to catch up to the vehicle once it passed us.

7. Trooper Layton was driving the police vehicle at the time and I was riding in the front passenger seat. Both of us were in standard issue blue utility uniforms, displaying badges of authority and state police patches. We were both equipped with gun belts. Trooper Layton had equipped a body-worn microphone; I did not.

8. Trooper Layton overtook traffic to catch up to the suspect vehicle to observe and pace the vehicle without emergency equipment activated. This was done in attempts to (1) not alert the speeding driver we were attempting to affect a stop until we were in a closer position to him such that he would more strongly consider complying with us once we did activate our lights (2) to observe any further potential pre-stop indicators of DUI (3) to mentally and tactically gather ourselves (4) to gather as much information as possible about the vehicle in case a pursuit did ensue and the suspect successfully evaded us (5) to prefill the traffic stop into the mobile data terminal (MDT), including entering the license plate.

9. After catching up to the vehicle Trooper Layton paced the vehicle at above 90MPH (last I remember was 98MPH; Trooper Layton was narrating for the dashcam at the time).

10. In addition, the suspect vehicle failed to maintain its lane multiple times, crossing over the dotted lane markers.

11. I had already manually activated the dash-cam recorder to capture what we were seeing (as it otherwise would not come on automatically until after the emergency lights were activated). The dash cams found on state police vehicles are always recording, but will not save any data unless activated either manually or by the activation of the emergency lights. Once activated, Trooper Layton's vehicle's dash cam was set to retroactively save the two minutes of footage it had captured prior to activation.

12. After I entered the stop location and suspect vehicle tag into the computer-aided dispatch (CAD) system, Trooper Layton activated his emergency lights in an attempt to stop the vehicle.

13. Within a few seconds, the suspect vehicle shut its lights off and subsequently sped up. At that point, I took over radio communications and called in that we would be WB from the traffic stop I entered and in pursuit going approximately 120 MPH as we tailed the suspect. I also informed dispatch that the suspect vehicle had shut the lights off. As we pursued the vehicle, it failed to maintain its lane several times.

14. The vehicle continued on for approximately 4 miles before beginning to slow down and pull over to the right shoulder. Around about the 172.6mm the suspect vehicle continued forward, pulling into the right lane and then onto the right shoulder, then went back

and forth between both while slowing down. I updated dispatch over the radio that the vehicle may be pulling over.

15. Instead of coming to a stop, once we got behind the suspect vehicle fully on the right shoulder, it abruptly turned to the left, across all three lanes of 1-64, ultimately entering the grassy median in the center of the highway where it stopped sideways facing eastbound with the passenger side of the vehicle in contact with the tree-line (small trees/shrubbery) and the driver side parallel with the roadway. I updated dispatch again that the driver was trying to turn around and went down the embankment into the median.

16. Trooper Layton parked the police vehicle so that it was positioned across the middle of the highway diagonally and facing the suspect vehicle. I told Trooper Layton to turn off the siren, which he did, and we began to approach on foot with our state-issued sidearms drawn.

17. At this point, we could hear the suspect revving his engine and spinning his tires in a continued effort to escape. Because he was still trying to move the vehicle, I gave the suspect three loud verbal commands to "get out of the car now."

18. Trooper Layton and I approached the vehicle in a triangulating manner with our sidearms pointed toward the suspect vehicle. I approached from the rear angle on the driver side of the vehicle, behind the rear tire, and Trooper Layton approached from the front angle on the driver side.

19. Because the driver side window was down, I could hear the suspect yelling "fuck" in an exasperated manner, and I saw him slam his hands into the steering wheel after he stopped attempting to move the vehicle.

20. I stopped my approach approximately 20 feet from the vehicle.

21. I asked Trooper Layton, "you got him?" referring to the suspect (meaning that he should take responsibility for the primary verbal commands), and Trooper Layton replied he did.

22. From then on, I allowed Trooper Layton to take the lead in giving verbal commands and control which commands would be given.

23. Trooper Layton was telling the suspect "let me see your hands," and I yelled "put your hands up" as I walked closer.

24. The suspect briefly put his hands up, and Trooper Layton then commanded him to put his "hands out the window" multiple times.

25. I noticed that the suspect was looking all around, to include the inside of his vehicle. His arms were shaking heavily as he initially held his hands up, but not fully out the window, for a few seconds. The shaking made me think he was in a panicked state. The way he was looking around and shaking indicated to me that he was considering other options, or was planning something—possibly to escape, to discard something, or to retrieve a weapon. Based on my training and experience with thousands of traffic stops and hundreds of violent suspects throughout my career in law enforcement with two different agencies, his actions did not indicate true compliance with the verbal commands given.

26. My recollection on the scene that day was that the driver stated, "I can't get out" multiple times at that point, though we were not currently telling him to get out. Upon review of the dash cam video footage, the suspect was saying "my door doesn't open" instead of what I remembered hearing. I remember thinking we were not telling him to get out the vehicle at that point, and for that reason, his choice of words struck me as strange. The entire focus of Trooper Layton's verbal commands was for the suspect to show his hands and put them out the window.

27. The suspect never looked at me through all this, he continued looking around.

5

28.     In an effort to begin eliminating the unknown variables, as I got closer to the vehicle, I asked the suspect if there was anyone else in the vehicle. This cannot be heard because the remote microphone Trooper Layton was wearing did not pick it up. I asked about two times but the suspect did not respond.

29.     Due to not hearing a reply, and knowing there was another Trooper there covering the driver, I started walking up slowly and looking through the side window areas. I saw no one else in the vehicle. The dashcam footage shows the suspect's left arm out the window at that time, but I did not and still do not remember seeing that at that time. I did notice however that his right arm went down inside the vehicle to his right. After he reached, I began moving toward the rear of the vehicle in attempt to gain a vantage point on his hands.

30.     The suspect abruptly turned his whole body to the right in a large, quick, and obvious manner, with both arms completely abandoning the brief compliance he had just shown. It looked like he was going for the area of the center console. Because of the angle (the B pillar of the suspect vehicle/the seat he was sitting in/his body/the small rear window behind the driver seat-all blocking), I couldn't see what the driver was doing with his hands, but he kept moving around with his arms near the center console. From what I could see of his movements, it seemed like he may have opened and shut the center console.

31.     Concurrent with the events transpiring in paragraphs 29 and 31, Trooper Layton yelled that the suspect was reaching.

32.     I came back around to the driver side of the suspect vehicle and I walked up within about 2-3 feet from behind the B pillar still trying to get a vantage point on the suspect's hands. As soon as I did that, I saw the driver come back toward the steering wheel area and in an abrupt motion he went down again but this time to his left. Just before he went down to his left,

6

he looked like for a split second that whatever he had, he lost control of and dropped based on how he went for it. I never saw what he had at that point.

33. The driver then quickly turned toward the driver door area and against continual, loud commands of, "don't reach," the driver reached with his hands down in a large, and determined (rapid movements and looking down toward whatever he was doing with his hands) manner towards the inside of the driver door/bottom of his seat with both of his hands completely out of view. I could not see what he was doing from his shoulders down. There was a lot of movement down out of my view. His arms seemed completely extended downward as I remember his back was rounded.

34. In an instant, the driver abruptly sat up and faced forward again while bringing his hands up. I don't remember exactly what his left hand was doing, but it was positioned near the steering wheel, and he may have been gripping it to pull himself upright I don't recall him holding an object in his left hand. However, I immediately noticed in his right hand he was holding a dark colored handgun. When I saw it, I recognized it immediately as a gun. I saw the grip of the gun that wasn't being covered by his right hand-the part that would have been between the ends of the fingers and the lower meaty portion of the palm of his right hand, near the wrist. I also saw the slide of the gun and saw it was all dark colored or black. The texture of the grip as being rough sticks out in my mind. I saw how he was holding it in his hand-he held it up high enough for me to see it, from behind and outside the vehicle, and in a grip that is traditionally used to hold a pistol that a person is about to fire (could not see his trigger finger however), and his motion just prior to seeing his hands and the gun was one that looked like he was coming upwards as to clear over the dashboard for a shot forward toward where Trooper Layton was standing. When I first saw the gun, it was angled up toward the top driver side corner

7

of the windshield, and then it looked like it came down and was leveled slightly as the driver was still moving upright.

35. I recall hearing "gun" yelled multiple times, but on scene I believe I said I wasn't sure if I yelled "gun" or Trooper Layton did or we both did. However, the dashcam footage shows both me and Trooper Layton yelling "gun" multiple times before, during, and after shooting the suspect along with giving specifics that he was holding a gun and that it was in his right hand.

36. Backing up to the point of shooting, I already had my gun out, and was about 5 to 10 feet away from the driver/vehicle. I felt an instantaneous and intense surge of panic through my mind and body like I had to do something instantly or the driver was going to shoot Trooper Layton and/or myself. I remember shifting my focus from the gun (it seemed like I was looking through a telescope at his hands and the gun at the time) to the suspect's neck. As I shifted from his hands/the gun to my target, I felt like my field of vision panned all the way out in an instant to the point I could see almost the entire again including the driver, and even Trooper Layton up near the front/side angle of the vehicle. Then in an instant, my mind focused on the driver door blocking center mass of the suspect and for a split second my mind told me that my rounds may not hit the suspect if I shoot through his door. Then my field of vision telescoped back to the driver's neck, which was the only part of him I could see besides the dark hair on the back of his head. I instinctually squeezed 2 rounds off in rapid succession with them both aimed at the driver's neck. I fired a third round almost immediately after the first two as the driver moved towards his right toward the front the passenger seat in an instant.

37. After the first 2 shots I fired, but prior to the 3rd round I fired, I did not know the suspect had been critically wounded and it was him slumping over. I was not sure I hit him at all

8

with how fast he moved over, I still considered him a threat until the time after my 3rd shot was fired. I focused on the center mass of the white t-shirt I remember he was wearing as I fired that 3rd round while moving a step up and around the b-pillar of the car. At some point, I hear Trooper Layton fire, but saw no muzzle flash. I know I shot first and last. Having seen the vehicle after the fact, in conjunction with the autopsy report, I do not think my 3rd round struck the suspect.

38. I could not see the suspect's hands after firing. Trooper Layton and I both waited briefly and monitored the driver further while holding him at gunpoint. I saw the suspect was tensing up very slightly with his whole body as if his nervous system was shutting down and I could see blood on his neck, the back of his head, and his upper torso/shoulder(s). Within seconds, I notified dispatch via my portable radio that we had shots fired, and we needed EMS for a male subject approximately 25 years of age, slumped over, and we needed more units. Trooper Layton shouted something to the effect of, "I can't see the gun" to me at that point. I then began talking with Layton saying the same thing and we tried to move around the car at different angles while holding the suspect at gun point and we both reported to each other that we still could not see the gun at that point. I made sure Layton had him covered. I holstered my pistol, opened the driver car door, and peered inside looking for the gun. I still couldn't see it, but I could see the suspect was slumped all the way over and there was no movement so I told Trooper Layton I was going to go around and check the other side of the car.

39. I made sure Trooper Layton confirmed verbally that he had the suspect covered, and then I moved around the rear of the suspect vehicle with my pistol drawn. I shouted "crossfire" to Trooper Layton as I did so we both were of the understanding to have a clear backdrop considering that any rounds we may have to fire again at the suspect at that point may

hit each other. I then moved up to the front passenger door, still monitoring the suspect for movement and peered inside through the closed windows. I could see the gun as I peered in. It was underneath his hands as he lay slumped over the center console and front passenger seat. I opened the door and monitored the suspect for movement briefly, but he appeared dead.

40. I could see the gun sitting on the seat directly underneath his hands as he was slumped over top of it but not touching it because his torso/ arms were being stopped by the center console. His hands were less than 6 inches from the gun directly over top of it at that point. The gun was a compact black pistol (semi-automatic style) that looked like the slide was out of battery. It was covered almost completely in blood that had dripped down from the suspects head/neck onto his arms and hands and onto the gun and may have come from the initial blood spatter from the gunshot wounds as well. I made the decision not to touch the gun considering there were two of us there for cover/contact and it was covered in blood.

41. At that point I told Trooper Layton to holster and pull him out of the car and that if I yelled to let him go, as my thought process was he may still be a threat until we separated him from the firearm and I may have to shoot the suspect again if he made movements toward it. Layton agreed and as he began moving him, the suspect's body appeared completely limp. I never touched the gun, but instead left it where it lay as I felt confident Trooper Layton had the driver under control. Trooper Layton said he needed help getting the driver out, so I went around the driver side of the car and we pulled him out together. Again, his body was completely limp and I could feel/hear his neck vertebrae grinding as his head moved around. We pulled him out and laid him on the grass on his back just outside the driver door. I checked for a pulse immediately and felt none. His eyes were open, there was no agonal or other breathing whatsoever and I could see obvious gunshot wounds to his neck and face. He appeared obviously

dead and any CPR would have caused him to bleed out more and pressure would not have been appropriate for a spinal injury. I patted subject down for more weapons and did not feel any others, so we left him on his back in the grass not in handcuffs. I told dispatch over the radio that we had shots fired, the subject had a gun, and that the subject did not have a pulse. I also asked for traffic to be diverted onto I-288.

42. Trooper Layton and I asked if each other was okay at that point and I could see Layton's hands were covered in blood. I was trying to think of anything that needed to be done at that point as we waited for additional units. Though it was clear to us that the suspect was deceased, I asked Trooper Layton (who I know has medical knowledge and used to ride on an ambulance based on our conversations) if he thought there was anything we could do to include CPR, and he said that it would just pump the blood out more. Based on his injuries and his apparent death, I did not know anything to do medically at that point for the suspect. Trooper Layton asked what we should do, and I replied that we would stay out of the car, not make any other statements, and just wait to get things done when more people arrive. After a few moments, other police officers arrived on scene to include VSP, Henrico PD, Goochland Sherriff's Office or PD, and Goochland EMS. Once we were able to tell a responding Trooper what had occurred, I told them that Trooper Layton and I were going to go stand in front of Layton's car in view of the dashcam. We stood there for what seemed about 20 minutes before Sgt. Ellmore (VSP) arrived and took over the scene. He told us to sit in Trooper Layton's car and begin writing statements. So, we got in the car and did that. I immediately manually activated the inside camera on Trooper Layton's dash-cam system and pointed it at our faces as we typed our statements. I did not read Trooper Layton's statement, nor did he read mine, nor did we discuss the incident on scene.

11

12

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 2/5/2023

**Trooper Benjamin I. Bone**
**Virginia Department of State Police**