EXHIBIT 4

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LATOYA K. BENTON,                       )
ADMINISTRATOR OF THE ESTATE OF          )
XZAVIER D. HILL, deceased,              )
                                        )
     Plaintiffs,                        ) Civil Action No.:
                                        ) 3:22-cv-25 HEH
v.                                      )
                                        )
SETH W. LAYTON, et al,                  )
                                        )
     Defendants.                        )

-----------------------------------------------------------

AUDIOVISUAL DEPOSITION OF SETH W. LAYTON

Taken on behalf of the Plaintiffs


DATE TAKEN:          Friday, January 27, 2023

TIME:                10:13 a.m. - 1:56 p.m.

PLACE:               Office of the Attorney General
                     202 North Ninth Street
                     Richmond, Virginia 23219




REPORTED BY:
Jacquelin O. Gregory-Longmire, RPR
Stenographic Reporter/Notary Public

-----------------------------------------------------------

Copyright: 2023
Copying for opposing parties
constitutes piracy.

1    APPEARANCES:

2    Counsel for Plaintiffs:

3         Ms. Verbena M. Askew
          Attorney at Law
4         The Verbena Askew Law Firm, PC
          2 Eaton Street
5         Suite 708
          Hampton, Virginia 23669

6

7    Counsel for Defendants:

8         Mr. Calvin Brown
          Mr. Robert B. McEntee, III
9         Attorneys at Law
          Office of the Attorney General
10        202 North Ninth Street
          Richmond, Virginia 23219

11

12   ALSO PRESENT:

13   Benjamin I. Bone
     Roque King, King Legal Video
14

15

16

17

18

19

20

21

22

23

24

25

1                        I  N  D  E  X

2   WITNESS:                                          PAGE:

3   SETH W. LAYTON

4       Examination by Ms. Askew....,,,,...............    4
        Examination by Mr. Brown.......................  139
5

6   REPORTER'S CERTIFICATE.............................  154

7

8

9                       E X H I B I T S

10                    Plaintiffs' Exhibits

11  Exhibit
    No.        Description
12
    1          Photograph                                85
13

14

15

16

17

18

19

20

21

22

23

24

25

1           P R O C E E D I N G S

2              THE VIDEOGRAPHER:  It begins media number 1 in

3           the videotaped deposition of Seth W. Layton, in the

4           matter of Benton versus Layton, et al.  Civil Action

5           Number 3:22-cv-25-HEH, pending in the United States

6           District Court for the Eastern District of Virginia,

7           Richmond Division.

8              Today's date is January 27, 2023, and the time

9           on the video monitor is 10:13 a.m.

10             My name is Roque King, video specialist, and the

11          court reporter is Jackie Longmire.

12             Would counsel please introduce themselves for

13          the record and state who they represent.

14             MS. ASKEW:  My name is Verbena Askew and I

15          represent the plaintiff in this matter.

16             MR. BROWN:  I'm Cal Brown.  I represent the

17          defendants.

18             THE VIDEOGRAPHER:  Please swear in the witness.

19      (Witness sworn.)

20                  SETH W. LAYTON,

21       having been first duly sworn, testified as follows:

22                  EXAMINATION

23  BY MS. ASKEW:

24      Q.   Sir, my name is Verbena Askew.  As I indicated, I

25  represent Ms. Latoya Benton, who's the administrator of the

1 estate of Xzavier D. Hill, the deceased in this matter, and I

2 am going to ask you a series of questions.  If you would answer

3 out loud so that the court reporter can transcribe your

4 answers, and if you would refrain from saying "huh-uh,"

5 "uh-huh," shaking your head or otherwise, I think we would move

6 along well.

7      If you need to take a break, I would ask that you

8 take the break after the question has been answered and not in

9 the middle of a question.

10      Have you ever had a deposition taken before?

11     A.   Yes, ma'am.

12     Q.   Okay.  Well, let's say, why don't you state your full

13 name for us?

14     A.   Seth Walker Layton.

15     Q.   All right.  And where are you employed?

16     A.   I'm with the Virginia State Police.

17     Q.   All right.  Now, and how are you employed with the

18 Virginia State Police?

19     A.   I'm a trooper.

20     Q.   Now, you said you had a deposition taken before.

21     When did you have your deposition taken?

22     A.   Oh, I don't recall exactly when.

23     Q.   You don't recall when?

24     A.   Yes, ma'am.

25     Q.   How many have you had?

1    A.    I've had several, mostly for just crash things that I
2  have investigated.

3    Q.    Accident reports.

4          Have you ever had a deposition taken where you were a
5  party in the litigation?

6    A.    Listed as a defendant, is that what you mean?

7    Q.    As any party?

8    A.    Just as a witness.

9    Q.    As a witness, but not a party.

10         You understand what I mean, party meaning either
11  plaintiff or defendant?

12   A.    I didn't, but I have not been a plaintiff or a
13  defendant in a deposition hearing before.

14   Q.    Okay.  Prior to becoming a state trooper, tell me
15  where did you grow up?

16   A.    I grew up in Fredericksburg.

17   Q.    Fredericksburg?

18   A.    Yes, ma'am.

19   Q.    Okay.  And did you go to school there?

20   A.    Yes, ma'am.

21   Q.    Where did you go to school?

22   A.    I went to Riverbend High School.

23   Q.    All right.  And after Riverbend High School, did you
24  go to school after that?

25   A.    Yes, ma'am.

1    Q.   Where?

2         Where did you go?

3    A.   I went to a couple of different universities after

4 Riverbend High School.

5    Q.   Which ones?

6    A.   I attended Radford through the Virginia Tech Corps of

7 Cadets, and then I attended Virginia Commonwealth University

8 and Liberty University.

9    Q.   All right.  Now, let's begin with the first one.

10         Did you go -- how long did you attend the first

11 school?

12    A.   Just a year.

13    Q.   And what did you major in there?

14    A.   Biochem, pre-medicine.

15    Q.   And why did you leave there?

16    A.   Virginia Commonwealth University, where I transferred

17 after my freshman year of college, had a better medical

18 program.

19    Q.   All right.  And what did you study there?

20    A.   Pre-medicine, the same.

21    Q.   Pre-medicine?

22    A.   Yes, ma'am.

23    Q.   All right.  And how long were you there?

24    A.   I believe two years.

25    Q.   And why did you leave there?

1    A.   I was employed with the Richmond City Police

2    Department.

3        Q.   All right.  So you left the medical program?

4             You said you were pre-med or --

5        A.   Yeah.  I was pre-med.  That was my undergrad major.

6        Q.   And you left that program because you wanted to be a

7    city police officer?

8        A.   Correct.

9        Q.   All right.  And is your father a police officer?

10       A.   Yes.

11       Q.   Where is he employed?

12       A.   The city of Fredericksburg.

13       Q.   And how long has he been there?

14       A.   I believe since 1994.

15       Q.   All right.  So you -- and what is his position there?

16       A.   Currently, he's the police chief of the city of

17   Fredericksburg.

18       Q.   Okay.  Did you grow up with your father being a

19   police officer?

20       A.   Yes.

21       Q.   Okay.  And did your father have any influence on you

22   deciding to become a police officer?

23       A.   No, ma'am.

24       Q.   Just that was just your decision?

25       A.   Yes, ma'am.

1    Q.    He would rather you stay in pre-med?

2    A.    I don't know.

3    Q.    You don't know.  You didn't have discussions with

4    him?

5    A.    No.

6    Q.    Okay.  So when you went to the City of Richmond

7    Police Department, did your father have any involvement in

8    making a recommendation for you to serve there?

9    A.    I didn't tell my father that I got employed with

10   Richmond City until after I had already been hired.

11   Q.    Okay.  And after you were hired with the City of

12   Richmond Police Department -- before you were hired, did you go

13   through any type of training?

14   A.    Before I was hired?

15   Q.    Yes.

16   A.    No.

17   Q.    Okay.  So did you go through training after you were

18   hired?

19   A.    Yes.

20   Q.    Tell me what training you went through.

21   A.    I attended the Richmond Police Department basic

22   officer academy.

23   Q.    Is that an in-house training, or are they trained by

24   some academy outside of Richmond?

25   A.    It's in-house.

1    Q.    In-house?

2    A.    Yes, ma'am.

3    Q.    All right.  And how long were you in that training

4    program?

5    A.    I believe that was seven months.

6    Q.    Okay.  And after the seventh month, did they then --

7    well, before your training, were you provided with a gun and a

8    badge, or you had to go through the training first?

9    A.    You were provided with a firearm during certain parts

10   of training in the academy, but you're not actually -- for

11   firearms training, but you're not actually given your firearm

12   and badge until you graduate the academy.

13   Q.    Okay.  Did you graduate after the seven months?

14   A.    Yes.

15   Q.    And so then what happened then?

16         Did they give you a gun and a badge after seven

17   months?

18   A.    They did, and I started field training.

19   Q.    All right.  And so what did the field training

20   entail?

21   A.    Field training was an eight-week program where you

22   ride with a field training officer and you learn just regular

23   job duties for day-to-day functions.

24   Q.    Were you a patrol officer?

25   A.    Yes.

1    Q.    And what were your regular day-to-day duties?

2    A.    Primarily in Richmond City, it was responding to a

3    very high call volume of radio calls.

4    Q.    Okay.  And what kind of radio calls?

5          Are they traffic?

6    A.    They varied very frequently.  It could be a domestic.

7    It could be traffic-related.  Noise complaints were a very big

8    thing that we had to deal with in Richmond City Police.  It

9    could be robberies, burglaries.  We -- we dealt with all kinds

10   of things in patrol.

11   Q.    Did your field training officer ride with you on each

12   call or on each -- each response that you had to make as a

13   patrol officer?

14   A.    During the first eight weeks of my career after

15   graduating, yes.

16   Q.    And did your training officer keep a log -- your

17   field training officer keep a log of your progress in the field

18   during that period?

19   A.    Yes, ma'am.

20   Q.    All right.  Was it a daily log or a monthly log or a

21   weekly log?

22   A.    It was daily.

23   Q.    All right.  And what were the areas in which he

24   was -- that he addressed on those logs?

25   A.    I believe there were over 20 categories, perhaps 30.

1  I don't recall exactly, but there were different categories

2  that I was graded on per day.  I couldn't give you the

3  specifics of each one because it's been several years, but they

4  varied from driving behavior to calls, driving in stressful

5  conditions such as with lights and siren, uniform appearance,

6  and dealing with calls.

7       Q.  All right.  And did your training field officer ever

8  had any issues with any of those areas in which you were -- he

9  wrote the logs with?

10      A.  Not to my recollection.

11      Q.  Did he ever have any discussions with you about how

12 he may have thought that you did something in a way and he

13 believed -- he or she believed that you should have done

14 differently?

15      A.  Not to my recollection.

16      Q.  So do you recall having any conversation with your

17 field training officer about anything that he -- he or she

18 believed that they would have done differently?

19      A.  No, ma'am.  I don't recall.

20      Q.  Okay.  And in those field training reports, did

21 there -- were there any follow-ups with any of your supervisors

22 outside your field training officer?

23      A.  I'm not -- I'm not sure what you mean.

24          Could you ask that again?

25      Q.  Was there someone who reviewed these field training

1  reports?

2      A.   Yes, ma'am.

3           Do you want me to tell you what that process look

4  like?

5      Q.   That would be nice.  Yeah.  Thanks.

6      A.   So from what I understand just going -- as a trainee,

7  it wasn't my responsibility to submit that paperwork, but from

8  my understanding, it was submitted by the field training

9  officer to the shift supervisor and then I believe it was sent

10 from that supervisor to the training academy for review, but I

11 don't know the frequency, if that was daily, if that was every

12 week, every month.  I'm not sure.

13     Q.   Okay.  Were there any follow-up discussions with you

14 in that process?

15     A.   Not to my recollection.

16     Q.   Okay.  So after then the -- during the time that you

17 were having your field training officer with you, did you have

18 any questions that you raised with your field training officer?

19     A.   I don't remember, ma'am.  That was quite a while ago.

20     Q.   How long ago was this?

21     A.   This would have been in the very early part of 2018.

22     Q.   Okay.  2018?

23     A.   Yes, ma'am.

24     Q.   What, four years ago, five?

25     A.   Five years.

1    Q.    Okay.  And you don't recall ever asking your field

2  training officer any questions?

3    A.    No, ma'am.  I don't remember.

4    Q.    Nothing stuck out?

5    A.    No, ma'am.

6    Q.    Okay.  So -- and you don't recall your field training

7  officer saying anything to you?

8    A.    I remember my field training officer saying things to

9  me, but I don't remember in a -- that happening in a critiquing

10  manner.

11    Q.    Okay.  Well, what about your field training officer

12  telling you things to do?

13    A.    I remember vaguely my field training officer

14  explaining the proper way to handle certain calls, but it

15  wasn't in a critiquing manner.  It was just for informational

16  purposes.

17    Q.    Okay.  And is it your understanding that that was the

18  normal course in terms of your field training officer being

19  there to assist you if -- in terms of explaining, for example,

20  for how to handle a certain call or how to handle a traffic

21  stop?

22    A.    I do apologize.  I'm having trouble --

23    Q.    Understanding me?

24    A.    Yes.

25    Q.    Let me see if I can rephrase it.

1        A.    Please.

2        Q.    Okay.  That's fair enough.

3              So do you recall then that your field training

4    officer, the process being that there were times where he or

5    she would explain a process to you while you were out in the

6    field?

7        A.    Yes, ma'am.

8        Q.    Okay.  And say, for example, if you had a traffic

9    stop, would a field -- the field training officer explain to

10   you the process in terms of what you should do in responding

11   to, say, the traffic stop?

12       A.    What I meant along the lines of that was it's almost

13   impossible to experience everything in your full career in the

14   first eight weeks after graduating, so it's fairly typical for

15   your field training officer to walk you through scenarios that

16   is possibly unlikely for you to experience in eight weeks.

17       Q.    Okay.  Well, I guess -- I appreciate that, but my

18   question really is, did -- was it customary for your training

19   officer, when you were out in the field, to explain, for

20   example, if you had a traffic stop, that the field training

21   officer would explain to you the process or give you advice on

22   what it is that you should do?

23       A.    I think it's kind of situational dependent based on

24   the stop that you would make.

25       Q.    Okay.  So they did -- your training officer didn't

1  always tell you what he or she thought you should do?

2       A.   That's correct.

3       Q.   But your training field officer at times would tell

4  you what he or she thought you should do?

5       A.   Perhaps.  I can't -- I don't recall that happening to

6  me but...

7       Q.   So are you saying the field training officer never

8  told you what he thought or she -- he or she thought you should

9  do?

10      A.   I told you that I don't recall a time where my field

11  training officer critiqued me in the field.

12      Q.   I wasn't saying "critiqued."

13           I was saying suggested to you what you should do in

14  the field when he or she was with you?

15      A.   Again, I only remember my field training officer

16  walking me through certain circumstances that I wasn't

17  necessarily likely to experience in eight weeks.

18      Q.   What does that mean?

19      A.   I can give you an example, if you'd like.

20      Q.   That would be nice.

21      A.   One time I asked a question about how to handle a

22  protective order, for example, like an emergency protective

23  order and what the process look like for that, and my field

24  training officer explained the process for obtaining an

25  emergency protective order from a victim's standpoint.

1      Q.   All right.  Is it fair to say that during the -- is

2  it seven months that you were in the academy that -- that there

3  were several incidences that you would potentially experience

4  out in the field that they didn't equip you for that?

5      A.   I'm sorry.  I don't quite understand.

6      Q.   Well, there's a reason, I guess, for you to have a

7  field training officer when you're out for the next eight weeks

8  or was it six or eight weeks, that there must have been a

9  reason for you to have a field training officer there as

10  opposed to just putting you out on the street by yourself?

11      A.   I believe that's mandated across the entire

12  Commonwealth of Virginia as you're required to do that to get

13  certified.

14      Q.   I understand.

15           Do you have any idea of why?

16      A.   No, ma'am.

17      Q.   You don't know.  You just do it?

18      A.   Yes, ma'am.

19      Q.   Okay.  Did you ever ask?

20      A.   Sorry?

21      Q.   Did you ever ask any questions about it?

22      A.   About why we have to do field training?

23      Q.   Or why you have a field training officer?

24      A.   I don't think so.  I just --

25      Q.   You just do it?

1      A.    That's part of training.

2      Q.    Okay.

3            All right.  So tell me how long then were you on the

4      police force for the City of Richmond.

5      A.    From -- including academy time, that would have been

6      early, mid-2017 through September of 2020.

7      Q.    All right.  And who was the police chief there during

8      that time?

9      A.    I believe we had a few.

10     Q.    You had a few police chiefs?

11     A.    Yes.

12     Q.    Do you remember them?

13     A.    I believe the first one when I started employment was

14     Chief Durham, then we moved to Chief Will Smith, then interim

15     Chief Jody Blackwell, and then when I left, I believe we had

16     Chief Gerald Smith.

17           There was a period of time in 2020 where we quickly

18     rotated police chiefs, so I'm not sure if I missed anyone

19     there, but I think that was it.

20     Q.    Okay.  Did you ever have any -- any complaints from

21     any citizens or -- about your policing when you were with the

22     City of Richmond Police Department?

23     A.    The only complaint that I was ever aware of was

24     during the riots in 2020.

25     Q.    During what?

1    A.    The riots.

2    Q.    The riots?

3    A.    Yes, ma'am.

4    Q.    In 2020?

5          Okay.  And what kind of complaints did you have

6    against you during that period?

7    A.    The only one --

8                MR. BROWN:  I'm going to object to form on that.

9                Go ahead.

10               THE WITNESS:  Sorry.

11               I'm sorry, ma'am.  One more.

12   BY MS. ASKEW:

13   Q.    Tell me what you recall in terms of the complaint

14   against you.

15   A.    Sure.

16         I believe it was -- I had to deploy OC spray during

17   the riots for someone that was attacking us and that person

18   tried to file a complaint against me for using OC spray.

19         That was forwarded to the Commonwealth Attorney's

20   Office.  The Commonwealth Attorney put out still images of my

21   body camera of that person attacking us to the news media and

22   said that I did nothing wrong.  That's all I remember from that

23   incident.

24   Q.    Was that riot pertaining to the removal of the

25   statues?

1     A.    I --

2     Q.    Do you recall?

3     A.    I don't recall.  There were so many.

4     Q.    There were so many riots?

5     A.    Correct.

6     Q.    In Richmond?

7     A.    Yes.

8     Q.    Uh-huh.  In 2020?

9     A.    Yes.

10    Q.    How many do you recall?

11    A.    I don't.  A lot.

12    Q.    You don't recall.  You said a lot of riots?

13    A.    Uh-huh.

14    Q.    Okay.  And you responded to all of them or some of

15 them?

16    A.    Some of them.

17    Q.    All right.  And do you recall any others that you

18 responded to?

19    A.    Any other?

20    Q.    Riots that you were involved with.

21    A.    That was all in 2020.

22    Q.    Correct.

23          You recall that one incident where you were -- there

24 was a complaint that was lodged against you.

25          Do you recall any other riots --

1              You said there were several.

2              -- that you were on duty and policing?

3         A.    There was almost a riot every single night for a

4    couple of weeks straight, so, no, I don't recall all of them.

5         Q.    Do you recall any of them?

6         A.    Details about some of them, yes, but I wasn't on the

7    front line of every single riot every single night.

8         Q.    Okay.  Tell me about the ones that you recall.

9         A.    I mean, do you have a specific question about them?

10   I don't know what to -- I don't know how to answer that.

11        Q.    No, just tell me about the riots that you were

12   present at that you recall.

13        A.    Again, I don't quite --

14        Q.    You don't understand what that means?

15        A.    -- know how to answer that question.

16        Q.    All right.  What riots did you observe that you were

17   on duty for?

18        A.    The very first night, I believe, was May 29th.  I had

19   to participate in that.  There was another on May 30th.  The

20   third night was May 31st.  Those stand out quite a bit because

21   they were the first few days.

22        Q.    The first few days of what?

23        A.    Of the multi-week riots every single night.

24        Q.    Were they for different reasons, the riots?

25        A.    I --

1    Q.    You don't know?

2    A.    I'm not sure.  That wasn't my job.

3    Q.    All right.  Well, what was your job?

4    A.    Just to respond when they call me.

5    Q.    All right.  And what was your -- what were -- what

6    were you supposed to do at these riots?

7    A.    The duties depended -- they varied by the day.

8    Sometimes I would have to interview people that we arrested at

9    jail.  Other nights I had to stand on the front line with a

10   shield and a helmet.  I don't --

11         Does that answer your question?

12   Q.    All right.  So you -- you said there were several and

13   you participated in some.

14         Now, the ones that you do recall, do you know what

15   the issues were involved with the riots, or you just showed up?

16   A.    I just showed up.

17   Q.    And did you observe anything?

18   A.    Sorry?

19   Q.    Were you curious about why they were there?

20   A.    Why the rioters were there?

21   Q.    Yes.

22   A.    Not really.

23   Q.    Not really?

24   A.    No, ma'am.

25   Q.    All right.  So you left, when, the City of Richmond

1  Police Department and came to the Virginia State Police?

2      A.    Again, I left the Richmond Police Department in

3  September of 2020 and I immediately came to Virginia State

4  Police in September of 2020.

5      Q.    All right.  And when you applied to Virginia State

6  Police in September of 2020, did you solicit recommendations in

7  your appli- -- who recommended you to the Virginia State

8  Police?

9      A.    I don't remember.

10      Q.    You don't remember who recommended you?

11      A.    Correct.

12      Q.    You don't -- did you ask anybody?

13      A.    I don't remember.

14      Q.    This is in 2020 and that wasn't a long time ago.

15  That was maybe, what, three years ago?

16      A.    Three years ago.  Sure.  Three years ago.

17      Q.    Okay.  And you applied to the Virginia State Police,

18  and you don't recall who you asked for a recommendation?

19      A.    That's correct.

20      Q.    Okay.  So it could have been your father?

21      A.    Again, I answered that question.  I don't recall.

22      Q.    You don't recall if your father gave you a

23  recommendation to the Virginia State Police for you to be a

24  Virginia State Police officer?

25      A.    Again, ma'am, I don't recall.

1      Q.    You don't recall?

2            Okay.  Fair enough.

3            So why did you leave the City of Richmond Police

4   Department?

5            He can't answer that.

6      A.    The Virginia State --

7            Excuse me?

8      Q.    You're looking at him.  He can't answer that.

9            You -- I asked --

10     A.    Okay.  I'm sorry.

11     Q.    -- why did you leave --

12     A.    A lot is going on.  Can you --

13     Q.    -- the Virginia State Police Department?

14     A.    Okay.

15     Q.    I mean, why did you leave the City of Richmond Police

16  Department?

17     A.    Right.  I left because the Virginia State Police

18  offered more career progression opportunities for me.

19     Q.    Okay.  And you didn't have any problems with

20  Virginia -- with the City of Richmond Police Department before

21  you left?

22     A.    That's correct.

23     Q.    Okay.  Now, when you came over to the Virginia State

24  Police, what kind of training did you have to do?

25     A.    Oh, I had to do a two-month modified academy because

1   I was already certified as a police officer in Virginia and

2   then another several weeks of field training.

3      Q.   Okay.  And what did the -- what did the first

4   training entail?

5      A.   Are you talking about the two-month period, ma'am?

6      Q.   Yes.  The first two months.

7      A.   That would have been multiple DCJS objectives.

8      Q.   Okay.  How about telling me some of those.

9      A.   I don't remember the DCJS objectives right now.

10     Q.   You don't remember what your training was?

11     A.   I don't remember the DCJS objectives right now that

12   you asked about.

13     Q.   All right.  Tell me what your training was for the

14   first two months.

15           MR. BROWN:  I'm going to object to form on that

16           one.

17           You can answer that.

18           THE WITNESS:  I remember a one-week period of

19           defensive tactics training.  That was an entire week.

20           I remember another full week of driving.  I remember

21           another full week of getting certified on firearms.

22           I remember the week of graduation.

23           Then, again, there were several classes every

24           day that we had to participate in to knock off DCJS

25           objectives.

1  BY MS. ASKEW:

2      Q.    All right.  Those that you remember, can you give us

3  some details in terms of what your training entailed?

4      A.    For defensive tactics training, I remember going over

5  the same techniques that I learned in the Richmond Police

6  Academy, just maneuvers on handcuffing properly.  There was

7  ground fighting involved.

8           For driving, I remember we had certain courses set up

9  that you had to navigate through cones.  There were mock

10  pursuit scenarios that you did.  That's what I remember.

11      Q.    All right.  And you said that you were trained in

12  driving.  Do you remember how you were trained in driving?

13      A.    I'm not sure how to answer that.

14      Q.    Well, just to follow up, when you say you went

15  through training in terms of driving, do you want to tell us

16  what that training entailed?

17      A.    I mean, again, I remember having to drive through

18  different courses with cones set up.  We have a skid pan at our

19  driver training complex down in Blackstone where they're able

20  to put water on the track and practice hydroplaning at high

21  speeds.

22      Q.    Okay.  Any other type of training regarding driving?

23      A.    I mentioned mock pursuits, but that was what I

24  remember.

25      Q.    All right.  Can you explain the mock pursuits?

1   A.   You would be behind a vehicle and that vehicle would

2  not stop when lights and siren were activated and you would

3  chase the vehicle at high speeds on the interstate courses that

4  we have.

5   Q.   And where did those trainings take place?

6   A.   At the driver training complex in Blackstone.

7   Q.   And was that on the interstate?

8   A.   No, ma'am.  We have a mock track that closely

9  resembles the interstate.

10   Q.   All right.  And how -- how high did the speeds get

11  during your training?

12   A.   I believe the speeds -- the top speed that we were

13  able to get on the track was only around a hundred miles per

14  hour.

15   Q.   All right.  And how often did you engage in that

16  training?

17   A.   Again, it was only a week long.

18   Q.   It was a week long?  Okay.

19        And what were you taught with reference to the

20  pursuit with a traffic stop?

21   A.   I'm sorry?

22   Q.   Pursuit for traffic infractions, what did they teach

23  you?

24        What did they train you with reference to pursuits

25  involving traffic infractions?

1           MR. BROWN:  Objection.  Form.

2           THE WITNESS:  I'm not quite sure how to answer

3              that question.

4  BY MS. ASKEW:

5      Q.   All right.  With your driving, did you get training

6  regarding pursuits of vehicles that were -- that had traffic

7  infractions?

8           When you're pursuing vehicles that committed

9  traffic infractions, were you trained during that time in

10 pursuits?

11          MR. BROWN:  Objection.  Form.

12          THE WITNESS:  The mock pursuits that we did

13             weren't for vehicles with traffic infractions.

14 BY MS. ASKEW:

15     Q.   What were they for?

16     A.   It was, again, just a mock pursuit.

17     Q.   Mock pursuit.

18          Pursuit for what?

19     A.   I'm not sure.

20     Q.   You just were pursuing something and you didn't know

21 what it was?

22     A.   I believe the point of that drill was to experience

23 the interstate track at high speeds.

24     Q.   So you were just traveling at a high rate of speed

25 for no reason?

1          MR. BROWN:  Objection.  Form.

2          You got to let me --

3          THE WITNESS:  Sure.

4          MR. BROWN:  -- object and then you can answer.

5          So you can answer.

6    BY MS. ASKEW:

7      Q.   So the purpose of the mock pursuit was just to

8    travel at a high rate of speed.  Is that what you're saying?

9      A.   To experience the interstate track at a high speed

10   and while manipulating the radio.

11     Q.   Okay.  So you didn't have any purpose in mind.

12          Did they have a purpose in mind in training you in

13   that regard?

14          Do you know?

15     A.   Again, I believe that it was to experience the

16   interstate-related track at high speeds and while manipulating

17   the radio and calling out a pursuit.

18     Q.   Okay.  So did you have any experience during the

19   training where you had actual mock traffic infractions that

20   were occurring that you then pursued the vehicle?

21     A.   I don't recall.

22     Q.   Okay.  So what you're saying, it could have happened,

23   but you don't recall it?

24     A.   I'm saying I don't recall.

25     Q.   Well, what does that mean, you don't recall?

1    A.   I don't remember.

2    Q.   You just don't remember it?

3         Okay.  You don't remember some of your training?

4         Is that what you're telling us?

5    A.   I'm sorry.  What's your question?

6    Q.   You're saying you don't remember, you don't recall.

7  Does that mean you don't remember some of your training that

8  you had?

9              MR. BROWN:  Objection.  Form.

10  BY MS. ASKEW:

11   Q.   What does that mean?

12   A.   I'm saying --

13   Q.   You could have been trained, but you don't remember

14  it?

15   A.   Ma'am, I'm trying to answer your question.

16   Q.   Oh, I'm so sorry.  Go ahead.

17   A.   You asked if I remembered the reason for the pursuit

18  being for a traffic infraction and my answer is I don't

19  remember pursuing a car for a traffic infraction.

20   Q.   I understand that and I appreciate that answer, but

21  my question really was, do -- did you remember having an actual

22  training where you had a vehicle that, in fact, was -- had a

23  traffic infraction and you then pursued it?

24              MR. BROWN:  Objection.  Form.

25              THE WITNESS:  No, ma'am.  Again, I don't

1          remember the reason for the pursuit to be for a

2          traffic infraction.

3  BY MS. ASKEW:

4      Q.   My question is, did you ever experience during your

5  training an actual vehicle that had committed a traffic

6  infraction and you then exercised the pursuit of that vehicle?

7      A.   We did pursue a vehicle in training, but I don't

8  recall the reason being for a traffic infraction.

9      Q.   You don't know why you pursued it?

10     A.   I -- I don't remember why we pursued it.

11     Q.   Okay.  So you pursued a vehicle, but you don't know

12  why, in training?

13     A.   I don't remember why we pursued it in training.

14     Q.   Okay.  Do you know why you would pursue a vehicle --

15          Well, strike that.

16          All right.  Then after that training, Trooper Layton,

17  you then -- then what happened after you went through the two

18  months of your training?

19          What happened after that?

20     A.   I began field training.

21     Q.   Okay.  Did you take any written tests during those

22  two months?

23     A.   Yes, ma'am.

24     Q.   And what -- what kind of test did you have to take?

25          Written?

1    A.   Yes, ma'am.

2    Q.   I'm waiting.  I said what type of test did you take?

3    A.   You said --

4         MR. BROWN:  You said "written."

5  BY MS. ASKEW:

6    Q.   Written test.  Yes.

7    A.   I said, yes, ma'am.

8    Q.   What type?

9         I said what type of written test did you take?

10   A.   I don't know what your question is.  You said written

11  test.  There was a written test.

12   Q.   No.  I said what type of written test did you take?

13        What were the topics?

14        Let's -- let's back it up a little bit.  I'll try

15  to -- try to make it simple.

16        Did you have topics of written tests that you had to

17  take?

18   A.   I don't recall each tests topic.

19   Q.   Do you recall any topics where you had to take a test

20  that were written?

21   A.   I don't recall any specific topics of the test.

22   Q.   So you don't know what written tests that you took.

23  You don't know the topics of them?

24   A.   I believe the written tests covered several different

25  topics, but I don't recall what those topics were.

1      Q.   You recall there were several topics, but you don't

2  remember one topic of a written test that you had to take?

3      A.   So each test wasn't a specific topic.  There were

4  multiple different things covered within each written test.

5           Does that make sense?

6      Q.   All right.  Such as?

7      A.   The one thing that I remember was a marijuana law

8  that had just recently changed.  That was -- that's all I

9  really remember about it.

10     Q.   All right.  So what was the test?

11          What was the question on your test dealing with the

12 marijuana law?

13     A.   I don't remember.

14     Q.   You don't remember.  You just remember it was a

15 marijuana law that changed.  Okay.

16          Did you have any written test that you took involving

17 traffic pursuits or pursuit of traffic infractions or drivers

18 who committed traffic infractions in which you had to pursue

19 the vehicle?

20               MR. BROWN:  Objection.  Form.

21               THE WITNESS:  I'm sorry.  Could you ask that

22          again?  There was a lot of --

23 BY MS. ASKEW:

24     Q.   Do you remember any written tests that you took

25 involving the pursuit of vehicles who had committed traffic

1   infractions?

2        A.   I don't remember any written test questions during

3   field training about pursuing vehicles for traffic infractions.

4        Q.   It wasn't about field training.

5             The two months that you were in training, did you

6   take written examinations?

7        A.   Yes, I did.

8        Q.   Okay.  Do you recall any of the topics of those

9   written examinations?

10       A.   Yes, I do.

11       Q.   Can you give me any of the topics that you can

12   recall?

13       A.   One was homeland security.  They -- the test

14   questions that we had to take during the academy itself were in

15   reference to DCJS objectives that we took from classes in the

16   academy.  So one was homeland security.  I believe another

17   involved domestic violence.  That's all I'm remembering right

18   now.

19       Q.   That's all you remembered?

20       A.   That's all I recall about the DCJS test at this time.

21       Q.   All right.  So after then, the two months you went

22   into field training, and who were your field training officers?

23       A.   Trooper Benjamin Bone was my field training officer.

24       Q.   And that's the only one you had?

25       A.   I believe I worked with another officer or two, but

1  it depended if they were certified or not at the time.  So

2  Trooper Bone was my primary field training officer, but I don't

3  remember who else I might have worked with in field training.

4       Q.    All right.  You remembered Trooper Bone, but you

5  don't remember anyone else?

6       A.    That's correct.

7       Q.    Okay.  And when you say you're not sure whether they

8  were certified, what does that mean?

9       A.    Field training carries a mandatory minimum number of

10  hours that you're required to complete and if you have to work

11  with a field training officer that isn't certified as a field

12  training officer, those hours for your shift don't count as

13  time towards graduating field training.

14       Q.    All right.  So do you recall -- if you don't recall

15  the name of those or that were not certified that were your

16  field training officers, do you recall how many times that

17  someone other than Trooper Bone was your field training

18  officer?

19       A.    I recall one time, but that's all I remember right

20  now.

21       Q.    What do you recall about that one time?

22       A.    I believe I had rode with Trooper Dodson for a night,

23  but he wasn't certified so that -- that shift didn't count

24  towards my hours for completing field training.

25       Q.    Okay.  And what happened on that shift with

1  Trooper Dodson?

2      A.    The only thing I remember from that shift is we -- he

3  discussed taking certain exit ramps to be able to turn around

4  faster.

5      Q.    Okay.  And so he -- did he -- did you deem it to be a

6  training session where he gave you certain lessons?

7      A.    How do you mean "lessons?"

8      Q.    Well, did he teach you anything, Dodson, Trooper

9  Dodson?

10     A.    Did Trooper Dodson teach me anything?

11     Q.    Uh-huh.

12     A.    The only thing I remember that Trooper Dodson told me

13 was a tip on how to turn around faster by taking the second

14 exit if it -- if the -- that specific exit has more than one

15 because you can turn around faster.

16     Q.    Okay.  So, I mean, did you think that was a teaching

17 moment?

18     A.    I think I would have figured it out anyway but...

19     Q.    Okay.  So you didn't learn anything from him?

20           MR. BROWN:  Objection.  Form.

21 BY MS. ASKEW:

22     Q.    Is that what you're saying?

23     A.    In regards to normal duties --

24     Q.    You said you would have learned it anyways.

25     A.    I don't believe so.

1    Q.   So you didn't think you learned anything from him?

2    A.   No, ma'am.  I don't think so.

3    Q.   Okay.

4         All right.  So let's go to Trooper Bone.

5         Did you learn anything from Trooper Bone?

6    A.   Yes, ma'am, I believe I did.

7    Q.   Tell me what you learn from Trooper Bone.

8              MR. BROWN:  Objection.  Form.

9              Go ahead.

10             THE WITNESS:  Trooper Bone was very thorough

11        with firearms investigations, so when someone's

12        prohibited from purchasing a firearm, for example,

13        like, he taught me a lot about investigating those

14        kinds of offenses as well as DUI.

15   BY MS. ASKEW:

16   Q.   Okay.  Did he teach you anything else?

17   A.   I'm sure he did, but I don't remember right now.

18   Q.   You don't remember anything else he taught you?

19        Okay.  So how long -- how many times were you out in

20   the field with Trooper Bone?

21   A.   I don't recall exactly how many times.

22   Q.   Are there any moments that stuck out involving

23   Trooper Bone and anything that you learned from him while out

24   in the field with him?

25   A.   No, ma'am.

1    Q.   You would have learned on your own or you just don't

2   recall that he taught you anything?

3    A.   I don't recall anything else that Trooper Bone taught

4   me.

5    Q.   All right.  So do you -- what is your understanding

6   of what the field training officer was supposed to do?

7    A.   So I was already certified in Virginia, so

8   Trooper Bone was there to grade me and just oversee the way

9   that I handled daily business.

10    Q.   Okay.  Did he ever give you any tips?

11    A.   I don't remember.

12    Q.   You don't recall anything that he told you that stuck

13   out?

14    A.   That's correct.

15    Q.   Okay.  So you would have figured everything out by

16   yourself, or he just never told you anything that he thought?

17             MR. BROWN:  Objection.  Form.

18             THE WITNESS:  Again, I was already a certified

19             police officer by that time.

20   BY MS. ASKEW:

21    Q.   So did you think you needed a field training officer?

22    A.   Again, field training is a DCJS objective.  It's

23   something required by the state.

24    Q.   I understand, but it is -- but did you feel you

25   needed one?

1       A.   I felt that it wasn't up to me.

2       Q.   But did you personally feel that -- felt that you

3   needed one or not need one?

4       A.   I mean, I believe that I benefitted from having a

5   field training officer.

6       Q.   And how so?

7       A.   Being certified already as a police officer, I was

8   used to the way that the Richmond Police Department handled

9   certain things.  For example, the paperwork that had to be done

10  and having a field training officer through the Virginia State

11  Police, I was able to learn the way that VSP handles certain

12  things and the paperwork that needs to be done.

13      Q.   Okay.  What about when you're out in the field, was

14  there anything different than what you -- that you learned as a

15  police officer with the City of Richmond than as a state

16  trooper?

17      A.   I never dealt with the interstate with the Richmond

18  City Police Department, so that was incredibly new to me.

19      Q.   Okay.  So when you came with the Richmond State

20  Police, did -- was Trooper Bone, did he go out on the Virginia

21  State highways with you, the interstate?

22      A.   I'm sorry.  Could you repeat that question?

23      Q.   Sure.

24           When you were out in field training with

25  Trooper Bone, did he go out on the interstate with you as your

1  field training officer?

2      A.   Yes.

3      Q.   How many times?

4      A.   I -- I don't recall.

5      Q.   Was it more than one?

6      A.   Yes, ma'am.

7      Q.   Was it more than five?

8      A.   Yes, ma'am.

9      Q.   Was it more than ten?

10     A.   Are you talking about before the incident or just in

11 field training in general?

12     Q.   Well, let's start with before the incident.

13     A.   Yeah.  I'd say more than ten.

14     Q.   More than ten times?

15     A.   (Nodded head.)

16     Q.   Okay.  Was it more than 15?

17     A.   I'd have to go back and look at what we did every day

18 and how long I was in field training before the incident

19 started.

20     Q.   So you don't know if it's more than 15?

21     A.   No.  I don't remember.

22     Q.   Okay.  But you do know it's more than ten?

23     A.   Yes, ma'am.

24     Q.   Okay.  Do you recall any traffic stops when you were

25 on the interstate prior to the incident where your field

1  training officer was Trooper Bone --

2              MR. BROWN:  I'm going to object.

3  BY MS. ASKEW:

4      Q.   -- prior to the incident?

5              MR. BROWN:  I've got to object to form on that

6          and vague.

7              THE WITNESS:  Yes, ma'am.

8  BY MS. ASKEW:

9      Q.   Okay.  Which ones do you recall?

10     A.   I recall one speeding stop before the incident with

11 Trooper Bone.

12     Q.   Okay.  Did you take the lead in dealing with that

13 traffic stop, or did Trooper Bone take the lead?

14     A.   Can you explain what you mean by "take the lead?"

15     Q.   Well, where you have a traffic stop, did Trooper Bone

16 get out of the -- handle it or did you handle it?

17     A.   I'm having trouble with your --

18     Q.   Or did both of you handle the stop?

19          I mean, tell me what happened.

20          Just tell me what happened as you recall.

21     A.   I approached the car.  I spoke with the violator

22 about why they were driving so fast.  This was for reckless

23 driving.  The driver told me that he was running late for work.

24 I went back to my patrol car and I wrote a summons.

25     Q.   All right.  And where was Trooper Bone?

1    A.   I believe Trooper Bone approached the car with me the

2  first time, but I believe that he stayed in the car when I gave

3  the driver a summons.

4    Q.   Okay.  Did Trooper Bone observe your interaction with

5  the driver?

6    A.   I'm not sure.

7    Q.   Okay.  Did Trooper Bone give you any advice involving

8  that stop?

9    A.   I don't remember.

10   Q.   You just remember he was with you?

11   A.   That's correct.

12   Q.   Okay.  Do you recall another incident where it

13 involved the traffic infraction where Trooper Bone was with

14 you?

15            MR. BROWN:  Objection.  Form.

16            THE WITNESS:  No, ma'am.  That's the -- the stop

17            that I remember.

18 BY MS. ASKEW:

19   Q.   Okay.  Did they have any other incidents involving

20 drivers of vehicles where you had the occasion to interact with

21 that Trooper Bone was with you?

22   A.   I'm sorry, ma'am.  I don't understand your question.

23   Q.   Did you have any other vehicles --

24        Well, strike that.

25        Did Trooper Bone ever give you any kind of advice

1  that you recall with reference to driving on the interstate?

2      A.   I don't remember.

3      Q.   You don't recall?

4           Did you have the occasion while you were with

5  Trooper Bone prior to this incident of why we're here today

6  where you drove your police car at high rates of speed while

7  Trooper Bone was with you?

8      A.   Could you repeat that question?

9      Q.   Did you have -- did you have the occasion to drive

10 the police cruiser with the Virginia State Police at high rates

11 of speed on the interstate while you were with Trooper Bone

12 prior to the incident that we're here on?

13     A.   Yes, ma'am.

14     Q.   Okay.  Do you recall those occasions?

15     A.   I would refer to the traffic stop that I just told

16 you about for reckless driving.  I had to catch up to that

17 violator at a high rate of speed.

18     Q.   Okay.  Any others?

19     A.   That's all I remember.

20     Q.   Okay.

21          All right.  Prior to catching up with that vehicle,

22 how did you -- were you stationary radar?

23     A.   Yes, ma'am.  That was stationary radar.

24     Q.   Where was that located?

25          Do you recall?

1    A.    I believe that was northbound Interstate 95 at the

2    73 mile marker.

3    Q.    Okay.  And had you been assigned a vehicle at that

4    time?

5    A.    Yes, ma'am.

6    Q.    Okay.  So were you -- you were in your vehicle that

7    was assigned to you?

8    A.    I don't remember what vehicle we were in.

9    Q.    Okay.  Well, typically, would you drive someone

10   else's vehicle that's not assigned to you?

11   A.    During field training, that's not uncommon.

12   Q.    Okay.  So --

13         All right.  You don't recall which vehicle, but you

14   were at stationary radar.

15         Did you clock the vehicle with the radar?

16   A.    I don't know what you mean by "clock."

17   Q.    Okay.  Maybe my terminology might be off.

18         All right.  Did you then see the vehicle traveling

19   past the radar where it registered at a speed?

20   A.    Again, I -- I don't quite understand that.

21   Q.    All right.  How did you know the vehicle was

22   speeding?

23   A.    I observed the vehicle speeding visually and I

24   estimated that vehicle's speed and that vehicle's speed was

25   consistent with the audible Doppler tone and digital target

1 readout of my radar set.

2     Q.   All right. And what did it read out at?

3     A.   I don't remember.

4     Q.   All right. But what was the speed limit on that

5 interstate?

6     A.   55 miles per hour.

7     Q.   Okay. So it -- to be reckless driving, did it not

8 have to be at least 75?

9     A.   That's correct.

10     Q.   Okay. So it had to be 75 or more.

11     And then what did you do once you saw that he was

12 speeding?

13     A.   Again, we caught up to the vehicle and conducted a

14 traffic stop.

15     Q.   All right. Did you immediately put on your siren and

16 your lights?

17     A.   No, ma'am.

18     Q.   All right. What did you do?

19     A.   We got the vehicle's license plate number, entered it

20 into the traffic stop page of our computer automated dispatch,

21 and then once we sent that message, it generated a traffic

22 stop, and then I activated my lights.

23     Q.   Okay. And how long did it take you to do that?

24     A.   I don't remember.

25     Q.   You don't remember.

1          Was it five minutes?

2     A.    I don't remember.

3     Q.    Ten minutes?

4     A.    I don't remember.

5     Q.    You don't remember how long you traveled before you

6    put your siren and lights on?

7     A.    Correct, ma'am.

8     Q.    Okay.  What were you trained to do under those

9    circumstances where you gave the vehicle a ticket, or when you

10   stopped the vehicle?

11          What were you trained to do after stopping?

12          MR. BROWN:  Objection.  Form.

13          THE WITNESS:  I'm not quite sure how to answer

14          that question, ma'am.

15   BY MS. ASKEW:

16    Q.    What was your training -- what did your training

17   entail once you had the vehicle?

18          You put your siren and lights on, the vehicle

19   stopped.  What were you trained to do after that?

20          MR. BROWN:  Objection.  Form.

21   BY MS. ASKEW:

22    Q.    Did you have any training involved with that?

23    A.    That answer is situationally dependent based on the

24   vehicle, the driver, the cooperation of the driver, and any

25   occupants in the car.  I would need more information.

1    Q.   Well, based on that particular situation that you

2  gave us, what were you trained to do under those circumstances?

3    A.   Again, it's completely situationally dependent.  I

4  don't know how to answer that question.

5    Q.   Well, let's take the situation that you encountered.

6    A.   Can you --

7    Q.   Well, you -- you know the circumstances because you

8  stopped.  So under those circumstances, what were you trained

9  to do?

10   A.   Are you referring specifically to the incident that I

11 gave you about the reckless driver?

12   Q.   Correct.

13   A.   Okay.  I got behind the vehicle.  We entered the

14 license plate information into the traffic stop page of the

15 computer automated dispatch.  I activated my lights and siren.

16        That specific vehicle pulled over and was compliant.

17 There was only one occupant in the car.  I had approached him

18 and I identified who I was, my agency, the reason for the

19 stop.  I asked for his information and asked why he was

20 speeding.

21   Q.   Okay.  Anything else --

22   A.   That --

23   Q.   -- you were trained to do?

24   A.   That's correct.

25   Q.   That's it?

1  A. That's what I was trained to do.

2  Q. Okay.  Let's direct your attention then to the

3 incident on January the 9th of 2021.

4   Do you recall that, sir?

5  A. Yes, ma'am.

6    THE WITNESS:  Ms. Askew, is it okay if we take a

7    bathroom break?

8    MS. ASKEW:  Oh, absolutely.

9    THE VIDEOGRAPHER:  We're going off the video

10    record at 11:10 a.m.

11  (Off the record.)

12    THE VIDEOGRAPHER:  This marks the beginning of

13    media number 2.  We're back on the video record at

14    11:17 a.m.

15 BY MS. ASKEW:

16  Q. All right.  Are you ready, Trooper Layton?

17  A. Yes, ma'am.

18  Q. All right.  Let's look at -- let's direct your

19 attention to January 9, 2021, somewhere on that -- on that

20 occasion.  Now, prior to -- did you -- on that evening, you

21 were on evening duty, were you -- what was your -- when did

22 your shift begin?

23  A. I was on midnight shift and that shift began at

24 10:00 p.m.

25  Q. Okay.  And how did that work?

1           Did you have to meet Trooper Bone?

2      A.   Yes, ma'am.

3      Q.   Okay.  And did you both have cars that were assigned

4  to you?

5      A.   Yes, ma'am.

6      Q.   All right.  And did you decide -- you or Trooper Bone

7  decide what car you were going to take that night?

8      A.   I don't remember who decided what car we were going

9  to take.

10     Q.   Okay.  Where did you meet Trooper Bone?

11     A.   I don't remember, ma'am.

12     Q.   All right.  Do you remember what car?

13          Was it yours or was it Trooper Bone's?

14     A.   It was mine.

15     Q.   All right.  And where was your vehicle when you came

16 on duty?

17          Is it one that you take home or was it stationed

18 somewhere?

19     A.   It was my assigned vehicle so I took it home every

20 night.

21     Q.   All right.  So you had it when you left and went on

22 duty at 10:00 o'clock or was it 12:00 o'clock?

23     A.   I'm sorry?

24     Q.   What time did you get on duty?

25          Did you say 10:00?

1    A.    Yes, ma'am.

2    Q.    Okay.

3    A.    It started at 10:00.

4    Q.    I'm sorry.  I didn't remember.

5          So you went on duty at 10:00.  You already had your

6    vehicle?

7    A.    Yes, ma'am.  I brought it home with me.  It was

8    assigned to me.

9    Q.    All right.  So where did you go when you left with

10   your vehicle?

11   A.    I don't remember exactly where I went on that night.

12   Q.    So how did Trooper Bone get to get in your vehicle?

13   A.    Typically, we met at the area office, but I don't

14   remember exactly where we met on the night of January 9th.

15   Q.    All right.  So, routinely, tell me what you would do.

16   A.    Routinely, we would meet each other at the area

17   office fairly close to the beginning of shift, whether that was

18   before or at the beginning of shift.

19   Q.    Okay.  And then what would you do?

20   A.    It completely depended on the shift, if we had

21   pending calls, if we had paperwork to catch up on.  It was very

22   dependent.

23   Q.    Did you have pending calls on this occasion?

24   A.    I don't remember.

25   Q.    Did you have paperwork to do on this occasion?

1     A.   I also don't remember.

2     Q.   All right.  So you don't remember how Trooper Bone

3 got into your vehicle?

4     A.   I don't remember where we met up that night.

5     Q.   All right.  So it could have been you could have

6 picked him up at his house?

7     A.   Again, ma'am, I don't remember where we met up that

8 night.

9     Q.   All right.  So you say it could have been anywhere.

10 He could have been waiting on the interstate for you.

11         You don't recall?

12     A.   I don't remember where I picked up Trooper Bone that

13 night.

14     Q.   Okay.  But you do remember you picked him up?

15     A.   I mean, I remember that we were driving my car that

16 night.

17     Q.   Well, you remember him sitting next to you?

18     A.   That's correct.

19     Q.   Do you remember -- you don't remember how he get in

20 that seat.  You just remember him sitting next to you?

21     A.   Yes, ma'am.

22     Q.   Okay.  And what time do you remember him sitting next

23 to you?

24     A.   The entire shift after we were together.

25     Q.   Okay.

1    A.    I drove the entire night.

2    Q.    You drove the entire night.

3          Do you remember where you drove from?

4    A.    No, ma'am.

5    Q.    You don't remember where you drove from.

6          Do you remember how you got to the interstate on I-64

7    near 177 mile?

8    A.    Can you explain what you mean by how I got there?

9    Q.    Well, I'm assuming you drove, right?

10   A.    Yes, ma'am.

11   Q.    Well, how did you drive there?

12         What route did you take to get there?

13   A.    Westbound I-64.

14   Q.    Okay.  And was Trooper Bone in the car at that point

15   before you drove to the crossover on I-64 near the 177 mile

16   marker?

17   A.    Yes, ma'am.

18   Q.    Okay.  Did you all have any other duties prior to

19   getting to that point?

20   A.    Yes, ma'am.

21   Q.    What were they?

22   A.    Other duties that we do in patrol are checking on the

23   road that we're assigned to that day, checking for disabled

24   vehicles, occupants that may be stranded on the -- on the

25   shoulder.  That's what I remember that night.

1    Q.   All right.  Do you remember any stranded vehicles?

2    A.   No, ma'am.  I don't recall any specific stranded

3  vehicles.

4    Q.   Do you remember having any other assignments or any

5  calls prior to arriving at that location at I-64 near the

6  177 mile marker?

7    A.   No, ma'am.  I don't remember.

8    Q.   All right.  Once you reached the I-64 near the

9  177 mile marker, how long were you there prior to this

10  incident?

11    A.   I don't remember exactly how long.

12    Q.   Do you remember having any other vehicles that you

13  stopped?

14    A.   No, ma'am.

15    Q.   Do you remember anything other than this incident

16  involving the Mercedes?

17    A.   No, ma'am.

18    Q.   Do you remember having any conversations with

19  Trooper Bone prior to this incident?

20    A.   No, ma'am.  I don't remember.

21    Q.   Do you remember whether you were awake or sleep while

22  you were sitting at this marker?

23    A.   Awake.

24    Q.   You do remember being awake?

25    A.   Yes, ma'am.

1    Q.   You don't remember anything else?

2    A.   I'm -- I'm sorry?

3    Q.   Do you remember anything else other than that you

4  were awake?

5              MR. BROWN:  Objection.  Form.

6              THE WITNESS:  I mean, ma'am, we do a lot every

7         single night from regular field training,

8         paperwork, to checking on our assigned road,

9         assisting other units on calls, so, no, I don't

10         remember the specifics of that night other than this

11         incident.

12  BY MS. ASKEW:

13    Q.   So you don't remember anything other than his

14  incident?

15              MR. BROWN:  Objection.  Form.

16  BY MS. ASKEW:

17    Q.   I mean, other than that you were awake?

18              MR. BROWN:  Objection.  Form.

19  BY MS. ASKEW:

20    Q.   Is that correct?

21    A.   Again, we do a lot every night, so other than this

22  incident on January 9th of 2021, then, no, I don't.

23    Q.   Do you remember having conversations with

24  Trooper Bone?

25              MR. BROWN:  Objection.  Form.

1        THE WITNESS:  No, ma'am.  I don't remember.

2   BY MS. ASKEW:

3        Q.    You don't remember any conversa- -- was he awake?

4        A.    Yes, ma'am.

5        Q.    Okay.  Do you remember whether you had coffee?

6        A.    I'm sorry?

7        Q.    Do you remember whether you had coffee?

8        A.    No.

9        Q.    Whether you were drinking coffee?

10       A.    No, ma'am.

11       Q.    Do you remember whether you had a meal?

12       A.    No, ma'am.

13       Q.    Do you remember whether Trooper Bone had coffee?

14       A.    No, ma'am.

15       Q.    Do you remember whether he ate anything?

16       A.    No, ma'am.

17       Q.    Do you remember stopping anybody who went through

18  your radar when you were on the crossover on I-64 near 177 mile

19  marker?

20       A.    No, ma'am.

21       Q.    Do you remember whether it was raining?

22       A.    It was not raining.

23       Q.    It was not raining.

24             All right.  Do you remember whether it was snowing?

25       A.    It was not snowing.

1     Q.   Do you remember whether you had to write any tickets

2  that night for any individuals who had committed traffic

3  infractions?

4     A.   No, ma'am.

5     Q.   You don't remember or you didn't write any?

6     A.   I don't remember.

7     Q.   So you could have, you just don't recall?

8     A.   Yes, ma'am.

9     Q.   All right.  So while you were operating stationary

10  radar in this crossover on I-64 near the 177 mile marker, how

11  was your vehicle?

12     Where was it facing, in what direction?

13     A.   My vehicle was facing eastbound.

14     Q.   All right.  And did you have your radar set up?

15     A.   Yes, ma'am.

16     Q.   All right.  And had it been calibrated prior to this

17  point?

18     A.   It had been tested.

19     Q.   All right.  And so you then have a -- you're sitting

20  in the driver seat, correct?

21     A.   Yes, ma'am.

22     Q.   Trooper Bone's in the passenger seat.

23     He's in the front or the back?

24     A.   He's in the front.

25     Q.   All right.  And then you observed a Mercedes that's

1  traveling in -- on the highway that then --

2          What did you do when you observed this Mercedes?

3      A.    I activated the front antenna of my radar set.

4      Q.    Okay.  Were there other cars that were before this

5  Mercedes?

6      A.    Yes, ma'am.

7      Q.    Were there any after this Mercedes?

8      A.    Yes, ma'am.

9      Q.    You remember that?

10     A.    Yes, ma'am.

11     Q.    Okay.  Good.

12          And so what did you do after you then set up your

13  antenna?

14          What did you do after that?

15     A.    I'm sorry.  After I, you mean, activated the front

16  antenna of the radar?

17     Q.    Correct.  Yes.

18     A.    I observed the speed of the Mercedes in the target

19  window of my radar set.

20     Q.    And what did you observe?

21     A.    I observed an increasing speed from 92 miles per hour

22  to 96 miles per hour.

23     Q.    All right.  And then what did you do?

24     A.    I waited for that vehicle to pass through the target

25  window of my radar set and pass me, obviously, after I made a

1  visual estimation of speed that was consistent with that speed

2  and, yeah.

3      Q.  All right.  And what do you mean when you say you

4  made a visual estimation of speed?

5      A.  Yes, ma'am.

6          So I visually observed the speed.  I estimated that

7  speed in my head and then activated the front antenna of my

8  radar set.

9      Q.  All right.  And where does your training teach you to

10  visually estimate a speed?

11      A.  You do that in radar training.

12      Q.  All right.  And when did you get radar training?

13      A.  I had gotten multiple different versions of radar

14  training at that point.  I received one through the Richmond

15  City Police Department, which was a week, and then another week

16  through the Virginia State Police before this.

17      Q.  All right.  And your radar training in the City of

18  Richmond, did that entail radar through the streets of

19  Richmond, or did it also entail -- well, did it entail the

20  streets of Richmond in terms of your radar?

21              MR. BROWN:  Objection.  Form.

22              THE WITNESS:  I'm sorry.  Could you --

23  BY MS. ASKEW:

24      Q.  Your training, did that involve your training for

25  radar in the inner-city streets when you were with the City of

1  Richmond Police Department?

2       A.   Yes, ma'am.

3       Q.   Okay.  And then you had a week training of that; is

4  that correct?

5       A.   Yes, ma'am.

6       Q.   All right.  And then when you became a state trooper,

7  your training then was for a week of radar with the Virginia

8  State Police Department?

9       A.   Yes, ma'am.

10      Q.   When was that?

11      A.   It was the week after we graduated.

12      Q.   And when was that?

13      A.   I don't remember the exact date.  I can roughly

14  estimate if that's --

15      Q.   Sure.

16      A.   It would have been the end of November or beginning

17  of December of 2020.

18      Q.   2020.  Okay.

19           So is that when you graduated, November 2020?

20      A.   Yes, ma'am.

21      Q.   Okay.  And so was this your first radar setup or

22  you -- after you graduated?

23      A.   I don't --

24           MR. BROWN:  Objection.  Form.

25           THE WITNESS:  I don't remember, ma'am.

1  BY MS. ASKEW:

2      Q.   You don't remember?  All right.

3           All right.  So --

4           All right.  After then you visually -- then what did

5  you do after that?

6      A.   I'm sorry.  Could you elaborate?

7      Q.   After you say you visually observed and estimated the

8  speed, then what did you do?

9      A.   I activated the front antenna of my radar set.

10     Q.   All right.  And after you did that, what did you do?

11     A.   I observed the vehicle traveling in the target window

12 of my radar from 92 miles per hour to an increase speed of

13 96 miles per hour as it approached me.

14     Q.   And then what did you do?

15     A.   I waited for the vehicle to pass through the target

16 window of my radar set.

17     Q.   Okay.  And then what did you do?

18     A.   I had to wait for two other vehicles behind it that

19 were traveling the speed limit and then turned on the

20 headlights of my car.

21     Q.   All right.  And then what did you do?

22     A.   After those other vehicles had passed through, there

23 was no one else behind.  It was safe for me to pull out into

24 the interstate, so I pulled out onto the interstate.

25     Q.   And then what did you do?

1    A.    I had to pass -- there's other vehicles going the

2  speed limit -- in order to catch up to the Mercedes.

3    Q.    How did you pass those?

4    A.    I don't quite understand your question.

5    Q.    Well, what did you do to pass it?

6    A.    I believe I had to pass them on the right.  I'm not

7  sure if that's what you're asking, ma'am.

8    Q.    Yeah.  Just which lane were you traveling in the

9  passing?

10   A.    I don't remember.

11   Q.    You don't remember which lane?

12   A.    I don't remember what lane the other two vehicles

13 were in.

14   Q.    Okay.  Were they both in the same lane?

15   A.    I don't remember, ma'am.

16   Q.    All right.  So you don't remember how you passed

17 them, the other two vehicles?

18   A.    Correct.

19   Q.    You say you had to pass them, but you don't remember

20 how?

21   A.    Again, I believe I had to pass them on the right.

22   Q.    Meaning that you were in the right lane?

23   A.    I believe so.

24   Q.    You believe, but you don't remember?

25   A.    Yes, ma'am.

1    Q.   Okay.  Yes, ma'am, you don't remember?

2    A.   Correct.

3    Q.   Okay.

4        So -- all right.  So you're getting past these two

5 vehicles that are doing the speed limit.

6        Then what do you do?

7    A.   After I had passed those vehicles, I was able to

8 catch up to the Mercedes.

9    Q.   Okay.  How long did it take you to catch up to the

10 Mercedes?

11    A.   I don't remember, ma'am.

12    Q.   All right.  Did you have -- did you -- did you have

13 a --

14        What do you call it?

15        -- a dash cam video in your car?

16    A.   Yes, ma'am.

17    Q.   All right.  Was that on?

18        When you first entered the intersec- -- the

19 interstate, was that on?

20    A.   The dash cam was actually manually activated by

21 Trooper Bone, I believe, about ten seconds after we pulled out

22 onto the interstate.

23    Q.   Ten seconds after you pulled out.

24        Do you remember that, ten seconds?

25    A.   I said I believe, roughly, ten seconds.

1    Q.    Okay.  And that was done by Trooper Bone?

2    A.    Yes, ma'am.

3    Q.    All right.  And then what did you do after that, you

4  driving?

5    A.    Correct.  Do you mean after I -- or after

6  Trooper Bone turned the camera on?

7    Q.    Yes.

8    A.    Trooper Bone activated the camera while I was still

9  trying to catch up to the vehicle.

10    Q.    Okay.  And how long did it take you --

11    A.    Again, ma'am --

12    Q.    -- to catch up to the driver?

13    A.    -- I don't remember.

14    Q.    You don't remember how long it took you?

15    A.    Yes, ma'am.  That's correct.  I just said -- I just

16  said that twice.

17    Q.    Okay.  Thank you.

18          So when you caught up with the vehicle, were you able

19  to identify the license plate on the vehicle?

20    A.    Not initially.  No, ma'am.

21    Q.    All right.  Then who is responsible for that, you or

22  Trooper Bone, to get the license plate number?

23    A.    I don't believe that responsibility is delegated

24  specifically to one person.

25    Q.    Okay.  So you can see it when you're driving a

1  license plate number?

2      You can get it while you're driving?

3      A.   Sure.

4      Q.   Okay.  Now, do you know how long -- you're saying you

5  don't know how long it was before you were able to secure the

6  number on the license plate?

7      A.   No, ma'am.  I remember -- after following the vehicle

8  for a little bit, Trooper Bone asked me to get closer to get

9  the license plate.

10     Q.   Okay.  And you were able to do that?

11     A.   Yes, ma'am.

12     Q.   Okay.  And so did you get the license plate or did --

13 was it Trooper Bone?

14     A.   I believe that we both got the license plate.

15     Q.   You both got the license plate.

16          All right.  So when you got the license plate, then

17 what did you do?

18     A.   After Trooper Bone entered the license plate in the

19 computer, is that what you're referring to?

20     Q.   Well, I'm asking you what you did.

21          Is that what he did?

22     A.   I was just driving.

23     Q.   So you don't know.

24          You're saying you don't know what Trooper Bone did?

25     A.   No.  I know for -- that Trooper Bone entered the

 1  license plate into our computer automated dispatch.

 2      Q.   Okay.  Thank you.

 3           So he entered it into the computer and did you wait

 4  to hear a response about the license plate in terms of -- were

 5  you not -- when you entered it, what was the purpose of

 6  entering it?

 7                MR. BROWN:  Objection.  Form.

 8                THE WITNESS:  Could you repeat the question,

 9           please?

10  BY MS. ASKEW:

11      Q.   What is the purpose of entering the license plate

12  into the computer?

13           Is it a C-A-D?

14      A.   Our computer automatic dispatch is C-A-D.

15      Q.   Okay.  What's the purpose of entering it?

16      A.   There's several reasons that we have for entering in

17  the license plate of a vehicle.

18      Q.   What are they?

19      A.   So, for example, when you -- on the computer itself,

20  there's a button labeled for traffic stops, right?  So if you

21  click that button, you can enter the location where the traffic

22  stop is and you can also below that enter the license plate of

23  the car.  When you do that, you're required to enter the

24  location.  You're not required by CAD, in order to create the

25  event, to enter the license plate.

1          But we enter the license plate for several reasons:

2   One, for example, if the vehicle takes off and we're not able

3   to catch it.  Another, for example, officer safety purposes, so

4   if something happened to us during our interaction with that

5   vehicle and the vehicle got away, people would be able to know

6   what car we had stopped, but those are the main ones.

7          Q.    What was the purpose of this?

8                Why did you enter it for this time, on this occasion?

9                Was there any particular reason?

10               MR. BROWN:  Objection.  Form.

11               THE WITNESS:  Trooper Bone and I did that on

12               each stop.  I still do that on each stop, but in the

13               example that I gave you about the reckless driver, we

14               did the exact same thing so...

15               We didn't do that specifically for any

16               specific purpose on this stop.  That was standard

17               practice.

18  BY MS. ASKEW:

19         Q.    This stop, meaning the January 9th stop?

20         A.    Yes, ma'am.

21         Q.    All right.  So you didn't have any particular

22  purpose, you're saying, for this stop to enter the license

23  plate number?

24         A.    Yes, ma'am.  It was standard practice to do that.

25         Q.    Just standard.  Okay.

1          Procedurally, were you required to continue to have

2    dialog with the dispatcher when you entered the license plate

3    number?

4               MR. BROWN:  Objection.  Form.

5               THE WITNESS:  I'm not sure what you mean.

6    BY MS. ASKEW:

7         Q.   Well, you procedurally -- well, did your training

8    tell you or teach you that you should under these circumstances

9    continue to have communications with the dispatcher in this

10   case?

11        A.   By dispatcher do you mean the person on the radio?

12        Q.   Yes.

13        A.   No, ma'am.

14        Q.   You're not required to?

15        A.   Excuse me.  Oh, that's correct.  We're not required

16   to do that.

17        Q.   Okay.  Now, when you entered the license plate number

18   in this particular occasion, did you wait to receive anything

19   from -- in response regarding the license plate?

20        A.   No, ma'am.

21        Q.   You didn't?

22        A.   Correct.

23        Q.   Okay.  So what did you do then after the license

24   plate number was entered?

25             You were driving.

1          What are you doing as the driver?

2     A.   I activated the light bar on the top of the car with

3 flashing blue lights and takedown lights simultaneously.

4     Q.   Okay.  And then you -- then what did you do after you

5 activated your lights and siren?  I guess that's --

6     A.   I didn't initially activate the siren.  I activated

7 the light bar and takedown lights and proceeded to follow the

8 vehicle.

9     Q.   Okay.  And how long did you follow the vehicle?

10    A.   I don't recall exactly how long.

11    Q.   You don't recall.  Okay.

12         And what was Trooper Bone doing during that time?

13    A.   I'm not sure, ma'am.

14    Q.   Were you and Trooper Bone having a conversation while

15 you were following this vehicle?

16    A.   After the lights were turned on, no, ma'am.

17    Q.   You did not.

18         You didn't say anything to each other?

19    A.   I believe at one point after the vehicle had already

20 accelerated speed, I believe Trooper Bone said, "Turn your

21 siren on," but I think it's the only dialog we had to each

22 other.

23    Q.   Okay.  And tell me what happened next.

24    A.   I'm sorry.  In --

25    Q.   After you turned on your siren and lights.

1    A.   Okay.  Well, after I activated the light bar on top

2  of the car and takedown light simultaneously, I followed the

3  vehicle for a matter of seconds, I believe, and then observed

4  the vehicle increase its speed to well over a hundred miles per

5  hour.

6    Q.   Okay.  Do you know the exact speed?

7    A.   I was pacing the vehicle, so I wasn't able to get an

8  exact reading on the vehicle speed.

9    Q.   Okay.  So then what did you do?

10    A.   Trooper Bone told me to turn the siren on.  I reached

11  down and turned the siren on.

12    Q.   All right.  And then what did you do after that?

13    A.   I continued to drive and follow the car.  I narrated

14  a couple of maneuvers that the vehicle did, for example,

15  turning the lights off.  I believe I said, "He's taking off."

16    Q.   Who were you saying that to?

17    A.   I was narrating to the camera.

18    Q.   To the camera.

19         Okay.  So you weren't talking to Trooper Bone?

20    A.   That's correct.

21    Q.   Okay.  And so after -- at that point then what

22  happened?

23    A.   We accelerated to speeds in the 120 miles per hour.

24    Q.   Then tell me how did you know that.

25    A.   My vehicle's speedometer was calibrated and displayed

1  a speed over 120 miles per hour.

2      Q.   Okay.  So then at some point you're saying you were

3  traveling at a high rate of speed.  You couldn't tell, but now

4  you can tell --

5              MR. BROWN:  Objection.

6  BY MS. ASKEW:

7      Q.   -- that it was 120; is that --

8              MR. BROWN:  Objection.  Form.

9  BY MS. ASKEW:

10     Q.   Is that right?

11     A.   Your question earlier was how fast was the other

12  vehicle going, correct?

13     Q.   No.  I asked you how fast were you going in terms of

14  traveling to pace this vehicle.

15          So how fast were you going?

16              MR. BROWN:  Objection.  Form.

17              THE WITNESS:  Okay.  I think I'm confused.  We

18          may need to go back a little bit.

19  BY MS. ASKEW:

20     Q.   No, no, no.  You just follow my lead.  Okay.  I

21  question; you answer.

22          Tell me how fast were you going when you were pacing

23  the vehicle.

24     A.   So, initially, when I was pacing the vehicle, I was

25  pacing between speeds of 93 to 97 miles per hour prior to

lights coming on.

Q.   Okay.  Now, you got your lights on.

     How fast are you going now with your lights on?

A.   With my lights on, we accelerated to speeds over
120 miles per hour.

Q.   All right.  And how do you know that?

A.   My vehicle's speedometer was calibrated.

Q.   Okay.  And you were looking at your speedometer?

A.   Yes, ma'am.

Q.   Okay.  And then what happened after that?

A.   I followed the vehicle for several miles.

Q.   All right.  Now, at this point prior to getting up to
the speed of 120 miles per hour, what were you looking at
stopping the vehicle for?

     What did you observe that the vehicle -- what kind of
crimes or traffic infractions, what did you observe the vehicle
do?

A.   Reckless driving by speed --

Q.   Okay.

A.   -- over 20 miles per hour over the speed limit.

Q.   Okay.

A.   Defective equipment and --

Q.   What was the defective equipment?

A.   Passenger headlight.

Q.   Okay.

1     A.    And suspicion of DUI.

2     Q.    Okay.  What was the suspicion of DUI?

3     A.    I'm sorry?

4     Q.    What was the suspicion of DUI?

5     A.    So as I was pacing the vehicle between speeds of 93

6  and 97 miles per hour, the camera was manually activated by

7  Trooper Bone and I was narrating as the vehicle crossed over

8  the left dotted line into the left lane multiple times and

9  swerving throughout the lane.

10    Q.    Okay.  And so at that point you were looking at

11 potential DUI.  You didn't know whether that existed or not,

12 correct?

13          You didn't know whether he was under the influence at

14 that point.  He was suspicious, correct?

15    A.    Yes, ma'am.  We were just observing pre-stop

16 indicators of DUI.

17    Q.    All right.  So now what are your pursuit policies

18 with those -- what you're suspicious of and with the reckless

19 driving, what are your pursuit policies in pursuing a vehicle

20 that is traveling at that rate of speed?

21    A.    I'm sorry, ma'am.  You asked two different questions.

22          Could you repeat?

23    Q.    What is your pursuit policy under the circumstances

24 where you observed this Mercedes driving with one headlight

25 out, high rate of speed, which you said reckless driving, and

1  suspicious of driving under the influence, what are your

2  pursuit policies in that regard?

3      A.   We can pursue vehicles for those reasons.

4      Q.   All right.  Is there any cutoff point with reference

5  to how fast you can go to pursue the vehicle?

6      A.   Not to my knowledge.

7      Q.   So if your vehicle goes up to 200 miles an hour, you

8  can still pursue this vehicle?

9      A.   My vehicle would not go up to 200 miles per hour.

10     Q.   I understand.

11          How fast does it go?

12     A.   131 miles per hour.

13     Q.   All right.  So you got to stop at 131.

14          If he takes off, you can't catch them at 131.  That's

15  it.  That's as fast as your vehicle goes?

16     A.   The vehicle I had at the time, yes, ma'am.

17     Q.   Okay.  Are there some that go faster than that?

18     A.   I'm sorry?

19     Q.   Some police cruisers that you're aware of that go

20  faster than 131?

21     A.   Yes, ma'am.

22     Q.   Okay.  But yours is 131?

23     A.   The one I had at the time was 131.

24     Q.   Okay.  Well, with your policies now and would you --

25  did you -- would you pursue -- did you consider that at the

1  point where he was doing 120, what does that tell you?

2      Was that a pursuit based on your policies?

3      A.   I'm sorry.  Could you please repeat the question?

4      Q.   When he was traveling at, you said, 120 miles per

5  hour based on your looking at your vehicle, you were traveling

6  at 120, was that a pursuit in your mind?

7      A.   We had already called a pursuit over the radio.

8      Q.   Had you called it a pursuit into dispatch?

9      A.   Yes, ma'am.

10     Q.   Okay.  And who called that in?

11     A.   Trooper Bone.

12     Q.   Bone called that in.

13          All right.  Did you continue to have dialog with the

14  dispatcher during that pursuit?

15     A.   I did not.  Trooper Bone --

16     Q.   Trooper Bone?

17     A.   -- was on the ra- --

18     Q.   Did you hear what he was saying?

19     A.   Again, I did not.  Trooper Bone was the one

20  communicating over the radio.

21          What was your question?

22     Q.   No.  I'm going to try to slow it down a little bit

23  for you.

24          I want to know if you heard what Trooper Bone was

25  saying to the dispatcher.

1      A.   No, ma'am.  The wind was too loud going 120-something

2  miles per hour.

3      Q.   What was -- what was too loud?

4      A.   The wind.

5      Q.   The wind.  Okay.

6      Explain that to me, the wind.

7      A.   When driving 120 miles per hour in a police car with

8  a light bar on top of the car, a spotlight, several antennas,

9  it's very, very loud inside the car.

10      Q.   Okay.  So you couldn't hear what Trooper Bone was

11  saying?

12      A.   At the time Trooper Bone called the pursuit, we

13  hadn't reached the speed of 120 miles per hour yet, so I heard

14  him call the pursuit, but after that, I couldn't hear him.

15      Q.   Okay.  So could you -- you didn't know whether he was

16  telling them that the speed had accelerated and -- at all

17  beyond the 97?

18      A.   I'm sorry.  I don't quite understand.

19      Q.   Well, let me see if I understood you.

20      When -- at what speed did you hear Trooper Bone call

21  in to dispatcher about the speed or about the pursuit?

22      A.   It was when we were still accelerating.

23      Q.   Okay.  So as you were accelerating, do you have a

24  policy that you should continue to communicate with dispatcher?

25      A.   I mean, I'm not sure.  I don't know what --

1    Q.   You don't know if you do?

2    A.   I'm not sure what you mean by that.

3    Q.   Well, if you're pursuing a vehicle, do you have a

4  policy that you are to comply with that indicates that you

5  should have continuing communications with the dispatcher?

6    A.   I'm not entirely sure what you mean by that.  I'm

7  trying to answer your question here.  I know that I could hear

8  the radio chirp when Trooper Bone activated the -- the

9  microphone, if that makes sense.  You can -- I could hear that

10  because we had our radio turned all the way up.

11    Q.   Okay.

12    A.   But I wasn't able to hear the specific words that

13  Trooper Bone was saying after we had reached speeds of

14  120 miles per hour.

15    Q.   Okay.  So is it your rec- -- can you tell me what you

16  recall?

17        How long did this chirp last when Trooper Bone first

18  called in the pursuit?

19    A.   The -- the chirp on the radio is very quick.  It's

20  less than a second long.

21    Q.   Is it continuous or does it stop?

22    A.   It's -- it's kind of three -- I think three -- it's

23  several different little beeps, if that makes sense.

24    Q.   Okay.  Do you recall it stopping?

25    A.   It only -- it only chirps when the person with the

 1  microphone for the radio pushes the talk button.  It doesn't

 2  chirp again when the microphone button is released.  It only

 3  chirps when the button is actually pushed for the first time.

 4      Q.   All right.  So if Trooper Bone stops, then do you

 5  hear anything, stops communicating with the dispatcher?

 6      A.   No, ma'am.  It only chirps when the button is pushed.

 7      Q.   Okay.  So let me see if I understand what you're

 8  saying.

 9      A.   Sure.

10      Q.   If you push the button, right, it chirps as long as

11  the button is pushed.  Is that what you're saying?

12      A.   No, ma'am.

13      Q.   Okay.  So it just chirps -- tell me what you said.

14      A.   The radio itself only chirps when the microphone

15  button is initially pushed.

16      Q.   Okay.  So it won't chirp ever again?

17      A.   Not during the same radio transmission.

18      Q.   Okay.  So you heard the chirp.

19           Did you hear Trooper Bone talking other than the

20  first time that he calls in the pursuit?

21      A.   No, ma'am.  I couldn't hear his dialog, but I heard

22  the chirping indicating that he keyed up on the radio several

23  times while we were chasing the car.

24      Q.   So you couldn't hear him say anything?

25      A.   That's correct.  All I could hear was the chirping

1    several times while we were in pursuit of the vehicle.

2        Q.    Okay.  Now, I recall hearing something like a

3    "whooo."

4            Do you know what that was?

5            Do you recall that?

6        A.    So what I believe that you're talking about -- are

7    you talking about before the lights were activated?

8        Q.    I don't know when it was.

9            Do you recall?

10       A.    The only thing that I recall that even remotely

11   reassembles that sound is when Trooper Bone manually activated

12   the camera when we initially pulled out onto the interstate and

13   when we were trying to catch up to the vehicle by overtaking

14   those other cars.  Trooper Bone was recreating the sound of the

15   audible Doppler tone of the radar set as -- as the vehicle came

16   towards us at an increasing speed.

17       Q.    Okay.  And what is that sound?

18       A.    I'm sorry?

19       Q.    What is the sound of the radar?

20       A.    The audible Doppler tone.

21       Q.    Okay.  And what is that sound?

22       A.    So when -- I'm sorry.  I'm trying to figure out how

23   to explain this the best way.

24            When I'm recording speed on a vehicle, I have to

25   visually estimate the speed.  I then activate the antenna of

1   the radar set.  Typically, there's one in the front and one in

2   the rear of the car, and I have to manually activate which

3   antenna I'm trying to use.

4           Then after that antenna is activated, the radio waves

5   leave the antenna in a cone formation and then as radio waves

6   come back to the antenna after bouncing off of an object, the

7   environment, whatever it is, then it will -- if it's recording

8   the speed of a vehicle, will produce a number in the target

9   window or the fastest window depending on how many cars are on

10  the roadway.

11          And the radio -- the radar set will also put out an

12  audible Doppler tone.  And that audible Doppler tone, if it's a

13  consistent sound, then that means that you're accurately

14  reading your vehicle.  If the sound is broken up or sounds like

15  TV static, for example, then it's not a very good read on a

16  car.

17      Q.   How --

18      A.   However -- excuse me.

19      Q.   Go ahead.  I'm sorry.  I don't mean to interrupt.

20           Go ahead.

21      A.   As a vehicle is approaching and as it's increasing

22  speed, the Doppler town -- excuse me -- the Doppler tone

23  creates a deeper to higher pitch sound as the speed goes up in

24  a target window.

25      Q.   Do you remember what the sound was like on this

1  occasion?

2       A.   Yes, ma'am.

3       Q.   What was it?

4            Can you tell us -- I mean, can you -- can you --

5       A.   It was a deep sound, a deeper sound --

6       Q.   Uh-huh.  Yeah.

7       A.   -- that increased to a higher pitch noise.

8       Q.   Can you demonstrate what it is?

9       A.   Sure.  It's --

10      Q.   Yeah.  Yeah.

11      A.   It's -- it goes from "boooo."

12      Q.   Okay.

13      A.   I'm trying to --

14      Q.   Was it just like that or was it high?

15      A.   No, ma'am.  It was really high, but I can't -- I

16  can't recreate that.

17      Q.   But you can't do it because your voice is too deep?

18      A.   Yeah.

19      Q.   Okay.

20      A.   Yes, ma'am.  It's very -- it was high.

21      Q.   Okay.  So was that Trooper Bone that we heard, not

22  you?  It was him?

23      A.   Yes, ma'am.

24      Q.   Okay.  Fair enough.

25           (Ms. Benton leaves the deposition.)

1          All right.  And you don't know that whether or not

2   Trooper Bone was still on with dispatch?

3          Is that safe to say?

4      A.   I'm sorry.  What are you talking about?

5      Q.   His -- my question before we got to the "woo-woo"

6   part, my question was, do you know whether or not Trooper Bone

7   was still having communications with the dispatch?

8      A.   That was well before -- that was still while we were

9   catching up to the car.

10     Q.   Okay.  So after you got the license plate -- my

11  question is, was there any interaction after that, any

12  communications with dispatch after you got the license plate?

13     A.   There was no communication with dispatch until after

14  the license plate was already entered in the computer.

15     Q.   I thought that's where we are.  So we're talking

16  about the dispatch after you got the license plate.

17          Was there continuous communications with dispatch?

18          Do you recall?

19     A.   I'm sorry.  I'm a little bit confused.  There was no

20  communication with dispatch until after we had already caught

21  up to the vehicle and --

22     Q.   We got that.

23     A.   -- had entered the license plate.

24     Q.   I'm there with you.

25     A.   Okay.  Sorry.

1     Q.    Was there continuous communications with dispatch at

2  that point?

3     A.    While we were behind the vehicle, I told you that I

4  could hear the radio chirping several times indicating that

5  Trooper Bone was trying to talk on the radio, so from what I

6  could tell, yes.

7     Q.    So what you could tell, there was continued

8  communications by Trooper Bone with dispatcher?

9     A.    As far as I could hear with the chirping of the radio

10  indicating that Trooper Bone was trying to talk on the radio.

11     Q.    Was there any communications back from dispatch to

12  Trooper Bone or to you?

13     A.    The only thing I could hear from dispatch was him

14  saying "10-4."

15     Q.    That he received it?

16     A.    I believe that it was -- it was in response to one of

17  Trooper Bone's radio transmissions.

18     Q.    Okay.  But you don't know what he was saying to

19  Trooper Bone?

20     A.    I'm sorry?

21     Q.    You don't remember or you do -- the only thing you

22  heard was a 10-4?

23     A.    Yes, ma'am.

24     Q.    Okay.  You didn't hear anything else?

25     A.    I don't recall anything else.

1      Q.   Okay.

2           All right.  So after then you caught up with the

3      vehicle.  The vehicle was traveling at a high rate of speed.

4           Then what happens?

5      A.   We caught up to the vehicle.  It was traveling

6      between speeds of 93 and 97 miles per hour, which I recorded on

7      the calibrated speedometer, and then I activated the lights.

8      Q.   We're beyond that, Trooper.

9           We're now at the point where you're saying it's up

10     to 120.  Yours doesn't go but to 131.  Okay?  So we're now up

11     to -- beyond that to a hundred -- you say at 120.

12          What happens after that?

13     A.   I followed the vehicle for some time.

14     Q.   For some time.

15          Do you know how long?

16     A.   I don't recall exactly how long I was in pursuit of

17     the vehicle for.

18     Q.   Okay.  Then what happened after you were in pursuit?

19     A.   I followed the car for an amount of time that I don't

20     exactly recall and then I observed the vehicle still traveling

21     into other lanes while driving at an extremely high rate of

22     speed after having the headlights and rear lights turned off of

23     the car.  And then I observed the vehicle pull over to the

24     right shoulder of the -- of the interstate.

25     Q.   Okay.  And then what did you do?

1      A.    I followed the vehicle onto the right shoulder of the
2  interstate.

3      Q.    All right.  And then what did the vehicle do?

4      A.    The vehicle then made an abrupt left turn, appearing
5  to be a U-turn in the middle of the interstate, driving
6  perpendicular to oncoming traffic, and I tried to turn left to
7  maybe get in front of that car, if they were able to make a
8  successful U-turn.

9      Q.    Can you describe that?

10           You're trying to get in front of the car.

11           What did you do with your vehicle?

12     A.    Yes, ma'am.  So I followed the vehicle onto the right
13  shoulder as the vehicle was driving perpendicular to oncoming
14  traffic by making an abrupt left turn to go towards a U-turn.
15  I pulled my car off at a 45-ish degree angle to try to get in
16  front of the car if they were able to successfully complete a
17  U-turn into oncoming traffic.

18     Q.    Okay.  So your goal was to keep it from getting
19  into -- assuming that that's what he was trying to do -- to get
20  into the oncoming lane going in the opposite direction, so you
21  pulled your vehicle in both the lanes to prevent that?

22           Is that what you're saying?

23     A.    I had multiple reasons for trying to take up both
24  lanes, but one main reason for the position of my vehicle was
25  because in case he was able to successfully make a U-turn, I

1  did not want him driving into oncoming traffic.

2      Q.   Okay.  So you put -- you stopped your vehicle there

3  and then what happened with his vehicle?

4      A.   The -- his vehicle then went into the grassy

5  embankment and it look like it had gotten stuck.  The wheels

6  were still spinning, but the car wasn't going anywhere.

7      Q.   Okay.  Now, you stopped your vehicle there where

8  it -- did it -- well, let me show you the picture, so I guess

9  we can do that.

10          MS. ASKEW:  Can you mark this?

11      (Plaintiff's Exhibit No. 1 marked for identification.)

12  BY MS. ASKEW:

13      Q.   All right.  I'm going to show you Plaintiff's Exhibit

14  Layton 1.

15          Is that where you stopped your vehicle?

16      A.   Yes, ma'am.

17      Q.   And that's where you initially stopped as he made --

18  the Mercedes made the -- what you thought was a U-turn and then

19  got stuck in the embankment?

20      A.   Yes, ma'am.

21      Q.   Okay.  Now, did you move your vehicle at all after

22  that point?

23      A.   No, ma'am.

24      Q.   Okay.  Did you and Trooper Bone have a discussion

25  about your vehicle being placed there?

1      A.    I'm sorry.  When -- when --

2      Q.    You stopped the vehicle.  Prior to stopping it there

3   where it's located, did you and Trooper Bone have a discussion

4   about the vehicle?

5      A.    About where I parked it?

6      Q.    Yes.

7      A.    No, ma'am.

8      Q.    Okay.  And did you and Trooper have a discussion

9   about whether or not you should keep it there or move it?

10     A.    No, ma'am.

11     Q.    All right.  So once the vehicle got stuck, what did

12  you and Trooper Bone do?

13                  MR. BROWN:  Objection.  Form.

14                  THE WITNESS:  Well, I had already activated the

15             takedown lights of the light bar from -- of my police

16             vehicle, so I already had two floodlights pointing

17             directly at the other vehicle and Trooper Bone and I

18             then exited the marked police vehicle.

19  BY MS. ASKEW:

20     Q.    All right.  Did you and Trooper Bone discuss or have

21  a plan -- discuss a plan before you and Trooper Bone exited the

22  vehicle?

23     A.    No, ma'am.

24     Q.    Did Trooper Bone say anything to you at all before

25  exiting the vehicle?

1          A.   Yes, ma'am.

2          Q.   What did Trooper Bone say to you?

3          A.   I started to get out of the vehicle and the siren was

4     still on so Trooper Bone said, "Hey, cut the siren off."

5          Q.   Okay.

6          A.   So I hit it.

7          Q.   Did Trooper Bone say anything else to you?

8          A.   No, ma'am.

9          Q.   Did you say anything to Trooper Bone?

10         A.   I don't believe so.

11         Q.   Who got out of the vehicle first?

12         A.   We got out of the vehicle at the same time.

13         Q.   You both got out of the vehicle at the same time.

14              All right.  And so what was in your mind when you got

15    out of the vehicle?

16         A.   I'm sorry.  I don't quite understand.

17         Q.   What were you thinking when you got out of the

18    vehicle?

19         A.   I -- I don't exactly know how to answer that

20    question.

21         Q.   You don't remember what you were thinking?

22         A.   I mean, I remember thinking a lot at that very

23    particular moment.

24         Q.   I understand.

25              Were you excited?

1    A.    Again, I don't quite understand what you mean.

2    Q.    You don't know what "excitement" means?

3    A.    I don't -- I don't quite understand what you mean by

4    excited.

5    Q.    Were you scared?

6    A.    No, ma'am.

7    Q.    Did you think that this person in this vehicle -- did

8    you know who he was?

9    A.    No, ma'am.

10   Q.    Did you know whether it was a he or a she?

11   A.    During the U-turn maneuver, he was perpendicular to

12   traffic, and I was able to see that it was a male.

13   Q.    Could you say whether it was a black male or a white

14   male?

15   A.    I don't remember.

16   Q.    You don't remember in your statement saying that you

17   could see it was a black male?

18   A.    No, ma'am.  I don't remember that but...

19   Q.    You don't remember saying that?

20         You don't?

21   A.    That's what I just said, ma'am.

22   Q.    All right.  Well, the answer is yes or no, not to

23   argue with me.  Okay?

24         So you don't remember?

25         All right.  So you could see it was a male.

1          Could you see anything else in the vehicle?

2     A.   No, ma'am.

3     Q.   All right.  And did you have any information from

4 dispatch about the vehicle at all?

5          For example, did you have information that the

6 vehicle may or may not have been stolen?

7     A.   No, ma'am.

8     Q.   Did you have information about how old the victim

9 was?

10    A.   I'm sorry?

11    Q.   How old the person who was in the vehicle, did you

12 receive any information about his age?

13    A.   No, ma'am.

14    Q.   Did you receive any information about whether or not

15 he was armed?

16    A.   No, ma'am.

17    Q.   Did you know whether or not he was armed?

18    A.   I had no affirmative belief that the occupant was

19 armed.

20    Q.   Okay.  When you and Trooper Bone exited your vehicle

21 and approached the vehicle that was stuck, you had your weapons

22 drawn, correct?

23    A.   Yes, ma'am.

24    Q.   Did you look at Trooper Bone before you drew your

25 weapon, or did you both draw your weapon, or did you

1 independently draw your weapon?

2     A.   I independently drew my weapon.

3     Q.   Okay.  So you didn't have a conversation with

4 Trooper Bone about drawing your weapon.  You just drew it

5 yourself?

6     A.   That's correct.

7     Q.   Okay.  And so the two of you simultaneously get out

8 the car and you and Troop- -- and Trooper Bone had his weapon

9 drawn, correct?

10     A.   Yes, ma'am.

11     Q.   All right.  So you both approached this vehicle and

12 you don't know who it is.  You don't know anything about the

13 vehicle.

14          What did your training tell you the kind of stop this

15 was?

16               MR. BROWN:  Objection.  Form.

17               THE WITNESS:  Could you repeat that question,

18          please?

19 BY MS. ASKEW:

20     Q.   What kind of stop was this?

21          Was it unknown?

22          Was it a traffic stop?

23          Was it a felony stop?

24          What was it?

25     A.   It was a high-risk or unknown risk stop.

1    Q.   Okay.  Fair enough.

2         All right.  So what are you taught -- what kind of

3    training did you receive for high-risk traffic stops?

4    A.   I'm not quite sure how to answer that question.

5         Could you be a little more specific?

6    Q.   Yes.

7              MR. BROWN:  I also have to object to the form.

8    BY MS. ASKEW:

9    Q.   What training did you receive from the Virginia State

10   Police regarding high-risk car stops?

11   A.   Every training scenario that we went through with the

12   Virginia State Police was on a compliant motorist, meaning when

13   we activated our emergency lights and/or siren behind a

14   vehicle, that vehicle either pulled to the right or left

15   shoulder into a flat area where we were able to see inside of

16   the vehicle and they were compliant with our commands, meaning

17   putting hands out of the vehicle, turning the car off when

18   prompted.  And, again, we were able to -- we were on a flat

19   leveled part of the roadway where we were able to see inside of

20   the car.

21   Q.   All right.  Have you ever then received training

22   regarding a situation such you -- such as you were confronted

23   on January 9, 2021?

24   A.   There were some elements that were consistent with

25   training that I had received, but I had never been in a

1  training situation involving that incident.  No.

2      Q.   All right.  So let me make sure I understand.  Your

3  training involved where you had a vehicle that stopped on a

4  leveled road and the driver was compliant; is that correct?

5          If it's not, you can tell me.

6      A.   What's your question?  I --

7      Q.   Well, I just want to make sure I understood what you

8  said about, your training entailed where --

9          Well, that's all right.  We can move on.

10          What did your training -- what did you re- -- what

11  kind of training did you receive from the Virginia State Police

12  where you had a high-risk, unknown infraction where you had no

13  knowledge of what to expect?

14      A.   I'm not sure how to answer that question.  The

15  terminology was unknown traffic stop.

16      Q.   Well, you said it was unknown or a felon, correct?

17      A.   No, ma'am.  That's what not what I said.

18      Q.   You did not?

19          What did you say?

20      A.   High-risk or unknown risk stop --

21      Q.   All right.

22      A.   -- is the terminology we use for --

23      Q.   And that's what -- did you consider this a high-risk,

24  unknown stop?

25      A.   High-risk, unknown risk stop.  Yes.

1     Q.   Unknown risk stop.  Okay.

2          And so what training did you receive in terms of as

3     how to respond to it?

4     A.   Again, as I mentioned earlier, it's on a flat part of

5     the roadway with a compliant motorist.  You're able to --

6     usually, your car is covered on a flat part of the roadway

7     where you can see inside of the vehicle.  You're able to

8     utilize that cover and slowly get people out of the car under

9     your control one at a time and get them into custody.

10         But, again, it's very situationally dependent in our

11    training based on compliant motorists.

12    Q.   Okay.  So did your training ever teach you to exit

13    your vehicle such as you and Trooper Bone did with your guns

14    drawn to approach the vehicle?

15    A.   Our training, again, was for a compliant motorist on

16    a flat part of the roadway where you can see inside of the

17    vehicle and you're able to utilize your vehicle as cover

18    without traffic being a concern on the right or left shoulder.

19         Our training did tell us to take our guns out, but in

20    our training, there was no need to approach the car.

21    Q.   In your training?

22         All right.  So why did you approach this vehicle?

23    A.   There were several reasons for needing to approach

24    this vehicle.

25    Q.   Okay.  Tell me what the several reasons are.

1     A.   For one we needed to be able to see inside of the

2  car, and the training that we received on a flat part of the

3  roadway, for example, the right or left shoulder, you're able

4  to see all the occupants inside of the car, gauge their level

5  of compliance, which was compliant in our training scenarios,

6  but you're able to visualize all that in training.

7     And these circumstances, based on the angle of the

8  car, all the different things we've talked about already, the

9  only logical thing to do was to approach the car to be able to

10  see inside.

11     There's concerns for any kind of emergency that may

12  be involved inside of the car.  There could be multiple people.

13  There was technically a crash.  There could have been injuries

14  involved.  We needed to be able to see all that to gauge our

15  further reactions.

16     Q.   All right.  Did you think that anyone in the vehicle

17  was going to flee?

18     A.   We weren't able to see the passenger side of the car

19  and the car was at a very steep angle, so it is absolutely

20  possible that someone could have fled out the passenger side of

21  the car.  And without approaching the car and being able to

22  see, we never would have known.

23     Q.   All right.  And tell me, were you -- do you have a

24  policy that involves the use of deadly force?

25     A.   Yes, ma'am.

1    Q.   All right.  Does your policy indicate that a law

2  enforcement officer, meaning you, shall not use deadly force

3  against a person unless the law enforcement officer reasonably

4  believes that deadly force is immediately necessary to protect

5  the law enforcement officer or another person other than the

6  suspect of the use of deadly force from the threat of serious

7  bodily injury or death?

8          Do you recall that being something that's in your

9  policy?

10    A.   Is this the policy from the time of incident or the

11  revised policy?

12    Q.   The time of the incident.

13    A.   It is okay if I see the policy?

14    Q.   I'm asking you what you remember.

15    A.   Okay.  Then --

16    Q.   Do you remember what it is?

17    A.   Our use of force policy has recently changed so, no,

18  ma'am, I don't recollect --

19    Q.   Well, do you know what the policy was at the time, at

20  the time of the incident?

21          Do you know what your use of force policy was?

22    A.   In regards to this incident, yes, ma'am.

23    Q.   What was it?

24    A.   The use of deadly force to protect myself or someone

25  else from the threat of seriously bod- -- serious bodily injury

1  or death.

2      Q.   All right.  Does your policy -- did your policy at

3  the time say, if feasible, the law enforcement officer has

4  provided a warning to the suspect of the deadly force that he

5  will use deadly force?

6          Do you recall that being in your policy?

7      A.   I don't believe that was in policy at the time of

8  this incident.

9      Q.   You don't think so?

10     A.   I don't believe so.

11     Q.   Okay.  Fair enough.

12         Do you recall the policy being that the law

13  enforcement officer's actions are reasonable given the totality

14  of the circumstances and all other options have been exhausted,

15  or do not reasonably lead themselves to the circumstances?

16         Do you remember that being in your policy?

17     A.   I believe so.

18     Q.   All right.  Can you tell me whether or not you at the

19  time of this incident on January the 9th, 2021, when you and

20  Trooper Bone got out of your vehicle, whether or not the two of

21  you had a discussion at all about having some means of

22  addressing the issue at hand other than approaching the vehicle

23  with your guns drawn?

24             MR. BROWN:  Objection.  Form.

25             THE WITNESS:  I'm sorry, ma'am.  Would you mind

1          breaking that --

2               MS. ASKEW:  Sure.

3               THE WITNESS:  -- down a little bit?

4               MS. ASKEW:  Sure.  Be happy to.

5     BY MS. ASKEW:

6          Q.   Do you recall having any kind of discussion, you and

7     Trooper Bone, about a plan of action other than approaching the

8     vehicle with your guns drawn?

9          A.   No, ma'am.

10         Q.   Did you talk about at all a plan of positioning your

11    vehicle in a manner that would provide protection for you and

12    Trooper Bone prior to approaching this vehicle?

13         A.   No, ma'am.  We did not talk about that.

14         Q.   Did you think about it at all, you, Trooper Layton,

15    prior to approaching this vehicle?

16         A.   Yes, ma'am.

17         Q.   You thought about it?

18         A.   Yes, ma'am.

19         Q.   When did you think about it?

20         A.   As I was moving the vehicle to attempt to block off

21    the violator vehicle from conducting a U-turn on the

22    interstate.

23         Q.   Okay.  So did you accomplish that?

24              Keeping him from -- you blocked him off in terms of

25    him not coming on the interstate.  Did you accomplish that?

1    A.    I wouldn't have been able to do that unless he was

2  able to get back onto the roadway.

3    Q.    All right.  So he's stuck, right?

4    A.    Well, I was just trying to position my car in such a

5  way that I would be able to do that, but as we approached the

6  vehicle, I could see tires spinning and hearing the engine

7  revving, but the car wasn't going anywhere.

8    Q.    Okay.  So explain to me, what was the -- what was --

9  why did you approach the vehicle with your gun drawn?

10          He can't answer that.  I'm asking you, not him.

11              MR. BROWN:  I was going to object, but I'm not.

12              MS. ASKEW:  Okay.

13              THE WITNESS:  Again, as I already mentioned, we

14          had several reasons for needing to approach the car.

15  BY MS. ASKEW:

16    Q.    What was your reason?

17    A.    I, again --

18    Q.    You said you hadn't discussed it.

19    A.    -- as I mentioned already --

20    Q.    Oh, I'm sorry.  Go ahead.

21          What else?

22    A.    We had several reasons that we needed to approach the

23  car.

24    Q.    Okay.

25    A.    One being to see how many people are inside.  We

1  couldn't see anything at all from our vantage point from up on

2  the roadway.

3     Q.   Okay.

4     A.   So we had to approach the car in order to see.

5          There's other concerns that could have been in play

6  depending on how many people were in the car, if anyone was

7  injured.  And then, obviously, if someone could have escaped

8  out the passenger side of the car without us knowing at all.

9     Q.   Well, where were they going?

10    A.   Excuse me?

11    Q.   If people -- you were concerned about them escaping.

12         Where were they going to go?

13    A.   There's a wood line on the other side of the vehicle

14 that they could have run into and we never would have known

15 unless we approached the car and were able to see.

16    Q.   Well, were they at risk to you running?

17    A.   I'm sorry?

18    Q.   Were they at a risk to you or Trooper Bone if they

19 ran?

20    A.   Perhaps.

21    Q.   Perhaps.

22         Give me a scenario where they would have been at risk

23 to you and Trooper Bone by running.

24    A.   They could have easily set up an ambush scenario in

25 the wood line without us being able to see anything.

1    Q.    How would that happen?

2    A.    I'm sorry.  What --

3    Q.    What kind of -- what kind of ambush did you think of

4  them by fleeing?

5    A.    People could have easily hidden behind a tree or

6  something with a firearm or removed important evidence from the

7  car.  There could have been hundreds of things that could have

8  happened with that.

9    Q.    But -- okay.  So you parked your car there because

10  you didn't want the vehicle to come back on the interstate and

11  be able to get on there; is that correct?

12         Did I phrase that -- if I'm wrong, tell me.

13    A.    There's multiple reasons for me wanting to keep my

14  vehicle there, but that was one of them.

15    Q.    That wasn't the initial reason, though, wasn't it,

16  that you parked it there?

17    A.    It was one of several reasons why I parked the

18  car there.

19    Q.    So what was going on in your head at the time you

20  parked it there?

21    A.    So I had already -- I told you before that I

22  activated the takedown lights on my light bar.  There are two

23  floodlights with bright white light independent of the flashing

24  blue lights that were already in this position shining onto the

25  vehicle.

1          Another thought that I had for keeping the car here

2   was to try to block traffic from behind us, to keep any other

3   vehicles from passing the roadway, or from where the car was,

4   at least, and then also to set up in such a way that I'd be

5   able to block, if he was able to complete a successful U-turn,

6   from driving the wrong way into oncoming lanes of travel.

7       Q.   Well, did you and -- well, how successful were you in

8   terms of keeping the traffic from passing through there,

9   passing your vehicle on the highway, how successful were you

10  with that?

11      A.   One car was able to get by in a grassy shoulder on

12  the left side of the roadway, but other -- otherwise, the other

13  vehicles behind it stopped.

14      Q.   Okay.  So there was a vehicle that came between the

15  vehicle that you were driving that was stopped in the middle of

16  the highway and the Mercedes is over stuck, correct?

17          MR. BROWN:  Objection.  Objection.  Form.

18  BY MS. ASKEW:

19      Q.   Do you recall that?

20          MR. BROWN:  Objection.  Form.

21          THE WITNESS:  Yes, ma'am.  And it -- I believe

22          it actually hit the grass off the left side of the

23          shoulder --

24  BY MS. ASKEW:

25      Q.   Do you remember --

1     A.   -- that drove off the roadway.

2     Q.   Okay.  Do you remember where you were?

3     A.   Yes, ma'am.

4     Q.   Where were you?

5     A.   I was already in the grass.

6     Q.   You were in the grass.

7          All right.  So the car passed behind you, correct?

8     A.   Yes, ma'am.

9     Q.   All right.  So you couldn't see what was going on

10 with that car, correct?

11    A.   I'm -- I'm not sure what you mean.

12    Q.   You couldn't see what was going on with the car.  You

13 don't know whether somebody could have shot you, correct?

14           MR. BROWN:  Objection.  Form.

15           THE WITNESS:  I'm -- I'm sorry.  I'm having

16           trouble with that --

17 BY MS. ASKEW:

18    Q.   Well, I'm just -- you're saying you were trying to

19 keep the cars from passing but, obviously, one passed, correct?

20    A.   Yes, ma'am.

21    Q.   And don't you think that was dangerous for you and

22 Trooper Bone?

23    A.   That a car passed our blocked car?

24    Q.   That a car came between you and the other vehicle

25 that was stuck.  You don't think that was dangerous for the two

1  of you and Trooper Layton -- I mean, I'm sorry, Trooper Layton,

2  you and Trooper Bone?

3      A.   Could you repeat the question?  I'm sorry.

4      Q.   Do you not think it was dangerous?

5      A.   For a car to drive by us, between my car and us?

6      Q.   Yeah.

7      A.   Perhaps, but we were already well into the grassy

8  shoulder.

9      Q.   Well, apart -- well, okay.  But you were trying to

10 avoid it, but that didn't work, correct?

11     A.   I mean, again, that was one reason out of several

12 that I had for wanting to put the car there, but every other

13 car behind that stopped.

14     Q.   All right.  Well, we're talking about under the

15 circumstances, a car could have come by and you and Trooper

16 were out of your vehicle and somebody could have shot you and

17 shot Trooper Bone, right?

18            MR. BROWN:  Objection.  Form.

19 BY MS. ASKEW:

20     Q.   That could have happened, couldn't it?

21     A.   Sure.

22     Q.   Yeah.  There's no answer but yeah.

23          So, therefore, didn't you put you and Trooper Bone in

24 danger --

25     A.   I don't --

1    Q.    -- by parking the car right there?

2          He can't answer.  Stop looking at him.  You have to

3    look -- just answer my question.

4    A.    Okay.  Could you repeat the question, please?

5    Q.    I said, did you not put yourselves in danger?

6    A.    Again, we were well into the grassy shoulder already,

7    but we had to move towards the car.  We didn't have another

8    choice.

9    Q.    You didn't have any other choice?

10   A.    Correct.

11   Q.    Uh-huh.  Did you think about another choice?

12   A.    As opposed to sitting in the car?

13   Q.    I didn't ask you about as opposed to.

14         Did you think about another choice?

15   A.    No, ma'am.  That was the only logical thing that we

16   could do was approach the car.

17   Q.    You used logic.

18         Did you use your training?

19   A.    Our training is only for a compliant motorist on a

20   flat portion of the roadway --

21   Q.    Oh.

22   A.    -- where we can see into the car.  We can use our

23   lights properly.  We have someone complying to our orders so...

24   Q.    So you never trained for anything like this?

25         MR. BROWN:  Objection.  Form.

BY MS. ASKEW:

    Q.   This was the first time?

    A.   I have never encountered a situation like this before.

    Q.   So you kind of went on gut?

          MR. BROWN:  Objection.  Form.

          THE WITNESS:  Again, we had to do something to be able to see into the car to mitigate all of those things that I already explained to you.

BY MS. ASKEW:

    Q.   Okay.  So back to my question.  You put yourself in danger, did you not, by allowing a car to come between you and the car that was stuck?

          MR. BROWN:  Objection.  Form.

BY MS. ASKEW:

    Q.   Did you not?

    A.   Again, every other car behind that one stopped so...

    Q.   I'm not talking about the other cars.  I'm talking about the one that went through.  You could have been shot.

       Did you not create this scenario, you, because Bone said you were driving, so did you not create this scenario by parking the car there?

    A.   So if I had put the car on the shoulder, for example --

    Q.   Answer my question, yes or no.

1     A.    Every -- the cars would have been going by anyway.

2     Q.    It's a yes or no answer.

3           Did you create it?

4                 MR. BROWN:  Objection.  Form.

5   BY MS. ASKEW:

6     Q.    Did you create it by parking the car there?

7                 MR. BROWN:  Objection.  Form.

8   BY MS. ASKEW:

9     Q.    Did you or did you not create it?  Yes or no.

10                MR. BROWN:  Objection.  Form.

11                THE WITNESS:  Again, ma'am --

12  BY MS. ASKEW:

13    Q.    The answer is yes or no.

14    A.    -- I don't think that's a yes or no question.

15    Q.    Yes, it is.

16    A.    I would like to explain --

17    Q.    Can you answer --

18    A.    -- a little bit further.

19    Q.    He can ask you to explain it.

20          Did you create this scenario?

21          You parked the car there, did you not?

22                MR. BROWN:  Objection.  Form.

23  BY MS. ASKEW:

24    Q.    Did you not?

25    A.    I parked the car there.

1     Q.    Thank you.

2           All right.  Do you not have a policy that indicates

3   that when you have a less lethal option that does not increase

4   the risk to yourself or others, you should take it?

5           Do you know of that policy?

6     A.    Are you referring --

7     Q.    Are you familiar with it, your -- Virginia State

8   Police policy?

9     A.    Ma'am, I'm trying to answer your question.

10    Q.    Sure.

11    A.    Are you referring to the use of force policy --

12    Q.    Yes.

13    A.    -- that's in effect for us?

14    Q.    Yes.

15    A.    I don't recall if that was in policy at the time of

16  the incident.

17    Q.    You do not recall whether your policy indicated that

18  when you have a less lethal option that does not increase the

19  risk to yourself or others that you should take it?

20          You don't recall that?

21    A.    Again, I don't recall if that was in our policy at

22  the time of the incident.  Our use of force policy has changed

23  since then.

24    Q.    I'm talking about the one that was in the time -- at

25  the time that this incident took place on January 9th of 2021.

1          You don't recall that?

2     A.   Correct.

3     Q.   Okay.

4          All right.  Now, let's go to at the point where you

5 and Trooper Bone approached the Mercedes that's stuck.

6          Who gives the command first to the driver?

7               MR. BROWN:  Objection.  Form.

8               THE WITNESS:  When do you mean?

9          Do you mean as soon as we exited the car?

10 BY MS. ASKEW:

11    Q.   Yes.

12    A.   Trooper Bone.

13    Q.   Trooper Bone.

14         Do you recall what Trooper Bone said?

15    A.   Yes, ma'am.

16    Q.   What did he say?

17    A.   "Get out of the car now."

18    Q.   Okay.  Do you recall what the driver said?

19    A.   The driver did not say anything at that point.

20    Q.   Okay.  Did you say anything?

21    A.   Not yet.

22    Q.   All right.  What happened after that?

23               MR. BROWN:  Objection.  Form.

24               THE WITNESS:  Trooper Bone and I walked towards

25          the vehicle and when we reached the grassy part of

1       the shoulder, I switched the commands to something to

2       the effect to have the driver show us his hands.

3  BY MS. ASKEW:

4       Q.   All right.  And what was on your mind as how the

5  driver was to show you his hands?

6       A.   Typically, when I ask people to show me their hands,

7  they just put them up.

8       Q.   They put them up inside the vehicle.  Is that what

9  you're saying?

10       A.   Yes, ma'am.

11       Q.   Okay.  So that's what you were asking him to do, show

12  hands and put them up inside the vehicle?

13       A.   Yes, ma'am.  I believe I said, "Show us your hands.

14  Do it now."

15       Q.   Okay.  So show your hands, meaning show it in the

16  vehicle so you could see it?

17       A.   Preferably.  Yes, ma'am.

18       Q.   Okay.  Did you have your flashlight?

19       A.   Yes, ma'am.

20       Q.   Did -- would you have it pointed towards the driver?

21       A.   Yes, ma'am.

22       Q.   And where were you situated?

23            Where were you located?

24            Where were you standing?

25       A.   I was standing to the left of the vehicle on the

1  driver side of the target vehicle just -- still on the upper

2  part of the grassy shoulder.  We haven't -- hadn't made our way

3  down to the car yet and I was standing, let's see, parallel to

4  the rearview mirror.  If not, just a little bit in front of it.

5      Q.    So you weren't in front of the side mirror?

6      A.    That's what I was talking about.

7      Q.    The side mirror?

8      A.    Next to it --

9      Q.    Yeah.  Because I --

10      A.    -- just a little in front of it.

11      Q.    Look, the rearview mirror, I'm thinking, it's in --

12      A.    Up here.

13      Q.    Yeah.

14      A.    Correct.

15      Q.    So I'm talking about the side.  You were not in front

16  of the side view mirror?

17      A.    Yes, ma'am.  I'll clarify.

18      Q.    Yeah.

19      A.    The mirror just next to the driver door.

20      Q.    Okay.

21      A.    Right.  I was standing next -- parallel to that

22  mirror, just a little bit in front of it towards the front of

23  the car.

24      Q.    Uh-huh.  So -- and -- and could you tell whether

25  anybody else was in the vehicle?

1     A.   I couldn't see anything else inside the car until we

2  made our way closer to the car.

3     Q.   Okay.  So when you made your way closer to the car,

4  did the driver say anything?

5     A.   Initially, as we were still exiting our car and

6  walking to the grass, the driver, I recall him hitting the

7  steering wheel with his hands and saying, "fuck."

8     Q.   That's all you recall?

9     A.   Later after commands were being given, the driver

10  stated, "My door doesn't open."

11     Q.   Okay.  And what did that mean to you?

12     A.   Well, we had already changed our commands -- excuse

13  me.  I had already taken over commands.

14     Q.   No.

15     A.   I'm trying to answer your question, ma'am.

16     Q.   No, no, no.  I'm -- but you're going somewhere else.

17          I'm asking you, what did that mean to you?

18          Not just --

19     A.   Right.  I'm trying to answer your question.

20     Q.   Okay.

21     A.   So I had already started giving commands consistent

22  with trying to see his hands, and he told me that his

23  doesn't open, which is not what I was asking him to do at that

24  time, but that also tells me that he, perhaps, heard what

25  Trooper Bone was saying when he initially said, "Get out of the

```
 1  car."
 2       Q.   Okay.  So you and Trooper Bone were giving commands
 3  to the driver, correct?
 4       A.   Yes, ma'am.
 5       Q.   Did, perhaps, you think that he had to listen to both
 6  of you?
 7       A.   We weren't giving commands simultaneously.
 8       Q.   That you recall?
 9       A.   That's correct.
10       Q.   Okay.  Were they different commands?
11       A.   I was asking to see the driver's hands and
12  Trooper Bone initially asked him to get out of the car now.
13       Q.   So the answer is, yes, they were different, right?
14       A.   Slightly.  Yes, ma'am.
15       Q.   Yes.  I didn't say whether they were greater or
16  slightly.
17            Were they different?
18            It's simple.  Yes?
19       A.   Yes, ma'am.
20       Q.   The commands were different.  Okay.  I'm not trying
21  to trick you.  I'm trying to get the answers.
22            Could you see the face of this individual?
23       A.   Not entirely until we made our way closer to the car.
24       Q.   Okay.  Could you tell he was a young man?
25       A.   Young being?
```

1    Q.   Well, what do you think "young" mean?

2    A.   I mean, I feel like I'm fairly young myself.

3    Q.   All right.

4    A.   So I believed he was close to my age.

5    Q.   All right.  So could you see his hands inside the

6    vehicle?

7    A.   When I -- when we first started approaching the car,

8    I could see his left hand manipulating the steering wheel and

9    his right hand doing something in the car.  I couldn't see his

10   right hand.

11   Q.   You couldn't see his right hand?

12   A.   After I changed the commands to "show me your hands"

13   or "let me see your hands" or "put your hands" or "do it now,"

14   something to that effect, the driver then put both hands in

15   front of his face.

16   Q.   So you could see them?

17   A.   Yes, ma'am.

18   Q.   So that was -- he was in compliance at that point to

19   you?

20   A.   He also at that time --

21   Q.   My question --

22   A.   -- said that my door --

23   Q.   Wait a minute.

24   A.   -- doesn't open so...

25   Q.   Slow up.  Okay.  But I'm just --

1     A.   And I wasn't asking him that.

2     Q.   I haven't got that yet.

3          When he put his hands on his face, he was in

4  compliance, correct?

5     A.   He didn't put his hands on his face, just to clarify.

6  They were in front of his face.

7     Q.   But you could see it?

8     A.   For a period of seconds, yes, ma'am.

9     Q.   Did you find him to be in compliance?

10    A.   For that moment, yes, ma'am.

11         MS. ASKEW:  Okay.  Y'all want a quick -- let's

12         take a quick break.  Well, five minutes or you need

13         ten?

14         MR. BROWN:  Let's do ten so we can get some

15         vending machine stuff.

16         MS. ASKEW:  Okay.  Ten minutes.

17         THE VIDEOGRAPHER:  We're going off the video

18         record at 12:42 p.m.

19      (Off the record.)

20         THE VIDEOGRAPHER:  This marks the beginning of

21         media number 3.  We're back on the video record at

22         12:59 p.m.

23  BY MS. ASKEW:

24    Q.   Okay.  So, Trooper Layton, I think we were at the

25  point where I asked you, you had approached the vehicle and my

1  question in terms of, I asked you at the point where the driver

2  had complied with holding his hands up.

3          Can you show us what you observed with his hands

4  being up?

5      A.   Yes, ma'am.  So he put both hands in front of his

6  face between six to eight inches apart with his palms facing

7  together.

8      Q.   Okay.  All right.

9          And what happened after that?

10     A.   I then gave commands, I believe, to put his hands out

11  of the window.  He then reached out with his left hand to

12  the -- towards the door handle while simultaneously reaching

13  towards the center console with his right hand.

14     Q.   Okay.  Why did you ask him to put his hands out the

15  window?

16     A.   It's just something from training that worked out

17  really well for us.

18     Q.   Okay.  With putting the hands up like that, could you

19  not proceed on to secure the suspect?

20     A.   It is much more safe and effective to try to secure

21  the suspect's hands with the hand outside of the window.

22     Q.   Okay.  And you would agree he couldn't get out of the

23  vehicle, correct?

24     A.   Well, he tried to reach back towards the door, to the

25  door handle on the outside of the car, which is not what I told

1   him to do while also simultaneously reaching to the center

2   console with his right hand.

3        Q.   I'm sorry.  I know you want to explain what happened,

4   but I just want you to answer my question.

5             Could he get out of the vehicle?

6        A.   If he opened it from the outside, I'm not sure.  It

7   look like he was trying to.

8        Q.   He was trying to get out of the vehicle.

9             Was there a command from someone to get out of the

10  vehicle?

11       A.   I believe a while before that.

12       Q.   Okay.  So with him reaching out to grab the handle,

13  did it appear to you he was trying to open the door to get out

14  of the vehicle?

15       A.   Perhaps, but that wasn't what I was telling him to do

16  at the time.

17       Q.   Somebody did.

18            Did Trooper Bone tell him to get out of the vehicle?

19       A.   Earlier.  Yes, ma'am.

20       Q.   Okay.  So is it conceivable that with him reaching

21  out to try to open the door, he was trying to get out of the

22  vehicle?

23       A.   With -- what his hand was doing, it look like he was

24  trying to reach for the door handle.

25       Q.   To get out of the vehicle.

1          Why would he open the door?

2     A.   I'm not sure, ma'am.  I'm not -- I'm not him.

3     Q.   Well, what did it look like to you?

4          He was trying to open the door, correct --

5     A.   It -- all I --

6     Q.   -- outside?

7     A.   Again, he was trying to reach to the door handle, but

8  also his right hand was also reaching towards the center

9  console.

10    Q.   I'm talking about the left hand.  You can get there

11 if you want later.  Right now I'm talking about the left hand.

12         Did it appear to you in your observation that he was

13 trying to open the door from outside?

14    A.   Perhaps.  It was just reaching towards the door

15 handle.  That's when that stopped.

16    Q.   All right.  Well, what other -- what other thought in

17 your mind that he was trying to do --

18    A.   My main attention was focused --

19    Q.   -- with his left hand?

20    A.   -- on the right hand.

21    Q.   All right.  So --

22         All right.  So you had your flashlight, did you not?

23         Was it flashed inside the car, inside his face, or

24 where was the flash- -- your flashlight?

25         Where was it?

1    A.    Just towards the driver compartment of the vehicle.

2    Q.    All right.  So you had the flashlight that you could

3    see in the vehicle?

4    A.    No, ma'am.  I wasn't close enough to see inside the

5    vehicle.

6    Q.    Okay.  So then was the flashlight in your left hand

7    or your right hand?

8    A.    Left hand.

9    Q.    Okay.  And your gun was in your right hand?

10    A.    Yes, ma'am.

11    Q.    Okay.  And so could you see Trooper Bone?

12    A.    In my peripheral vision.  Yes, ma'am.

13    Q.    And where was Trooper Bone?

14    A.    To my right.

15    Q.    Was he in the rear of the vehicle on the passenger

16    side?

17         Where was he situated with reference to the vehicle

18    that was stuck?

19    A.    He was on the driver side.

20              MR. BROWN:  Hang on.

21              THE WITNESS:  I'm sorry.

22              MR. BROWN:  Objection.  Form.

23    BY MS. ASKEW:

24    Q.    Go ahead.

25    A.    He was on the driver side with me, but that's as far

1  as I could tell from my peripheral vision.

2      Q.  Okay.  Did he say anything to you --

3          Well, strike that.

4          All right.  Could you -- when you and Trooper Bone

5  approached the vehicle with the guns drawn, would you describe

6  your commands to the driver to be loud?

7      A.  I'm sorry.  Could you repeat that, please?

8      Q.  Were they loud?

9      A.  My commands?

10     Q.  Yes.  To the driver.

11     A.  In my opinion, I believe they were fairly loud.

12     Q.  They were loud.

13         Okay.  Were they rapid, quick?

14     A.  In -- in what way?

15         My -- my speaking of them or my saying them again?

16     Q.  Both.

17         Were they -- did you have rapid commands?

18         Were they quick?

19     A.  I believe my commands were clear and concise.

20     Q.  I didn't ask you that.

21     A.  So, no, I don't believe so.

22     Q.  They were not rapid?

23     A.  I don't believe so.

24     Q.  They were not quick?

25     A.  I don't believe so.

1    Q.   Okay.  Did you attempt to -- other than command, did

2  you attempt to have a conversation with the individual?

3    A.   No, ma'am.

4    Q.   Did Trooper Bone attempt to have a conversation with

5  the individual?

6    A.   I don't recall.

7    Q.   So you don't know everything Trooper said there?

8    A.   I'm sorry?

9    Q.   Trooper Bone, you don't know everything he said to

10  the driver?

11    A.   I was giving the driver commands so I was focused on

12  what I was doing.

13    Q.   So you don't know what Trooper Bone was doing?

14    A.   After Trooper Bone communicated to me to take over

15  commands, that's what I did.

16    Q.   All right.  So when was that, that he told you to

17  take over commands?

18    A.   Trooper Bone -- excuse me.  I said something to the

19  effect the first time of, "Show us your hands.  Do it now."

20  And then Trooper Bone then transferred that over to me.

21    Q.   Oh, and how did he say that?

22    A.   He said, "You got him?"

23    And I said, "Yeah."

24    Q.   Okay.  So that's what means -- "You got him" means

25  that you take over command?

1      A.   Yes, ma'am.

2      Q.   Okay.  And so then you were the one -- nobody else

3 was communicating with the driver.  Is that what that mean?

4      A.   Yes, ma'am.

5      Q.   Okay.  And when did that happen?

6      A.   When -- when did what happen?

7      Q.   When did you say, "You got him?"

8      A.   As I just said, when I first said something to the

9 effect of "Show us your hands.  Do it now," that first time,

10 that's when Trooper Bone said, "You got him," and I proceeded

11 to provide commands from then.

12     Q.   And he didn't say anything else?

13     A.   Not that I'm aware of.

14     Q.   Do you know or you don't recall?

15     A.   I just -- not that I'm aware of.  I don't --

16     Q.   So you don't know?

17     A.   Right.

18     Q.   Okay.  Do you -- did you have any training regarding

19 de-escalation of situations?

20     A.   I -- yes, ma'am.

21     Q.   What -- tell me what training you received regarding

22 de-escalation of situations that you encountered out in the

23 field.

24     A.   I attended a crisis intervention training course with

25 Richmond PD.

1    Q.   All right.  That's with the City of Richmond?

2    A.   Yes.

3    Q.   Crisis intervention training.

4         Does that generally deal with mentally ill

5 individuals that you encounter?

6    A.   Yes.

7    Q.   Okay.  Other than that --

8         Well, tell me about that training.

9         Do you recall what they trained you to do?

10    A.   It was a 40-hour course with several different

11 objectives.

12    Q.   Do you recall what they were?

13    A.   I'm not a CIT instructor, so, no, I'm not sure what

14 the objectives are of the course.

15    Q.   Well, I mean, you mentioned them, so do you know?

16    A.   What I was saying was we covered dozens and dozens of

17 different topics in the course over the 40-hour school.

18    Q.   All right.  So what did you learn that helps you out

19 in the field?

20    A.   One thing or one major takeaway that I learned from

21 that was when dealing with someone in a mental emergency was

22 to -- when they're no longer a threat and the scene is already

23 secured and you're trying to, for example, get them to go to

24 the hospital willingly or under ECO, to speak to them, again

25 not being a threat or anything like that.  You speak to them to

1   iden- -- you identify yourself preferably with first name as a
2   de-escalation maneuver, right?

3           We would find out what they'd like to be called, what
4   their friends call them, what their parents call them, maybe
5   something they don't want to be called.  For example, if they
6   were named after their dad and they have a bad relationship
7   with that person, you would want to ascertain that.  And then
8   repeating things that they say, for example, to show that
9   you're listening, that's another big role in verbal
10  de-escalation.

11      Q.   Did you attempt any kind of de-escalation in your
12  having a conversation with Mr. Hill?

13      A.   In regards to the CIT training that I just told you
14  about?

15      Q.   Did you try to use that in this situation?

16      A.   No, ma'am.  That scenario only applies if the person
17  is not being a threat and they're being compliant.

18      Q.   Okay.  When did Mr. Hill become a threat to you?

19      A.   Mr. Hill became a threat to me, after we were out of
20  the vehicle, when he started to reach his right hand to the
21  center console of the vehicle.

22      Q.   Okay.  Prior to that, you didn't consider him a
23  threat?

24      A.   Prior to that, I had no affirmative belief that he
25  was armed, but he was not being completely compliant.

1    Q.  Well, before you approached him, you didn't tell him

2  to do anything, correct?

3    A.  I don't follow.

4        Do you mean when Trooper Bone --

5    Q.  You didn't have a conversation -- you and

6  Trooper Bone didn't have a conversation -- conversation

7  verbally with him prior to approaching, correct?

8    A.  Yes, ma'am.

9    Q.  You did?

10    A.  No.  You're correct.

11    Q.  Okay.  When you -- I'm just trying -- your answer is

12  you did not have a conversation prior to approaching Mr. Hill?

13    A.  That's correct.

14    Q.  Okay.

15        All right.  And are you familiar with a policy --

16  your policy, in existence at the time that this incident took

17  place, that you were -- policy indicating that you should look

18  at, the law enforcement officer engaged in de-escalation,

19  measures prior to the use of deadly force?

20        Did you attempt any of those?

21    A.  Again, the measures that I learned to de-escalate the

22  scenario were not applicable to this situation.

23    Q.  Okay.  Did you attempt to take cover in any way in

24  this situation?

25    A.  I'm sorry.  Could you repeat that question?

1    Q.    Did you attempt to take cover prior to approaching

2   the vehicle in this situation?

3    A.    I'm sorry.  Would you mind explaining what you mean

4   by "cover."

5    Q.    Well, it's in your policy.  You don't know what it

6   means?

7    A.    I'm not sure what you mean by "cover," ma'am.

8    Q.    Well, it's in your policy.  It said "taking cover."

9          They never taught you what that meant?

10   A.    So my knowledge of taking cover would be to get

11   behind, for example, a bulletproof object where you're probably

12   not going to be able to see through anything.

13   Q.    Like your vehicle?

14   A.    Perhaps.

15   Q.    Okay.  So you didn't do that?

16   A.    Again, we could talk about the high-risk stop

17   training that I received but --

18   Q.    I didn't ask you --

19   A.    -- based on the circumstances of this --

20   Q.    -- but one question.

21   A.    --- I could not use my vehicle for cover.

22   Q.    The question is, you didn't do that, right?

23   A.    Yes, ma'am.  Correct.  I did not do that.

24   Q.    Okay.  Could you see Mr. Hill's hands at the time

25   that you say he was reaching?

1    A.    The time where he reached with his right hand to the

2    center console?

3    Q.    Correct.

4          Could you see it?

5    A.    I could not see his hand.  No, ma'am.

6    Q.    Okay.  Could you see Trooper Hill -- I mean, I'm

7    sorry.

8          Could you see Mr. Hill's hand pointing a gun at you?

9          MR. BROWN:  Objection.  Form.

10          THE WITNESS:  Eventually, yes, ma'am.

11   BY MS. ASKEW:

12   Q.    Describe it to us.

13   A.    Him pointing the gun at me?

14   Q.    Yeah.  Can you show us how the gun was pointed at

15   you?

16   A.    Like this (indicating) in front of his face --

17   Q.    It was in front of his face --

18   A.    -- with the barrel pointed directly at me.

19   Q.    Pointed to you.

20          And where were you?

21   A.    To his left.

22   Q.    You were to his left and you were on the driver side?

23   A.    Yes, ma'am.

24   Q.    And he was in the driver seat?

25   A.    Yes, ma'am.

1      Q.    And he had the gun pointing it to the -- to the

2  right.  And were you in front of the vehicle?

3      A.    That's --

4              MR. BROWN:  Objection.  Form.

5  BY MS. ASKEW:

6      Q.    Where were you?

7              MR. BROWN:  That wasn't his testimony.

8  BY MS. ASKEW:

9      Q.    Where were you located?

10     A.    I was to his left.

11     Q.    To his left.

12            Was he behind -- were you behind this side mirror or

13 in front of it?

14     A.    I was next to it slightly in front of it towards the

15 front of his vehicle.

16     Q.    You were towards the front.  Okay.

17            So he's pointing at -- so he had to take his right

18 hand and show it across his body, correct?

19     A.    I'm not sure what you mean.

20     Q.    Well, you were on the left, so did he not have to

21 point the gun in front of his body, or was it in front of his

22 head?

23     A.    It was directly in front of his face --

24     Q.    It was in front of his --

25     A.    -- probably about five inches.

1     Q.    It was in front of his face and he was pointing it at

2  you?

3          Can you show it to us --

4     A.    Sure.  Again --

5     Q.    -- since you're on camera.  We can see it.

6     A.    -- the gun was pointed at me to the left about

7  five inches in front of his face.

8     Q.    Okay.  And so what did you do?

9     A.    I fired my weapon.

10     Q.    You didn't move?

11     A.    So that was a very quick gesture.  As soon as I

12  looked down the barrel of the gun, I fired my weapon.

13     Q.    You didn't move.  You just fired?

14          You stayed where you were?

15     A.    Well, I had already moved back to create distance

16  from the car to give myself a little bit more of a stable

17  position.

18     Q.    So you did move?

19     A.    Prior.  But when he was still reaching, that's when I

20  created space from the vehicle.

21     Q.    Okay.  While he was reaching before he picked up the

22  gun, you moved?

23     A.    Yes, ma'am.

24     Q.    Okay.  So you moved back, right?

25     A.    Yes, ma'am.

1     Q.    Okay.  That's consistent what I remember, too,

2  Mr. Layton.

3         You moved back and then you fired, right?

4     A.    After --

5     Q.    Well, tell me.

6     A.    After I moved back, then the gun was pointed at me

7  and then I fired.

8     Q.    Oh, I got you.

9         Now, where was -- where was Trooper Bone?

10     A.    When do you mean?

11     Q.    Did you see him or you -- you weren't pay- -- you

12  were probably paying attention to yourself, right?

13     A.    I could see Trooper Bone --

14     Q.    Okay.

15     A.    -- in my peripheral vision, but I asked when you

16  mean.

17     Q.    At that point.  Well, we're talking about this

18  situation.  You moved back.  Could you see Trooper Bone?

19     A.    There were several seconds between when he was

20  reaching inside the car, when I moved back, when the gun was

21  pointed at me, and when I was firing.

22         So, again, at what point are you talking about

23  when -- where Trooper Bone was?

24     Q.    All I'm trying to -- I'm not trying to confuse you.

25  Really.  I'm just trying to get on the record what happened.

1      So at the point where you fired at him, where was

2  Trooper Bone?

3      A.   When I squeezed the trigger, Trooper Bone was, again,

4  still on the driver side of the car, but a little bit, like,

5  closer to the rear window.

6      Q.   Okay.

7      A.   Not the -- not the far rear windshield, just the rear

8  passenger door window.

9      Q.   Okay.  When you fired, do you know where your bullet

10  hit Mr. Hill?

11     A.   No, ma'am.

12     Q.   You don't know which one hit -- which one you shot?

13          Well, did you shoot at him from --

14          Well, excuse me.

15          One bullet hit him in the neck.  Do you know?

16     A.   I saw that on the autopsy report.

17     Q.   Okay.  So one bullet hit him in the back of the neck.

18          Do you know who shot that bullet?

19     A.   No, ma'am.

20     Q.   It wasn't -- you don't know if it was you or

21  Trooper Bone?

22          You don't know who did that?

23     A.   That likely couldn't have been me based on where I

24  was standing.

25     Q.   Okay.  So we're going to assume then it was

1  Trooper Bone.

2          Now, do you know where your bullet hit Mr. Hill?

3     A.   No, ma'am.  I don't know exactly which one.

4     Q.   All right.  So the autopsy report says he was hit in

5  the hand, left hand, and in the face, left face.

6          Could that have been your bullet?

7     A.   Which one are you talking about?

8     Q.   Hand or -- and/or face.

9     A.   I couldn't see Mr. Hill's left hand clearly at the

10  time, so it probably wasn't that one.

11     Q.   All right.  Well, Trooper Bone is to the back, right?

12          Is it conceivable -- how is it that he could hit the

13  hand if it's on the left?

14     A.   Trooper Bone was closer to the vehicle than I was.

15     Q.   Okay.  You stepped back.  He was closer at the time

16  you were firing?

17          Is that what you're saying?

18     A.   Yes, ma'am.

19     Q.   Okay.  So when all the evidence was gathered and they

20  did an investigation, nobody told you which of your bullets hit

21  him?

22     A.   No, ma'am.

23     Q.   So you don't even know if you hit him, huh?

24          You don't know if your bullet hit him?

25     A.   Presumably, based on the evidence that I've seen, I

1  assume that it was the left side of his face.

2      Q.   Okay.  Now, after -- after he was shot by you and

3  Trooper Bone, then what did you do?

4      A.   I'm sorry.  Could you repeat the question, please?

5      Q.   After Mr. Hill was shot by you and Trooper Bone, what

6  did you do?

7      A.   After we discharged our firearms, I tried to maneuver

8  to an area -- after checking on Ben Bone, I tried to maneuver

9  towards the front of the vehicle so that we could see the

10 firearm before trying to -- just to make the scene safe before

11 trying to do anything else.

12     Q.   And how long did it take you and Trooper Bone to find

13 this firearm?

14     A.   We couldn't see it from the driver compartment, so we

15 had to wait for Trooper Bone to go around to the -- to the

16 passenger side, but it was probably a matter of seconds.  It

17 was fairly fast.

18     Q.   And once it was found --

19          Who found it?

20          Mr. Bone?

21     A.   Yes, ma'am.  I was still on the driver side, so I

22 wasn't able to see it.

23     Q.   So you searched for the gun.

24          And can you tell us, did you see it?

25          Did you find it or did Trooper Bone find it?

1      A.     Trooper Bone located the firearm in the car and

2 verbalized that to me.

3      Q.     All right. Did you ever see where the firearm was?

4      A.     I'm sorry?

5      Q.     Did you ever see where it was located, the firearm?

6      A.     Yes, ma'am.

7      Q.     You saw it?

8      A.     Yes, ma'am. Eventually.

9      Q.     After he found it, eventually.

10            Okay. Was it in Mr. Hill's hand?

11      A.     No, ma'am. It was on the seat.

12      Q.     Okay. It wasn't on the floor. It wasn't in his

13 hand. It was on the seat.

14            Was he on top of the gun?

15      A.     His body had slumped over into the passenger side of

16 the car where the gun was located, but he was already out of

17 the car by the time that I actually put eyes on the firearm.

18      Q.     Okay. So you didn't see it while he was in the car?

19      A.     Not after discharging the firearms.

20      Q.     I got you.

21            So at the time then that I guess Trooper Bone was

22 trying to secure the vehicle, were you the one that was trying

23 to remove Mr. Hill's body from the vehicle?

24      A.     Yes, ma'am. Initially.

25      Q.     Okay. Did you -- when you looked at trying to pull

1 him out the vehicle, did you check his pulse when you --

2 when -- before doing that?

3     A.   While I was standing in the front, I looked for

4 breathing, but my main concern was to get him out of the car

5 before checking the pulse to, hopefully, separate him from the

6 firearm.

7     Q.   So the answer is, no, you did not check the pulse

8 when he was in the vehicle?

9     A.   That's --

10     Q.   Correct?

11     A.   Yes, ma'am.

12     Q.   Okay.  So did you check anything else while he was in

13 the vehicle?

14     A.   Oh, I checked for breathing.

15     Q.   All right.  And how did you do that?

16     A.   Visually.

17     Q.   You visually.

18     All right.  And what were you looking at?

19     A.   The rise and fall of his chest.

20     Q.   Okay.  And so it took a minute to get them out the

21 door, right?

22     A.   I'm not sure exactly how long it took, but I wasn't

23 able to get him out by myself.

24     Q.   All right.  So Trooper Bone helped you get him out

25 the car?

1     A.   Yes, ma'am.

2     Q.   All right.  Then when y'all pulled him out the car,

3 then you dragged him on the ground, correct?

4     A.   I'm not sure what you mean by that.

5     Q.   Well, did you lift him up?

6     A.   How so?

7     Q.   Did you pick him up in your hands?

8     A.   No, ma'am.  I wasn't able to do that.

9     Q.   So the answer is no.

10     You didn't pick him up in your hands, correct?

11     So when you pulled him out the car, you pulled him

12 from, what, his legs or his arms?

13     A.   His arms.

14     Q.   All right.  So when I said dragged him, you pulled

15 his arms and he fell on the ground, correct?

16     A.   Yes, ma'am.

17     Q.   All right.  And then you dragged him.  And who --

18 someone maybe said, "Turn him over?"

19     A.   I don't recall dragging him from the car.  I think

20 once he was out, we immediately rolled him over.

21     Q.   Okay.  So did Trooper Bone pick him up?

22     A.   I'm sorry?

23     Q.   Did Trooper Bone pick up his body to get him out of

24 the car?

25     A.   No, ma'am.  I believe we each tried to grab on to an

1  arm.

2  Q.  Okay.  So you pulled him out of the car, correct?

3  A.  Yes, ma'am.

4  Q.  All right.  And he landed on the ground, correct?

5  A.  I'm not sure.  What do you mean by "landed"?  But...

6  Q.  Well, you didn't pick him up, so where else was he

7  going?

8  A.  I mean, we placed him on the ground.

9  Q.  Oh, did you pick him up to put him on the ground?

10  A.  We had his entire upper body controlled and put him

11  on the ground.

12  Q.  So you had him by the arms and you pulled him and he

13  went on the ground?

14        MR. BROWN:  Objection.  Form.

15  BY MS. ASKEW:

16  Q.  Correct?

17  A.  Yes, ma'am.

18  Q.  All right.  Then what did you do?

19  A.  I'm sorry?

20  Q.  Then what did you do?

21  A.  After -- after he was on the ground?

22  Q.  After he got on the ground.

23  A.  Well, we rolled him over on to his back so that we

24  wouldn't create positional asphyxiation or anything so he could

25  still breathe, if that was a vital sign that he still had.

1      Q.    All right.  Tell me about your CPR training.

2            What did you -- you received something from the

3  Virginia State Police?

4      A.    Yes, ma'am.

5      Q.    All right.  What was it?

6      A.    I'm sorry?

7      Q.    Tell me about your training, CPR training.

8      A.    I mean, it was a course where they taught you the

9  proper methods to performing CPR, ensuring scene safety, trying

10  to get the proper equipment to do so, such as an AED, for

11  example, and then just the proper method to performing the

12  actual movement of chest compressions and breathing.

13     Q.    Do you have any equipment in your -- did you, on this

14  occasion, January 9, 2021, any equipment in your vehicle to

15  assist you in any way of first aid for Mr. Hill?

16     A.    We have first aid equipment in the vehicle, but

17  nothing that we could have used for this situation.

18     Q.    What do you have in your vehicle?

19     A.    Mostly, like, trauma kits for trying -- like,

20  tourniquets, for example.

21     Q.    What is a tourniquet?

22     A.    A tourniquet is something that we can place on an

23  external part of the body to stop a major arterial bleed, for

24  example.

25     Q.    Okay.  Do you know how to use it?

1    A.   Yes, ma'am.  It's only for extremities, though.

2    Q.   Okay.  Did you attempt that in this case?

3    A.   No, ma'am.  His major bleed was not on an extremity.

4    Q.   And you know that because?

5    A.   I'm sorry?

6    Q.   And how do you know that?

7    A.   We could see it.

8    Q.   What did you see?

9    A.   A major bleed coming from the back of the neck.

10   Q.   Okay.  And there was nothing you're saying that you

11   could do to assist him?

12   A.   The only way that I'm aware of to stop a major bleed

13   is by applying direct pressure and if we tried to apply

14   pressure to that part of his body, then we most absolutely

15   would have occluded an airway.

16   Q.   I see.  And that would have been worse than just

17   letting him die there?

18   A.   So occluding an airway would lead to probably

19   respiratory arrest, which would lead to cardiac arrest on top

20   of a major bleed.

21   Q.   I see.  So --

22   A.   What they teach you in CPR that -- your ABCs.  For

23   example, A, being airway, being the most important thing that

24   you have to configure.  So if that was obstructed in any way,

25   then we couldn't have proceeded.

1     Q.   Okay.

2          MS. ASKEW:  All right.  Let's go off the record.

3     I want to talk to my client.

4          THE VIDEOGRAPHER:  We're going off the video

5     record at 1:29 p.m.

6     (Off the record.)

7          THE VIDEOGRAPHER:  We're back on the video

8     record at 1:41 p.m.

9                          EXAMINATION

10    BY MR. BROWN:

11    Q.   All right.  Earlier, counsel had asked you questions

12    about your training, correct?

13    A.   Yes, sir.

14    Q.   And you were talking about, you know, the scenarios

15    that you were exposed to in training.

16    A.   Yes, sir.

17    Q.   During your training, do you get exposed to

18    scenarios?

19    A.   Yes, sir, we do.

20    Q.   And are there scenarios that you were not exposed to?

21    A.   Absolutely, sir.  I mean, it would be impossible to

22    expose us to every scenario that we might encounter in the

23    field.

24    Q.   How long have you been a police officer?

25    A.   I have been a police officer now for almost

 1  five years.

 2       Q.    And how many arrests, if you have any idea, have you

 3  made?

 4       A.    I couldn't even tell you.

 5       Q.    Would it be in the dozens, the hundreds, or the

 6  thousands?

 7       A.    The hundreds.

 8       Q.    And of those arrests, did you use force in any of

 9  them?

10            And I'm not specifying any certain kind of force,

11  just force.

12       A.    Yes, sir.

13       Q.    Were any of those scenar- -- incidences, did they

14  consist of the exact same circumstances?

15       A.    No, sir.  Absolutely not.

16       Q.    So earlier counsel was asking you about the reasons

17  for the stop, and I think you testified that the suspect or

18  Mr. Hill passed you and was committing reckless driving; is

19  that right?

20       A.    Yes, sir.

21       Q.    And that you then -- I'm sorry -- also noticed a

22  headlight out?

23       A.    Yes, sir.

24       Q.    And you were also observing for a potential DUI?

25       A.    Yes, sir.

1     Q.   And you also testified that you activated your

2  lights?

3     A.   Yes, sir.

4     Q.   And what happened when you did that as far as

5  Mr. Hill's vehicle?

6     A.   Mr. Hill turned his lights off, accelerates to an

7  extremely high rate of speed.

8     Q.   At that point, was -- did you have any additional

9  reasons to pursue or stop Mr. Hill?

10     A.   Absolutely, sir.  I had observed an on-view felony

11  for eluding.

12     Q.   And you testified earlier that Mr. Hill had done a

13  U-turn?

14     A.   Oh, yes, sir.

15     Q.   Or attempted a U-turn?

16     A.   Yes, sir, attempted a U-turn.

17     Q.   And that was -- you testified that that was into or

18  towards oncoming lanes of travel?

19     A.   Yes, sir.

20     Q.   Was that also a consideration in your approach to the

21  vehicle?

22     A.   Absolutely, sir.

23     Q.   During the time that you had your overhead lights on

24  and you were pursuing, did you have occasion to view the -- I'm

25  sorry -- Mr. Hill do anything or see any part of his body?

1    A.   Yes, sir.  I saw a hand come out of the driver

2  window.  I don't re- -- I don't -- I couldn't tell which hand

3  it was and it was only for a split second.

4    Q.   And can you describe, for the record, what you saw as

5  far as could you describe the specific movement of his hand or

6  arm?

7    A.   It just -- it appeared to be a throwing motion from

8  what I could tell.

9    Q.   And how did that inform your stop and approach of the

10  vehicle or -- I'm sorry.  Did it inform at all your approach

11  and stop of the vehicle?

12    A.   Yes, sir.  It indicated to me that he may be trying

13  to get rid of some kind of evidence.

14    Q.   And how would that play into how you conducted a

15  stop?

16    A.   It just shows that he's trying to get away from

17  something --

18    Q.   Earlier --

19    A.   -- and even more desperate --

20    Q.   I'm sorry.

21    A.   -- to escape.

22    Q.   Finish.  I'm sorry.

23    A.   No.  You're fine.  And just trying to get away from

24  something and, perhaps, more desperate to escape.

25    Q.   Earlier, you were asked by opposing counsel about

possible discussions with Trooper Bone during this incident; is
that right?

A.   Yes, sir.

Q.   You testified that you did not have a discussion with
Trooper Bone about where to place the vehicle?

A.   Yes, sir.

Q.   Why was that?

A.   I mean, this was a very rapidly evolving situation.
There was a lot of urgency.  We did not have time to try to
figure out exactly where we should put the car.

Q.   Did you determine where this stop occurred?

A.   No, sir.  That wasn't up to me.  That was up to
Mr. Hill.

Q.   Did Trooper Bone determine where to conduct this
stop?

A.   No, sir.

Q.   Earlier, you were asked about if you had discussed a
plan and I'm -- now, I'm not talking about the placement of
your police vehicle, but a plan for the approach.

Same question, why didn't you discuss a plan with
Trooper Bone?

A.   Again, sir, it was a very rapidly evolving situation.
We didn't have time to do any of that.  There was a sense of
urgency.  We had to do something quickly.

Q.   What if you had taken time to discuss a plan, could

1  that have affected the danger level?

2      A.    I mean, absolutely.  I mean, when we parked the car

3  and started approaching the car, the wheels of the suspect

4  vehicle were still spinning and the engine was still revving.

5  And I testified that I saw the driver manipulating the steering

6  wheel, so even as we were approaching, he was still trying to

7  get away.

8      Q.    So those facts that you just referenced, the spinning

9  wheels and the manipulation of the steering wheel, did that

10  factor into your decision to approach the vehicle as opposed

11  to, as counsel said, take a cover?

12      A.    Oh, yes, sir.  Definitely.

13      Q.    And why is that?

14      A.    I mean, again, it just shows that he's still actively

15  trying to get away from us.  And if he was able to correct

16  that, he would have been -- he was already facing oncoming

17  travel on 64.

18      Q.    In your training or in troopers' training, are police

19  trained to take cover when somebody is fleeing from them?

20      A.    No, sir.  We're trained to chase them.

21      Q.    In fact, if you did not pursue a felony suspect,

22  could you be written up or disciplined for cowardice?

23      A.    Yes, sir.  Absolutely.

24      Q.    Earlier, you testified that you did not have

25  affirmative belief that Mr. Hill was armed; is that right?

1  A.  Yes, sir.

2  Q.  Did you have any belief as to whether he was unarmed?

3  A.  No, sir.

4  Q.  Similar question, you were asked earlier about if you

5  had a conversation with Trooper Bone about whether to draw your

6  weapons.

7      My question is, did you?

8      And I think your answer was, no, correct?

9  A.  Was that in reference to a conversation?

10  Q.  Yes.

11     You were asked whether you had a conversation with

12  Trooper Bone about drawing your weapons.

13  A.  Correct.  We did not.

14  Q.  And why was that?

15  A.  Again, there was a sense of urgency.  We both

16  independently made our own decisions to do that.

17  Q.  So going back to your training, you were -- you

18  received training in what you, I believe, called high-risk

19  stops?

20  A.  Yes, sir.

21  Q.  And how would you describe this stop in this

22  incident?

23  A.  I would describe this stop as high-risk.

24  Q.  Now, when we used the term "stop," is that -- does

25  that mean that the suspect has stopped voluntarily?

1    A.    No, sir.  Not necessarily.

2    Q.    Can you explain that a little bit?

3    A.    If the suspect puts himself in a situation, for

4    example, during a vehicle pursuit, when they've damaged their

5    vehicle to where it can't be operable anymore, then that would

6    be an example of a noncompliant driver who was forced to come

7    to a stop.

8    Q.    Okay.  I think you testified earlier that the

9    high-risk stop training covered certain scenarios?

10    A.    Yes, sir.

11    Q.    Can you describe what those are?

12    A.    Compliant motorist, someone, after we activated

13    lights and/or siren, they pull over to a convenient spot in the

14    roadway, be that the right shoulder or the left shoulder, and

15    they're able to, taken out at gunpoint, under our control.

16    Q.    Does your training allow you to exercise judgment and

17    discretion during stops?

18    A.    During high-risk stops or during --

19    Q.    Correct.  High-risk.  High-risks stops.

20    A.    I mean, absolutely.  There's no two scenarios that

21    are the same, so they have to be fluid.

22    Q.    Does the suspect's behavior drive those decisions and

23    discretion?

24    A.    Absolutely.  One hundred percent.

25    Q.    And was that the case in his incident?

1     A.   Yes, sir.

2     Q.   I'm going to transition into the use of deadly force.

3        In this case when did you use deadly force?

4     A.   When the gun was pointed at me.

5     Q.   And counsel had testified earlier that the gun was

6 pointed to the right.

7        Where was the gun?

8        MS. ASKEW:  Objection to your form of the

9        question about testifying.  I didn't testify.

10        MR. BROWN:  And that's how I'm going to keep my

11        question.

12        MS. ASKEW:  Well, I'm going to object to it.

13        MR. BROWN:  Okay.  Your objection is noted.

14        MS. ASKEW:  You didn't object to my questions.

15        MR. BROWN:  I did.

16        MS. ASKEW:  So you don't object to how I answer.

17        MR. BROWN:  I did object to it.

18        MS. ASKEW:  Well, I'm going to object to yours

19        and the characterization of it.

20        MR. BROWN:  Okay.  Duly noted.

21 BY MR. BROWN:

22     Q.   Earlier, counsel testified that the gun was pointed

23 to the right.

24        Where was the gun pointed?

25     A.   It was pointed to the left at me.

1    Q.    Specifically, where?

2    A.    I looked down the barrel, so at my face.

3    Q.    And counsel asked you earlier about warnings.

4          Did you give any warnings before you fired your

5    sidearm?

6    A.    No, sir.  We were just giving lawful commands.

7    Q.    From the time that you saw the gun pointed at your

8    face until the time you discharged your weapon, did you give

9    any warnings?

10   A.    No, sir.  That was a split second time frame.

11   Q.    Would -- would your training have instructed you to

12   give a warning in that scenario?

13   A.    No, sir.

14   Q.    Why didn't you use a less lethal option?

15   A.    The opportunity wasn't present for us to use any less

16   than lethal force.  If I -- if I could have used less lethal

17   force, I would have done it.

18   Q.    Earlier, you testified that one of the reasons you

19   approached the vehicle was that there could have been a

20   passenger or a flight on foot; is that right?

21   A.    Yes, sir.

22   Q.    And you testified there's a tree line?

23   A.    Yes, sir.

24   Q.    Did that inform your approach or help you decide

25   whether to approach the vehicle at the time?

1    A.    Yes, sir, it did.

2    Q.    Does your training tell you to avoid foot chases

3    because they might be risky?

4    A.    No, sir.  Absolutely not.

5    Q.    Police officers take risks in pursuing suspects; is

6    that -- is that right?

7    A.    Yes, sir.

8    Q.    Is it required?

9    A.    No, sir.

10    Q.    Well, let me ask you this:  Is part of the job as a

11    police officer, you're expected to take risks if you're

12    pursuing or confronting criminals or suspects?

13    A.    Yes, sir, I agree.  You are -- it is expected of us

14    to take risks.

15    Q.    So is it fair to say it's part of your job to put

16    yourself in danger?

17    A.    Yes, sir.

18    Q.    Moving on to your commands to Mr. Hill.

19          So who gave the first commands?

20    A.    Trooper Bone.

21    Q.    And do you remember how that went or what he said?

22    A.    I believe the words were, "Get out of the car now."

23    Q.    And at some point Mr. Hill said something?

24    A.    Yes, sir.

25    Q.    Do you remember what it was?

1      A.    "My door doesn't open."  I believe he said it twice.

2      Q.    After he said that, were there any commands to get

3 out of the vehicle?

4      A.    No, sir, not after I took over.

5      Q.    And how did you know to take over?

6      A.    Trooper Bone asked -- he said, "Do you got it?"

7           And I said, "Yes."

8      Q.    So after he -- Mr. Hill -- I'm sorry -- said, "My

9 door doesn't open," were there any commands that conflicted,

10 meaning between you and Trooper Bone?

11      A.    No, sir.  The only commands that he was receiving at

12 that time were to put his hands up.

13      Q.    Earlier, you testified that you asked him to put his

14 hands up or out the window?

15      A.    Yes, sir.

16      Q.    Why did you want to see his hands?

17      A.    So I would know that he's not reaching for anything.

18 When I wanted his hands out the window, it was a lot -- it's a

19 lot more effective for us to be able to control someone's hands

20 out of the window so we know that they're not going to be,

21 like, reaching into the car, for example.

22      Q.    And what do you -- why do you -- why do not want them

23 reaching into a car?

24      A.    Because it's all unknown to us.  They could present a

25 weapon or something when we're that close to them.

1    Q.   Earlier, you were asked about taking cover behind

2  your vehicle or -- I'm sorry -- by your vehicle.

3         Why didn't you do that?

4    A.   Well, the vehicle was in the middle of the roadway

5  and we had to approach the car.  Again, that was the only

6  logical thing for us to do so we could see what was going on.

7    Q.   Now, during the pursuit, you testified earlier that

8  you had passed vehicles?

9    A.   Yes, sir.

10   Q.   Did that inform your decision to not take cover or

11 stay with your police cruiser in the -- in the travel lanes?

12   A.   Yes, sir.

13   Q.   Why?

14   A.   I mean, it would be very dangerous for us to, like,

15 sit in the car, for example, with cars coming by.

16   Q.   I'm going to move on to after the shooting.

17        So you testified earlier that you didn't check

18 Mr. Hill's pulse while he was in the car?

19   A.   Yes, sir.

20   Q.   Why didn't you check for a pulse at that point?

21   A.   He wasn't separated from the gun yet.

22   Q.   And is that consistent with your training to separate

23 a suspect from a weapon prior to medical treatment?

24   A.   Oh, yes, sir.  It's part of securing the scene.

25   Q.   At any point, did you throw or drop Mr. Hill on the

1  ground?

2       A.   No, sir.

3            MR. BROWN:  I think that's all I have.  That's

4       all I have.

5            MR. MCENTEE:  Hold on.  Hold on.

6            MR. BROWN:  Hang on.

7  BY MR. BROWN:

8       Q.   Oh, earlier, you testified about Trooper Bone

9  activating the cruiser's video recording system?

10      A.   Yes, sir.

11      Q.   And I believe your testimony was he did that about

12 ten seconds after -- well, actually, I don't recall now what

13 you said, but what was the ten seconds?

14      A.   He activated the camera manually about ten seconds

15 after we pulled out into the roadway.

16      Q.   And if I told you that in the video there's --

17 there's video before that period --

18      A.   Sure.

19      Q.   -- of the inside of the police cruiser, why would --

20 how could that be?

21      A.   So our cameras are always recording.  Whether it's

22 saving that video or not determines on if the camera is

23 activated.  So if the camera is always recording and it's

24 constantly rewriting to the disk that's in the -- in the

25 system, it won't -- it will -- it will save video two minutes

1  before the camera is actually activated, but there's no audio

2  with that.

3              MR. BROWN:  Okay.  I think that's all I have

4        then.

5              THE VIDEOGRAPHER:  This concludes the deposition

6        of Seth Layton.  We're going off the video record at

7        1:56 p.m.

8

9        (This proceeding was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF VIRGINIA                          **COPY**

2  COUNTY OF CHESTERFIELD, TO WIT:

3

4       I, JACQUELIN O. GREGORY-LONGMIRE, Notary Public in

5  and for the State of Virginia at Large, do hereby certify that

6  the aforementioned appeared before me, was duly sworn by me,

7  and was thereupon examined by counsel, and that the foregoing

8  is a true and correct and full transcript of the testimony

9  adduced, taken to the best of my ability.

10      I further certify that I am neither counsel for, nor

11 related to or employed by any of the parties to the action in

12 which this deposition is taken.  And, further, that I am not a

13 relative or employee of any of the counsel in the case, or

14 interested in the outcome.

15      WITNESS my hand this _____ day of _____,

16 2023.

17      My commission expires September 30, 2025.

18      Notary Registration No. 7275579.

19

20  _____

21           JACQUELIN O. GREGORY-LONGMIRE

22

23

24

25



EXHIBIT

Layton
11/01/23    FL

PENGAD 800-631-6989