IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LATOYA K BENTON,
ADMINISTRATOR OF THE ESTATE OF
XZAVIER D. HILL, DECEASED,

      Plaintiffs,

v.                                  Civil Action No. 3:22-cv-225 HEH

SETH W. LAYTON, *et al*

      Defendants.

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Latoya K. Benton, Administrator of the Estate of Xzavier D. Hill, Deceased, pursuant to the Federal Rules of Civil Procedure, files this Memorandum in Opposition to Defendants' Motion for Summary Judgment for reasons that are set forth in the Memorandum of Points and Authorities in Support herein.

## INTRODUCTION

Plaintiff Xzavier D. Hill ("victim Hill")was halfway through his 18th year when he had the monumental misfortune to cross paths with Troopers Seth W. Layton and Benjamin I. Bone. As a result, victim Xzavier D. Hill never reached his 19th year. Ex. 1, Declar. at pg 1, Benton.  Defendants quote *Elliot v. Leavitt, 99 F. 3d 640, 644 (4th Cir. 1996), that* "no citizen can fairly expect to draw a gun on police without risking tragic consequences).   Plaintiff contends Defendants lied and victim Hill never drew a gun on the Virginia State Troopers.   Furthermore, as President Joseph R. Biden said in his February 2023, State of the Union Address to the country, "just as every cop when they

pin on that badge in the morning has a right to be able to go home in the morning, so does every body else out there.   Our children have a right to come home safely."   All across this country from Tennessee to Virginia to California young black men are being stopped by police for possible misdemeanor infractions and end up dead.   The story is often the same; a lone frightened young black man was such a threat to two, four, or five police officers that he warranted being shot, tased or beaten to death.

Defendants contend Troopers Layton and Bone "calmly and slowly" approached Xzavier D. Hill's car once he ended up in an embankment after a high-speed chase. Defendants' dash cam video shows defendants rushed the car, guns drawn, shouting inconsistent commands simultaneously and then began firing at victim Hill. Defendants contend Hill took out a gun and pointed it at Trooper Layton, causing Layton and Bone to fire simultaneously, killing victim Hill.   The gun on which these Troopers based their deadly act was jammed, one bullet in the chamber, without a loaded clip. Furthermore, victim Hill was left handed and could not have acted as Troopers describe, nor does the video from the Virginia State Police dashboard camera show any such encounter. Ex. 1, Declar. Benton at pg. 2.   Defendants attitude seems to be much like the cliche, "who are you going to believe, us or your lying eyes."   Defendants try to buttress their contention by snidely suggesting that Plaintiff is "not accepting of Grand Jury and clear facts.", as if the Plaintiff has no right to contest the Troopers' view of this young man's unnecessary and tragic death,   Again, they misstate what dashboard camera footage shows.   Such actions reflect the "police can't be questioned" attitude too prevalent in American Law Enforcement. The Troopers forget they are employed to serve and protect the public.

In contrast, camera footage paints an entirely different picture. First, no properly trained

police officer rushes a suspect's car without knowing what they might encounter.   That Defendants did so shows their lack of training or at best, their desire to cast aside protocol and to pursue the victim and punish him with a death penalty sentence for traffic offenses.

The Grand Jury received evidence from Goochland Commonwealth's Attorney, himself a former State Trooper, who controlled and provided information that tried and convicted the victim on unsubstantiated so-called evidence that was gathered some time after victim Hill's death and was unknown by the Troopers when they shot and killed him. The whole process was designed and orchestrated to cause the Grand Jury to refuse to indict either Trooper. There are multiple statements provided by both state Troopers that call into question the veracity of their accounting of what transpired. In addition, the Commonwealth's Attorney never inquired about Trooper Layton's pending excessive force investigation by the City of Richmond Police Department.


## DISPUTED FACTS

7.     **Defendants:** Trooper Layton overtook several vehicles in traffic to catch up to the suspect to observe and pace the vehicle driven by Hill without activating their marked state police vehicle's emergency signals to (a) not alert the speeding driver that the Troopers were attempting to effect a stop until the Troopers were closer to him so he would more strongly consider complying with the Troopers, (b) to observe any further potential pre-stop indicators of DUI, (c) to allow the Troopers time to mentally and tactically gather themselves, (d) to gather as much information as possible about the vehicle in case a pursuit did ensue and the suspect successfully evaded the Troopers, and (e) to prefill the traffic stop into the mobile data terminal including

entering the license plate. ECF #43, page 4, lines 9-18;

**Plaintiff:**   Plaintiff disputes that Troopers Layton and Bone ever considered at the time any of the above assertions. In fact, Trooper Layton said they had no particular reason to enter the license plate number into the terminal. Ex. 2, Layton Dep. Tr. Page 66 Lines 15, 16 17.

Troopers Bone and Layton, once the audio begins, appear to enjoy the fact that they were driving at a high rate of speed without sirens or lights on (contrary to Section 46.2-920 of the Virginia Code) and not thinking strategically at all.   Bone even joked, "These people are like whaaaa (inaudible.   Exhibit 3, page 9 line 3.   The Troopers also did not wait to receive any information from dispatch before rushing victim Hill's vehicle with guns drawn .   Ex. 2, Layton Dep. Tr.,pg. 89 , lines 3-19.         .

**12.   Defendants**: Claimed victim Hill was traveling at a rate of 120MPH when they began the pursuit.EC #43, pg.1   lines 5-8 ;

**Plaintiff:** Troopers Layton and Bone never indicate in their audio that that Victim Hill reached a speed of 120MPH when they began a pursuit, they do mention 96MPH. Ex. 3; pg. 9-14.

11. **Defendants**: Within a few seconds thereafter, the suspect shut his vehicle's lights off and sped up. EC# 43, pg. 5, 11.

**Plaintiff**:   Defendants only assume without concrete evidence that victim Hill deliberately turned his lights off. They never tested the vehicle to determine if the lights worked after the crash.

. 14.. **Defendants**: One of suspect's arms is seen exiting his vehicle's window in what appears to be a throwing motion. EC #43, pg. 5 para 14.

**Plaintiff: It** was at that point that Xzavier D. Hill gestured with his left arm out

the window.   Troopers produced no evidence that victim Hill threw anything out the window. Defendants' expert indicated it was possible he could be gesturing to the police. Ex. 4, Dep. Bartel pg. 76 line24.

15   **Defendants:**   Instead of coming to a stop, once the Troopers got behind the suspect vehicle fully on the right shoulder, the suspect vehicle abruptly U-turned to the left, across both lanes of I-64. The vehicle then slid down into the grassy median in the center of the highway where it stopped facing eastbound with the passenger side of the vehicle in contact with the tree line and the driver side parallel with the roadway. EC #43 para. 15 lines 22-23 ,pg. 5 page 6, lines 1-4.

**Plaintiff**: Xzavier D. Hill turned his vehicle around and drove into an embankment where his vehicle got stuck ... the car wasn't going anywhere.   Ex. 2, Layton dep., Pg. 85 at 4,5,6.   .

17.   **Defendants:**   "Trooper Layton positioned the police vehicle perpendicular to the suspect's vehicle in order to (a) block the suspect from traveling eastbound in the westbound lanes of I-64, (b) use the state police vehicle's headlights and flood lamps to illuminate the suspect vehicle without having to resort to manually adjusting his vehicle's spotlight, (c) block oncoming traffic from passing through and interfering with their stop, and (d) position the dash cam such that it would continue to capture and record the entire event. EC #43, page 6, lines 9-14

**Plaintiff:** Trooper Layton said, "I pulled my car off at a 45-ish degree angle to try to get in front of the car if they were able to successfully complete a U-turn into oncoming traffic. Ex. 2, Pg. 84, Deposition Layton at 18-25 .   "I had multiple reasons for trying to take up both lanes, but the main reason for the position of my vehicle was because in case he was able to successfully make a U-turn, I did not want him driving

into oncoming traffic". Id. at 84-85. A car traveled past the police cruiser and Troopers Layton and Bone while the vehicle was stopped in that position and the Troopers were out of the vehicle facing victim Hill.

Layton and Bone had no discussion about where the vehicle Layton was driving should be placed. Ex. 2, Layton deposition pages 85 and 86, at 24, 25, 1.

19. **Defendants**: Both Troopers then exited their vehicle, drew their weapons, and slowly approached Hill's vehicle on foot walking in a triangulating manner with their state-issued pistols pointed toward the suspect vehicle. EC #43, page 6, para. 19, lines 17-19.

**Plaintiff:** Troopers Layton and Bone exited the vehicle with their weapons drawn, both simultaneously screaming orders at victim Hill without any discussion and without any plan and rushed toward the car. Ex. 2 Layton Dep. Pages 99-100. As to their" slow approach" defendants can be seen and heard breathing heavily minutes after the incident ended with Hill's death., see Def. Ex. 1 video 5:40-7:07.

Layton said during his deposition that, " It was a high risk stop". Ex. 2 Layton Dep. Page 90 , lines 20-25.

Q.      Okay.   So did your training ever teach you to exit your vehicle such as you and Trooper Bone did with your guns drawn to approach the vehicle? Ex.2, Layton Dep. Pg. 93,lines 12-14.

A.      Our training did tell us to take our guns out, but in our training, there was no need to approach the car. Ex. 2, Layton Dep., lines 19,20.

Q.      In your training?   All right. So why did you approach this vehicle?

A.      Layton said "There were several reasons for needing to approach this vehicle. For one we needed to be able to see inside of the car, and the training that we received

on a flat part of the roadway, for example, the right or left shoulder, you're able to see all the occupants inside of the car, gauge their level of compliance, which was compliant in our training scenarios, but you're able to visualize all that in training.

And these circumstances, based on the angle of the car, all the different things we've talked about already, the only logical thing to do was to approach the car to be able to see inside.

There are concerns for any kind of emergency that may be involved inside of the car.   There could be multiple people. There was technically a crash.   There could have been injuries involved.   We needed to be able to see all that to gauge our further reactions.Ex.2 Layton Dep. Pg. 93 Lines 15-25, pg. 94 lines 1-15.

Page 94 Layton:   Trooper Layton was concerned there were passengers that could flee.   Ex. 2, pg. 94 lines 16, 17.

Defendants' expert witness indicated during his deposition that there was no indication that victim Hill was going to get out of his vehicle and run at the time Layton and Bone stopped their vehicle. Ex. 4, Dep. Bartel, page 117, Lines 3-17.

Trooper Bone, as Layton's Field Training Officer never discussed with him, what the proper protocol was or provide him with guidance on what he should do. Bone Deposition: Bone said he exited the vehicle because of his safety. Bone Dep. Page 87 line 24.

Layton did not know what the policy said at the time of the incident concerning use of deadly force. Ex. 2, Layton Dep. Page 107 lines 1-25; page 108, line1,2.

Page 96, lines 2-8;

Q.      All right.   Does your policy – did your policy at the time say, if feasible, the law enforcement officer has provided a warning to the suspect of the deadly force that

he will use deadly force? Do you recall that being in your policy?

A.   I don't believe that was in the policy at the time of the incident. Ex. 2, Layton

Dep. Page 96 Lines 2-10.

Q.      Do you recall having any kind discussion, you and Trooper Bone, about a **plan**

of action other than approaching the vehicle with your guns drawn?

A.      No, ma'am.

Q.      Okay.   So explain to me, what was –what was why did you approach the

vehicle with your guns drawn?   (Layton looks to his attorney

Did you know whether or not he was armed?

Layton, when asked whether or not Hill was armed, he said he had no affirmative

belief that the occupant was armed. Ex. 2, Layton Dep. Pg 89, 14-19. Troopers Layton

and Bone exited the vehicle with their weapons drawn without any discussion, without

any plan.   They independently drew their weapons. Ex. 2, Layton Dep. Pg.90 lines 2-

13.

21.   **Defendants:** As the Troopers approached and Trooper Bone was issuing

commands, the suspect continued to rev his vehicle's engine and spin his vehicle's

wheels for nine seconds in an effort to move the vehicle.   Both Troopers observed the

suspect still manipulating the steering wheel. The lights on the rear of the suspect's

vehicle illuminate and the body of the vehicle can be seen moving. EC # 43page 7, lines

3-8.

**Plaintiff:** Xzavier D. Hill turned his vehicle around and into an embankment

where his vehicle became immobilized.     Layton dep.,Page 85, at 17-20.     .

Ex. 3, Captain Robert P. Chappell Internal Affairs Report dated May 11, 2021, page

6 line 21-24   "He continued to try to move the vehicle, but once Layton and Bone got

out of their vehicle, he stopped."

23.    **Defendants:** Trooper Bone stopped giving verbal commands upon approach after he asked Trooper Layton, "you got him?" (meaning that Trooper Layton should take responsibility for the primary verbal commands) and Trooper Layton replied in the affirmative, stating "I got you." From then on, Trooper Layton gave the primary verbal commands. EC #43, page 7 line 13- 17.

**Plaintiff:**    Troopers Layton and Bone engaged in poor commands because they were inconsistent and given by them simultaneously. Ex. Bone Deposition Page 98 line 15-23; .   "There is a scripted protocol, where one officer talks to the motorist and the rest have other assignments. This is done to not confuse the motorist. The Law Enforcement professional talking gives specific commands to the motorist to gain compliance and resolve the event."   Kenneth Miller Expert Report Ex. 5 # page 7 para 2.

See below verbal exchanged transcribed by Captain Chappell: The transcript produced by Defendants indicate that the phrase, " you got him" had nothing to do with Layton taking over the commands as further indicated by Bone to give commands.

  Layton did not know what the policy said at the time of the incident concerning use of deadly force. Ex. 2, pg. 96 lines 2-10.

24.      The following verbal exchange can be heard on the video and was transcribed by the Virginia State Police and produced in discovery by Troopers Layton and Bone:

BONE: Slow, stopping

BONE: Alright radio, he turned around on us, he is going down into embankment

BONE: Get out of the car now, get out of the car now, get out of the car now

LAYTON: Show me your hands, do it now

LAYTON: Put your hands up

BONE: Hey, get him, (gesturing flashlight)

LAYTON: I got you

LAYTON: Put your hands up

LAYTON: Let me see your hands

BONE: Put your hands up

Hill: My door doesn't open

BONE: Put your hands up

**25.** **Defendants:** At this time, the suspect's hand can be seen in front of his face, inside the vehicle.

**Plaintiff** : Commands are given simultaneously by Troopers Bone and Layton, confusing victim Hill. Ex. 2, Layton Dep. Page 114-115 Trooper Layton testifies in his deposition that Victim Hill was "In compliance by putting hands in front of face." Layton changed command to put hands out the window even though Hill was in compliance. Layton Dep. Page 113, line5-25, pg. 114 lines 1-10;

HILL: My door doesn't open

LAYTON: Put your hands out the door, do it now

LAYTON: Put your hands out the door

HILL: My door doesn't open

LAYTON: Put your hands out of the door

LAYTON: Stop moving

LAYTON: Put your hands out the door

LAYTON: Put your hands out the window

LAYTON: Put your hands out the window

LAYTON: Hey, he is reaching, reaching, reaching

Trooper Layton never sees a gun, nor does he yell gun. Def. Exhibit 1 5:15,   Ex. 3,

Chappell report, pg 10.

BONE: Stop it he's got a gun

Two Shots

BONE: Gun

One Shot

BONE: Gun

BONE: He's got the gun in his hand

LAYTON: Yea, I got you

LAYTON: Hey drop the gun

BONE: Shots fired, subject's got a gun, have EMS start our way, approximately

25-year-old male, he is slumped up, need another unit

LAYTON: I can't see that gun, Bone

BONE: I can see it, dude

LAYTON: You got the gun?

DISPATCH: Copy, shots fired

LAYTON: Moving up to you, moving up to you

BONE: Move up, move up

BONE: Get your light

LAYTON: Yea, I got it

LAYTON: Do you see a gun?

BONE: You see the gun?

LAYTON: No, I can't see it

BONE: You got him?

LAYTON: Yep, hold on one sec, I gonna move, I gotta move

LAYTON: I can't see...I can't see the gun

LAYTON: I can't see it, I can't see it

LAYTON: I'm backing up

BONE: Okay, this is what I am gonna do

LAYTON: I got you, go ahead, (inaudible), I got you

BONE: Stay right there, right back where you were

LAYTON: Alright

BONE:   Alright, go right back up front

LAYTON: Yep

BONE: You don't see the gun at all?

LAYTON: No, I can't see it

BONE: Cross fire

LAYTON: Yep

BONE: I see it

LAYTON: You got it?

BONE: I see the gun, dude

Trooper Bone identifies the gun in the car and it was tucked in between the cushions of the passenger seat. Consistent with it being partially hidden and not under the body of victim Hill. Deposition Bone, page line. Exhibit # 6. Picture of gun.

LAYTON: Alright, cool

It was not possible that Hill pointed a gun at Trooper Layton.

PAGE 21" Layton said Hill was pointing gun at windshield, then began pointing it right out the driver's side window at him, he had begun to move back away from the vehicle; Never saw his finger.

LAYTON: I am gonna go for contact, ready?

BONE: He's bleeding everywhere man

LAYTON: Yea, I got your...

BONE: Just pull him out...holster and pull him out.

BONE: You hear him yell, let him go.

At this point Troopers Bone and Layton do not know whether he is alive or not. They do not check for a pulse or any other vital signs while he is in the vehicle.

LAYTON: Okay

BONE: Just pull him out

BONE: He's shot in the base of the neck

LAYTON: Okay, yea, I see it

BONE: Pull him out, get him on the ground

BONE: (Inaudible)

BONE: Pull him out and get him on the ground

LAYTON: I can't get him out

BONE: Here, I'm gonna help, I'm gonna help

BONE: You got gloves?

LAYTON: Na, in my bag

BONE: 1,2,3

LAYTON: Okay

BONE: Alright, let's turn him over, on stomach

LAYTON: Okay, good

BONE: Pull him up turn him on his stomach

LAYTON: Alright, I got him

LAYTON: Fuck

LAYTON: Anything?

BONE: It is very clearly no pulse

At this point Troopers Bone and Layton tampered with evidence by removing the body and destroyed any possibility of Plaintiff being able to demonstrate Victim Hill did not have a gun in his hand.

34. **Defendants**: The suspects hands were not touching the gun only because his torso   and arms were being stopped by the center console. EC #43, page 10.

**Plaintiff**: The physical evidence does not support Trooper Bone's contention that victim Hill ever held a gun. Forensic cannot confirm that victim ever held the gun. Ex. Chappell Report page   Troopers Bone and Layton moved the body which destroyed any opportunity for Plaintiff to prove victim Hill did not point a gun at Layton. . "Primer residue samples were collected from Hill at the scene, however, the results were not submitted to the lab for testing due to Bone and Layton both touching Hill when they removed him from the vehicle. Ex. 3, Page 8 Captain Chappell, Jr. lines 34-37.

25. **Defendants:** Trooper Bone moved up to the front passenger door, still monitoring the suspect for movement and peered inside through the closed windows. Trooper Bone could see the gun as he peered in. the gun was directly underneath the suspect's hands as he lay slumped over the center console and front passenger seat. The suspect's hands were not touching the gun only because his torso and arms were

being stopped by the center console. EC# 43 page 10, para. 34 lines 4-9

      **Plaintiff:**   Dragged him out of car by his arms; did not lift him out of the car. Ex. 2, Layton Dep.,Pages 135-136 lines 25; 1-17. At this point Troopers Bone and Layton tampered with evidence by removing the body and destroyed any possibility of Plaintiff being able to demonstrate victim Hill did not have a gun in his hand. "Primer residue samples were collected from Hill at the scene, however, the results were not submitted to the lab for testing due to Bone and Layton both touching Hill when they removed him from the vehicle. Ex.3   Page 8 Captain Chappell, Jr. lines 34-37.

First Aid Tourniquet Ex. 2, Layton Dep.,Page 137 lines 18-25; Page 1-25; Earlier said he could not see breathing the said applying pressure would cut off airways. Troopers Bone and Layton rendered no aid to victim Hill.

**Additional Facts to Consider:**

**Truth and Veracity of Troopers:**

    **A.**     **Trooper Layton**

       1.     Trooper Layton was asked in his deposition :

          Q.     I mean, why did you leave the City of Richmond Police Department?

          A.     Right.    I left because the Virginia State Police offered more career progression opportunities for me.

          Q.     Okay.    And you didn't have any problems with Virginia - - with the City of Richmond Police Department before you left?

          A.     That's correct.

Ex. 2, Layton Deposition page 24, Lines 15-22.

Trooper Layton lied because he abruptly resigned from the City of Richmond Police /Department while he was the subject of Internal Affairs investigation for excessive force.

Ex. 7  #    page 34.  " Violation 1-General Order 1-1 Code of Conduct, X Rules of Conduct, #38 Use of Force-All Other Violations.   Layton did not cooperate in the investigation   did not make a statement due to his separation from the department. The investigation did not clear him.

INTERNAL AFFAIR DIVISION I.A.D. 2020-0038 *(authenticated pursuant to Rule 901(b)(4) U.S. v. Vidacak, 553 F. 3d 344, (4th Cir. 2009); United States v. Bagaric, 706 F. 2d 42 (2d Cir. 1983).*

2.      Layton was asked to "produce documents of all complaints lodged against you since you have been employed as a law enforcement officer including the time before and after you became a Virginia State Trooper.   His response was "[d]efendant has no documents responsive to this request." Exhibit # 8, page 2, para. 4. . His answer is a second lie.

3.      Layton indicated that Xzavier D. Hill pointed a gun directly at him"
In the audio and video that was produced by him in discovery and in his deposition testimony he stated that he moved back from the vehicle 8 feet towards the back of the vehicle when he saw Xzavier D. Hill reaching. He never saw a gun, but just began shooting. Ex. 3, pg., 9-11, pg. 22, line 18.Chappell Report.

4.      Layton said Xzavier D. Hill was not compliant but in his deposition testimony he said that victim Hill "In compliance by putting hands in front of face. Ex. 2 Pg. 116 Changed command to put hands out the window even though Hill was in compliance.

**B.  Trooper Bone:**

1.      Trooper Bone said that as the field Training Officer for Trooper Layton, he did not provide any directives for Layton but was only there to monitor him. Ex. 9

Deposition pg.35 , lines 3-10; however Bone gave several directives to Layton, e.g., "turn off the siren; don't reload your gun, don't make any statements.

2.      Trooper Bone initially stated "He was raising it (pistol) up high enough for me to see and up righting his body…he came up with the gun, quickly and started to right himself almost to gain control of his body with the gun in his hand firmly and that's when I fired, I believe two rounds, maybe three and he slumped over to the right, passenger seat."   Ex 9,   page 7, lines7-11. Trooper Bone later said the gun was pointed at Layton. (Must have figured it out that just having a gun without a threat would not justify his shooting and killing victim Hill. Deposition page 97    lines 3-8 Captain Robert P. Chappell, Jr. dated May 11, 2021

Commonwealth Attorney for Goochland County:

Plaintiff viewed the video dash cam from Trooper Layton vehicle in the office of the Commonwealth attorney for Goochland county.   She and her family have indicated that the video viewed in his office is different from the video that was released from to the public. See affidavits from Corey Benton , and LaTonya Snow a Declaration Ex.1 from Plaintiff.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide that a District Court "shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a); Jacobs v. N.C. Admin. Office of the Courts, 780 F. 3d 562, 568 (4th Cir. 2015).*   Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56 (c)*. The existence of an alleged factual dispute between the parties will not defeat a properly supported motion for summary judgment, unless the disputed fact is one that might affect the outcome of the litigation. *JK Holding Co. LLC v Washington Sports Ventures, Inc., 264 F. 3d 459, 465 (4th Cir. 2001) (citing Hooves-Lewis v. Caldera, 249 F. 3d 259, 265 (4th Cir. 2001)).* Mere speculation by the non-movant cannot create a genuine issue of material fact. *Cox v. County of Prince William, 249 F. 3d 295, 299 (4th Cir. 2001).* A material fact is one where its existence or non-existence could result in a different jury verdict. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).*

Any permissible inference to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. Ltd. V. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).* However, such inferences must "fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *Thompson Everett, Inc. v. National Cable Advert., L.P. 57 F. 3d 1317, 1323 (4th Cir. 1995).*

When a moving party "seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense." *Ray Commc'ns, Inc. v. Clear Channel Comms'ns, Inc. 673 F. 3d 294, 299 (4th Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 331, 106 S.Ct. 254, 91 L. Ed. 2d 265 (1986)).*

The function of the Court at the summary judgment stage is not to determine the truth of a matter or to weigh credibility, but to determine whether there is any genuine issue of fact that can only properly be resolved by a finder of fact because it could reasonably be resolved in favor of either party. *Anderson, 477 U.S. at 250.*

## ARGUMENT

### A.   FOURTH AMENDMENT USE OF EXCESSIVE FORCE

### There Exist Disputes of Material Facts

Whether an officer utilized excessive force in violation of the Fourth Amendment requires that a court pay close attention to the facts of each case, by weighing factors including the seriousness of the crime under investigation, whether the suspect poses an imminent threat to the safety of officers or third parties, and whether the suspect is actively resisting arrest or fleeing. *See Graham v. Conner, 490 U.S. 386, 396-97 (1989).*

Victim Hill was not at risk of fleeing. Defendants' expert witness indicated during his deposition that there was no indication that victim Hill was going to get out of his vehicle and run at the time Layton and Bone stopped their vehicle. Ex. 4, Dep. Bartel, page 117, Lines 3-17. Victim Hill was also not trying to flee when he became stuck in the median and remained in his vehicle. Ex. 3, Captain Robert P. Chappell Internal Affairs Report dated May 11, 2021, page 6 line 21-24   "He continued to try to move the vehicle, but once Layton and Bone got out of their vehicle, he stopped."

Victim Hill was not an imminent threat to the safety of Troopers Layton, Bone or any third parties. Troopers Bone and Layton both indicated they had no reason to believe that Victim Hill was armed.   Ex. . Bone Dep.     Ex. 2, Layton Dep. Pg 89, 14-19 was asked about whether his training tells him to approach a vehicle as in this case with guns drawn .Ex. 2 Page 93 Layton deposition : "Our training did tell us to take our guns out, but in our training, there was no need to approach the car."   Plaintiff's expert indicated that "[o]n felony stops which are based on behavior, known information and or radio traffic, Law Enforcement professional treats the motorist in the vehicle as a

barricaded person and does not approach.    In this type of case, Law Enforcement have their weapons at the ready position and are behind cover.    Normally the wheel wells or engine block.    There is a scripted protocol, where one officer talks to the motorist and the rest have other assignments. This is done to not confuse the motorist.    The Law Enforcement professional talking gives specific commands to the motorist to gain compliance and resolve the event."    *Kenneth Miller Expert Report Exhibit #5 , pg 7 para 2.* Trooper Layton admitted that he and Bone did not follow their policy when they approached the vehicle with guns drawn. *Layton at 93*

In fact, Defendants' expert Perry Bartels indicated that he relied upon section 19.2-83.5 of the Code of Virginia and Virginia State Policy Training Course in rendering an opinion. One main contention is whether Troopers Layton and Bone should have complied with their training: 1) whether the law-enforcement officer engaged in de-escalation measures prior to the use of deadly force, including taking cover, waiting for backup, trying to calm the subject prior to the use of force, or using non-deadly force prior to the use of deadly force; 2) whether any conduct by the law-enforcement officer prior to the use of deadly force intentionally increased the risk of a confrontation in deadly force being used; and 3) the seriousness of the suspected crime. Ex # 4, Bartel Dep. Pg.100 line 22-25; pg. 101, lines 1-5;     .

Troopers Bone and Layton did not comply with any of this. They did not know what the situation was; they just blindly began rushing toward the vehicle.

. Mr. Miller, Plaintiff's expert, indicated there was no need for Troopers Layton and Bone to leave cover and approach victim Hill; There was no indication that victim Hill was a dangerous person, since they did not wait to receive any information from dispatch, he obviously was not going anywhere, since he was immobilized and his car

door couldn't open. Page 7,8, Expert report Ex.4 . If the troopers had followed their policies and procedures the crimes victim Hill could have been charged with would not cause him to end up dead. Dep. Page 171, lines 10-14; Mr. Miller indicated the Troopers did nothing to try and calm Hill or any other Ex 5, pg.197 lines 17-25; page 198 lines 1;

Defendants have stated that victim Hill was in compliance when he responded to the commands of putting his hands up; victim Hill put his hands up; *see Layton Deposition and Report from captain Chappell;* Ex. 3,Captain Robert P. Chappell Internal Affairs Report dated May 11, 2021 page 6, line 27-30; Bone said, "He put his hands up and he put them out the window, they were obviously shaking and his eyes were darty, he was looking around." Hill said, "I can't get out." Hill was complaint again when Layton told him to put his hands up, he put them up in front of his face as directed and then Layton changed the command. Layton Dep. Pg 116 . In addition Layton and Bone gave commands simultaneously, (see transcription of tape from Captain Chappell report pages 9-11. Plaintiff's expert witness, Kenneth Miller, said they were poor commands because "two officers yelling at him, shocking him with information...were poor commands." Ex. 5, Dep. Kenneth Miller, page 162 lines 8-14. Miller indicated in this case, you had two officers yelling at him giving di one officer should talk the other does not talk and does the work. Id. Lines 8-10.

Victim Hill did not pose an imminent threat to the safety of officers or third parties after Bone fired the first shot. Bone: "[a]fter the first 2 shots I fired, but prior to the 3rd round I fired, I did not know the suspect had been critically wounded and it was him slumping over. I was not sure I hit him at all with how fast he moved over, I still considered him a threat until the time after my 3rd shot was fired. I focused on the center mass of the white

t-shirt I remember he was wearing as I fired that 3rd round while moving a step up and around the b-pillar of the car.  At some point, I hear Tpr. Layton fire but saw no muzzle flash.  I know I shot first and last." Bone, Statement made to Chappell, Jr. April 28, 2021, Ex. 3, page 5, lines 6.

Bone continued to shoot Victim Hill even after he was no longer a possible threat.  See *Brockington v. Boykins, Civil No. CCB-8-1713 (D.Md. Sep. 24, 2014)* ( a fact finder must evaluate the magnitude of Brockington's injuries after the first volley of shots; whether those injuries were apparent; Brockington's excessive-force claim is premised on the latter volley(s) of shots alone; he long ago conceded that Boykin's initial use of force to subdue him was lawful.  *See, e.g., Brockington v. Boykins, 637 F. 3d 503, 507 (4th Cir. 2011)*.  In addition, it is questionable whether victim Hill was armed and posed a threat to Troopers Layton and Bone .The conflicting evidence is 1) Victim Hill had a gun pointing up towards the ceiling of the vehicle; Bone Dep.. page, line   . Bone Statement made to Ex. 3, Chappell pg. 10 line 26; . 2) Layton " did not see gun, yelled reaching , reaching; video, transcribed by  Chappell; Victim Hill pointed gun directly at Layton;. Layton, I stepped back 8 feet from the vehicle when I saw Hill reaching... ;   Plaintiff's expert witness has indicated he does not believe that Victim Hill was pointing   a gun at Layton when Bone and Layton shot and killed him. He bases his opinion upon the autopsy report (he was hot in the left side of his face , left hand and back of his neck) if Victim Hill had pointed the gun at Layton the way he or Bone described Victim Hill would have been shot in the "frontal with wounds." Shot in the face. Ex.5, Pages 204-205   lines 14-25; 1-5;

In addition, victim Hill was left handed, the gun Defendants alleged Bone located in the vehicle was jammed, with no clip in it.  They would want a person to believe that victim hill pointed a jammed gun with his nondominant hand at an officer who was armed

with gun pointed at him along with another officer to his right with a gun pointed at him. Unless victim Hill wanted to commit suicide or was mentally ill it defies logic.

### B. THE TROOPERS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Although Defendants assert (at 14 ,EC #43) that they are entitled to qualified immunity in this matter, they are mistaken.   As the Fourth Circuit has explained, "[t]he burden of proof and persuasion with respect to [the] defense of qualified immunity rests on the official asserting that defense." *Meyers v. Baltimore Cty., 713 F. 3d 723, 731 (4th Cir.(2013); See also Belton v. Belue, 942 F. 3d 184, 190 (4th Cir. 2019).*

Qualified immunity shields police officers who commit constitutional violations from liability when, based on "clearly established law," they "could reasonably believe that their actions were lawful." *See Booker, 855   F. 3d at 537-38; see also Maciariello v. Sumner, 973 F. 2d 295, 298 (4th Cir. 1992)* ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.") To determine whether qualified immunity applies, the Court conducts a two-step inquiry, in either order: (1) whether a constitutional violation occurred; and (2) whether the right was clearly established at the time of the violation. *See Booker, 855 F.3d at 538.*

Should this Court correctly determine that a jury could find that Troopers Layton and Bone violated Hill's Fourth Amendment right to be free from excessive force, the question then becomes whether Hill's right was clearly established.

To determine whether this right was clearly established, the Court must first define the right at the "appropriate level of specificity." *See Booker, 855 F.3d at 539 (citation omitted).* Although *Tennessee v. Garner, 471 U.S. 1 (1985), and Graham v. Conner, 490 U.S. 386 (1989),* guide the Court's analysis of whether deadly force is unconstitutionally

excessive, those cases define the right generally and "do not by themselves create clearly established law outside 'an obvious case.'"   *White v. Pauly, 137 S. Ct. 548, 552 (2017) (citation omitted); see also Graham, 490 U.S. at 396* (holding that among the factors to be considered under the Fourth Amendment's "objective reasonableness" standard are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight").

Victim Hill was not suspected of committing a violent crime; he posed no threat to anyone, including Troopers Bone and Layton; and he was not attempting to evade arrest when he was trapped in his vehicle and put both hands up as commanded by Trooper Layton. As in prior cases, "the weakness of the   Graham factors was so apparent that any reasonable officer would have realized that the force employed was excessive." *Smith v. Ray, 781 F. 3d 95, 106 (4ᵗʰ Cir. 2015).*

This prohibition on using grossly disproportionate force was firmly established as of January 9, 2021, the date on which Layton and Bone shot and killed victim Hill. As if forecasting this case's very fact pattern, the Fourth Circuit had previously rejected an officer's effort to assert qualified immunity due to " the simple fact that the officer took a situation where there obviously was no need for the use of any significant force and yet took an unreasonable aggressive tack that quickly escalated into a violent exchange." *Smith, 781 F. 3d at 104; see also Meyers, 713 F. 3d 734* ("[O]fficers using unnecessary, gratuitous, and disproportionate force . . . are not entitled to qualified immunity" (quotation omitted)); *Jones v. Buchanan, 325 F. 3d 520, 530 (4ᵗʰ Cir. 2003) (*clarifying that a use of force exceeds constitutional bounds when there is no "legitimate law enforcement need. Even if Layton and Bone's version of events were not blatantly contradicted by the record,

traffic infractions and even evading and eluding, or suspected commission of nonviolent crimes – cannot justify the type of "violent exchange" Bone and Layton initiated.   Layton and Bone did not follow the Virginia State Police Policy and escalated the encounter with victim Hill:   (1) The law-enforcement officer reasonably believes that deadly force is immediately necessary to protect the law-enforcement officer or another person, other than the subject of the use of deadly force, from the threat of serious bodily injury or death; (2) If feasible, the law-enforcement officer has provided a warning to the subject of the deadly force that he will use deadly force; (3) The law-enforcement officer's actions are reasonable, given the totality of the circumstances; and (4) All other options have been exhausted or do not reasonably lend themselves to circumstances. See Page 2, II The Code of Virginia (19.2-83.5) Deadly Force Training, Exhibit # 10; Also, Ex. 9 Dep. of Bone page 109 Line # 13-25, page 110,lines 1-25 .

The Fourth Circuit finds a clearly established right even if the court has not explicitly recognized the right "in a specific context. *Meyers v. Balt. County, 713 F.3d 723, 734 (4th Cir. 2013) (citations omitted)* ("it is not required that a right violated already have been recognized by a court in a specific context before such right may be held 'clearly established' for purposes of qualified immunity").   Troopers Layton and Bone claim they were never confronted by a situation like the one encountered with victim Hill on January 9, 2021. They however, should know that they were not allowed to shoot and kill an unarmed ,18 year old child, because they were either over reacting, did not follow policy and lied about the events that led up to the shooting.

The Fourth Circuit has also ruled that the clearly established analysis includes whether the official acted "beyond the boundaries of his discretionary authority. *Better Gov't Bureau v. McGraw (In re Allen), 106 F.3d 582, 593 (4th Cir. 1997).*

Unlawfulness can be apparent "even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); see also *Groh v. Ramirez*, 540 U.S. 551, 564 (2004) *Halsey v. Pfeiffer, 750 F. 3d 273, 296 (3d Cir. 2014)* (holding that even though it had not previously decided on the viability of a stand-alone claim for fabrication of evidence, reasonable officers should have known that they certainly could not fabricate inculpatory evidence");   Troopers Layton and Bone lied about the events that took place involving the shooting of "victim Hill." First, Kenneth Miller, Plaintiff's expert witness opined that if the incident occurred in the manner in which Bone described it ( Hill pointing the gun up towards the ceiling of the car) or Layton's version (Hill was pointing the gun with his right hand towards the left of the car) Hill would not have been shot in the back of the neck and left side of the hand and face, but would have been shot in the front of his face. Ex. 5, Miller Depos. Pg 205, 1-6; page 202- 203 lines 21 thru lines 1-11.

In this case, there are three distinct facts that separately define Hill's right to be free from excessive force at an appropriate level of specificity: (1)   That, although there may have been a gun in his car, had been secured by Troopers Layton and Bone immediately before he was released and shot; Hill was in compliance when he raised his hands in front of his face as commanded by Layton ; Layton and Bone violated the Virginia State Policy and Virginia State Law(Section 19.2-83.5), because they failed to engage in de-escalation measures prior to the use of deadly force, including taking cover, waiting for backup, trying to calm the subject prior to the use of force, or using non-deadly force prior to the use of deadly force; whether any conduct by the law enforcement officer prior to the use of deadly force intentionally increased the risk of a confrontation resulting in deadly force being used; Layton indicated in his deposition testimony that victim Hill was compliant and instead of trying to de-escalate the situation the troopers increased the risk of a confrontation by

continuing to give him different commands and shouting at him; (v) the seriousness of the

suspected crime.   (2)   Hill was immobilized before he was shot and killed;

This Court has to look to the dishonesty of both Troopers.   Layton never sees a gun as

delineated in the video produced by Defendants; Layton claims, only after Bone says he

saw a gun, that victim Hill pointed the gun in his (Layton's) face while at the same time he

says when he saw Victim Hill reaching, he moved back from the vehicle 8 feet. Grand Jury

testimony.   (3)   Based upon the Plaintiff's expert witness, the fact that Hill was shot in the

back of the neck, his left hand and his left face, it was impossible for Hill to be pointing a

gun at Layton when the Troopers shot and killed him; Hill would have been turning his head

to the left and he would have been shot in the face and the side of his right face.              .

Miller deposition.

In addition, Defendants destroyed evidence that would determine that victim Hill

did not have a gun in his hand. Dragged him out of car by his arms; did not lift him out of

the car. Ex. 2,   Pages 135-136 lines 25; 1-17. At this point Troopers Bone and Layton

tampered with evidence by removing the body and destroyed any possibility of Plaintiff

being able to demonstrate victim Hill did not have a gun in his hand. "Primer residue

samples were collected from Hill at the scene, however, the results were not submitted

to the lab for testing due to Bone and Layton both touching Hill when they removed him

from the vehicle. Ex.3   Page 8 Captain Chappell, Jr. lines 34-37. This represents

spoliation of the evidence. "Spoliation refers to the destruction or material alteration of

evidence or to the failure to preserve property for another's use as evidence in pending

or reasonably foreseeable litigation." Silvestri v. Gen. Motors Corp., 271 F. 3rd 583, 590

(4th Cir. 2001). A party may be sanctioned for spoliation where the party had a duty to

preserve material evidence and willfully engaged in conduct that resulted in the loss or

destruction of such evidence at a time when the party knew – or should have known – that the destroyed evidence was or could be relevant in litigation. Turner v. United States, 736 F. 3d 274, 282 (4th Cir. 2013).

The Defendants not only did not preserve the evidence, but destroyed the evidence intentionally and in bad faith, intended to deprive Plaintiff of access to the evidence it needed to prove her claim. Plaintiff has been irreparably harmed by the destruction of evidence, so a jury instruction will be an insufficient sanction. The appropriate sanction is for the Court to enter a judgment (as to liability) against the defendants. See QueTel Corp. v. Hisham Abbas No. 18-2334 (4th Cir. (Va.) July16, 2020).    In the alternative, an Adverse Inference should arise therefrom.

Because it was clearly established that officers my not shoot a secured, nonviolent or incapacitated person, the Troopers are not entitled to qualified immunity.

Defendants' Designations to the degree that it contradicts the other objective evidence, Plaintiff objects. Plaintiff incorporates her arguments set forth in her Motion to Exclude Evidence herein and asks that they be decided consistent with her requested relief sought.

### . PLAINTIFF'S STATE LAW CLAIMS CONTINUE TO BE VALID

The state law claims are not governed by Qualified Immunity.

### Conclusion

Because there are material issues in dispute Troopers Bone and Layton's use of force was unreasonable under the circumstances and because it fails both prongs of the qualified immunity analysis at this stage the Motion for Summary Judgment should be denied.

LATOYA K. BENTON, ADMINISTRATOR
OF THE ESTATE OF XAZIER D. HILL,
DECEASED

By _____/s/_____
    Verbena M. Askew, Esquire
    Virginia State Bar #19511
    THE VERBENA ASKEW LAW FIRM, P.C.
    2 Eaton Street, Suite 708
    Hampton, Virginia 23669
    (757) 722-4100 Telephone
    (757) 722-1801 Facsimile
    vaskewlawfirm@verizon.net

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of February 2023, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Robert B. McEntee, III, Assistant
Attorney General
**Office of the Attorney General**
202 North 9th Street
Richmond, VA 23219
(804) 786-8198
(757) 453-7578 Fax
rmcenteeiii@oag.state.va.us

             _____/s/_____
             Verbena M. Askew, Esquire
             Virginia State Bar #19511
             THE VERBENA ASKEW LAW FIRM, P.C.
             2 Eaton Street, Suite 708
             Hampton, Virginia 23669
             (757) 722-4100 Telephone
             (757) 722-1801 Facsimile
             vaskewlawfirm@verizon.net