1  assume that it was the left side of his face.

2      Q.   Okay.  Now, after -- after he was shot by you and

3  Trooper Bone, then what did you do?

4      A.   I'm sorry.  Could you repeat the question, please?

5      Q.   After Mr. Hill was shot by you and Trooper Bone, what

6  did you do?

7      A.   After we discharged our firearms, I tried to maneuver

8  to an area -- after checking on Ben Bone, I tried to maneuver

9  towards the front of the vehicle so that we could see the

10  firearm before trying to -- just to make the scene safe before

11  trying to do anything else.

12      Q.   And how long did it take you and Trooper Bone to find

13  this firearm?

14      A.   We couldn't see it from the driver compartment, so we

15  had to wait for Trooper Bone to go around to the -- to the

16  passenger side, but it was probably a matter of seconds.  It

17  was fairly fast.

18      Q.   And once it was found --

19          Who found it?

20          Mr. Bone?

21      A.   Yes, ma'am.  I was still on the driver side, so I

22  wasn't able to see it.

23      Q.   So you searched for the gun.

24          And can you tell us, did you see it?

25          Did you find it or did Trooper Bone find it?

1    A.    Trooper Bone located the firearm in the car and

2  verbalized that to me.

3    Q.    All right.  Did you ever see where the firearm was?

4    A.    I'm sorry?

5    Q.    Did you ever see where it was located, the firearm?

6    A.    Yes, ma'am.

7    Q.    You saw it?

8    A.    Yes, ma'am.  Eventually.

9    Q.    After he found it, eventually.

10         Okay.  Was it in Mr. Hill's hand?

11    A.    No, ma'am.  It was on the seat.

12    Q.    Okay.  It wasn't on the floor.  It wasn't in his

13  hand.  It was on the seat.

14         Was he on top of the gun?

15    A.    His body had slumped over into the passenger side of

16  the car where the gun was located, but he was already out of

17  the car by the time that I actually put eyes on the firearm.

18    Q.    Okay.  So you didn't see it while he was in the car?

19    A.    Not after discharging the firearms.

20    Q.    I got you.

21         So at the time then that I guess Trooper Bone was

22  trying to secure the vehicle, were you the one that was trying

23  to remove Mr. Hill's body from the vehicle?

24    A.    Yes, ma'am.  Initially.

25    Q.    Okay.  Did you -- when you looked at trying to pull

1  him out the vehicle, did you check his pulse when you --

2  when -- before doing that?

3      A.   While I was standing in the front, I looked for

4  breathing, but my main concern was to get him out of the car

5  before checking the pulse to, hopefully, separate him from the

6  firearm.

7      Q.   So the answer is, no, you did not check the pulse

8  when he was in the vehicle?

9      A.   That's --

10      Q.   Correct?

11      A.   Yes, ma'am.

12      Q.   Okay.  So did you check anything else while he was in

13  the vehicle?

14      A.   Oh, I checked for breathing.

15      Q.   All right.  And how did you do that?

16      A.   Visually.

17      Q.   You visually.

18          All right.  And what were you looking at?

19      A.   The rise and fall of his chest.

20      Q.   Okay.  And so it took a minute to get them out the

21  door, right?

22      A.   I'm not sure exactly how long it took, but I wasn't

23  able to get him out by myself.

24      Q.   All right.  So Trooper Bone helped you get him out

25  the car?

1  A. Yes, ma'am.

2  Q. All right.  Then when y'all pulled him out the car,

3 then you dragged him on the ground, correct?

4  A. I'm not sure what you mean by that.

5  Q. Well, did you lift him up?

6  A. How so?

7  Q. Did you pick him up in your hands?

8  A. No, ma'am.  I wasn't able to do that.

9  Q. So the answer is no.

10   You didn't pick him up in your hands, correct?

11   So when you pulled him out the car, you pulled him

12 from, what, his legs or his arms?

13  A. His arms.

14  Q. All right.  So when I said dragged him, you pulled

15 his arms and he fell on the ground, correct?

16  A. Yes, ma'am.

17  Q. All right.  And then you dragged him.  And who --

18 someone maybe said, "Turn him over?"

19  A. I don't recall dragging him from the car.  I think

20 once he was out, we immediately rolled him over.

21  Q. Okay.  So did Trooper Bone pick him up?

22  A. I'm sorry?

23  Q. Did Trooper Bone pick up his body to get him out of

24 the car?

25  A. No, ma'am.  I believe we each tried to grab on to an

1  arm.

2      Q.   Okay.  So you pulled him out of the car, correct?

3      A.   Yes, ma'am.

4      Q.   All right.  And he landed on the ground, correct?

5      A.   I'm not sure.  What do you mean by "landed"?  But...

6      Q.   Well, you didn't pick him up, so where else was he

7  going?

8      A.   I mean, we placed him on the ground.

9      Q.   Oh, did you pick him up to put him on the ground?

10     A.   We had his entire upper body controlled and put him

11  on the ground.

12     Q.   So you had him by the arms and you pulled him and he

13  went on the ground?

14            MR. BROWN:  Objection.  Form.

15  BY MS. ASKEW:

16     Q.   Correct?

17     A.   Yes, ma'am.

18     Q.   All right.  Then what did you do?

19     A.   I'm sorry?

20     Q.   Then what did you do?

21     A.   After -- after he was on the ground?

22     Q.   After he got on the ground.

23     A.   Well, we rolled him over on to his back so that we

24  wouldn't create positional asphyxiation or anything so he could

25  still breathe, if that was a vital sign that he still had.

1    Q.   All right.  Tell me about your CPR training.

2         What did you -- you received something from the

3    Virginia State Police?

4    A.   Yes, ma'am.

5    Q.   All right.  What was it?

6    A.   I'm sorry?

7    Q.   Tell me about your training, CPR training.

8    A.   I mean, it was a course where they taught you the

9    proper methods to performing CPR, ensuring scene safety, trying

10   to get the proper equipment to do so, such as an AED, for

11   example, and then just the proper method to performing the

12   actual movement of chest compressions and breathing.

13   Q.   Do you have any equipment in your -- did you, on this

14   occasion, January 9, 2021, any equipment in your vehicle to

15   assist you in any way of first aid for Mr. Hill?

16   A.   We have first aid equipment in the vehicle, but

17   nothing that we could have used for this situation.

18   Q.   What do you have in your vehicle?

19   A.   Mostly, like, trauma kits for trying -- like,

20   tourniquets, for example.

21   Q.   What is a tourniquet?

22   A.   A tourniquet is something that we can place on an

23   external part of the body to stop a major arterial bleed, for

24   example.

25   Q.   Okay.  Do you know how to use it?

1     A.   Yes, ma'am.  It's only for extremities, though.

2     Q.   Okay.  Did you attempt that in this case?

3     A.   No, ma'am.  His major bleed was not on an extremity.

4     Q.   And you know that because?

5     A.   I'm sorry?

6     Q.   And how do you know that?

7     A.   We could see it.

8     Q.   What did you see?

9     A.   A major bleed coming from the back of the neck.

10    Q.   Okay.  And there was nothing you're saying that you

11 could do to assist him?

12    A.   The only way that I'm aware of to stop a major bleed

13 is by applying direct pressure and if we tried to apply

14 pressure to that part of his body, then we most absolutely

15 would have occluded an airway.

16    Q.   I see.  And that would have been worse than just

17 letting him die there?

18    A.   So occluding an airway would lead to probably

19 respiratory arrest, which would lead to cardiac arrest on top

20 of a major bleed.

21    Q.   I see.  So --

22    A.   What they teach you in CPR that -- your ABCs.  For

23 example, A, being airway, being the most important thing that

24 you have to configure.  So if that was obstructed in any way,

25 then we couldn't have proceeded.

1    Q.   Okay.

2              MS. ASKEW:  All right.  Let's go off the record.

3         I want to talk to my client.

4              THE VIDEOGRAPHER:  We're going off the video

5         record at 1:29 p.m.

6    (Off the record.)

7              THE VIDEOGRAPHER:  We're back on the video

8         record at 1:41 p.m.

9                             EXAMINATION

10   BY MR. BROWN:

11   Q.   All right.  Earlier, counsel had asked you questions

12   about your training, correct?

13   A.   Yes, sir.

14   Q.   And you were talking about, you know, the scenarios

15   that you were exposed to in training.

16   A.   Yes, sir.

17   Q.   During your training, do you get exposed to

18   scenarios?

19   A.   Yes, sir, we do.

20   Q.   And are there scenarios that you were not exposed to?

21   A.   Absolutely, sir.  I mean, it would be impossible to

22   expose us to every scenario that we might encounter in the

23   field.

24   Q.   How long have you been a police officer?

25   A.   I have been a police officer now for almost

1   five years.

2       Q.   And how many arrests, if you have any idea, have you

3   made?

4       A.   I couldn't even tell you.

5       Q.   Would it be in the dozens, the hundreds, or the

6   thousands?

7       A.   The hundreds.

8       Q.   And of those arrests, did you use force in any of

9   them?

10          And I'm not specifying any certain kind of force,

11  just force.

12      A.   Yes, sir.

13      Q.   Were any of those scenar- -- incidences, did they

14  consist of the exact same circumstances?

15      A.   No, sir.  Absolutely not.

16      Q.   So earlier counsel was asking you about the reasons

17  for the stop, and I think you testified that the suspect or

18  Mr. Hill passed you and was committing reckless driving; is

19  that right?

20      A.   Yes, sir.

21      Q.   And that you then -- I'm sorry -- also noticed a

22  headlight out?

23      A.   Yes, sir.

24      Q.   And you were also observing for a potential DUI?

25      A.   Yes, sir.

1    Q.    And you also testified that you activated your

2  lights?

3    A.    Yes, sir.

4    Q.    And what happened when you did that as far as

5  Mr. Hill's vehicle?

6    A.    Mr. Hill turned his lights off, accelerates to an

7  extremely high rate of speed.

8    Q.    At that point, was -- did you have any additional

9  reasons to pursue or stop Mr. Hill?

10   A.    Absolutely, sir.  I had observed an on-view felony

11  for eluding.

12   Q.    And you testified earlier that Mr. Hill had done a

13  U-turn?

14   A.    Oh, yes, sir.

15   Q.    Or attempted a U-turn?

16   A.    Yes, sir, attempted a U-turn.

17   Q.    And that was -- you testified that that was into or

18  towards oncoming lanes of travel?

19   A.    Yes, sir.

20   Q.    Was that also a consideration in your approach to the

21  vehicle?

22   A.    Absolutely, sir.

23   Q.    During the time that you had your overhead lights on

24  and you were pursuing, did you have occasion to view the -- I'm

25  sorry -- Mr. Hill do anything or see any part of his body?

1  A.  Yes, sir.  I saw a hand come out of the driver

2  window.  I don't re- -- I don't -- I couldn't tell which hand

3  it was and it was only for a split second.

4  Q.  And can you describe, for the record, what you saw as

5  far as could you describe the specific movement of his hand or

6  arm?

7  A.  It just -- it appeared to be a throwing motion from

8  what I could tell.

9  Q.  And how did that inform your stop and approach of the

10  vehicle or -- I'm sorry.  Did it inform at all your approach

11  and stop of the vehicle?

12  A.  Yes, sir.  It indicated to me that he may be trying

13  to get rid of some kind of evidence.

14  Q.  And how would that play into how you conducted a

15  stop?

16  A.  It just shows that he's trying to get away from

17  something --

18  Q.  Earlier --

19  A.  -- and even more desperate --

20  Q.  I'm sorry.

21  A.  -- to escape.

22  Q.  Finish.  I'm sorry.

23  A.  No.  You're fine.  And just trying to get away from

24  something and, perhaps, more desperate to escape.

25  Q.  Earlier, you were asked by opposing counsel about

1  possible discussions with Trooper Bone during this incident; is

2  that right?

3      A.   Yes, sir.

4      Q.   You testified that you did not have a discussion with

5  Trooper Bone about where to place the vehicle?

6      A.   Yes, sir.

7      Q.   Why was that?

8      A.   I mean, this was a very rapidly evolving situation.

9  There was a lot of urgency.  We did not have time to try to

10 figure out exactly where we should put the car.

11     Q.   Did you determine where this stop occurred?

12     A.   No, sir.  That wasn't up to me.  That was up to

13 Mr. Hill.

14     Q.   Did Trooper Bone determine where to conduct this

15 stop?

16     A.   No, sir.

17     Q.   Earlier, you were asked about if you had discussed a

18 plan and I'm -- now, I'm not talking about the placement of

19 your police vehicle, but a plan for the approach.

20          Same question, why didn't you discuss a plan with

21 Trooper Bone?

22     A.   Again, sir, it was a very rapidly evolving situation.

23 We didn't have time to do any of that.  There was a sense of

24 urgency.  We had to do something quickly.

25     Q.   What if you had taken time to discuss a plan, could

1  that have affected the danger level?

2      A.   I mean, absolutely.  I mean, when we parked the car

3  and started approaching the car, the wheels of the suspect

4  vehicle were still spinning and the engine was still revving.

5  And I testified that I saw the driver manipulating the steering

6  wheel, so even as we were approaching, he was still trying to

7  get away.

8      Q.   So those facts that you just referenced, the spinning

9  wheels and the manipulation of the steering wheel, did that

10  factor into your decision to approach the vehicle as opposed

11  to, as counsel said, take a cover?

12      A.   Oh, yes, sir.  Definitely.

13      Q.   And why is that?

14      A.   I mean, again, it just shows that he's still actively

15  trying to get away from us.  And if he was able to correct

16  that, he would have been -- he was already facing oncoming

17  travel on 64.

18      Q.   In your training or in troopers' training, are police

19  trained to take cover when somebody is fleeing from them?

20      A.   No, sir.  We're trained to chase them.

21      Q.   In fact, if you did not pursue a felony suspect,

22  could you be written up or disciplined for cowardice?

23      A.   Yes, sir.  Absolutely.

24      Q.   Earlier, you testified that you did not have

25  affirmative belief that Mr. Hill was armed; is that right?

1     A.   Yes, sir.

2     Q.   Did you have any belief as to whether he was unarmed?

3     A.   No, sir.

4     Q.   Similar question, you were asked earlier about if you

5 had a conversation with Trooper Bone about whether to draw your

6 weapons.

7          My question is, did you?

8          And I think your answer was, no, correct?

9     A.   Was that in reference to a conversation?

10    Q.   Yes.

11         You were asked whether you had a conversation with

12 Trooper Bone about drawing your weapons.

13    A.   Correct.  We did not.

14    Q.   And why was that?

15    A.   Again, there was a sense of urgency.  We both

16 independently made our own decisions to do that.

17    Q.   So going back to your training, you were -- you

18 received training in what you, I believe, called high-risk

19 stops?

20    A.   Yes, sir.

21    Q.   And how would you describe this stop in this

22 incident?

23    A.   I would describe this stop as high-risk.

24    Q.   Now, when we used the term "stop," is that -- does

25 that mean that the suspect has stopped voluntarily?

1    A.    No, sir.  Not necessarily.

2    Q.    Can you explain that a little bit?

3    A.    If the suspect puts himself in a situation, for

4  example, during a vehicle pursuit, when they've damaged their

5  vehicle to where it can't be operable anymore, then that would

6  be an example of a noncompliant driver who was forced to come

7  to a stop.

8    Q.    Okay.  I think you testified earlier that the

9  high-risk stop training covered certain scenarios?

10   A.    Yes, sir.

11   Q.    Can you describe what those are?

12   A.    Compliant motorist, someone, after we activated

13  lights and/or siren, they pull over to a convenient spot in the

14  roadway, be that the right shoulder or the left shoulder, and

15  they're able to, taken out at gunpoint, under our control.

16   Q.    Does your training allow you to exercise judgment and

17  discretion during stops?

18   A.    During high-risk stops or during --

19   Q.    Correct.  High-risk.  High-risks stops.

20   A.    I mean, absolutely.  There's no two scenarios that

21  are the same, so they have to be fluid.

22   Q.    Does the suspect's behavior drive those decisions and

23  discretion?

24   A.    Absolutely.  One hundred percent.

25   Q.    And was that the case in his incident?

1    A.    Yes, sir.

2    Q.    I'm going to transition into the use of deadly force.

3          In this case when did you use deadly force?

4    A.    When the gun was pointed at me.

5    Q.    And counsel had testified earlier that the gun was

6    pointed to the right.

7          Where was the gun?

8          MS. ASKEW:  Objection to your form of the

9          question about testifying.  I didn't testify.

10         MR. BROWN:  And that's how I'm going to keep my

11         question.

12         MS. ASKEW:  Well, I'm going to object to it.

13         MR. BROWN:  Okay.  Your objection is noted.

14         MS. ASKEW:  You didn't object to my questions.

15         MR. BROWN:  I did.

16         MS. ASKEW:  So you don't object to how I answer.

17         MR. BROWN:  I did object to it.

18         MS. ASKEW:  Well, I'm going to object to yours

19         and the characterization of it.

20         MR. BROWN:  Okay.  Duly noted.

21   BY MR. BROWN:

22   Q.    Earlier, counsel testified that the gun was pointed

23   to the right.

24         Where was the gun pointed?

25   A.    It was pointed to the left at me.

1     Q.   Specifically, where?

2     A.   I looked down the barrel, so at my face.

3     Q.   And counsel asked you earlier about warnings.

4     Did you give any warnings before you fired your

5 sidearm?

6     A.   No, sir.  We were just giving lawful commands.

7     Q.   From the time that you saw the gun pointed at your

8 face until the time you discharged your weapon, did you give

9 any warnings?

10    A.   No, sir.  That was a split second time frame.

11    Q.   Would -- would your training have instructed you to

12 give a warning in that scenario?

13    A.   No, sir.

14    Q.   Why didn't you use a less lethal option?

15    A.   The opportunity wasn't present for us to use any less

16 than lethal force.  If I -- if I could have used less lethal

17 force, I would have done it.

18    Q.   Earlier, you testified that one of the reasons you

19 approached the vehicle was that there could have been a

20 passenger or a flight on foot; is that right?

21    A.   Yes, sir.

22    Q.   And you testified there's a tree line?

23    A.   Yes, sir.

24    Q.   Did that inform your approach or help you decide

25 whether to approach the vehicle at the time?

1      A.   Yes, sir, it did.

2      Q.   Does your training tell you to avoid foot chases

3   because they might be risky?

4      A.   No, sir.  Absolutely not.

5      Q.   Police officers take risks in pursuing suspects; is

6   that -- is that right?

7      A.   Yes, sir.

8      Q.   Is it required?

9      A.   No, sir.

10     Q.   Well, let me ask you this:  Is part of the job as a

11  police officer, you're expected to take risks if you're

12  pursuing or confronting criminals or suspects?

13     A.   Yes, sir, I agree.  You are -- it is expected of us

14  to take risks.

15     Q.   So is it fair to say it's part of your job to put

16  yourself in danger?

17     A.   Yes, sir.

18     Q.   Moving on to your commands to Mr. Hill.

19          So who gave the first commands?

20     A.   Trooper Bone.

21     Q.   And do you remember how that went or what he said?

22     A.   I believe the words were, "Get out of the car now."

23     Q.   And at some point Mr. Hill said something?

24     A.   Yes, sir.

25     Q.   Do you remember what it was?

1     A.   "My door doesn't open."  I believe he said it twice.

2     Q.   After he said that, were there any commands to get

3 out of the vehicle?

4     A.   No, sir, not after I took over.

5     Q.   And how did you know to take over?

6     A.   Trooper Bone asked -- he said, "Do you got it?"

7        And I said, "Yes."

8     Q.   So after he -- Mr. Hill -- I'm sorry -- said, "My

9 door doesn't open," were there any commands that conflicted,

10 meaning between you and Trooper Bone?

11     A.   No, sir.  The only commands that he was receiving at

12 that time were to put his hands up.

13     Q.   Earlier, you testified that you asked him to put his

14 hands up or out the window?

15     A.   Yes, sir.

16     Q.   Why did you want to see his hands?

17     A.   So I would know that he's not reaching for anything.

18 When I wanted his hands out the window, it was a lot -- it's a

19 lot more effective for us to be able to control someone's hands

20 out of the window so we know that they're not going to be,

21 like, reaching into the car, for example.

22     Q.   And what do you -- why do you -- why do not want them

23 reaching into a car?

24     A.   Because it's all unknown to us.  They could present a

25 weapon or something when we're that close to them.

1     Q.    Earlier, you were asked about taking cover behind

2     your vehicle or -- I'm sorry -- by your vehicle.

3           Why didn't you do that?

4     A.    Well, the vehicle was in the middle of the roadway

5     and we had to approach the car.  Again, that was the only

6     logical thing for us to do so we could see what was going on.

7     Q.    Now, during the pursuit, you testified earlier that

8     you had passed vehicles?

9     A.    Yes, sir.

10    Q.    Did that inform your decision to not take cover or

11    stay with your police cruiser in the -- in the travel lanes?

12    A.    Yes, sir.

13    Q.    Why?

14    A.    I mean, it would be very dangerous for us to, like,

15    sit in the car, for example, with cars coming by.

16    Q.    I'm going to move on to after the shooting.

17          So you testified earlier that you didn't check

18    Mr. Hill's pulse while he was in the car?

19    A.    Yes, sir.

20    Q.    Why didn't you check for a pulse at that point?

21    A.    He wasn't separated from the gun yet.

22    Q.    And is that consistent with your training to separate

23    a suspect from a weapon prior to medical treatment?

24    A.    Oh, yes, sir.  It's part of securing the scene.

25    Q.    At any point, did you throw or drop Mr. Hill on the

1  ground?

2      A.   No, sir.

3              MR. BROWN:  I think that's all I have.  That's

4          all I have.

5              MR. MCENTEE:  Hold on.  Hold on.

6              MR. BROWN:  Hang on.

7  BY MR. BROWN:

8      Q.   Oh, earlier, you testified about Trooper Bone

9  activating the cruiser's video recording system?

10     A.   Yes, sir.

11     Q.   And I believe your testimony was he did that about

12 ten seconds after -- well, actually, I don't recall now what

13 you said, but what was the ten seconds?

14     A.   He activated the camera manually about ten seconds

15 after we pulled out into the roadway.

16     Q.   And if I told you that in the video there's --

17 there's video before that period --

18     A.   Sure.

19     Q.   -- of the inside of the police cruiser, why would --

20 how could that be?

21     A.   So our cameras are always recording.  Whether it's

22 saving that video or not determines on if the camera is

23 activated.  So if the camera is always recording and it's

24 constantly rewriting to the disk that's in the -- in the

25 system, it won't -- it will -- it will save video two minutes

1  before the camera is actually activated, but there's no audio

2  with that.

3         MR. BROWN:  Okay.  I think that's all I have

4      then.

5         THE VIDEOGRAPHER:  This concludes the deposition

6      of Seth Layton.  We're going off the video record at

7      1:56 p.m.

8

9      (This proceeding was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF VIRGINIA

COUNTY OF CHESTERFIELD, TO WIT:

ORIGINAL

    I, JACQUELIN O. GREGORY-LONGMIRE, Notary Public in
and for the State of Virginia at Large, do hereby certify that
the aforementioned appeared before me, was duly sworn by me,
and was thereupon examined by counsel, and that the foregoing
is a true and correct and full transcript of the testimony
adduced, taken to the best of my ability.

    I further certify that I am neither counsel for, nor
related to or employed by any of the parties to the action in
which this deposition is taken.  And, further, that I am not a
relative or employee of any of the counsel in the case, or
interested in the outcome.

    WITNESS my hand this _____3rd____ day of ___February___,
2023.

    My commission expires September 30, 2025.

    Notary Registration No. 7275579.


_____
JACQUELIN O. GREGORY-LONGMIRE

Jacquelin O. Gregory-Longmire
Commonwealth of Virginia
Notary Public
Commission No. 7275579
My Commission Expires 9/30/2025

CHANDLER & HALASZ, INCORPORATED
(804) 730-1222