# EXHIBIT 3



# COMMONWEALTH OF VIRGINIA
## DEPARTMENT OF STATE POLICE

May 19, 2021

TO:      Captain Ted E. Jones

FROM:   Captain Robert P. Chappell, Jr. RC

SUBJECT: Discharge of Firearm - Xzavier D. Hill
              303 14th Street NW
              Charlottesville, Virginia 22903
              (Trooper II Seth W. Layton #10821)
              I.A. Case No. 21-0111-0007A

The aforementioned subject matter was referred to the Office of Internal Affairs for investigation as prescribed by General Order ADM 12.01, paragraph 4.

This investigation was assigned to Sergeant Angela L. Shaffier, Office of Internal Affairs, and her completed report is attached hereto. I am forwarding this report to you for disposition in keeping with General Order ADM 12.01, paragraph 4, subparagraph b.

Please be guided by General Order ADM 12.00 for time frames for completion of investigations.

Attachment

RPCjr/plp



# COMMONWEALTH OF VIRGINIA

## DEPARTMENT OF STATE POLICE

May 11, 2021

TO:       Captain Robert P. Chappell, Jr

FROM:    Sergeant Angela L. Shaffier

SUBJECT:   Discharge of Firearm - Xzavier D. Hill
                     303 14th Street NW
                     Charlottesville, Virginia 22903
                     (Trooper II Seth W. Layton #10821)
                     I.A. Case No. 21-0111-0007A

Cross reference with I.A. Case No. 21-0111-0007B.

On January 9, 2021, I responded to the scene of a shooting on Interstate 64 (I-64) west at the 172.6 mile marker (mm). Upon arrival, I met with Captain Ted E. Jones (BFO, Division I) and Special Agent Justin R. Cowan (BCI, GIS, Richmond), who is the case agent assigned to investigate the shooting. Cowan informed me Trooper Benjamin I. Bone (Division I, Area 8) and Trooper Seth W. Layton (Division I, Area 8), fired their respective issued weapons at Xzavier D. Hill during an incident resulting in the death of Hill. BCI, Richmond Field Office processed the scene. I completed an Executive Summary from the information provided and after notification from Captain Norman E Gray, Sr. (BCI, Richmond) that BCI had concluded their investigation, I was assigned this case on April 21, 2021 (See Attachment No. 1).

A Use of Force Report (SP-80) was completed and forwarded to the Office of Internal Affairs (OIA) on January 11, 2021 (See Attachment No. 2).

Cowan documented the criminal investigation under LEAMS case # 21-533 and is summarized as follows:

> On January 9, 2021, the VSP Bureau of Field Operations (BFO) requested the VSP Bureau of Criminal Investigations (BCI) to respond to I-64 west at the 172.6 mm, in Goochland County, to investigate an Officer Involved Shooting incident which resulted in the death of Xzavier Hill.

BCI responded to the scene and observed a marked VSP patrol vehicle diagonal in the roadway and facing the median. A silver Mercedes was in the median, against the wood line and facing east bound. Hill was lying face up on the ground outside of the Mercedes driver's door.

BCI Agents viewed video from the in-car camera and observed Bone and Layton operating stationary radar on I-64 at Route 288. Layton was driving, in field training status and Bone, field training officer, was in the passenger seat. Layton pulled out behind a vehicle traveling west bound, activated the in-car camera and began to narrate the observed driving behavior. The narration included speeds from 93 miles per hour (mph) to 97 mph and driving behaviors of the vehicle. Bone entered the tag number from the Mercedes into his mobile data terminal (MDT) and the response from the MDT entry "KP1555" was heard in the audio review. The driver and only occupant of the vehicle was later identified as Xzavier Demonte Hill.

Layton and Bone activated their emergency equipment to affect a traffic stop. Lights were activated first and the distance between the troopers and the Mercedes increased. Layton stated, "taking off" and "turned his lights off". Bone turned on the siren and notified dispatch of the situation.

Bone advised dispatch the vehicle was turning around and then going down into an embankment. Layton stopped the patrol car and he and Bone approached the Mercedes. Bone and Layton both had their weapons and flashlights in their hands as they approached the Mercedes. Layton approached the front of the Mercedes and Bone approached the rear. Bone shouted a series of commands to the driver, to include, "get out of the car, now."

Layton instructed the driver to show his hands. Layton instructed Hill to put his hands up while Bone instructed Hill to get out of the car. Layton instructed Hill to put his hands up and to let him see his hands. Bone instructed Hill to put his hands up. Hill informed the troopers that his door does not open, multiple times. Hill reached out of the driver's window with his left hand and extended his arm outward in order to attempt to function the outside handle of the driver's door.

Layton and Bone continued to close the distance between themselves and the Mercedes and shouted commands at Hill. Hill retreated his left hand back into the Mercedes. Troopers instructed

Hill to stop moving and to put his hands out of the door. Layton closed his distance to the Mercedes and appeared to be in close proximity to the driver's side mirror. Bone appeared to be in close proximity to the rear quarter panel and looking into the vehicle with his flashlight from both the driver's side and the rear of the vehicle.

Layton announced Hill was "reaching" and he began to back away from the vehicle. Bone advanced on the vehicle and reached for the driver's door handle with flashlight in hand. Bone was looking into the vehicle and instructing Hill to stop reaching. Layton and Bone announced "gun" and fired their weapons.

Layton and Bone fired their weapons in quick succession, however, it is not clear from the video, which trooper fired first. Trooper Layton fired one shot and attempted to address a malfunction with his weapon. A distinct fourth shot appeared as having been fired from Trooper Bone's gun.

Immediately following the shooting, Bone notified dispatch he needed Emergency Medical Services (EMS) to respond to his location. Bone advised Layton, "He's got the gun in his hand." Layton responds, "Yea I got you." Layton advised he could not see the gun and Bone responded that he could not see it either and they both approached the vehicle again. Bone maneuvered to the passenger side of the Mercedes, where he informed Layton he saw the gun. Bone instructed Layton to holster his weapon, pull Hill from the vehicle, and to not touch anything in the car. Bone identified Hill was shot in the face and the neck. Once they removed Hill from the vehicle, they checked for a pulse and respirations and neither were detected.

Layton and Bone were instructed by supervisors to stand by and hold the scene. Both troopers remained in camera view as they awaited additional resources. Additional troopers, Henrico County Police Officers, Goochland County Deputies, and Goochland County EMS arrived at the scene. Hill was pronounced deceased at the scene by Fire Fighter/Paramedic David Huddleston (Goochland County Fire and EMS).

Upon the arrival of the Bureau of Criminal Investigation, Layton and Bone were found seated in Trooper Layton's patrol car. They were directed to exit the vehicle and sit in separate BFO vehicles outside of the immediate area of the crime scene. The scene remained secured until custody of the scene was transferred to the forensic team at 0719 hours.

A search warrant was obtained for the 2003 Mercedes and executed at 10:31 a.m. A crime scene examination was conducted by Special Agent William K. Johnson (BCI, GIS, Richmond). The crime scene report was completed on January 19, 2021 (See Attachment No. 3).

Special Agent Johnathan W. Johnson (BCI, GIS, Richmond) conducted LEICA scans of the scene. W. Johnson took overall photographs prior to the collection of evidence and during the crime scene examination. The photographs were documented with file numbers 20210112_000008, 20210112_000011 and 20210112_000012 (See Attachment No. 4).

Forensic Agents recovered a Smith & Wesson .40 caliber model SD40 semi-automatic pistol, Serial Number: "FCL1110", from the passenger seat of the Mercedes-Eenz. The pistol was covered in a red substance, consistent with blood and a cartridge appeared to be jammed in the chamber. The cartridge was .40 caliber with a head-stamp of "AGUILA .40 S&W". There was no magazine seated in the pistol.

A Smith & Wesson magazine was recovered in the front passenger floorboard leaning up against the passenger seat position lever and close to the center console. This magazine had a capacity of 13 rounds. A total of 8 cartridges were found to be loaded in the magazine. Each of the cartridges were .40 caliber with a head-stamp of "AGUILA .40 S&W".

The following is a list of all items collected:

Item 1: Sig Sauer P320 Semi-Automatic Pistol .357 caliber, S/N: 58C295057, with magazine and cartridges, recovered from Bone

Item 2: Sig Sauer P320 Semi-Automatic Pistol .357 caliber, S/N: 58C273133, with magazine and cartridges, recovered from Layton

Item 3: DVD of dash camera video from Layton's vehicle

Item 4: Primer Residue Kit collected from Hill

Item 5: DVD of dash camera video from Trooper J. Woodward's vehicle

Item 6: .357 caliber cartridge case from median near edge of roadway

Item 7: .357 caliber cartridge case from median, driver side rear tire of VA-UKP1555

Item 8: .357 caliber cartridge case from median, behind passenger

Item 9: Smith & Wesson SD40 Semi-Automatic Pistol .40 caliber, S/N: FCL1110, with cartridge, recovered from front passenger seat of VA-UKP1555

Item 10: 'Airsoft' type pistol PSM45, S/N: 20G68185 and magazine, recovered from front driver door pocket of VA-UKP1555

Item 11: Apple iPhone recovered from front driver door pocket of VA-UKP1555

Item 12: Counterfeit money from inside of VA-UKP1555, $100 denomination

Item 13: Apple iPhone recovered from front dash of VA-UKP1555

Item 14: Two (2) .40 caliber cartridges from cup holder in center console of VA-UKP1555

Item 15: One (1) .40 caliber cartridge from black stocking hat behind passenger seat of VA-UKP1555

Item 16: Smith & Wesson magazine recovered from front passenger floorboard of VA-UKP1555 containing eight (8) .40 caliber cartridges

Item 17: U.S. currency from inside of VA-UKP1555, totaling $435.00

On January 9, 2021, Cowan submitted an E-Trace request for the Smith & Wesson .40 Cal. pistol (S/N: FCL1110) recovered from Hill's vehicle. The trace provided the pistol was originally purchased on July 11, 2020, by Brendon Ervin Meekins of Chesapeake, Virginia (See Attachment No. 5).

On January 9, 2021 at 7:23 a.m., Cowan and Special Agent Kecia A. Perdue (BCI, GIS, Richmond) attempted an interview with

**HILL 078**

Layton, at the scene in Cowan's vehicle. Cowan introduced himself and Perdue, advised of the purpose of the interview and read Layton his Miranda rights. Layton advised he would like to have a lawyer present and the interview was concluded.

On January 9, 2021, Cowan and Special Agent Kecia A. Perdue (BCI, GIS, Richmond) interviewed Bone, at the scene in Cowan's vehicle. Cowan introduced himself and Perdue, advised of the purpose of the interview and read Bone his Miranda rights. The interview began at 7:27 a.m. and concluded at 7:42 a.m. The interview was recorded (See Attachment No. 6).

Bone agreed to speak with the agents and the following is a summary of his statements.

Bone advised, he and Layton were in the crossover, two crossovers east of Interstate 288 on I-64. Layton was driving and they were checking (radar) westbound traffic when the vehicle (referenced the silver vehicle currently sitting in the median) came through "the beam" in the low 90s and "we pulled out on him."

After they ran the tags, they activated the lights and "that guy blacked out his lights and sped up." The speed increased to 120 mph. They turned on the siren and initiated a pursuit.

Hill was slowing down and speeding up, moving from lane to lane and eventually turned around in the road and got stuck in the median. He continued to try to move the vehicle, but once Layton and Bone got out of their vehicle, he stopped.

Bone and Layton "triangled on the vehicle," with Bone on the rear of the vehicle and Layton on the front. They "yelled commands at the dude, show us your hands, put your hands out the window." Bone said, "He put his hands up and he put them out the window, they were obviously shaking and his eyes were darty, he was looking all around." Hill said, "I can't get out." Bone asked Hill if anyone else was in the vehicle and when he did not get an answer, he moved up to get a better view and Hill started moving to his right, toward the center console. Layton told Hill to show him his hands and Bone started to move back. Hill brought his hands from the right to the left and was making "gross movements...huge movements toward the driver's door...like the inside of the driver's door...the bottom of the seat where he was sitting in." Bone stated, "At that point, I don't know if we both shouted gun, I remember hearing gun and I remember 100 percent seeing a gun. He had

gone to the center console area, he turned and then he came back. He went for the bottom of his door panel and the bottom of his seat and it was very obvious, he was looking down...and all of his attention was down there, with both hands. At that point, I flanked some more and I saw him come up with his right hand and he was holding a pistol in his hand, gripping it as if he was going to shoot." Bone said, "He was raising it (pistol) up high enough for me to see and up righting his body...he came up with the gun, quickly and started to right himself almost to gain to control of his body with the gun in his hand firmly and that's when I fired, I believe two rounds, maybe three and he slumped over to the right, passenger seat."

Bone and Layton could not see the gun, so Bone moved around the vehicle to the passenger side. He observed the gun, covered in blood, but he did not touch it. Bone moved back to the driver's door and he and Layton pulled Hill out of the vehicle. The troopers then accessed Hill, observed severe bleeding and called for EMS.

This concluded the interview with Bone.

Investigator L. Carleton (Office of the Chief Medical Examiner) responded to the scene. Following her investigation of Hill's body and the conclusion of the forensic team's documentation, Hill's body was transferred by H & S Body Removal Service at 10:42 a.m.

On January 11, 2021, Special Agent Cowan attended Hill's autopsy at the Office of the Chief Medical Examiner (OCME) in Richmond, Virginia. As a result of the examination, Cowan obtained the evidence collected from the autopsy; two projectiles were recovered from Hill's body and forwarded to the Department of Forensic Science (DFS) for Examination.

On January 11, 2021, Cowan discovered the pistol recovered from the Mercedes had been reported stolen to Old Dominion University Police Department (ODUPD) on January 10, 2021(See Attachment No. 7). According to the ODUPD report, Meekins reported the gun was stolen from his vehicle between the January 7, 2021 and January 10, 2021. Meekins advised ODUPD that he knew Hill and Hill had been in his vehicle on January 7, 2021.

On January 19, 2021, Special Agent T. Cashin (BCI, HTC) provided an extraction of two cell phones recovered from Hill's Mercedes. Several photos were found of Hill holding a pistol in his right hand.

Multiple photos of the pistol recovered from the Mercedes were found on the phone, the earliest of which was dated January 7, 2021. The search history of the phone revealed searches which started on January 6, 2021, for topics such as "ran from police and got away," "ran from police and didn't pursue," "driving with lights off," Smith and Wesson SD40," "check gun serial number," "stolen guns," and "Smith and Wesson teach you a lesson" (See Attachment No. 8).

Hill had two pending legal matters at the time of his death. Madison County Sheriff's Office had an active warrant for failure to appear on a driving while suspended charge and Hill had a court date for pending charges in Stafford County Juvenile and Domestic Relations Court.

On February 23, 2021, Cowan received a copy of the DFS Certificate of Analysis report (#21-516) for the examination of all submitted firearms and projectiles. The report documented all three weapons (Smith & Wesson SD40 and two Sig Sauer P320s) functioning properly (See Attachment No. 9).

On February 23, 2021, Cowan received a copy of the Medical Examiner's Report to include toxicology (See Attachment No. 10). The cause of death was reported as gunshot wound to the neck and further stated the entrance of the wound was found at the posterior neck. The wound path involved the C1 and C2 vertebrae (fractured), partial transection of the spinal cord, pharyngeal soft tissue and maxillary sinus where the projectile terminates its path.

Another gunshot wound was noted to the left face. The wound path involved fractures of the left mandible and associated teeth, injury to the pharyngeal soft tissue, thyroid muscle, sternothyroid muscle and right clavicle where the bullet terminates its path.

Hill's toxicology report stated the following findings:

- 11-Hydroxy Delta-9 THC-6.1 ng/mL
- Delta-9 Carboxy THC-120 ng/mL
- Delta-9 THC-21 ng/mL

Primer residue samples were collected from Hill at the scene, however, the results were not submitted to the lab for testing due to Bone and Layton both touching Hill when they removed him from the vehicle.

**HILL 081**

This concludes the summary of the criminal investigation.

On January 9, 2021, at the scene, Cowan provided me with a digital video disc (DVD) copy of the video from Layton's dash camera at the scene (See Attachment No. 11). The video is transcribed as follows:

The audio begins at 2 minutes and 4 seconds into the video.

> BONE: What do you say, 96 right?
>
> LAYTON: I got 96
>
> BONE: These people are like whaaaa (inaudible)
>
> BONE: Okay, stay back from him (inaudible).
>
> BONE: West bound 175 and a half
>
> LAYTON: We are going 96 right now 94, 93, swerved
>
> LAYTON: Swerving, just crossed the, uh…crossed the line into the left lane
>
> BONE: Might as well get some more
>
> LAYTON: Just crossed it again
>
> LAYTON: Pacing at 95 right now, 96, 97, holding 97, I am gonna go ahead and turn it
>
> BONE: Let me get that tag before you light him up
>
> BONE: UKB1555
>
> LAYTON: You're ready, sorry I am going
>
> LAYTON: Alright, he is taking off
>
> BONE: Hang on, I'll call it in
>
> LAYTON: He turned his lights off
>
> BONE: Turn on your siren, I'll take the radio
>
> BONE: 957
>
> DISPATCH: Go ahead
>
> BONE: Not stopping turned lights off, still west bound
>
> DISPATCH: 10-4, I am direct
>
> BONE: Looks like he might be pulling over at 172.8

**HILL 082**

BONE:  Slow, stopping

BONE:  Alright radio, he turned around on us, he is going down into the embankment

BONE:  Cut your siren

DISPATCH:  10-4

BONE:  Get out of the car now, get out of the car now, get out of the car now

LAYTON:  Show me your hands, do it now

LAYTON:  Put your hands up

BONE:  Hey, get him, (gesturing flashlight)

LAYTON:  I got you

LAYTON:  Put your hands up

LAYTON:  Let me see your hands

BONE:  Put your hands up

HILL:  My door doesn't open

BONE:  Put your hands up

HILL:  My door doesn't open

LAYTON:  Put your hands out the door, do it now

LAYTON:  Put your hands out the door

HILL:  My door doesn't open

LAYTON:  Put your hands out of the door

LAYTON:  Stop moving

LAYTON:  Put your hands out the door

LAYTON:  Put your hands out the window

LAYTON:  Put your hands out the window

LAYTON:  Hey, he is reaching, reaching, reaching

BONE:  Stop it he's got a gun

Two Shots

BONE:  Gun

One Shot

**HILL 083**

BONE: Gun

BONE: He's got the gun in his hand

LAYTON: Yea, I got you

LAYTON: Hey drop the gun

BONE: Shots fired, subjects got a gun, have EMS start our way, approximately 25 year old male, he is slumped up, need another unit

LAYTON: I can't see that gun, Bone

BONE: I can see it, dude

LAYTON: You got the gun?

DISPATCH: Copy, shots fired

LAYTON: Moving up to you, moving up to you

BONE: Move up, move up

BONE: Get your light

LAYTON: Yea, I got it

LAYTON: Do you see a gun?

BONE: You see the gun?

LAYTON: No, I can't see it

BONE: You got him?

LAYTON: Yep, hold on one sec, I gonna move, I gotta move

LAYTON: I can't see...I can't see the gun

LAYTON: I can't see it, I can't see it

LAYTON: I'm backing up

BONE: Okay, this is what I am gonna do

LAYTON: I got you, go ahead, (inaudible), I got you

BONE: Stay right there, right back where you were

LAYTON: Alright

BONE: Alright, go right back up front

LAYTON: Yep

BONE: You don't see the gun at all?

LAYTON:  No, I can't see it

BONE:  Cross fire

LAYTON:  Yep

BONE:  I see it

LAYTON:  You got it?

BONE:  I see the gun, dude

LAYTON:  Alright, cool

LAYTON:  I am gonna go for contact, ready?

BONE:  He's bleeding everywhere man

LAYTON:  Yea

LAYTON:  Yea, I got your...

BONE:  Just pull him out...holster and pull him out

BONE:  You hear him yell, let him go

LAYTON:  Okay

BONE:  Just pull him out

BONE:  He's shot in the base of the neck

LAYTON:  Okay, yea, I see it

BONE:  Pull him out, get him on the ground

BONE:  (Inaudible)

BONE:  Pull him out and get him on the ground

LAYTON:  I can't get him out

BONE:  Here, I'm gonna help, I'm gonna help

BONE:  You got gloves?

LAYTON:  Na, in my bag

BONE:  1,2,3

LAYTON:  Okay

BONE:  Alright, let's turn him over, on stomach

LAYTON:  Okay, good

BONE:  Pull him up turn him on his stomach, turn, turn

LAYTON:  Alright, I got him

**HILL 085**

LAYTON: Fuck

LAYTON: Anything?

BONE: It is very clearly no pulse

LAYTON: Okay

BONE: I am gonna leave the car alone

LAYTON: I'm gonna let him go

BONE: Sounds good

BONE: It was in his right hand

LAYTON: You okay?

LAYTON: Yea, I saw it clear as a day. Are you okay?

BONE: Yea, he was reaching

BONE: Leave the car alone...you're good?

LAYTON: Yea

BONE: Nobody else in the back

LAYTON: Fuck

BONE: 957 Richmond, subject out of the vehicle, no pulse

BONE: We need everything diverted to the 288 exit, get the highway shut down now

BONE: Firearm recovered

BONE: You got blood on you?

LAYTON: Yep

BONE: Alright, maintain what you got, cut your light off so you won't lose it if you need more.

DISPATCH: 10-4, I'm direct, Henrico and Goochland are on the way.

LAYTON: You okay?

BONE: You good?

LAYTON: Yep, good

BONE: This sucks dude

LAYTON: Yea.

BONE:  You got your mic on?

LAYTON:  Yep...sure do

BONE:  We're just sittin...maintainin

LAYTON:  Yep

BONE:  So, we'll get more people here. Once they get that ramp closed down, we'll turn them around...

BONE:  We're not gonna make any more statements, nothing else said alright? Just accomplishing objectives for the scene.

BONE:  Don't reload. You didn't reload, did you?

LAYTON:  No

BONE:  Good, they'll make you count

This concludes the transcription of the first 9 minutes 58 seconds of the video as Layton and Bone begin to discuss moving traffic past the scene. Other units arrive at 12 minutes 50 seconds and the video continues to record for 1 hour, 33 minutes and 8 seconds. The video recording was stopped by Bone at the direction of First Sergeant Lee T. Elliott (Division I, Area 8) at 6:05 a.m.

The Computer Aided Dispatch System Incident History number for this incident is #DIV121001905 (See Attachment No. 12).

On February 25, 2021, the Multi-Jurisdictional Grand Jury for the Counties of Powhatan, Goochland, Louisa, Amelia, and Prince Edward concluded the actions of Layton and Bone to be justified and found no probable cause to believe the troopers committed any criminal offense in the shooting of Hill (See Attachment No. 13).

On April 26, 2021, First Sergeant Michael H. Hamer and I interviewed Bone at the OIA in Chesterfield. We identified ourselves and displayed our Internal Affairs identification. I explained the purpose of the interview was due to an administrative investigation. Bone was advised of his responsibilities and rights towards the investigation and he stated he understood them. The interview began at 10:28 a.m. and concluded at 11:09 a.m. Bone's response letter dated April 28, 2021 was consistent with his statements during the interview (See Attachment No. 14).

Bone's statements are summarized as follows:

At approximately four thirty in the morning, Layton was driving and Bone was in the passenger seat. Layton was running radar facing eastbound traffic checking traffic moving westbound on I-64 in Henrico County. The vehicle, later found to be operated by Hill, came through the beam in the mid to low 90s and increased as he passed by them. Layton pulled out of the crossover and Bone started to fill in the anticipated traffic stop information on the MDT. They ran the tag and continued to follow the vehicle and watch the driver's actions. Layton activated his lights and the suspect vehicle's lights went off. Bone handled radio communication and Layton verbalized what they were seeing as the vehicle continued to accelerate.

At the 172.8 mile marker, the vehicle started to veer off to the right shoulder and then made an abrupt turn and eventually ended up in the embankment where the vehicle became stuck. Layton and Bone approached the vehicle. Layton approached from an angle toward the driver's door and Bone approached from an angle behind the driver's door while the Hill continued to try to move the vehicle. Layton and Bone were both telling Hill to show his hands and Bone remembered hearing Hill say "fuck" as he took his hands off of the steering wheel and stopped trying to move the vehicle.

Bone advised Hill was looking all around as he and Layton gave commands and then Bone asked Layton, "you got him?", so that they were not both giving commands. Bone asked if anyone else was in the vehicle and remembered Hill saying he couldn't get out. Hill's hands were up and trembling. Bone had moved toward the back of the vehicle to attempt to see if anyone else was in the vehicle because Hill was not answering him and as he came back around he could see Hill's eyes were darting all around and he was looking all over the inside of the vehicle. Then Hill's right hand went down and Layton yelled, "he's reaching." Bone moved up toward the B pillar to get a better look and Hill put his left hand down and his hole upper torso with both hands turned toward the center console. Hill then made an abrupt movement with both hands from the center console to area between his seat and the driver's door. Bone could not see his hands until he came back up with a gun in his right hand in front of his face. Bone was approximately five feet from him and could see the gun well enough to see the texture of the grip on the gun. The gun was pointed at Layton as Bone found his sites, fired and hit Hill in the neck. Bone advised he yelled gun and he remembered hearing the word gun and Hill "leveled" the gun toward Layton. Bone immediately shot a second time and also observed Layton fire one shot. Hill slumped over toward the passenger seat and Bone fired a third shot toward Hill's center mass.

Layton and Bone communicated to each other that neither one of them could see the gun from the driver's side, so Bone holstered and as Layton covered him he moved around to the passenger side. Bone saw the gun on the passenger seat under Hill's hands. Bone advised Layton he would cover Hill as Layton attempted

**HILL 088**

to pull him from the vehicle. Bone could not get Hill out of the car, so Bone moved around to the driver's side and assisted with removing Hill from the car. Bone advised, "it's immediately clear that he's not alive...as his neck moved, you could feel the joints in his neck were destroyed." Bone immediately checked for a pulse and "there was nothing...there wasn't even body tremors...there was not agonal breathing, there was nothing."

Bone advised he had requested EMS immediately after he and Layton shot and he notified dispatch again after they removed Hill from the vehicle, that there was no pulse. Bone and Layton then waited for other units to arrive.

Bone was asked the following questions:

**So, a couple of times that you made gestures that to the recording, someone who is listening to it wouldn't quite know what you were referring to, so I wanted to go back. When you said you approached the vehicle and you came in from the back, let's see, from the driver's side rear tire?**

Bone said, "Correct, once I had gotten close to the vehicle, yes."

**You said, he had his hands up, still had his hands up, you said one hand went down. You showed us which hand...**

Bone said, "His right hand."

**His right hand went down. So, it went down toward the console?**

Bone said, "Center console, yes."

**Um, let's see...and then you said that it appeared that he dropped something right there or right here...what...you showed us with your hands, but...**

Bone said, "You want me to narrate it?"

**Yes**

Bone said, "So, he went to the center console with his right hand, um, his left hand was still initially up, but he abandoned that and then was, as I said before, reaching to the center console with what I would describe as a gross movement including a turning of his whole upper body. Then, he came back...I couldn't see what he was doing there with his hands...but it looked like he was going for the area of the center console, then a split second, he came back up, upright and at that point, it went from his

**HILL 089**

movement being quick but smooth to abrupt as if he was quickly trying to retrieve something down. It just seemed less coordinated I guess. Um, almost like he didn't expect it. I don't know how else to describe it but he went with both his hands down and his…his head, all of his attention was down between his…his seat and his driver door, where his left leg was before coming up and up righting himself and starting to level the gun."

**Okay and then you went into where you saw the gun…so, you were looking at him from, from the back and you showed us what you saw. Can you tell us what you saw, verbally without using your hands, with your kind of looking at the back of his head and can see his shoulders…what are you seeing?**

Bone said, "So, between…from my vantage point…he had a white t-shirt on…right above his right shoulder, like where his trapezius is and the edge of his shoulder and the right side of his face and neck where his right ear would be…that window, that square if you will, is where the gun was raised and that's where I could see it, right there. As he raised it up…"

**With his…with which hand?**

Bone said, "With his right hand, um, he was holding the gun in a grip that anyone would traditionally use to fire it. Um, I couldn't tell what his index finger was doing, but I immediately recognized that as a deadly threat and then his hands…I don't know what his other hand was doing, but I think he may have been gripping the steering wheel with his left hand. Um, but he was up righting himself and then the gun started to drop down like, kinda toward the front windshield area…"

**So, it was initially kinda pointed toward the roof of the vehicle?**

Bone said, "No, kinda like toward the A pillar. Almost like right passed the suspects face, towards his left."

**Which is where?**

Bone said, "Which is right where Layton was standing. Um and then he kind of came down a little bit with it, barely at all and that's something I noticed as I was finding my sites."

**So, when you're looking at him…you're looking at him through the driver/passenger widow or the driver window?**

Bone said, "Through the driver's window, the window is…or the driver's window hole…the window was down."

**The window was down, so you had a clear view of him?**

Bone said, "Clear view of him."

**So, were...first of all, let's see...why did you shoot?**

Bone said, "I felt that Layton was about to be shot and subsequently I could be shot...and killed obviously or seriously injured by the suspect."

**What were you aiming at when you fired?**

Bone said, "My initial shot, um, was at his right where I hit, his brain stem and the reason for that, I was going for center mass which would have been through the door and in that instant, my mind responded by thinking it may not stop the threat, it may not go through and then I raised up. His hair was...it kinda...he had black hair, so his hair blended in with kinda like the rest of the environment and then I just leveled on his neck and the second shot was the same spot."

This concluded the interview with Bone.

On April 29, 2021, Sergeant Michael H. DeBois and I interviewed Layton at the OIA in Chesterfield. We identified ourselves, I displayed my Internal Affairs identification and DeBois displayed his VSP ID (OIA credentials not yet received). I explained the purpose of the interview was due to an administrative investigation and delivered your notification letter, dated April 29, 2021 (See Attachment No. 15). Layton was advised of his responsibilities and rights towards the investigation and he stated he understood them. The interview began at 1:53 p.m. and concluded at 2:18 p.m. Layton's response letter dated April 29, 2021, was consistent with his statements during the interview (See Attachment No. 16).

Layton's statements are summarized as follows:

On January 9th at 4:45 a.m., Layton and his field training officer, Bone were operating stationary radar in the crossover on I-64 near the 177mm. Their vehicle was facing eastbound and they were monitoring westbound traffic. Layton was driving and observed a vehicle approaching at a high rate of speed, enter the radar at 92 mph and increased to 96 mph. Layton pulled out behind the vehicle and Bone activated the dash camera to capture the vehicle. They caught up to the vehicle and were travelling between 90 and 97 mph. The vehicle changed lanes multiple times as Layton narrated for dash camera purposes. Layton was able to get close enough to the vehicle to read the license plate number and after Bone entered it into the computer, Layton activated his lights and siren.

The vehicle immediately sped up to over 120 mph and all lights went off on the suspect vehicle. Bone notified dispatch that they were in pursuit and shortly after the vehicle moved over to the right shoulder and quickly attempted a U-turn. The vehicle drove across both lanes of travel, off of the left side of the roadway and into the median. The vehicle was now facing eastbound and the driver continued to accelerate, but the vehicle was stuck against the embankment.

Layton could see the driver and described him as a light skinned black male wearing a white T-shirt. The driver continued to attempt to move the vehicle as Layton and Bone approached with their issued pistols drawn. Bone approached from the rear as Layton approached from a forty five degree angle from the front of the vehicle.

Layton advised the driver to put his hands up and on initial approach, the driver's hands were up and directly in front of his face. Layton then advised the driver to put his hands out the door as he observed the driver reach out the driver's window with his left hand while simultaneously reached toward the center console with his right hand. Layton then advised him to "stop moving."

Layton advised the driver to put his hands out the window. The driver then used both hands to reach toward the center console, stopped looking at Layton and looked at the center console. Then the driver abruptly reached toward the bottom of the driver's door with both hands "as if he were reaching into the door storage …as if he had dropped something." Layton yelled, "reaching, reaching, reaching" and took steps backwards to create distance as the driver produced a black handgun and pointed it at Layton.

The driver was holding the handgun in his right hand and it was approximately five inches away from his face. Layton said, "As the driver produced the handgun it was initially slightly angled toward the windshield, but he quickly leveled the barrel off towards me." Layton could clearly see the gun outline when it was initially raised and after it was turned toward him, he was looking at the barrel.

Bone was yelling for the driver to stop reaching and then yelled "gun, gun." The driver slightly turned his head backwards as if he was trying to locate Bone, but kept the barrel pointed toward Layton. Layton advised, "I could still very clearly see down the barrel of the suspects firearm and I immediately feared for my life…he was trying to kill me. In response, I fired one shot from my service handgun and when I pulled the trigger the second time it felt like a stage one malfunction. What I mean by that is, when I pulled the trigger and I heard a loud click. I then attempted to seat my magazine and rack the slide. I then pulled the trigger for a third time and heard an audible click indicating I had a second malfunction."

Layton advised, after he cleared the malfunction, he noticed the driver slumped over toward the passenger side of the vehicle. Bone and Layton were several feet away from the vehicle as Bone announced the driver had the gun in his hand. Layton announced for the driver to show his hands with no response. Neither Bone nor Layton could see the firearm, so Bone moved around to the passenger side of the vehicle to locate the firearm as Layton covered him. Bone observed the gun on the passenger seat. Layton holstered and grabbed the drivers left hand and attempted to pull him out of the vehicle to render aid. Bone assisted and they removed the driver from the vehicle as Layton observed a single gunshot wound to the driver's face and a second one to the back of his neck. They checked the driver's person for any other weapons. They did not observe any breathing and Bone checked the carotid artery for a pulse. Bone advised Layton he did not find a pulse and asked if they should attempt CPR, but Layton advised based on the presence of bright red blood coming from the driver's neck, giving CPR would have pumped out the remaining blood. Bone and Layton then awaited the arrival of EMS and other units to arrive.

Layton was asked the following questions.

**In that short period of time there from where you just stopped to when he brought the gun up…go back through that slowly for me and tell me what you recall from that again.**

Layton said, "Sure, so, from the moment I just left off. Hill had brought one of his left hands out toward the handle on the driver door and his other arm went toward the center console. I yelled for him to stop reaching or excuse me, I yelled stop moving and he brought both of his arms back into the cab and then immediately put both arms and his…and his vision toward the center console of the vehicle. I yelled, put your hands out the window, put your hands out the window and then…as he was doing this and then I yelled for Trooper Bone that he's reaching, reaching, reaching…at that exact moment."

**When he went over with both hands and your showing me to your right, so both hands over toward the center console…what was his torso and his head and his face…what did you see there?**

Layton said, "Everything was giving attention to the center console of the vehicle. His face…he was looking straight at the center console; both of his arms went to the center console. His body turned completely toward the passenger seat to give him easier access to the center console and giving his full attention to the passenger side of the car. I yelled that he was reaching, reaching, reaching. At that point, um, his vehicle was at a pretty steep angle, so we were able to see below his shoulders, however it was very clear where both of his hands were because both of his shoulders were angle toward the same way, but we weren't

able to see what he was reaching for...so, he produced the, or...excuse me, before he produced the handgun, he brought an object toward the middle of his lap, right in front of the steering wheel."

**Could you see it?**

Layton said, "No Ma'am."

**How did you know he had an object?**

Layton said, "Both of his hands were, appeared to be holding something and he was looking down in his lap. At that point, he made a very quick motion toward the driver's side door storage compartment and it looked like had dropped something. If I was going to recreated that and I was holding a cell phone or something, it looked like he dropped something and then went to pick it up. Immediately after that...I was already creating distance and I had already yelled that he was reaching several times and at that point, he had picked up the object from the driver's side storage compartment and then picked...pulled up a gun and faced...brought it up toward the windshield. Again, it wasn't pointed at me initially, he brought it up toward the windshield. I was facing from the side angle of the firearm, so I could see very clearly the outline of the firearm. I had my flashlight on, my take down lights on my police car and Bone's flashlight. It was very obvious that I could see the outline."

**And it was pointing toward the windshield immediate...or at...in the beginning, when he first came up with it?**

Layton said, "Yes Ma'am, it was a very quick motion, but I saw this and he...I saw him pointing toward the windshield and then he leveled it off towards me, right out the driver's side window and very very quickly."

**Could you see his trigger finger at all?**

Layton said, "Pardon me, Ma'am?"

**Could you see his trigger finger...could you see his finger?**

Layton said, "Where his finger was? No Ma'am."

**So, at that point you fired.**

Layton said, "Yes Ma'am."

**Ok. Who fired first? Do you remember?**

Layton said, "I think we pulled the trigger at the exact same time."
**Ok, um and then when he...when he fell over...what was your initial...if you recall, your initial thought...the next thing to do?**

Layton said, "Well, I was still working my malfunctions, trying to get my gun back up and then I cleared it the second time and I, I felt pretty comfortable the second time I was clearly able to clear that malfunction, so I didn't try to mess with my gun anymore, but that was my main concern at the time. After I saw him slumped over into the passenger seat, I realized that he wasn't that he wasn't...he was no longer an immediate threat. I checked on Trooper Bone, we checked on each other. I yelled for him to drop the gun and then we reevaluated our approach on the car to try to get eyes on him again."

**Where did you aim? Where were you aiming when you shot him?**

Layton said, "The only thing I could was the firearm, which is five inches away from his face, his face and the upper part of his shoulders. That's the only target I had, so I was...the center mass for me was his left shoulder up to his head."

**And you said you were approximately how many feet from him when you shot?**

Layton said, "Uh, approximately eight feet."

**And you shot the one time and then you had the malfunction. You didn't shoot a second time?**

Layton said, "That's correct, yes Ma'am. I had two malfunctions."

**So, tell why you felt deadly force was justified in this situation.**

Layton said, "From my angle, I looked directly down the barrel of his firearm. I don't...that's as clear as I can put that."

This concluded the interview with Layton.

This concludes the investigation into this matter, barring any request for supplemental information.

**Attachments**

1. Executive Summary

2. SP-80

3. Forensics Crime Scene Report

4. DVDs Containing Crime Scene Photos

5. Firearms Trace Summary on Smith & Wesson SC40 (E-Trace)

6. Bone Interview with BCI at Scene

7. Old Dominion University Report for Stolen Firearm

8. Evidence (pictures and internet searches) from Hill's phone

9. DFS Certificate of Analysis Report on Firearms Functionality

10. Medical Examiners Report

11. DVD of Layton's Dash Camera Video Recording

12. Incident History #DIV121001905

13. Grand Jury Report

14. Bone Response Letter

15. Layton Notification Letter

16. Layton Response Letter

ALS