# EXHIBIT 4

1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF VIRGINIA

3

4   LATOYA K. BENTON,                    )
    ADMINISTRATOR OF THE ESTATE    )
5   OF XZAVIER D. HILL, DECEASED, )
                                                 )
6           Plaintiffs,              )    Civil Action No.
    V.                               )    3:22-cv-25 HEH
7                                    )
    SETH W. LAYTON, et al,           )
8           Defendants.              )

9

10

11

12

13

14        DEPOSITION UPON ORAL EXAMINATION OF

15               PERRY ALBERT BARTELS

16        TAKEN ON BEHALF OF THE PLAINTIFF

17          TUESDAY, JANUARY 24, 2023

18               HAMPTON, VIRGINIA

19

20

21

22

23

24

25

```
 1    APPEARANCES:          THE VERBENA ASKEW LAW FIRM, P.C.
                            BY:  VERBENA M. ASKEW, ESQUIRE
 2                          2 Eaton Street, Suite 708
                            Hampton, Virginia 23669
 3                          757.722.4100
                            valawfirm@verizon.net
 4                          Counsel for the Plaintiff

 5                          OFFICE OF THE ATTORNEY GENERAL
                            BY:  ROBERT B. MCENTEE, III, ESQUIRE
 6                          CALVIN C. BROWN, ESQUIRE
                            202 North 9th Street
 7                          Richmond, Virginia 23219
                            804.786.8198
 8                          rmcenteeiii@oag.state.va.us
                            cbrown@oag.state.va.us
 9                          Counsel for the Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          I N D E X

2

3    DEPONENT:                                    PAGE:

4    PERRY ALBERT BARTELS

5    Examination by Ms. Askew.......................    4

6    Examination by Mr. Brown...................... 129

7

8              EXHIBITS

9

10   No. 1 - Report.................................    5

11   No. 2 - Code of Virginia 46.2-920..............   61

12   No. 3 - Photograph.............................   67

13   No. 4 - Photograph.............................   80

14   No. 5 - Code of Virginia 19.2-83.5............. 100

15   No. 6 - Report of Autopsy..................... 124

16

17

18

19

20

21

22

23

24

25

1            Deposition upon oral examination of PERRY

2    ALBERT BARTELS, taken on behalf of the Plaintiff,

3    before Antonio Spratley, Court Reporter, a Notary

4    Public for the Commonwealth of Virginia at large, taken

5    pursuant to notice, commencing at 11:00 a.m. on

6    Tuesday, January 24, 2023, at the offices of The

7    Verbena Askew Law Firm, P.C., 2 Eaton Street, Suite

8    708, Hampton, Virginia.

9

10           PERRY ALBERT BARTELS was sworn and

11   deposed on behalf of the Plaintiff as follows:

12

13                       EXAMINATION

14   BY MS. ASKEW:

15         Q.    My name is Verbena Askew, and I represent

16   Ms. LaToya Benton, who is the administrator of the

17   estate for Xzavier D. Hill, who's the deceased in this

18   case.  I am going to ask you a series of questions and

19   I would ask that you answer out loud, don't nod your

20   head, don't say uh-huh or uh-uh so that he can

21   transcribe it.  I would ask also that if you need a

22   break, that's fine, but don't take a break in the

23   middle of a question.

24           So, if you would state your full name?

25         A.    Perry Albert Bartels.

1          Q.    Mr. Bartels, let's start with, where are

2    you employed now?

3          A.    I'm currently at the Hampton Roads

4    Criminal Justice Training Academy.

5          Q.    Are you actually an employee there?

6          A.    Yes, ma'am.

7          Q.    And how long have you been there?

8          A.    Since December of 2018, a little over

9    four years.

10         Q.    Let's take a look at your --

11               MS. ASKEW:  If you want to mark this,

12    please.

13               (Whereupon, Deposition Exhibit No. 1 was

14    marked.)

15   BY MS. ASKEW:

16         Q.    Take a look at that, Mr. Bartels, and

17    tell me if that looks to be the report that you

18    provided in the case of LaToya K. Benton, Administrator

19    of the Estate of Xzavier D. Hill, deceased, v. Seth W.

20    Layton and Benjamin I. Bone?

21         A.    This is the first one, yes, ma'am, it

22    appears to be.

23         Q.    And tell me, how did you come to be the

24    expert in this case?

25         A.    I was contacted by Mr. Calvin Brown.

1          Q.    And prior to that, had you done any work

2    as a consultant or expert with Mr. Brown before?

3          A.    No, ma'am.

4          Q.    And had you done any work or been a

5    consultant or an expert in any cases involving the

6    Attorney General's Office?

7          A.    I'm sorry?  Whose office?

8          Q.    The Attorney General?

9          A.    No, ma'am.

10         Q.    And tell me -- you indicated that -- your

11   experience is that -- you were retained at what point

12   in this case?

13         A.    I don't remember the date.  I was

14   contacted by Mr. Brown.  He gave me the initial set of

15   facts, and I believed that as long as they were

16   accurate according to what he explained, I believed

17   that I could provide an opinion regarding those facts.

18         Q.    And you don't remember what date that

19   was?

20         A.    I do not.  I want to say it was some time

21   in maybe November or December of last year.

22         Q.    Mr. Bartels, you indicated -- it looks

23   like in your report, you're being compensated at the

24   rate of $250 per hour; is that correct?

25         A.    Yes, ma'am.

```
 1              Q.    And $2,500 a day for your field work and
 2     court testimony?
 3              A.    Correct.
 4              Q.    How much so far have you billed the
 5     Attorney General's Office?
 6              A.    I'm trying to remember.  I didn't put it
 7     on here and I didn't bring that with me.  I believe I
 8     billed close to 30 hours.
 9              Q.    Okay.
10              A.    You're talking money-wise?
11              Q.    Yes, sir.
12              A.    Actually, I think I could give you that.
13     It was $6,750 so far.
14              Q.    And you indicate that your compensation
15     is not contingent upon the opinion that you've
16     provided?
17              A.    That is correct.
18              Q.    Now, let's talk about what's in this
19     first exhibit.  It indicates -- we're on page 1.  It
20     says that you began your twenty-four-year career with
21     the Newport News Police Department and Patrol Division
22     as a patrol officer, answering calls for service.  What
23     did that entail?
24              A.    Basically, being assigned to a district,
25     and then the dispatch center would receive calls for
```

1  police assistance, and then they would assign them with

2  an officer based on the district where that request has

3  been made, and then who works in that district.  So I

4  would answer those calls for service as well as patrol

5  that district and others for general police services --

6  monitoring traffic, monitoring for anyway that police

7  may be able to provide assistance.

8          Q.    Prior to you being hired by the Newport

9  News Police Department, what was your educational

10  background?

11         A.    Before the Newport News Police

12  Department, I was attending Thomas Nelson Community

13  College, and I was seeking an associate's degree in

14  criminal justice.

15         Q.    Did you receive that prior to being

16  employed by the Newport News Police Department?

17         A.    No, ma'am.  They hired me before I was

18  able to complete it.

19         Q.    Okay.  Now, so you had a high school

20  degree when you were employed by the Newport News

21  Police Department?

22         A.    Yes, ma'am.

23         Q.    And did you go through a police training

24  academy?

25         A.    I did, yes, ma'am.

1          Q.    Tell me where you went.

2          A.    I actually went to what is now the

3    Hampton Roads Criminal Justice Training Academy where I

4    currently work.  I think it went by a different name

5    back then, but it was located on Thomas Street here in

6    the City of Hampton.

7          Q.    And is that where the Newport News Police

8    Department trained all of their employees who were with

9    the police department at that time?

10         A.    At the time, yes, ma'am.

11         Q.    How many months did you go through that

12   training?

13         A.    That academy was -- I don't recall

14   exactly.  Approximately four months.

15         Q.    After the four months, then did you start

16   working with the Newport News Police Department?

17         A.    Yes.

18         Q.    And were you working under supervision of

19   someone?

20         A.    A field training officer, yes, ma'am.

21         Q.    Tell me what that field training officer

22   did for you in terms of -- what was the role in helping

23   you?

24         A.    The field training officer's role was to

25   act as a guide through field police work -- my

1  introduction to field police work, and also to ensure

2  that I was completing my tasks properly, appropriately

3  and completely, and to serve as a mentor and leader as

4  a senior officer, and to set an example of what they

5  think that I should do as a police officer.

6          Q.   Now, when they were training you, for a

7  field training officer, did they take the lead when you

8  were out in the field, or did you take the lead?

9          A.   It depends on what the call was.

10 Initially, they would take the lead as kind of a

11 demonstration to make sure I understood what was

12 expected of me, and then the next time we got a similar

13 call, they might let me take the lead.

14         Q.   Was it a teaching moment, I guess, is the

15 question I have.  For you, a learning, but in terms of

16 the field training officer, was it a teaching moment

17 from their perspective?

18         A.   I think they tried to find as many

19 teaching moments as possible.  That really was the

20 underlying purpose of it.  So, yes.

21         Q.   Did you learn?

22         A.   I learned quite a bit.  I had a very

23 good --

24         Q.   Did you have one or more than one?

25         A.   I had three field training officers.  My

1    first one was the best.  He did an outstanding job.

2                Q.    Do you remember his name?

3                A.    Morgan Tiegens (phonetic).

4                Q.    Morgan who?

5                A.    Morgan Tiegens.

6                Q.    Tiegens.  I'm thinking if I remember him.

7    So after three years there, then you became a field

8    training officer; is that correct?

9                A.    Yes, ma'am.

10               Q.    And then at the time you continued to

11   serve as a patrol for three additional years and

12   provide on-the-job training to new officers?

13               A.    Yes, ma'am, doing exactly what my field

14   training officers did for me.

15               Q.    Do you recall any particular things that

16   stood out when you were the field training officer

17   during that time?  I know it was a while ago.

18               A.    It was a while ago.  I think the only

19   thing that stood out to me was trying to emulate, like

20   I said, what my primary field training officer did for

21   me, and that was to do police work to the best of our

22   ability, to treat people with dignity and respect at

23   every opportunity, and also continuing and striving to

24   learn and improve.

25               Q.    At the time that you were the field

1   training officer, did you encounter any times where you

2   had to draw your weapon?

3          A.   Yes.

4          Q.   Do you recall it specifically?  Were

5   there many or just a few?

6          A.   There were many.  We often did it during

7   times when we would search a building.  We did it

8   during times when we would conduct a high-risk traffic

9   stop, or confront an armed subject.  Unfortunately,

10  there were many and I'm unable to really....

11         Q.   You don't remember any of them.  Do any

12  stick out?

13         A.   Not in particular.  I mean, there were a

14  couple of incidents of having discharged my weapon.

15  But other than that, incidents of drawing it were

16  actually quite frequent.

17         Q.   Do you recall the ones where you actually

18  had to discharge?

19         A.   Yes, ma'am.

20         Q.   Can you describe those for me?

21         A.   Sure.  The first one, I believe, was in

22  1996 or 1997.  I was on -- I don't even remember the

23  nature of the call, but I was at a house, checking

24  around the house due to a call that I was on.  The

25  neighbor had a pit bull that was unsecured.  It looked

1    up and saw me and it charged straight at me.  I drew

2    and fired one shot, and that deterred the dog from

3    attacking.  I did hit him, but I wounded it.  That

4    deterred him from continuing his attack.  That was the

5    only time as a patrol officer.  Did you want me to

6    continue through all of the examples?

7            Q.    Yes, if you remember.

8            A.    The next one after that, I don't remember

9    the order of these two, but they were also dogs.  I was

10   a police sergeant -- a patrol sergeant at the time.

11   Again, one of them in particular was a call for a loose

12   vicious dog that was harassing people and chasing

13   people.  That one, we had contained in an alley.  We

14   were waiting for animal control to respond.  I believe

15   that one was 2009.  I do remember that one was on

16   Easter, but I don't remember the year.  I think it was

17   about 2009.  We had him contained, waiting for animal

18   control when at one point he just lunged in a vicious

19   manner.  So, I fired.  Then my partner had deployed his

20   taser pretty much at the same time.  I missed.  He

21   connected.  So after the taser cycle, the dog got up

22   and ran away.

23            After that, there was another incident of

24   -- I was on a call with a sergeant with two other

25   officers.  We were checking an alarm at 35th and

1    Jefferson -- the Pizza King, I believe it was.  We were

2    back in the area of the drive-through, and a person who

3    lived on 34th Street let her dog out.  That was

4    nighttime.  She let the dog out to go to the bathroom,

5    and then she went back inside -- left the dog outside.

6    It saw us across the street, ran over to us, and had

7    basically taken a position and was holding its ground

8    and was challenging us, so to speak -- barking,

9    growling, snarling.

10            I had my weapon drawn.  Before we could

11    really kind of discuss any options that we had, the dog

12    lunged at me and I fired, wounding that dog, as well.

13    All of those dogs ultimately lived through their

14    incidents.

15            After that, I was on the SWAT Team.  This

16    incident occurred in November of 2011.  It was November

17    6th.  It was a Sunday night.  We got a call for a SWAT

18    response.  I was a team leader at the time.  As I was

19    driving out there, our team commander called me up, and

20    he said, "I'm not going to make, I'm sick, but it's a

21    hostage situation, and they were in a vehicle."

22            I arrived out there, started organizing

23    the team, gathering information, and then rapidly

24    deploying whatever resources we had available --

25    snipers and such -- trying to coordinate with the

1  negotiators to get them ready to do what they needed to

2  do so we could all work together in hopes of resolving

3  this.  By the time we arrived on the scene, the suspect

4  had already said, I want a phone; you have ten minutes

5  to get me a phone.  By the time we got there, we were

6  already past the ten minutes.  So we weren't really

7  sure what that meant as far as timeline goes.

8              The team got organized enough that we

9  deployed out there.  We were told -- the information we

10 were given is that this started as an abduction at

11 gunpoint, a boyfriend with his ex-girlfriend in York

12 County.  It turned into a vehicle pursuit which ended

13 at the dead-end street where it currently was at a

14 standstill.

15             So we deployed out there.  When we got

16 out there, I could see that the vehicle was running.

17 It was November, so it was a little cold outside.  The

18 windows were -- the side and the back windows were

19 fogging up, but the windshield was clear.  The suspect

20 was hanging articles of clothing up in the window to

21 prevent us from being able to see inside.

22             So I engaged him verbally.  I asked him

23 what he wanted.  He demanded a phone.  I assured him

24 that we were working on getting him a phone.  He was

25 upset that we didn't have one because everybody carries

16

1    a cell phone.  Even in 2011, most people had a cell

2    phone.

3                    So, he and I continued to talk, and I

4    asked him who he wanted to call.  He continued to

5    demand a phone.  As he was talking, he would roll -- he

6    and the young lady were in the back seat of a Camaro.

7    He would roll the window down and speak through a small

8    crack in the window that he created, then he would sit

9    back and roll it back up.  The window was fogged, so it

10   was very difficult to see him.

11                   So, we continued to talk.  I was trying

12   to get him to talk about something else while we were

13   working on getting him a phone.  Finally, he stopped at

14   one point.  He grabbed her and pulled her in his lap,

15   which was not a good sign to me.  Our snipper indicated

16   he could see through the windshield that they were

17   writing something on a pad of paper and passing it back

18   and forth in the car, but we didn't know what that

19   meant.

20        Q.    You mean between the hostage and the

21   suspect?

22        A.    Yes, ma'am.  So as I continued to talk to

23   him, finally she answered.  Well, let me back up.  I

24   said, who is it that you want to call?  His name was

25   Chris.  I said, "Chris, who do you want to call?"  He

1   said, "The phone is not for me, it's for her."  I said,

2   "Well, why don't you let her out of the car and we'll

3   let her make a phone call, and she can call whoever she

4   wants."  He said, "No.  She's not going anywhere."

5   Chris had made no clear threats.  We were only given

6   the information that was passed along to us in

7   combination with our independent observations as we're

8   out in the field.

9            Finally, Chris stopped talking to us.  He

10  let her go back into the passenger side in the back

11  seat.  I said, "Well, who is it that you want to call?"

12  She responded, she said, "The phone is for me to call

13  my kids."  So I didn't take that to mean anything good,

14  and at that point, I decided that Chris really had no

15  intentions of resolving it with us, so it was really up

16  to us to resolve it.  I couldn't see him.

17            I was at the passenger side of a vehicle

18  that was on the scene, looking through the driver side

19  angle at the Camaro.

20       Q.   At another car --

21       A.   Yes.  The initial pursuing police car

22  that we had taken over as a position.

23       Q.   So you were using that as cover?

24       A.   Yes, ma'am.  I had another officer at the

25  back side of that same car.  I moved to his position.

1   I could see the female was on the passenger's side in

2   the back of the Camaro.  I instructed that officer to

3   let me know immediately if she moved.  I went back to

4   my position, as long as I didn't hear anything from

5   him.

6                  I was waiting for the suspect, Chris, to

7   get close enough to the window that I was 90-plus

8   percent certain as to where he was.  When that

9   happened, I hadn't heard anything from the other

10  officer, meaning she was still over there in the clear,

11  so I opened fire on Chris.  Then the team moved up from

12  a different location to extract her from the vehicle,

13  to make sure she was safe.

14             Q.    So, she was safe?

15             A.    Yes.

16             Q.    You managed to get her?

17             A.    Yes.  So, she was safe.  Chris ended up

18  being armed, as a hindsight issue.

19             Q.    Were you aware he was armed at the time?

20             A.    No, ma'am.  Nobody had seen a gun.  We

21  were going off of the information we were given, and

22  the information as it developed on the scene.

23                  So, the other incident was April 29,

24  2017.  It was a Saturday morning.  At about five

25  o'clock, we got a page for an active shooter in an

1    establishment called The Pondo in Newport News.  So,

2    like I usually do, I called dispatch on my way down

3    there because, as the team leader, I want information

4    about what we are responding to so I can start

5    formulating ideas in my head as to what resources we

6    are going to need and a general idea of how I want to

7    handle it.  So I called them, and they said a man was

8    in a bar, and he pulled out a gun and shot the

9    bartender in the chest, and they can't make any headway

10   talking to him.  He's irrational.  No shots had been

11   fired for a few minutes now.

12                    We responded down there.  The patrol

13   officers had set up on the establishment.  They were

14   actually outside when it evolved.  It was an active

15   shooter for them, but they had all their perimeter

16   positions.  So when we got there -- on my way there, I

17   heard the dispatcher indicate that the bartender who

18   was on the phone since before we got all the way up to

19   the point we went through the door, he told the

20   dispatcher, after he had been shot in the chest for

21   some time, that he was cold and shaking and felt like

22   he was passing out.  So I understood the urgency in

23   getting through.

24                    So, when I got on the scene, one of the

25   other team leaders arrived first.  Although I was the

1   senior team leader by default, whichever one gets there

2   first and begins to develop the plan, takes charge of

3   that plan.

4               I arrived on the scene and started

5   grabbing a few pieces of gear, and I jumped in with a

6   small group that was getting ready to go across the

7   street to go provide aid to the bartender.  They put me

8   up front.  I'm assuming it's because I'm the most

9   senior and experienced member of the team, they wanted

10  that experience up front.  Quite honestly, this was the

11  type of a call that was a first for us even though I

12  had been on the team for 19 years at that point.

13              So, we had finished making our

14  preparations.  We breached the door and went inside.

15  As I was waiting for the rest of the team to come in

16  behind me, I started peering through the next glass

17  door that stood between us and the inside of the

18  establishment.  Right to where he was described to be

19  was the suspect -- about 42 or 43 feet back in the

20  establishment -- behind a partially opened or partially

21  closed door, with a gun in his hand, waiting for us to

22  come through.  So, I engaged him immediately.

23              We entered, and then I covered the

24  suspect, and they got all of the hostages out.  There

25  were two others along with the gentleman that had been

1    shot.  So we got them out.  We got aid to him, and then

2    the suspect was -- he was deceased.

3              Q.    You engaged the suspect.  What do you

4    mean?  What did you do?

5              A.    I shot him, yes, ma'am.  I want to

6    apologize if that sounds insensitive given the nature

7    of why we're here, but it's easier for me to present it

8    in a factual way.  I don't mean for it to come across

9    insensitive.

10             Q.    We appreciate that.  Do you recall any

11   other incidents?

12             A.    Those were the only incidents of having

13   to discharge my firearm, ma'am.

14             Q.    Now, still on page 1, you said you also

15   obtained your state certifications as a General

16   Defensive Tactics, Driving and Firearms Instructor.

17   Where did you obtain those certifications?

18             A.    The certifications were through the

19   academy.  We would go back there.  They would put on

20   instructor-level classes.  We would attend and then

21   finish off certifications through an apprenticeship

22   under a previously certified instructor.

23             Q.    It says you actively trained Newport News

24   Academy recruits and experienced officers in the use of

25   force as a support instructor to the department's

1    training division and regional police academy.  Is that

2    the academy where you're working at now?

3          A.    Yes, ma'am.

4          Q.    And what did you do in terms of -- it

5    says you trained Newport News Academy recruits?

6          A.    Yes, ma'am.  We had what we called a

7    pre-academy, and we would take our trainees prior to

8    the academy starting and work with them a little bit.

9    Then we had a post-academy.  The regional academy

10   trains lots of different agencies.  They don't get

11   policy specific.  They stay fairly generic.

12               When the recruits would come back to us,

13   we would give them department specific training that

14   was related directly to our policies or the things that

15   we chose to do in our department.

16         Q.    Now, how did you create your policies

17   with the Newport News Police Department?  How did you

18   create -- who did the policies?

19         A.    I wouldn't create the polices.

20   Obviously, the chief would ultimately sign off on them.

21   Depending on the nature of the policies, either the

22   chief would write it or they would take an existing

23   policy and just amend it so that the current or

24   existing chief was satisfied with what it said.

25         Q.    And what was it based on?  Is it a

1    criminal justice --

2          A.    Department policies are specific to a

3    particular chief's philosophy in many cases.  Many

4    different agencies have policies that are very, very

5    similar, but in some ways, one chief may alter their

6    policy on pursuits, for example, in a way that a

7    neighboring jurisdiction would not.  So they're kind of

8    specific to a chief.

9          Q.    So at this point, you said you "actively

10   trained Newport News Academy recruits and experienced

11   officers in the use of force as a support instructor to

12   the department's Training Division and regional police

13   academy."

14         A.    Yes, ma'am.

15         Q.    Now, how long had you been with the

16   police department at that point?

17         A.    At that point, I'd probably been with

18   them about four years or so, maybe five years.

19         Q.    Tell me, how did you go about training

20   officers in the use of force at the time?

21         A.    The role of the support instructor would

22   be to assist during in-service.  An in-service class

23   might consist of 20 to 25 police officers attending

24   training.  So, if we were going to refresh on

25   handcuffing, the training division might not have

1    enough instructors to circulate around the room and

2    help everybody, so they would call in other support

3    instructors that had the instructor's certification at

4    the department to come in and assist.  So, although my

5    primary role was that of patrol officer, they would

6    reassign me temporarily to help with the in-service

7    class because I had the needed instructor's

8    certification.

9              Q.    In 2000, you transferred to the training

10   division where you served eight years as a training

11   staff member.  You were assigned to review all use of

12   force reports generated by the police department, which

13   was approximately 100 to 150 force reports per year.  I

14   was curious about that when I read it, the 100 to 150

15   per year.  Describe what the process was.  You received

16   the complaints?

17             A.    No, ma'am, they weren't complaints.  They

18   were just documented use of force from the patrol

19   officers in the field.

20             Q.    Tell me how that worked.

21             A.    The policy dictates when an officer is

22   generally required to report a use of force.  And as an

23   example, our policy might dictate that if you have to

24   use force to overcome resistance by a suspect, they

25   would require a use of force report.  If you did a

1    takedown of somebody -- in other words, you forced them

2    to the ground during the course of an arrest, that

3    would require a use of force report.  If you used a

4    baton or pepper spray or a firearm, or struck somebody

5    with a hand or a foot, then those would require a use

6    of force report.

7         Q.   Now, correct me if I'm wrong, but was it

8    designed to try to help make the officers better

9    officers?

10        A.   I think it had several purposes.  One was

11   that any responsible agency wants to track its activity

12   and monitor it.  Another was, at least as far as my

13   role goes, when I reviewed them, I looked to see what

14   officers were doing in the field as compared to what we

15   were training them in during in-service training.

16        Q.   So you would take these reports, then

17   you'd do what with them?

18        A.   Review them.  I would just look at the

19   circumstances.  Was this a call for service-generated

20   activity?  Was this an officer-generated activity?

21   What was the arrest for?  What did the suspect do?  How

22   did the officer respond?  It's just the general overall

23   circumstances to see what our officers were commonly

24   experiencing and how they were commonly responding, and

25   how they were handling and using their equipment.  That

1    would give us the opportunity to see where we needed to

2    do regular maintenance training with our officers.

3            Q.    So when you found a problem, then what

4    would you do?

5            A.    It would depend on what the problem is or

6    was.  It might just be something that I would make note

7    of, or it might be something that I would actually make

8    a phone call to one of our assistant chiefs and say, I

9    think we need to sit down and talk about this.

10           Q.    And say it did not rise to the level

11   where you took any action against the officer, but it

12   gave you some concerns where you thought the officer

13   needed, what, additional training maybe?

14           A.    That did happen, yes.  I would suggest,

15   at the very least, if I thought it was problematic

16   enough to address it, I would let the agency know I

17   wanted to sit down with that officer and at least

18   debrief the incident and have a discussion about it.

19           Q.    Do you remember a couple of incidents

20   where you actually took some action?

21           A.    Yes.  We had one incident where a

22   gentleman who had been shot was, as far as the officers

23   knew was the victim of a shooting.  He was inside of

24   his apartment.  He was present with the officers and

25   the medic.  The medics looked at his injury and

1    indicated that it appeared to them that it might be a

2    life-threatening injury.

3              The man was very well-aware of his

4    circumstances, his surroundings, and his mental acuity

5    was good.  He indicated he didn't want to go to the

6    hospital.  The medics told the officer on the scene

7    that he needed to go to the hospital, but he was

8    refusing treatment -- knowingly, voluntarily and

9    intelligently refusing treatment.

10             The officer, pursuant to medics saying he

11   needed to go to the hospital, displayed a taser and

12   said, "Get on the stretcher or I'm going to tase you."

13   The gentleman reluctantly agreed to get on the

14   stretcher, but when he wasn't moving fast enough, they

15   went to physically assist him.  He pulled his arm away,

16   and the officer considered that to be some sort of a

17   swing or resistance towards the medic, so he tased the

18   gentleman.  They put him on the stretcher and took him

19   to the hospital, and he continued to maintain he didn't

20   want to be treated.

21             I contacted our assistant chief at the

22   time, and I let him know I think this is problematic.

23   It's not for me to decide where this is

24   constitutionally as a factual matter, but I think that

25   nonetheless, if it was turned into an issue, I think we

1    would have a problem, so we need to at least address it

2    and then get with the officers and make sure we have

3    all the information and then kind of debrief it with

4    them.   Then the agency can decide as a disciplinary

5    matter whether or not they wanted to do anything with

6    that.   Disciplinary issues were not my concern.

7              Q.    Was that involving Internal Affairs?

8              A.    If that's the direction the agency wanted

9    it to go, yes.

10             Q.    Do you remember another one?

11             A.    Yes.   We had one officer who responded to

12   a domestic between a mother and her son.   The son, who

13   was, I believe, a juvenile in mid to late teens, was

14   clearly not happy that the officer was there.   The

15   officer was trying to talk to him.   He was refusing to

16   be cooperative with the officer.   He was moving in and

17   out of the apartment because the front door was open.

18   And he went to move past the officer and intentionally

19   brushed up on the officer.   The officer momentarily

20   grabbed him by the throat and pushed him up against the

21   door for about one second and then let go.   He didn't

22   clamp down on his neck or restrict his airflow or

23   ability to breathe, but for us, it was essentially a

24   de facto policy violation because our policy prohibited

25   that.

1          That was really nothing more than sitting
2    with the officer and talking about how we don't permit
3    that.  It's a violation of policy.  He said, "Well, I
4    was trained to do that," and I said, "Not by us."  He
5    said, "If the chief has a problem with this, I'll bring
6    in my martial arts instructor and he'll say that I was
7    trained to do this."  I reiterated to the officer that
8    that doesn't matter.  Your martial arts training does
9    not control over a policy restriction.  He says, "Well,
10   I don't really care.  I would do it again."  That
11   officer was released.  Not by me.  It was just my job
12   to have that conversation with him.
13          Q.    And you wrote lesson plans for classroom
14   instruction on use of force as well as for physical
15   skills, intermediate force options and use of deadly
16   force.  Now, tell me what qualified you for writing the
17   lesson plans.
18          A.    It was one of my assigned
19   responsibilities within the training division.  I would
20   agree that just because somebody holds an instructor's
21   certification, especially a police officer, doesn't
22   necessarily qualify them to write a lesson plan
23   regarding use of force.  They can, but it was always an
24   interest of mine to do quite a bit of homework and
25   research and seek guidance from people that knew more

1    about it than me in preparing those types of lesson

2    plans.  That's what I did.  My agency trusted me to do

3    it, so I continued in doing it and learned a lot as I

4    went.

5           Q.    Did you ever get the city attorney's

6    office involved when you created these lesson plans?

7           A.    The only time I got the city attorney's

8    office involved was when I wrote a training bulletin on

9    the Ronald Armstrong v. Village of Pinehurst case when

10   the Fourth Circuit ruled on that matter.  It's not as

11   clear as I would like it to be.  I took what I

12   interpreted from reading that case, created a training

13   bulletin.  My lieutenant and I, who, at the time was

14   Morgan Tiegens -- got reassigned to the training

15   division -- he and I went and sat down with the city

16   attorney.  I handed him the training bulletin.  I said,

17   "This is how I interpret this case.  Can you please

18   review it and tell us if we are either on or off

19   track?"  He called us back, and he said your training

20   bulletin interprets it the same way that I do.

21          Q.    Who was that?  Do you remember?

22          A.    Bob Pealo.

23          Q.    Who?

24          A.    Bob Pealo.  He attended all of our

25   shooting debriefs, and then that was primarily how I

1    knew Mr. Pealo.

2         Q.    When you had your classes, did you ever

3    have any attorneys from the city attorney's office to

4    come and teach any of your classes for you?

5         A.    We had Commonwealth's attorneys on

6    occasion come to teach our classes.  We did run into a

7    few problems doing that.  One year we had a four-hour

8    block set aside for Miranda and some other

9    constitutional issues.  It started out with one of the

10   senior Commonwealth attorneys teaching the four-hour

11   block.  By the end of the session -- not the four-hour

12   block, but by the end of the year, they had the junior

13   Commonwealth attorney in their place to come in and

14   teach it.  What was supposed to be four hours turned

15   into about an hour and a half.  That wasn't the only

16   time we had them come in.  We did have them come in

17   other times.

18              There were times when we saw things a

19   little bit differently, there were some things that I

20   observed in the use of force reports that I wanted to

21   address, as sometimes the Commonwealth's Attorney's

22   Office wouldn't address them the way we wanted them to.

23         Q.    Do you recall any particular ones?

24         A.    Yes, specifically issues of pat-downs, a

25   frisk search.  Officers would generally, when asked,

1    "Why did you pat the suspect down," would routinely

2    give the answer, "I did it for my safety." I was over

3    years and years and years impressing upon them that

4    that is not justification. That's the underlying

5    purpose for the pat-down. But it provides no

6    justification whatsoever.

7              The Commonwealth's attorney came in.

8    They were teaching pat-downs. They said, "Do you know

9    why you do pat-downs?" The officers engaged them a

10   little bit. They said, "For your safety." So on the

11   break, I pulled them aside, and I said, "Can you please

12   not present it that way?" I said that I don't have a

13   problem with you explaining that that's the purpose of

14   a pat-down, but I really need you to get into the

15   details relating to justification -- the types of

16   suspicious factors that they need to observe and

17   articulate in order to justify a pat-down.

18             They wanted to go back and forth about --

19   well, it is for your safety. I reassured them that I

20   understand that, but that's not what I want the

21   officers to understand and then move on. That's not

22   enough.

23        Q.   Did they ever resolve that?

24        A.   Honestly, I'm not even sure. I think

25   that those Commonwealth attorneys were replaced by some

1   others that came out later.

2           Q.    There was a policy -- there is a policy

3   dealing with the police department and the

4   Commonwealth's Attorney's Office that indicates that if

5   there are some felony charges that are brought against

6   suspects, that they have to be cleared by the

7   Commonwealth's Attorney's Office.  Are you familiar

8   with that?

9           A.    Not exactly.  It almost sounds like, are

10  you referring to the code that says that if a civilian

11  wants to obtain a felony warrant, they either have to

12  through the Commonwealth Attorney's Office or involve

13  the police department?

14          Q.    No.  What I mean is, in terms of felony

15  arrests -- obtaining warrants by police officers in

16  felonies, they have to consult with the Commonwealth's

17  Attorney's Office in Newport News?

18          A.    If that is a policy, it's a new one.  It

19  was never like that while I was there.  All the way up

20  to my retirement, it was never like that.

21          Q.    Here you have on page 2 you were assigned

22  to oversee the field training program.  What program

23  was developed?  Was it in-house at the Newport News

24  Police Department?

25          A.    The field training program is what we