1  call the San Jose model. There are two official models
2  of field training. One is the San Jose model. The
3  other one is called the Patrol Training Officer model.
4  We use the San Jose model, which you have a training
5  that rotates through three different shifts, and at the
6  end of the third rotation, they go back to where they
7  started. That FTO has a comparison for what they
8  looked like on day 1 as compared to what they now look
9  like at the end of that three months training cycle.
10 So they would do a daily observation. Whatever FTO the
11 trainee was assigned to, the field training officer
12 would do a daily observation report. They're supposed
13 to document their progress daily, and then that gets
14 forwarded to the field training coordinator. That's a
15 person under the training lieutenant. By policy, it's
16 the training lieutenant or their designee. So, the
17 training lieutenant designated me while I was assigned
18 to the training unit.
19            My job was to review all of the daily
20 observation reports that got sent in from everybody
21 that was in field training. At the end of that cycle,
22 they also had a book that listed the individual tasks
23 that they were required to demonstrate some level of
24 proficiency in. Then the field training officers would
25 sign it off in the book.

1              So, in addition to reviewing all of the

2    daily observation reports to monitor their progress and

3    to make sure that the field training officer were doing

4    what they needed to do, prior to their release, I would

5    go through their book and make sure that their book was

6    complete, and that all the paperwork was in order.

7              Q.    So if someone is a training officer in

8    the field, there's a progress report that is written?

9              A.    On a daily basis, yes, ma'am.

10             Q.    How long does that last?

11             A.    Their training, as long as it was

12   designed, was about three-and-a-half months.

13             Q.    So, there should be something every day

14   for three-and-a-half months dealing with the progress

15   of the person that is the trainee, and also in terms of

16   the observation of the person that's training them, the

17   field training officer?

18             A.    Yes.  We went to that model somewhere in

19   the late nineties.  Prior to us adopting that specific

20   model, there may not be daily observation reports

21   because it was just the book that they relied on.

22             Q.    And what are you looking for?  What does

23   the field training officer -- I know you generally said

24   that he monitors the person, the trainee.  Are you

25   looking to see if they're complying with policies?

1    A.    I'm looking to make sure that the field

2  training officer is giving them as much exposure to

3  police work as they can, so that they can learn

4  everything that they need to know.

5            I also, prior to their release, would

6  interview each person that was trained in the field,

7  and I would question them about how often their field

8  training officer volunteered them for calls for

9  service, how much time, if any, they spent sitting at

10  7-Eleven, and whether or not the field training officer

11  let them drive the car.  If the field training officer

12  is not proactively exposing them to these things, then

13  they're not going to learn what they need to know.  So

14  I was also making sure that the field training officers

15  that we appointed to the program, which is an extremely

16  important position, were doing their job.

17    Q.    Now, if the field training officer

18  observed that the officer that they're training is not

19  doing something correct that they observed, what does

20  that field training officer do?

21    A.    It depends on what the issue is.  For

22  example, if we're at an accident scene -- as the field

23  training officer, I give my trainee a tow sheet to fill

24  out.  If they don't do it right, that's not really a

25  big deal.  We can work on tow sheets at our leisure.

1   But if I go to make an arrest, and the suspect resists

2   and assaults me, and my trainee stands over there and

3   freezes and does not help, that's a much more

4   significant issue.  So that's from one end of the

5   spectrum to the other, and then a bunch of stuff in

6   between.  It would really depend on the nature of the

7   deficiency.

8           Q.   What if the trainee actually -- and the

9   person that's training them is observing them violate a

10  particular state statute, what is the person who is the

11  field training officer supposed to do?

12          A.   They would generally intervene and make a

13  correction.  Again, depending on the specifics of the

14  incident, would determine how severely they would

15  intervene and what follow-up action was taken after

16  that.

17          Q.   And what about if the field training

18  officer takes an action and doesn't say anything to the

19  person that they're training -- in essence, say the

20  field officer proceeds on to pursue a suspect, does he

21  say anything to the trainee or the person that's under

22  his training, or he just assumes that he's going to?

23          MR. BROWN:  I'm going to object to the

24  form of that one.

25          MS. ASKEW:  Let me try to rephrase it so

1   we can understand it.

2   BY MS. ASKEW:

3       Q.   What if the field training officer

4   pursues a suspect, does he just assume that he -- is he

5   supposed to say anything to the trainee or just let the

6   trainee stay there?

7           MR. BROWN:  Same objection.

8           THE DEPONENT:  I think that the field

9   training officer generally is going to talk to their

10   recruit during such a process.  To what extent depends

11   on the individual field training officer.  But there

12   are some learning opportunities there, as well.  How

13   they take advantage of it is kind of up to the field

14   training officer.

15   BY MS. ASKEW:

16       Q.   Now, it says, "In 2005, the Newport News

17   Police Department began a transition to become an

18   independent academy.  This separation from the regional

19   police academy allowed for department training to our

20   own recruits."  And your responsibilities, it says,

21   "with in-service training and field training program,

22   you became a primary academy instructor for use of

23   force, physical control tactics and firearms."  This

24   was in 2005.  What did you do as a primary academy

25   instructor?  This is in-house now?

1       A.    Yes, ma'am.

2       Q.    And you became a primary academy

3    instructor for use of force, physical control tactics,

4    and firearms.  What were you focused on there?

5       A.    Well, the Department of Criminal Justice

6    Services has a list of sub-objectives that, at a

7    minimum, we need to train.  They tell us what we need

8    to train, but they don't generally tell us how to train

9    it.

10          The agency instructors would collectively

11   decide how it was going to be trained, ultimately with

12   the approval of the department.  We would teach

13   handcuffing.  We would decide which takedowns were

14   going to be taught.  There are two things that are

15   occurring here.  One, we have to teach the technique in

16   a mechanical sense.  This is mechanically how you do

17   the technique.

18          I think the harder part of the equation

19   is trying to teach the officer when to do the

20   takedown -- when it's appropriate to do it either as an

21   appropriate level of force, or when it's appropriate

22   that it's not too unsafe to approach somebody.  I

23   wouldn't want to walk up to somebody wielding a knife,

24   and then grab their arm and try to do a takedown.  So,

25   the when is really more important, in many cases, then

1  the how.

2  　　　　Q.　　When you were looking at -- being that

3  you were the primary academy instructor for use of

4  force, physical control tactics and firearms, tell me

5  about what your instructions were to the officers with

6  regard to their own safety.

7  　　　　A.　　That's kind of a broad question.

8  　　　　Q.　　Let me try to narrow it.  It is.  Now,

9  when we're talking about use of force, physical control

10  tactics and firearms, what was your teachings with

11  regards to helping the officers determine how to keep

12  themselves away from danger?

13  　　　　A.　　Well, I think I could kind of narrow that

14  down to helping them understand what a threat looks

15  like.  We have to make sure that whether it's through

16  video as a training tool, or demonstration or scenario

17  based training, we demonstrate to them various ways

18  that a threat could present.  There are a lot of people

19  that don't lead their lives in a way that they learn to

20  recognize those things.  In the police academy, we

21  expose them to that, not presuming that they already

22  know.  We have to basically approach it as if they

23  don't.  That way, they learn to recognize patterns of

24  behavior that are typical of suspects who are

25  noncompliant, or dangerous, or displaying what we would

1    call preassault indicators.  We would do our best to

2    help them understand that.

3            Q.    Did you also focus on helping them to

4    determine when to avoid placing yourself in danger?

5            A.    If it's possible, yes.  It's very

6    difficult.  The nature of police work itself requires

7    that you proactively go to situations that are, in many

8    cases, already dangerous.  There are things that they

9    can do to try to mitigate that to the best of their

10   ability.  Sometimes the dynamics give them whatever it

11   gives them, and they do the best they can with it.  We

12   try to, yes.

13           Q.    Are you familiar with the term,

14   police-created exigent circumstances?

15           A.    Can I ask a clarifying question?

16           Q.    Sure.  Sure.

17           A.    Are you referring to officer-created

18   exigency or officer-created jeopardy?  They sound

19   similar, but they're two different things.

20           Q.    Okay.  Tell me the difference.

21           A.    Officer-created exigency is a term

22   normally associated with search procedure.  I think

23   we're all familiar enough with the Fourth Amendment to

24   know that it requires searches and seizures be

25   reasonable.  There are exceptions to that rule.  The

1    Amendment sets forth requirements for obtaining

2    warrants on probable cause and oath (phonetic)

3    affirmation, and specificity about where you're going

4    to search, and who and what you're looking for.

5              The officer-created exigency as it's

6    known, is a term that applies to officers who create

7    emergency circumstances.  The theory would be for the

8    sole purpose of avoiding the requirement to get a

9    search warrant.  In other words, if I smell marijuana

10   behind a door -- I'll use this example because it's

11   specific to Kentucky v. King, which is how the Supreme

12   Court addressed it.  If I smell marijuana behind a

13   door, and I knock and announce police, and I hear

14   rustling that would suggest that they're destroying

15   evidence, then I could now force my way in without a

16   warrant because getting a warrant would give them time

17   to destroy evidence.

18             The claim is that the officers knocked on

19   purpose because they knew that the people inside would

20   likely attempt to destroy evidence, and thereby pass

21   the requirement for them to get a warrant.  That was

22   the theory.  As I said, it was addressed in Kentucky v.

23   King.

24             The officer-created jeopardy applies to

25   safety issues.  The officer-created jeopardy theory,

 1   much like the officer-created exigency theory, relies

 2   on the idea that officers were negligent in their

 3   tactics or created a need to use force.  The Fourth

 4   Circuit addressed that in a variety of cases; Anderson

 5   v. Russell, Greenidge v. Ruffin, Elliott v. Leavitt.

 6   They address things such as not using cover, not using

 7   a flashlight at night, not waiting for backup, not just

 8   simply shifting your position.  The Fourth Circuit

 9   addressed those, and then the Supreme Court addressed

10   it in L.A. v. Mendez.  So, for me, I really kind of

11   need to understand the difference between the two

12   because they relate to use of force legalities, but

13   there's also the practical issue for officers that

14   really just kind of relies on some common sense about

15   things that we can do that don't create legal issues,

16   but they mitigate some of your potential risks.

17        Q.   Now, you said, "This training included

18   threat assessments, consideration of agency policy,

19   force transitions and deescalation."  Can you tell

20   me -- when the training included threat assessments,

21   what do you do when you're coming to a situation where

22   you have a person at a traffic stop?  How do you train

23   your officers to look at a threat assessment?  What are

24   they looking for?

25        A.   So they're on a vehicle stop --

1          Q.    Yes.

2          A.    -- such as somebody who ran a stop sign?

3          Q.    Okay.

4          A.    They approach the vehicle.  You're asking

5    how they would do a threat assessment throughout that

6    vehicle stop?

7          Q.    Yes.

8          A.    They would look at a variety of things.

9    Some of it would include the driver's demeanor, the

10   motions of the driver.  A lot of people will reach

11   during a traffic stop to get documents that they know

12   they're going to be asked for.  Other people will sit

13   motionless until they're requested by the police to get

14   the documents.  So they're watching hands, but, in

15   particular, I'm going to slide my chair back and

16   describe a motion for the record.

17              If the officer is walking up to the car,

18   and they see the driver lean forward and their right

19   shoulder drops down low, then officers are taught that

20   tends to suggest they're reaching under the seat.  We

21   would help them -- instruct things like that so the

22   officer would pay attention to some of those things.

23   Assess demeanor when they encounter the driver.  Also,

24   nervous behaviors.  Is the violator or the driver

25   shaking?  Are they stuttering?  Are they sweating?  Are

they breathing heavy?  These are things that tend to
suggest that a person is nervous or anxious.

Officers would need to pay attention to
that.  It could indicate a threat, but they're also
going to run a warrant check.  It would be that they
have a warrant on file.  The fact of the matter is,
until they know what they're dealing with, if they pick
up on an indicator, then they're going to pay close
attention to it and make sure that if there's any need
to make an adjustment to what they're doing, based on
an indicator or an accumulation of indicators, then
they should take action on that.

MR. MCENTEE:  Can we go off the record
for one second?

(Off-the-record discussion.)

MS. ASKEW:  We'll take a break.

(Break.)

MS. ASKEW:  Okay.  We're back.

BY MS. ASKEW:

Q.  Mr. Bartels, I understand that you have
an associate's degree from Thomas Nelson?

A.  Yes, ma'am.  I finally got around to
finishing that.

Q.  And let me ask you this:  You indicated
that you have testified in federal court as an expert

witness, but you didn't list any of your cases.

A.    I didn't put them in the CV, but I did
provide a separate list of cases.

Q.    You did give it to them.  Do you recall
what cases you listed?  Tell me about the cases that
you testified.

A.    I testified in -- Green was one of them.
If you'd like, when we're done, I can certainly forward
you the list.  There was one case where officers were
in pursuit of a stolen vehicle.  When they finally
apprehended the suspect, the vehicle came to rest in a
cow pasture.  It was in a rural area.

One of the troopers had fired through his
own windshield and through the windshield of the truck
he was pursuing.  The suspect threw his hands up.  They
ordered him out of the truck.  He didn't come out
immediately.  So as they were approaching, they were
giving him commands.

When they got to the truck, he had not
gotten out according to their commands.  So, they
opened the door, pulled him out and put him on the
ground.  According to the complaint, he says that they
handcuffed him, and after he was handcuffed, he was
tased.

They didn't have body cameras.  They had

1  a dash-cam.  The event occurred right on the edge of
2  the frame, half in and half out of the frame in some
3  fairly tall grass, so the view was obstructed.  There
4  was some information in the video that supported the
5  trooper's side that said, No, we didn't get him
6  handcuffed right away, and he was resisting.  We tased
7  him to gain compliance, which worked, and then we
8  handcuffed him.  There was enough in the video to
9  support that.  My role was to testify to the event
10  itself and whether or not it made sense according to
11  what the troopers were saying as the video depicted it.
12  So I was referencing details in the video that
13  supported the trooper's statement.
14         Q.   So what was your opinion?
15         A.   My opinion was that he said he was not
16  resisting, but the video clearly showed his hands and
17  arms and legs flailing as the troopers were working
18  with him.  At another point, he said he was on his
19  stomach, but you can see that he actually sat up
20  towards the troopers briefly.  So it was my opinion
21  that based on what the video represented, I believe
22  that he was continuing to resist and was not yet
23  secured.
24         Q.   So was the issue dealing with the taser?
25         A.   Yes.

1       Q.    You said that one trooper shot through

2   the windshield -- the front windshield of the vehicle?

3       A.    Yes.

4       Q.    Was he a felon that was fleeing?  Why did

5   he shoot through the windshield?

6       A.    I think because when the truck turned

7   around, it actually moved forward and bumped into the

8   trooper's vehicle.

9       Q.    So the vehicle itself was the weapon?

10      A.    The vehicle was the weapon.  I'd also

11  indicate that the pursuit was not over.  The suspect

12  was still in control of the vehicle, which was dragging

13  a barbed wire fence with a post on it, about 100 or so

14  feet back.  So when he took a turn, the post would

15  swing out with the barbed wire on it, and he had gone

16  through a construction site.  People were running to

17  get out of the way, and there was a continuation of the

18  pursuit.  He was still in control of the vehicle.

19      Q.    Did that go to trial?

20      A.    Yes.

21      Q.    What happened in that?

22      A.    They found in favor of the suspect.

23      Q.    The found for the plaintiff?

24      A.    Yes, ma'am.

25      Q.    And where was that case?

1        A.    That was in Tennessee.  Chattanooga, I
2    believe.
3        Q.    And what other cases did you testify in?
4        A.    I testified to another case in the same
5    court.  This particular case involved some sort of a
6    domestic dispute.  The deputies arrived on the scene.
7    I remember what it was.  There was a death in the
8    house.  The officers responded to basically conduct a
9    preliminary investigation, secure the scene, that sort
10   of thing.
11        A family member arrived and was very
12   upset and irate.  He was wearing a pistol in plain view
13   on his right hip.  When he arrived, he kind of focused
14   on the officers a little bit.  As I said, he was very
15   irate.  They were concerned that he may end up using
16   the pistol, so they disarmed him of the pistol.  That
17   caused a bit of a struggle.  They took him to the
18   ground and handcuffed him and then charged him with a
19   couple of minor offenses.  So they argued that arrest
20   was unlawful and that the force was excessive.
21        Q.    And who did you testify for?
22        A.    The defendants.
23        Q.    What happened in that case?
24        A.    They ruled for the defendants.
25        Q.    Any other cases?

1    A.    Not in federal court.  I did testify in

2  state court in Newport News.  That was not as an expert

3  witness as much as it was a trainer for the department.

4  The officer that was on trial -- it was a recent case.

5  It was the gentleman who the officers forced into their

6  residence, and they ended up shooting and killing him.

7  It was over some 9-1-1 calls.  So, I was called to

8  testify on behalf of the training division on how

9  reasonable use of force was trained because I trained

10  the officer in the academy.

11    Q.    What was the issue in terms of the

12  training?

13    A.    They just wanted to know how do you train

14  reasonable use of force.

15    Q.    And what happened in that case?

16    A.    In that case, that particular defendant,

17  Dwight Pitterson, was exonerated.  Then the companion

18  case to that was Sergeant Pearson who was recently

19  convicted of manslaughter.

20    Q.    I did read that.  You testified just as a

21  factual witness in terms of training?

22    A.    As a trainer, yes, ma'am.

23    Q.    For the Newport News Police Department?

24    A.    Yes, ma'am.

25    MR. BROWN:  Objection to form.

BY MS. ASKEW:

     Q.    Have you ever sat through any other depositions in a case?

     A.    Yes, ma'am.  Two.

     Q.    Tell me about those two cases.

     A.    One of them was a domestic case, and it involved a husband and a wife who were in a dispute. The neighbor called the police.  When the police arrived, they knocked on the door.  The husband got irate.  The wife came to the door.  I believe the husband got in front of her, talking to the police.  I don't remember exactly how it unfolded, but basically the officer ended up arresting the husband, and then the wife got upset and was in her house yelling at the officer.  Then the officer, when he directed her to come to him, she ran back into the house.

     So, the officer ran from the front porch where he was dealing with the husband into the house, challenged the female with his taser, ordered her to the floor.  She complied.  He then came back out and finished handcuffing the suspect.

     As he walked the suspect out to his car, the wife got up, ran outside and across the street to the neighbor's house.  After he was done with the husband, he went over and arrested the wife.

1    Q.    What was the issue?

2    A.    There were several issues.  One was the

3    use of the taser on the husband.  The other one was the

4    arrest of the wife, and then the third issue was that

5    pursuant to her arrest, she was searched at the jail

6    facility.  While she was being searched by a male

7    deputy, she said that the male deputy moved his hand

8    across her breast.  So, there was a complaint about the

9    nature of the search, the intrusiveness of the search.

10    Q.    What was the nature of your testimony in

11    that case?  Why were you called to do a deposition?

12    A.    To basically review the facts of the

13    arrest, the information available to the officers, and

14    then the use of the taser on the husband, and then the

15    arrest of the wife.  Basically, probable cause issues.

16    Q.    What was your opinion?

17    A.    My opinion was that the arrest of the

18    husband was reasonable in the eyes of the officer on

19    scene, although I had some problems with the arrest of

20    the wife.

21    Q.    What happened with the case; do you know?

22    A.    I was told by the attorney that it is

23    settled.

24    Q.    What's the other case?  You had another

25    one --

1    A.    Yes, ma'am.

2    Q.    Was that in Virginia?

3    A.    Yes.  The next one is -- the deposition

4  for that one -- that particular case a police officer

5  made an arrest one evening, and he recovered a firearm.

6  He worked in an agency where they had very limited

7  evidence storage facilities.  So, he brought -- at the

8  end of the shift, he secured the weapon in his vehicle

9  and brought it home with him that night intending to

10  put it into property and evidence the next day.

11           Not too long after they started their

12  shift, they had a call of a suicidal man missing with a

13  shotgun.  They called basically everybody on the shift

14  to come and help look for this man.  They located him.

15           This particular officer who secured the

16  gun in his car, ended up arresting the man and putting

17  him in his vehicle.  He was a fairly large and

18  inflexible man, so he required two pairs of handcuffs

19  to be handcuffed behind his back.  He was placed in the

20  back seat of the police car.

21           The deputy mistakenly left the window

22  open to the plexiglass shield.  The man was able to

23  slip his cuffs around from under his feet, and then

24  reach through that compartment and grab the pistol that

25  the deputy had had in his car, and he then shot himself

1    in the head with it.

2            Q.    So what was the issue there?

3            A.    The issue there was the arrest procedure,

4    the handcuffing and the evidence handling.

5            Q.    Who did you testify on behalf of?

6            A.    The defendant.  Well, for deposition,

7    yes.

8            Q.    For the defendant?

9            A.    Yes, it was for the defendant.

10           Q.    What happened?  Do you know in that case?

11           A.    I was told by the attorney that the

12   summary judgment motion was made in their favor.

13           Q.    That was in federal court in Virginia?

14           A.    No, ma'am.  That was a state case.

15           Q.    And could you provide for me a copy of

16   those?  You have a list of them, you said?

17           A.    Yes, ma'am.

18           Q.    I appreciate that.

19           A.    I've asked various attorneys if they want

20   the case history in a deposition separately, and

21   sometimes they -- they all have different preferences.

22   I'll be happy to provide that to you.

23           Q.    You said additional affiliation, 2009 to

24   present, Randy Means and Associates.  You're a team

25   member assisting with use of force instruction.  Tell

1   me, what do you do there?

2           A.    I don't really provide a lot of use of

3   force instruction lately for Mr. Means.  It has

4   primarily turned into references for expert witness.

5   He has basically a training firm or company.  If they

6   call him -- he advertises for expert witness work on

7   use of force or other matters.  So, if he gets a phone

8   call requesting that particular service, and he thinks

9   it's a matter that might be in my area, then he would

10  refer that to me.

11          Q.    Have you had any of those?

12          A.    Yes.

13          Q.    How many?

14          A.    I think about two or three.

15          Q.    Do you remember them?

16          A.    I want to say the first case that I

17  described testifying to in Tennessee about the vehicle

18  pursuit, I believe that was one of them.  I believe

19  another case that's still pending involves a deployment

20  of OC spray on a person during an arrest, I believe

21  that was one of his.  There may be one other.  I would

22  have to look at the list to identify, but I think

23  there's been at least two, possibly three that he has

24  referred me to.

25          Q.    And you're a member, from 2013 to

1   present, a member of the International Law Enforcement

2   Educators and Trainers Association.  As a member, what

3   do you do -- just attend meetings or go to conferences?

4           A.   They have annual conferences.  Up until

5   recently, I would instruct at the conferences.  The

6   only reason I haven't recently is because of the

7   demands at my job.  The scheduling just wouldn't line

8   up in a way that would permit me to go.  I think for

9   about five or six years almost, I instructed at the

10  conferences.

11          Q.   And here you have listed, Publication and

12  Interviews.  Tell me what your publication is.

13          A.   That is just an article coauthored with

14  Mr. Randy Means on body-worn cameras -- the benefit of

15  body-worn cameras.  I know that some agencies like to

16  push back on stuff like that, but they shouldn't,

17  really.

18          Q.   You support them?

19          A.   I do.

20          Q.   And then, what about -- you said you had

21  an interview with Jason Marks on Wavy 10 on use of

22  Less-Lethal/Bean Bag shotguns?

23          A.   Yes, ma'am.  So, that was after an

24  incident.  It was actually a SWAT callout that we had

25  with a mentally disturbed man who threatened somebody

1    where the officers were -- during high rates of speed,

2    didn't have their siren and lights on?

3            A.    Can you explain what you mean by high

4    rate of speed in relative terms.

5            Q.    Have you ever had any that did 96 in a

6    65?

7            A.    Aside from the interstate, we didn't have

8    any 65-mile-an-hour speed zones in Newport News.  We

9    generally did not monitor the interstate.  We would use

10   it to get from point A to point B as a straight line

11   shortest distance.  Or I was in pursuits on the

12   interstate, but that was only because the suspect went

13   there.

14           Q.    When you said pursuit, you had your

15   sirens and lights on?

16           A.    Yep.

17           Q.    Let me let you look at this.

18           MS. ASKEW:  Well, maybe this is a good

19   time to take a break.  I can't find a document.  Why

20   don't we do that, and I'll find the document and we can

21   pick up from there.

22                     (Break.)

23   BY MS. ASKEW:

24           Q.    Okay.  I was looking, and I had it in the

25   file, in the file room.

 1                    MS. ASKEW:  Would you mark this for me,

 2     please.

 3                    (Whereupon, Deposition Exhibit No. 2 was

 4     marked.)

 5     BY MS. ASKEW:

 6            Q.    Mr. Bartels, would you take a look at

 7     what looks like Plaintiff's Exhibit No. 2?

 8            A.    Yes, ma'am.

 9            Q.    Could you read the title?

10            A.    46.2-920.  Certain Vehicles Exempt from

11     Regulations in Certain Situations, Exceptions and

12     Additional Requirements.

13            Q.    And would you also read Section A1.

14            A.    You want me to read A and 1 or just --

15            Q.    A and 1.

16            A.    Okay.  "The driver of any emergency

17     vehicle, when such vehicle is being used in the

18     performance of public services, and when such vehicle

19     is operating under emergency conditions, may without

20     subjecting himself to criminal prosecution; one,

21     disregard speed limits while having due regard for

22     safety of persons and property."

23            Q.    Now, my question is, you will agree,

24     won't you, that in the case involving LaToya Benton,

25     administrator of the estate of Xzavier D. Hill,