deceased, and Seth Layton and Benjamin Bone -- that in your report, and what was presented to you, was that the trooper was driving 96 in a 65-mile-per-hour zone --

A. While he was pacing the suspect vehicle.

Q. Okay. Correct.

A. Yes.

Q. And now, would you agree, would you not, that based on that fact that the driver, of course, was Trooper Layton --

A. Yes.

Q. -- and that in this case, he was, in fact, doing more than the speed limit?

A. He was pacing the car at 97.

Q. And do you believe -- this section of code indicates that -- and if you'll read Subsection B --

A. Subsection B. You want me to read B, ma'am?

Q. Part of it. I guess you don't need to read all of it. Just read B-A. B, then all the way through A.

A. "The exemptions granted to emergency vehicles by Subsection A, in Subdivisions A1, A3, A4, A5 and A6, shall apply when the operator of such

vehicle displays a flashing, blinking or alternating emergency light or lights, as provided in Section 46.2-1022, and 46.2-1023, and the sounds of siren, exhaust whistle or air horn, designed to give automatically intermittent signals as may be reasonably necessary. The exemption granted under Subdivision A2 shall apply only when the operator of such emergency vehicle displays a flashing, blinking or alternating emergency light or lights, as provided in section 46.2-1022 or 1023."

Q. That's fine. I think that covers it. Now, you would agree then, would you not, that this statute applied to Officer Layton in his driving?

A. The statute does, but not that section of it.

Q. What section do you believe applies?

A. We go over this with our students. If you look down to Section D. I will read that if it's --

Q. Sure. Go ahead.

A. "Any law enforcement vehicle, operated by or under the direction of a federal, state or local law enforcement officer, may disregard speed limits while having due regard for the safety of persons and property; one, in the testing of accuracy of

speedometers of such vehicles; two, in the testing of the accuracy of speed measuring devices specified in 46.2882; or, three, in following another vehicle for the purposes of determining speed."

Q. What section -- you say this applies how so?

A. Because he was pacing a vehicle to determine his speed.

Q. But prior to pacing the vehicle, did he not clock him on radar at doing 96 in a 65?

A. Yes, ma'am.

Q. So, he already knew the speed, did he not?

A. By radar, but the speed may have -- because he was running stationary radar, so he wasn't in moving mode. So once he pulls out to follow the vehicle, it's possible that the vehicle's speed has changed. So that gives him his initial probable cause. So, if I'm not mistaken, Subsection A applies when responding to an emergency. So, he wasn't responding to an emergency. He was just pulling out to address a violator.

Q. So, Subsection A indicates the driver of any emergency vehicle, when such vehicle is being used in the performance of public services, and when such

vehicle is operating under emergency conditions, may, without subjecting himself to criminal prosecution -- and did you not think that when he clocks a vehicle at doing 96 in a 65, that that's not an emergency condition?

A. Not necessarily. I think --

Q. In this case?

A. Not in this case, no.

Q. You don't think it was?

A. To catch up to a speeder? Not generally, no.

Q. So you think he was proper not having his siren and lights on, in following this vehicle after he's clocked doing 96?

A. Yes, ma'am. That's actually not uncommon.

Q. Well, how do you know that?

A. I know that when I used to run radar, which wasn't very often -- I wasn't much of a radar guy, but when I ran radar -- when the other officers ran radar and we caught somebody for speeding violations, we would pull out and accelerate to catch up to them. Not in all cases would we turn on emergency equipment. If there was any reason for us to suspect DUI, we might want to follow the vehicle

without them knowing we're behind them so that we could observe other indicators as well. So there's a variety of situations where officers would do that.

Q. And you indicated that your officers didn't get on 64, on the highway?

A. Correct.

Q. Did they ever get up to speeds of 96 when you thought it was reasonable for them not to have the sirens and lights on?

A. I couldn't tell you how many of my officers ever got up to that speed in a residential area. I would like to think not many of them.

Q. Have you ever?

A. Yes.

Q. You have?

A. Not in a residential area. On the interstate.

Q. But you have, on the interstate, 96 without your siren and lights on?

A. No, ma'am.

Q. So there was never a time when you were at 96 without your sirens and lights on?

A. Not that I can recall. I was always responding to an emergency or in a vehicle pursuit.

Q. Okay. And in that regard, when the

vehicles then got up to -- did you -- well, let's get to that.

MS. ASKEW: Let's have that as an exhibit then.

(Whereupon, Deposition Exhibit No. 3 was marked.)

BY MS. ASKEW:

Q. Well, let me ask you this: This scenario, the factual situation involving this case, are you of the opinion that the officers are driving 96 -- we're at 96 now, 97 -- and pacing the vehicle that was driven by Mr. Hill, was not dangerous?

A. There is a certain amount of danger involved, but I don't know that the troopers, who have training in driving at high speeds, were necessarily at extreme risk at that point.

Q. Okay. What about when they said they got up to 120 miles per pour?

A. The danger was increased.

Q. Now, did you read anything that gives you any indication as to why Trooper Layton, who was driving, did not -- when he pulled behind the vehicle that was driven by Mr. Hill -- what the reason was for not immediately engaging the siren and lights?

A. Well, I could let you know that standard

police procedures -- what we recommend is that when you pull up behind the violator, that you call out the vehicle information first before you turn on your emergency equipment to get them to pull over. If I pull up behind them with my emergency equipment on and I never get a chance to read the tag, if there's an exchange of gunfire and somebody gets hurt, and then the vehicle drives away, then we don't know who that was. So we like for them to come up behind the vehicle, get some vehicle information, transmit that over the radio and turn on their emergency equipment. We would actually tell our officers -- there were some of them that were field training officers that would pull the vehicle over first, and even make contact with the driver before they marked out on the radio where they were and who they were with. We would tell them as a matter of agency policy and safety issue that we didn't want them doing that.

Q. I'm sorry. What's the safety issue?

A. The safety issue is, if something happens and the violator leaves, and you haven't called out a vehicle description, tag information or anything else, we don't know who was with you. We can't pursue the violator because we don't know what we're looking for. In this case, it was dark out. They pulled up behind

the vehicle. They were confirming their speed, which is not unusual. They then started watching the vehicle move over the line. They were observing now to see if there were additional indicators of potential DUI. Then at some point when they saw -- they believed they had enough, they went ahead and called in the information and activated their emergency equipment. It appears pretty standard to me.

Q. So then, then you go on to say in part of your summary, that Trooper Layton then activated his siren and pursued the vehicle. Then based on what your understanding is at that point, they have a license plate number?

A. Yes.

Q. And then the trooper pursued the suspect vehicle which accelerated to about 120 miles per hour?

A. Yes.

Q. And you think that was reasonable?

A. Do I think what was reasonable?

Q. The troopers going up to 100 miles per hour in pursuing this vehicle?

A. Sure.

Q. And then you indicate, "The suspect began to slow and pulled onto the right shoulder as if he were going to stop. At this point, an arm is seen

making a motion out of the window of the driver's side of the suspect's vehicle." Why is that important? Did you have any information other than that there was some arm?

A. No. That's an unusual motion and part of an event to take place at that particular time. We don't typically pull people over for speeding or during a pursuit where they would unnecessarily and for no reason put their arm out the window briefly in what appeared to be a throwing motion. Even though we don't know whether something was thrown or what the motion meant, it was done for a purpose, and that unknown purpose now raises suspicions in the mind of the officers.

Q. But you didn't have no idea what that was?

A. Correct. It's unusual.

Q. Just because you don't know? It was unusual because they put their hand out the window?

A. During a pursuit with the lights off at 120 right as they're pulling over, that is correct, yes.

Q. But when they pulled over, were they doing 120?

A. Oh, no, of course not.

Q. Okay. Did they do it at 120, or had they pulled over?
A. They couldn't see if he did it during 120 because he was further up, and the lights were not shining on the vehicle to that extent.
Q. And where did you get the 120 from? The officers?
A. Yes.
Q. So you had no independent review of anything that said they were doing 120?
A. Just the officers' statements.
Q. I mean, isn't there someway, by looking at the vehicle -- isn't there some kind of box that determines what their speed is at a certain period?
A. I don't know what the State Police have available to do that.
Q. But does the local police have any idea of -- do you have trained officers to determine, by looking at a vehicle after the fact, what the speed at a certain period of time was, going --
A. I have not been involved in such training, no, ma'am.
Q. So, you just don't know?
A. I don't know.
Q. "Made a sudden left turn across both

westbound lanes and attempted to U-turn. Then the vehicle went beyond the left shoulder and slid down the embankment so that the passenger side was up against the treeline, and the vehicle was leaning downward toward the passenger side. The driver continued to spin the tires in a constant attempt to escape."

A. Yes.

Q. And this narrative is based on what?

A. The observations in the video.

Q. Let's pull up the video then.

(Ms. Benton exits the room.)

MR. BROWN: Can we go off the record for a second?

MS. ASKEW: Yes.

(Off-the-record discussion.)

MS. ASKEW: All right.

BY MS. ASKEW:

Q. I will represent to you, Mr. Bartels, that this is a video that was produced by defense in this case. I'm going to let you see it.

(Video playing.)

MR. BROWN: Is the sound out?

MS. ASKEW: It comes on. They don't have it on yet.

(Video playing.)

MR. BROWN: Is there a question, or are you just going to have him watch it?

(Video playing.)

MS. ASKEW: Let's stop there.

BY MS. ASKEW:

Q. What is that to you -- that noise with one of the officers?

A. I couldn't tell you.

Q. You can't tell what that is?

A. No, ma'am.

Q. Did it sound like a "woo-woo" (phonetic), like they are enjoying the ride?

A. No. It sounds like there might be some adrenaline.

Q. Adrenaline?

A. Yes, ma'am.

(Video playing.)

BY MS. ASKEW:

Q. Can you tell me when you see his hand so we can mark where that is?

A. Yes.

Q. Okay.

A. Is it okay if I pause it where I see that?

Q. Yes. Okay.

A. And I'll try to time it --

Q. So I can put it on the record.

A. I think I just missed it, so let me do this --

Q. Okay.

A. May I try something?

Q. Sure. Do you want to slow it down?

A. That's what I was looking for.

MR. BROWN: Would it help if -- there's some dust on there.

THE DEPONENT: Say again, sir?

MR. BROWN: The screen is covered in dust.

THE DEPONENT: If we can get a tissue and wipe it off, that might be a little helpful.

MS. ASKEW: Sure.

(Video playing.)

THE DEPONENT: Right there.

BY MS. ASKEW:

Q. Would you agree with me that he has slowed and pulled over to the side of the road; correct? Can you show on the video so we can --

A. The timestamp?

Q. The timestamp. It's at 4:29?

A. It's 4:29. I can't tell you how many

frames, but 4 minutes, 29 seconds.

Q. And you'll see where he is located on the side of the road where he slowed, and it looks like he's almost coming to a stop --

A. Almost, yes.

Q. Almost. And that's when you first see his arm out the window?

A. Yes.

Q. Now, let's just leave it there for a minute. I'm going to have other questions -- more questions about that. And when you see his arm out the window, you don't know what he is gesturing?

A. No.

MR. BROWN: Objection to form.

BY MS. ASKEW:

Q. Do you know what he's doing?

A. No, ma'am, but it's typical and regularly taught that many suspicion factors can be entirely legal on their own, but in context, a situation can raise suspicions in an officer. It can make an officer wonder what somebody is doing that other people don't normally do at this particular point in time.

Q. All right. So, he slowed, pulled over to the side, and he puts his arm out the window. So, outside of that, everything is speculative; correct?

A. As far as?

Q. What he's doing.

A. Correct.

Q. As far as you know, he could be gesturing to the police officers and letting them know that he's going to turn the other way and stop.

A. I wouldn't have any reason to think that.

Q. You wouldn't have any reason to think otherwise. It doesn't show you anything otherwise?

A. I respectfully disagree.

Q. Well, show me something that tells you that he's doing something that's illegal?

A. I'm not saying he's doing anything illegal with a hand motion, but it would tend to suggest that if he's going to pull over, I think an officer is more likely to reasonably infer that he may be getting rid of some evidence before he stops.

Q. Right there, does it look like any evidence is being -- have they found any evidence?

A. It's not clear enough to --

Q. Did they find any when they stopped?

A. Not that I'm aware of.

Q. Has anybody told you they found any?

A. No, ma'am.

Q. So, as far as you know, he could be