1    to Trooper Layton's right just on the travel lane's

2    side of the shoulder line.

3                    (Video played.)

4                    THE DEPONENT:  At 4:57, Layton says, "Put

5    your hands up."

6                    (Video played.)

7                    THE DEPONENT:  Trooper Layton says, "Let

8    me see your hands."  Bone says, "Put your hands up."

9    BY MS. ASKEW:

10          Q.    Does that appear to you, in this video,

11   that there's an overlap with both of them saying

12   something at the same time?

13          A.    They were clearly distinct and separate,

14   but very close together.

15          Q.    Okay.  Go ahead.

16                    (Video played.)

17   BY MS. ASKEW:

18          Q.    Do you hear Mr. Hill say, "My door

19   doesn't open"?

20          A.    Yes.

21          Q.    And then, who is that speaking?  This is

22   at 5:01?

23          A.    Correct, 5:01.  I believe Bone just said,

24   "Put your hands up."  And then what's shown next here

25   is, Mr. Hill says again, "My door doesn't open."  I'll

1     play it and then pause it right after that.

2                 (Video played.)

3                 THE DEPONENT: He just said, "My door

4     doesn't open." Trooper Layton is in the process of

5     saying, "Put your hands out the door and do it now."

6                 (Video played.)

7                 THE DEPONENT: So, at 5:04, Trooper

8     Layton just finished saying, "Put your hands out the

9     door. Do it now."

10                 (Video played.)

11                 THE DEPONENT: At 5:05, Trooper Layton

12     said, "Put your hands out the door."

13                 (Video played.)

14                 THE DEPONENT: At 5:06 changing over to

15     5:07, Trooper Layton just said, "Put your hands out the

16     door" again, and started to say, "Stop moving." So I'm

17     at 5:07, and he just started to say -- that's Trooper

18     Layton, started to say, "Stop moving."

19                 (Video played.)

20                 THE DEPONENT: At 5:09, the vehicle had

21     passed between the trooper's vehicle, the trooper's and

22     Mr. Hill's vehicle. Trooper Layton has said again

23     clearly, "Put your hands out the door."

24                 (Video played.)

25                 THE DEPONENT: At 5:11, Trooper Layton

1  has now said, "Put your hands out the window."

2                 (Video played.)

3                 THE DEPONENT:  At 5:12, Trooper Layton

4  has again said, "Put your hands out the window."  I'm

5  sorry.  At 5:12.  Again, he just finished saying, "Put

6  your hands out the window."

7                 (Video played.)

8                 THE DEPONENT:  At 5:14, Trooper Layton

9  just finished saying, "Hey, he's reaching, reaching,

10  reaching" in an excited, elevated voice.

11                 (Video played.)

12                 THE DEPONENT:  So, at 5:15, Trooper Bone

13  just finished saying, "Stop reaching for the gun."

14                 (Video played.)

15                 THE DEPONENT:  At 5:16, Trooper Layton

16  just said, "He's got a gun."  I think that's where the

17  commands stop, and then the gunshots start.

18                 MS. ASKEW:  Okay.

19                 (Whereupon, Deposition Exhibit No. 5 was

20  marked.)

21  BY MS. ASKEW:

22        Q.    Mr. Bartels, you cite that section in

23  your report; do you not?

24        A.    I do.

25        Q.    So this is a statute you consulted in

1  preparing your report; is that correct?

2          A.    Yes.

3          Q.    Thank you.  Let's go to page 11 of your

4  report, Mr. Bartels.

5          A.    Yes, ma'am.

6          Q.    You indicated at the top, "The pursuit

7  ended unexpectedly when the vehicle became immobilized

8  after it slid down the embankment to trees.  With the

9  desperate suspect unable to flee in his vehicle, these

10 circumstances are tense and uncertain, and rapidly

11 evolving."  Now, you would agree that the vehicle was

12 immobilized; correct?

13         A.    Yes.

14         Q.    When you say "with the desperate suspect

15 unable to flee in his vehicle," you'd agree he couldn't

16 go anywhere in the vehicle?

17         A.    Yes.

18         Q.    At that point, can we look at what you

19 teach your officers with reference to what they should

20 do prior to using deadly force?  At the point that

21 Mr. Hill could not move his vehicle, could you tell us

22 what you would teach your police officers before

23 approach -- or what they should do prior to

24 approaching?  Or do you teach your police officers to

25 do as what was done here and have the two troopers exit

1  the vehicle with their guns drawn?

2          A.    We talk about different circumstances.

3  In this particular case, it would be very common to

4  exit your vehicle with your gun drawn.

5          Q.    So you think that under these

6  circumstances -- with the vehicle not being mobile and

7  not going anywhere -- that it's reasonable for Trooper

8  Layton and Trooper Bone to exit the vehicle and run

9  towards the vehicle with their guns drawn?

10              MR. BROWN:  Objection.  Form.

11              THE DEPONENT:  I did not see them

12  running.

13 BY MS. ASKEW:

14          Q.    Tell me what you saw.

15          A.    I saw them approach the vehicle, but I

16  didn't see them running.

17          Q.    Okay.  So approaching the vehicles with

18  their guns drawn, is that what you would teach your

19  police officers?

20              MR. BROWN:  Objection.  Form.

21              THE DEPONENT:  We don't teach so much to

22  specific circumstances.  If we use a circumstance, it's

23  usually kind of as a marker.  We would use something

24  obvious.  Our obvious marker would be the type of a

25  stop where a suspect pulls over on the side of the

road, like more people do, and how you can position

your vehicle and approach from that point.

A variation might be, it's not uncommon

to have an occupant of the vehicle run.  So we might

address that.  Sometimes we'll address that if the

suspect chooses the location of a stop, then you have

to take what you get.  Any deviation from what I would

call the standard taught technique is up to the officer

to make the tactical decision about whether to approach

or stay behind cover.  There isn't really anything in

our training curriculum that instructs our officers to

do only one thing in an unpredictable set of

circumstances.

So, the only thing I would do, if I was

going to debrief this, is I would ask the officers

questions about, So when this happened, what were you

thinking.  I need to know what's going on in their mind

in order to make sense of their decisions.  If they

say, well, he pulled over and we thought he was going

to jump out the window and run, so we approached in

case we were either going to engage in a foot pursuit,

or we wanted to get out of the roadway, or we wanted to

control them closer rather than from the travel lane --

it's totally within their discretion.  So, I would say,

good.  I just want to know your thought process.

1               If there was an adjustment that we wanted

2   to make, we would talk about it, but the chances they

3   would have that set of circumstances again to implement

4   a planned response to that exact set of circumstances

5   is almost zero.

6   BY MS. ASKEW:

7        Q.   So, when you're debriefing, is it not to

8   be concerned about the loss of life?

9        A.   Well, that's a concern on every call that

10   we go on.

11        Q.   So how do you know it wouldn't happen

12   again?

13        A.   I was talking about the circumstances --

14   in other words, the set of the stop, the positioning of

15   the vehicles.

16        Q.   How do you know that?

17        A.   Because, to have another circumstance

18   exactly like that, it's like winning the lottery.

19        Q.   How do you know that?

20        A.   Statistically speaking.

21        Q.   From what?  What statistics are you

22   looking at?

23        A.   I worked in the police department for 20

24   years.  Not once have I ever seen the exact same use of

25   force twice, ever.

1      Q.    Have you ever seen any situation like

2    this in which you are called to become an expert

3    witness?  Have you ever seen any scenario like this one

4    involving Trooper Bone and Mr. Hill?

5      A.    No.

6      Q.    So this was the first time you've seen

7    anything like that?

8      A.    All of my cases were a first time.

9      Q.    All right.  Trooper Bone indicated that

10   when he exited the vehicle, that he did not believe

11   that Mr. Hill was armed.

12              MR. BROWN:  Objection.  Form.

13   BY MS. ASKEW:

14     Q.    Is that a factor in anything that you

15   would -- does that have any impact on your opinion in

16   this case?

17     A.    I was never given that information, but,

18   no.

19     Q.    Were you aware also that Trooper Bone

20   said that he and Trooper Layton had no discussion about

21   a plan of action prior to exiting the vehicle with

22   their guns drawn?

23     A.    That's not significant to me.  But, no.

24     Q.    You didn't know that.

25     A.    I watched on the video.  I didn't hear

1    them discussing anything.

2         Q.    You don't think that that is something

3    that you would advise your officers, before exiting the

4    vehicle, that they would have a plan of action?

5         A.    I think their plan of action comes off of

6    their training and whatever happens at the end of the

7    pursuit.  They can't plan what to do at the end of the

8    pursuit when they don't know how it's going to end.

9         Q.    What about before they exit the vehicle

10   and drawing their weapons?  Would you teach your police

11   officers to do that?

12              MR. BROWN:  Objection.  Form.

13              THE DEPONENT:  Absolutely not.  It would

14   take too much time.

15   BY MS. ASKEW:

16        Q.    Do you teach them to do that?

17        A.    No.

18        Q.    In your years of training and -- well,

19   strike that.

20              When you are teaching your officers about

21   the use of force, was the first thing that you --

22   what's the number one thing that you talk to them

23   about?

24        A.    Are you referring to the presentation on

25   day 1 of use of force, like the first slide or bit of

1  information I present, or what is the most --

2          Q.    The number 1 thing -- the first thing you

3  start with.  When you talk to your officers in

4  training, what's the first thing that you tell them?

5          A.    I go over a couple of definitions with

6  them so that when we're having our discussion and we're

7  using a word or a phrase, they know what we're talking

8  about.

9          Q.    And what would that be?

10         A.    We discuss deadly force definition,

11  nondeadly force definition and objective

12  reasonableness.

13         Q.    And, do you -- strike that.

14                Is one of your teachings that the use of

15  deadly force should only be exercised when it's

16  immediately necessary to protect the officer or another

17  person from the threat of death, or serious bodily

18  injury?  Is that basically the standard that you --

19         A.    Yes.

20         Q.    Do you also teach your officers that when

21  they have a less-lethal option, to use that when it

22  doesn't increase the risk to themselves or others?

23         A.    That's going to be circumstance

24  dependent.  So if we are responding to an armed

25  subject, a firearm less-lethal is off the table.  If

1   they have some other object that they have to be within

2   close range to use, our policy prohibits the deployment

3   of less-lethal unless there's a support officer to

4   provide lethal coverage.  Of course, after that, it's

5   totally circumstance dependent.  So there's no

6   instruction that you must try less-lethal before lethal

7   because the circumstances would dictate which one is

8   appropriate.

9        Q.    Do you teach your officers that they

10   should attempt to use alternative means of apprehending

11   or securing a suspect outside of using deadly force?

12        A.    Do you mean when deadly force would be

13   justifiable?

14        Q.    Well, do you teach your officers to try

15   to use other means other than deadly force?  Do you

16   teach your officers to come up with another means of

17   approaching a situation to avoid using deadly force?

18            MR. BROWN:  Objection to form.

19            THE DEPONENT:  I would need to be

20   circumstance specific on that.  A lot of times the

21   response is suspect-driven rather than officer-driven.

22   I do emphasize to the officers that when it's

23   suspect-driven, you pretty much have to do what you

24   need to do.

25   BY MS. ASKEW:

1      Q.   Well, let me ask you this:  With

2  reference to this case -- Mr. Hill, Trooper Layton and

3  Trooper Bone -- if they, as I had indicated to you, had

4  hypothetically placed their vehicle on the left lane

5  and had, in fact, used the vehicle for cover, called

6  for backup and spoken to Mr. Hill from their covered

7  position using the PA, and remained safe where they

8  were, is that not a better alternative than what

9  Trooper Layton and Trooper Bone did?

10                 MR. BROWN:  Objection.  Form.

11                 THE DEPONENT:  I would say that is not a

12  better option.

13  BY MS. ASKEW:

14      Q.   Why not?

15      A.   Because, regardless of being in the left

16  lane, you're still in the travel lane of an interstate.

17  It might look like it would be common sense to just

18  safely go around to the right, but one of the things

19  about police work that is unique is that officers get

20  to see things that the average citizen doesn't get to

21  see, which is why, in this particular case, I would not

22  want them in the travel lane of the interstate.  Too

23  many troopers get hit on traffic stops, even off to the

24  side on a shoulder.  They're not even in the travel

25  lane and they get hit.

1          So, for a trooper to position their

2     vehicle in the travel lane of an interstate at 4:30 in

3     the morning when it's dark out, and then take cover at

4     that vehicle, would be extremely dangerous.

5          Q.   Do you see any other -- you're saying

6     there's no other means of doing it other than what they

7     did?

8          A.   Any time an officer does something,

9     there's always something else they could have done.

10    That there was something else they could have done

11    doesn't mean that that something else would be better.

12    In many cases, even if it was, in hindsight -- with the

13    amount of time they have to work with when they do the

14    best that they can, we look favorably upon that.

15         Q.   As a field officer, prior field officer

16    and a person who trained field officers, did you

17    believe that in the situation with Trooper Bone and

18    Trooper Layton, that Trooper Bone had any

19    responsibility in terms of helping or advising Trooper

20    Layton?

21         A.   With regards to what?

22         Q.   With regards to his approach to the

23    vehicle?  With regards to the actual placement of the

24    vehicle?

25              MR. BROWN:  Objection.  Form.

1          THE DEPONENT:  I think it would be

2   speculation, but I imagine if Trooper Bone wanted it

3   moved, that he would have instructed Trooper Layton to

4   do that, but I don't know.

5   BY MS. ASKEW:

6          Q.   Would it be surprising for you that

7   Trooper Bone said that he had nothing to do with it,

8   that Trooper Layton was the driver, so he didn't have

9   no say-so whatsoever about the placement of the

10  vehicle?

11         A.   No, that wouldn't surprise me because of

12  the amount of time they were dealing with.  The

13  position of the vehicle at that point, even if I was a

14  field training officer, even if it was remotely

15  acceptable, and our primary concern is controlling the

16  person in that vehicle, then I'm going to accept what

17  my trainee does.

18         Q.   And you'll agree with me that the vehicle

19  wasn't going anywhere; correct?

20              MR. BROWN:  Objection.  Form.

21              THE DEPONENT:  Ultimately, they learned

22  that, yes.

23  BY MS. ASKEW:

24         Q.   How long did it take?  Do you know?

25         A.   That would be speculation for me to try

1   to guess at what point they understood the vehicle was

2   not able to move.

3         Q.   At what point were you able to determine

4   that?

5         A.   I don't know that I necessarily, in

6   watching the video, could factually determine that it

7   couldn't move. I know that it didn't move. In looking

8   at the pictures, we can see it appears to be stuck.

9   Its tires are spinning. It looks like it's not moving.

10   I would say, if there was a point in time, that would

11   be it. When it was down the embankment, he attempted

12   to accelerate, and the vehicle went nowhere, that would

13   be the point that I would determine that the vehicle is

14   likely immobile.

15         Q.   You indicated then that -- or did you --

16   that this was considered a high-risk stop?

17         A.   Yes.

18         Q.   And did you determine that the pursuit

19   ended?

20         A.   At a point, yes.

21         Q.   At what point?

22         A.   At the point that the vehicle appeared to

23   be immobilized and it was unable to move. At that

24   point, the vehicle pursuit could be considered over.

25         Q.   And you do not -- in your opinion, you

1    said, "One method for conducting high-risk stops is

2    where officers position their vehicle behind the

3    vehicles -- the suspect vehicle. Stay behind the cover

4    of the police vehicle with weapons drawn, and give the

5    suspect verbal commands from that position of cover to

6    control the stop from a distance."

7              Now, tell me your experience when you say

8    that -- your experience as an officer and the scenario

9    where you have done that. What would you have trained

10   your officers to do?

11        A.    I have done -- I don't know how many

12   high-risk stops, but enough of them. Fortunately for

13   us, in the community that we were in, the vast majority

14   -- almost every time that we did one, we would be

15   behind the vehicle and be able to choose our own

16   position. There are times when officers would come up

17   the opposite direction, and they were -- what we would

18   say "down range" of our stop, and we would direct them

19   to move. So our experience in our environment was that

20   the standard setup for a high-risk stop was fairly

21   common for us.

22        Q.    Using the method for the high-risk stop,

23   the procedures where the officers position themselves

24   behind the suspect -- behind the vehicle. They then

25   stay covered behind the police vehicle with their

weapons drawn, and they give the suspect verbal
commands from that position of cover to control the
stop from a distance.

In your experience, over your years as an
officer, has there ever been any fatalities of police
officers, under those circumstances, that you're aware
of?

A.    In my department?

Q.    That you're aware of, in your experience?

A.    Not in my department, no.

Q.    Okay.  Now, you indicate that these --
I'm sorry.  It's page 11.

A.    Yes, ma'am.

Q.    You said that your techniques.  "These
techniques" -- well, let's back up.  You said, "This
response assumes that the vehicles are on a level
surface ideally positioned in a well-lit area of the
officer's choice.  Backup is present.  The suspect did
not flee on foot, and the suspect complies with all
verbal instructions."

Now, if the officer, Trooper, and Officer
Layton, before they left their vehicle with their guns
drawn, do you believe that it was prudent to call for
backup before they did that?

A.    Well, they had backup.  Normally, they're

1   in single-officer units.  So there were two officers

2   already there.

3           Q.    They were each other's backup?

4           A.    Yes.  Yes.

5           Q.    Prior to Trooper Layton and Trooper Bone

6   exiting the vehicle, is it your opinion that they were

7   not in danger at that point, or were in danger at that

8   point, before they exited the vehicle?

9           A.    I would say they were in danger.

10          Q.    They were?  Before they exit the vehicle?

11          A.    Yes.

12          Q.    How come?

13          A.    Because they were in the travel lane of

14  the interstate, and there were cars coming up behind

15  them that they passed when they were catching up to him

16  and ultimately pursuing Mr. Hill.

17          Q.    So, they were endangered by other

18  vehicles?

19          A.    Yes.

20          Q.    And again, if they had pulled off of the

21  travel lanes, would that eliminate the danger for them?

22                MR. BROWN:  Objection to form.

23                THE DEPONENT:  I see nowhere for them to

24  do that.

25  BY MS. ASKEW:

1     Q.   You didn't see anywhere for them to --

2    what about even on this side of the road over there, on

3    the side there, off of the roadway?

4          A.   I think that --

5          Q.   They couldn't pull off their vehicle

6    there?  What's the problem with that one?

7          A.   They could, but that puts them further

8    away from the suspect's vehicle and less able to see --

9    more chance for Mr. Hill to escape.  They'd have to

10   cross both travel lanes.  I don't know where the cars

11   were but....

12         Q.   You're saying that Mr. Hill was going

13   to -- there was concern about him getting out of the

14   car and running?

15         A.   Most likely, yes.

16         Q.   Why is that?

17         A.   Every police officer has that concern at

18   the end of a pursuit.

19         Q.   The car was immobile.  Is there any

20   gesture that he was getting out of the car to run?

21         A.   But that's why he would get out and

22   run -- because the car is immobilized.

23         Q.   Is there any kind of indication here

24   other than him trying to move the vehicle that he was

25   going to get out the car and run?

1          A.    But you're suggesting that if they parked

2    over here --

3          Q.    That's not my question.  Now it's, do you

4    have any indication from any evidence that you have

5    seen, that Mr. Hill was attempting to get out of the

6    car and run?

7          A.    And I am going to -- I don't mean to

8    be --

9          Q.    Just on the evidence that you've seen.

10         A.    And I don't mean to be difficult, but in

11   order to answer that question, it requires a little bit

12   more.  This is an ongoing event, so when they pull up,

13   there's no indication immediately, but that indication

14   could develop within a second.

15         Q.    So at that point, you're saying no.

16   There's no indication?

17         A.    Correct.

18         Q.    Do you believe that when Trooper Bone and

19   Trooper Layton then exited the vehicle, and they then

20   moved towards Mr. Hill's, is it your opinion that that

21   -- do you think that escalated a nondeadly situation

22   into a deadly encounter?

23         A.    No.

24         Q.    You don't?

25         A.    No, I do not.

1        Q.    Why not?

2        A.    Because a police officer's lawful actions

3    are just that.  Their instructions for Mr. Hill were to

4    put his hands out the window where we can see them.

5    When he doesn't comply with the instructions, the

6    escalation comes from the suspect, not the officers.

7        Q.    So when the law says that police officers

8    are to use means to avoid deadly force, do you see no

9    way that they could have done that in this case?

10        MR. BROWN:  Objection.  Form.

11        THE DEPONENT:  I'm not sure what you're

12    suggesting the law would require these officers to do

13    that would eliminate the threat that Mr. Hill posed.

14    BY MS. ASKEW:

15        Q.    Well, before they approached Mr. Hill,

16    what was the threat, other than the traffic?

17        A.    Presented from Mr. Hill?

18        Q.    Yes.

19        A.    At that point was unknown.

20        Q.    Well, what was known was that Bone said

21    he did not believe he was armed.  That's what Bone

22    testified in his deposition.

23        MR. BROWN:  Objection.  Form.

24    BY MS. ASKEW:

25        Q.    So what was the risk?

1          A.    It was unknown.  So what you have is a

2    man who is willing to turn his lights off and drive on

3    an interstate at 120 miles an hour to try to get away

4    from the police.  That is Mr. Hill putting his own life

5    in danger to try to escape from the police.  That's

6    great desperation.

7          Q.    But I think -- didn't you cite a case

8    where a person was shot in the back for fleeing and

9    they didn't have a gun?

10          A.    Did I cite that case?

11          Q.    Didn't you?  I thought it was in your --

12    I think you cite that as one of the things you

13    reviewed.

14          A.    Are you referring to <u>Tennessee v. Garner</u>?

15    I don't think I cited that case here.

16          Q.    Maybe that's the wrong one I read.  Just

17    because a person flees doesn't mean you get to shoot

18    him; is that correct?  You agree with me?

19          A.    Absolutely.

20          Q.    So, the scenario that we have is,

21    someone, who is Trooper Bone and Trooper Layton are

22    concerned about -- best case -- that he might jump out

23    the car and run?

24                MR. BROWN:  Objection.  Form.

25    BY MS. ASKEW:

```
 1              Q.    Based on what you've seen in this case.

 2              A.    As an experienced police officer, I know

 3       that it was a concern in their mind that Mr. Hill may

 4       run.

 5              Q.    Okay.  So, if somebody runs and they are

 6       unarmed, does that mean you get to shoot them?

 7              A.    No.

 8              Q.    If you have the license plate of the

 9       vehicle, was there some urgency?

10                    MR. BROWN:  Objection to form.

11                    THE DEPONENT:  Urgency to what?

12       BY MS. ASKEW:

13              Q.    To approach the vehicle with guns drawn,

14       even if they thought Mr. Hill was going to run on foot.

15              A.    For clarification, are we saying that --

16       are you suggesting the only reason they approached him

17       with guns drawn is because he may flee on foot?  That's

18       not how I saw it.

19              Q.    Okay.  So where was the danger and what

20       was the concern with the officers as to why they got

21       out of the vehicle and approached Mr. Hill with their

22       guns drawn?

23              A.    So, to back up just a little bit, you

24       have this desperate life-threatening attempt to escape.

25       So we have a person who is unconcerned about human
```

```
 1  life.
 2          Q.    Whose life was that?
 3          A.    Mr. Hill.  He was unconcerned for his own
 4  life enough to try to escape from the police.  Then we
 5  have the throwing motion as he's pulling over.
 6          Q.    Which you don't know what that was.
 7          A.    That is a suspicion factor for police.  A
 8  hindsight revelation as to whether or not anything was
 9  thrown -- that's not known to the police at the time
10  they observed the motion -- is not part of their
11  analysis.  So it's a suspicion factor.  I'm not saying
12  it's illegal.  I'm saying that it raises additional
13  suspicions in the mind of the officers because it's an
14  unusual behavior at that point in time.
15               So then you have now the immobilized
16  vehicle.  We're dealing with a person who is
17  disregarding his own life whose been noncompliant to
18  the police to that point, and we cannot see his hands
19  because he's in the vehicle, and we cannot see his
20  hands.  So as a precautionary measure, there's nothing
21  wrong with displaying a weapon.  I think the vast
22  majority of officers would display their weapon under
23  those circumstances.
24          Q.    But Trooper Bone said he didn't believe
25  he was armed.
```

1          MR. BROWN:  Objection to form.

2  BY MS. ASKEW:

3          Q.    You don't think that's significant?

4          A.    First of all, I was not given that

5  information.  In my view, I don't think that it would

6  matter because, as a precautionary measure, what

7  Trooper Bone doesn't know, as opposed to what he does

8  know, puts it in the unknown category.

9          MR. BROWN:  I'm going to further object

10  to that question on offering facts that were not

11  testified to.

12  BY MS. ASKEW:

13         Q.    So, if Trooper Bone says that he exited

14  the vehicle with his gun drawn because of his safety;

15  is that reasonable?

16         MR. BROWN:  Objection to form.

17         THE DEPONENT:  Yes.

18  BY MS. ASKEW:

19         Q.    What would be his safety?

20         A.    The fact that you have a person who

21  disregards his own life, who's noncompliant, whose

22  hands that we cannot see -- with his level of

23  desperation, we do not know what he is willing to do to

24  continue his attempt to escape.

25         Q.    So let's assume that you're concerned

1    about Mr. Hill getting out the car and running.  What

2    is the urgency?

3                    MR. BROWN:  Objection.  Form.

4                    THE DEPONENT:  I would not want him -- I

5    would assume, as a police officer, that he would run

6    through the woods and possibly out on the other side

7    where vehicles were traveling at night.  I wouldn't

8    want him to do that, nor would I want him to get across

9    the interstate into more woods where we were likely to

10   lose him.  So the urgency would be to apprehend a

11   violator.

12   BY MS. ASKEW:

13                    Q.    But you got his license plate.

14                    A.    But we don't know if that's the same

15   person that it's registered to.  It's not uncommon for

16   officers to find somebody driving a vehicle that

17   doesn't belong to them.  So they'd never confirmed who

18   he was.

19                    Q.    Mr. Bartels, we have both the troopers at

20   the car with their guns and they started to shoot --

21                    A.    Yes.  I think that might be where we left

22   off.

23                    Q.    Can you bring it up?

24                    (Video played.)

25                    THE DEPONENT:  That is immediately before

1  they shoot at 5:15.

2  BY MS. ASKEW:

3      Q.    And where are the officers located?  You

4  can cite what's --

5      A.    I see -- again at 5:15, Trooper Bone is

6  in front of Trooper Layton, but he is slightly back and

7  off of the car at an angle from the driver's side.

8  He's a little bit behind the driver's door, and a

9  little bit off of the vehicle moving backwards.

10          Trooper Layton is -- it looks like

11  slightly forward of the driver's door -- out from the

12  vehicle.  It's hard to tell his distance, but he looks

13  like he's up here at the top of the embankment, from

14  that.

15     Q.    Okay.

16     A.    When I say that, I was referring to

17  Exhibit 4.

18     Q.    I'm giving you the autopsy report.

19          (Whereupon, Deposition Exhibit No. 6 was

20  marked.)

21  BY MS. ASKEW:

22     Q.    Would you look at the Report of Autopsy.

23  At the top it says page 4.

24     A.    Yes, ma'am.

25     Q.    And would you look down to where it says

1  summary.  Could you read that for us?

2          A.    I'll try.  "The decedent was an

3  18-year-old male who was involved in a vehicular

4  pursuit with police, and was subsequently shot during

5  the incident.  He was pronounced dead at the scene.

6  The examination showed gunshot wounds involving the

7  face, neck, and left hand.  The gunshot wound to the

8  neck was associated with a lethal injury.  There was no

9  significant natural disease."

10         Q.    That's fine.  Thanks.  Now you have

11  experience, do you not, in firearm training?

12         A.    Yes.

13         Q.    Tell me, what kind of experience do you

14  have in that regard?

15         A.    Everything from basic marksmanship, safe

16  firearms handling, and tactics while using a firearm

17  such as how to properly shoot from cover, how to shoot

18  while moving, shooting from different positions --

19  unusual positions that police officers may find

20  themselves in, such as if they get knocked down.

21  Recognizing threats.  Making decisions about when to

22  shoot.  It's pretty extensive.

23         Q.    Are you able to determine the position of

24  a person when they -- from where they are shot?  Could,

25  for example -- are you skilled enough or do you know

1  from your firearm trainings, can you tell us the

2  position of Mr. Hill in terms of being shot in the

3  hand, left side of his face and back of his neck?  Are

4  you in a position to say where he was positioned in the

5  vehicle based on -- I mean, I'm just asking.  I'm not

6  saying you have to.  I'm just asking, are you in a

7  position to tell us that?

8          A.    I did not look at that as far as bullet

9  path, travel, et cetera.  That's not something I looked

10 at, no.

11         Q.    Are you skilled enough to do that or

12 nobody asked you that?

13         A.    I wouldn't say that I have a developed

14 expertise in it, but it's something that I think

15 anybody experienced with firearms and crime scenes

16 could gather information on.

17         Q.    But nobody asked you to render an opinion

18 on that?

19         A.    No.

20         Q.    Fair enough.  Thanks.

21              MS. ASKEW:  What time do we have?

22              THE COURT REPORTER:  We're at 3:32.

23              MS. ASKEW:  It's 3:32.  Not too bad.

24 Give me a minute.  I'm almost there.  Let me go meet

25 with my client for a second, guys.

1          (Pause in proceedings.)

2          MS. ASKEW:  Okay.

3   BY MS. ASKEW:

4          Q.   Let's talk about when they removed

5   Mr. Hill and laid him on the ground.  Trooper Bone

6   checked Mr. Hill for a pulse, but cannot detect one.

7   Then you go on to talk about providing some emergency

8   medical service for him and why you didn't think they

9   had to.

10         A.   Can you tell me --

11         Q.   The last paragraph.  Do you want to read

12  that for us?

13         A.   "Police receive basic first aid and CPR

14  training in the academy.  In the summary of Trooper

15  Layton's statement, Trooper Layton articulated that he

16  was concerned performing CPR would pump out the

17  remaining blood.  Many agencies now provide additional

18  training on the application of a tourniquet and chest

19  seals when appropriate.  There is no training or other

20  equipment provided that enables police to treat someone

21  with catastrophic gunshot injuries to the face and the

22  base of the neck where there's loss of consciousness

23  and no detectible pulse.  Requesting EMS as quickly as

24  possible, as was done here, is all the police can do to

25  assist."

1        Q.    Are you familiar with what Trooper Layton

2  was saying with reference to performing CPR?

3        A.    Yes, I understand what he was saying.

4        Q.    You understand what he was saying.  Is

5  that what was taught?  When they teach you CPR, when

6  you have CPR training, what did they teach you?

7        A.    I've never heard that addressed in CPR

8  training.  Normally, CPR training addresses somebody

9  who is an unconscious victim where they're not choking,

10  and you do the whole call 9-1-1, secure the scene, and

11  you start going through your standard checking the

12  airway, and so on and so forth.  I've never taken a CPR

13  class where they discussed CPR after an incident such

14  as this.

15        Q.    So this would be a first thing for you?

16        A.    Yes.

17        Q.    You have to pretty much rely upon what

18  Layton tells you?

19        A.    As far as what he did?

20        Q.    Yes.

21        A.    Yes.

22        MS. ASKEW:  Thank you.

23        I think I'm done.

24        MR. BROWN:  I think I have a couple of

25  questions.

1          Can you give me Exhibit 3?

2

3               EXAMINATION

4     BY MR. BROWN:

5          Q.   Let us direct your attention to

6     Exhibit 3.  So you were asked questions about the

7     location of the police officer's cruiser there; right?

8          A.   Yes.

9          Q.   So is it fair to say that the cruiser is

10    facing toward Mr. Hill's vehicle?

11         A.   Yes.

12         Q.   Is there some reason that an officer

13    might do that?

14         A.   Yes.  In the dark, you want to put as

15    much light on the vehicle as possible.  Even what we

16    would refer to as the standard format where you'd pull

17    up behind the vehicle, you're focusing on the top light

18    bar.  You have what are called takedown lights, and

19    they're essentially spotlights that shine forward.  You

20    have a spotlight outside the driver's door that most

21    people are probably familiar with seeing on many police

22    cars, and then you have the vehicle's headlights that

23    also offer illumination.

24         Q.   Now, what about the position of Mr.

25    Hill's vehicle in comparison with the police cruiser,

1    as far as their elevation?  Is there a difference in

2    elevation?

3          A.    Yes.  Mr. Hill's vehicle was lower.

4          Q.    Would that factor into where you might

5    have placed the cruiser or whether you would, as

6    opposing counsel had questioned you about, take cover

7    at the vehicle when you initially stopped the cruiser?

8          A.    Well --

9          Q.    Just to clarify, the difference in

10    elevation of vehicles and possibly the sidelines?

11          A.    I think that what I see here is that that

12    discrepancy creates an issue for an officer where they

13    have to decide on their visibility.  So, if an officer

14    needs to see differently than they can, then they have

15    to decide whether or not repositioning is advantageous,

16    or if the risks outweigh the rewards.  So, the trooper

17    has to -- or the officer has to figure out, based on

18    that difference -- because normally on the same street

19    level, it's a lot easier to see.  But here, that's not

20    the case.

21          Q.    The training that the officers receive

22    would allow them discretion to make judgment calls

23    about where to get a vantage point?

24          A.    I think that part of what I've tried to

25    explain throughout a lot of my answers is the fact that

1    almost all of police work, that's not specifically

2    directed by policy, involves discretionary

3    decisionmaking to include tactics.  So, whenever

4    there's a change in what we would call a normal or

5    standard set of circumstances, an officer has to make

6    decisions on how they're going to adjust for that.  So,

7    yes.

8            Q.    Earlier you testified that there were

9    three clear commands to get out of the vehicle; is that

10   right?

11           A.    Yes.

12           Q.    After those three commands, had Mr. Hill

13   exited the vehicle?

14           A.    No.

15           Q.    You testified earlier that at the 4:57,

16   Layton issued a command which followed Mr. Hill

17   indicating his door didn't open; is that right?

18           A.    Yes.

19           Q.    And do you remember what that command

20   was?  We can look at the video again if you need to.

21           A.    I think I can refer to my notes real

22   quick, that way Ms. Benton doesn't have to worry about

23   the video.

24           Q.    I'm sorry.  If that's better.

25           A.    In what I've transcribed from watching

1  the video, the first time Mr. Hill says my door doesn't

2  open, immediately following that is Trooper Bone's

3  command of, "Put your hands up."

4          Q.    So, were there any commands that you

5  heard, after he indicated his door doesn't open, to

6  exit the vehicle?

7          A.    No.

8          Q.    You testified earlier that you had never

9  seen -- and I'm shifting gears.  You testified that

10  you'd never seen an incident the same as this?

11          A.    Correct.

12          Q.    What did you mean by that?

13          A.    I mean that, as similar as some incidents

14  may be to each other, there are unique differences that

15  make an officer's decisions what they are.  That's

16  recognized in my use of force training, and I want my

17  officers to understand that the Supreme Court instructs

18  that each is to be evaluated on its own merit, facts

19  and circumstances.

20          Q.    So, you've seen more than one incident

21  involving the use of force?

22          A.    Yes.

23          Q.    Can you give an approximate estimation?

24  More than a hundred?

25          A.    Yes.