## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

LATOYA K. BENTON, Administrator )
of the Estate of Xzavier D. Hill, )
Deceased, )
                         )
               Plaintiff, )
                         )
v.                        )       Civil Action No. 3:22-cv-225–HEH
                         )
SETH W. LAYTON, individually )
and in his official capacity as State )
Trooper for the Virginia State Police, )
*et al.*, )
                         )
               Defendants. )

## <u>MEMORANDUM OPINION</u>
### (Granting Defendants' Motion for Summary Judgment)

This case arises from the tragic death of Xzavier D. Hill ("Hill" or the "Deceased"). On January 9, 2021, Virginia State Troopers Seth W. Layton ("Layton") and Benjamin I. Bone ("Bone") (collectively, "Defendants" or the "Troopers"), tried to initiate a traffic stop on Hill's vehicle, which was traveling at 96 miles per hour, well over the posted speed limit. Hill did not stop and led the Troopers on a high-speed chase for several miles, ending with Hill wrecking his vehicle in the median. The Troopers approached the immobilized vehicle and provided Hill with several commands. Hill allegedly disregarded the Troopers' instructions and eventually reached for a handgun. In response, the Troopers fired shots killing Hill. Latoya K. Benton ("Plaintiff"), Hill's mother, brings this wrongful death and civil rights case as the Administrator of the Deceased's estate against Layton and Bone.

This matter is presently before the Court on Defendants' Motion for Summary Judgment (the "Motion," ECF No. 42), filed on February 6, 2023. Defendants seek to dismiss Plaintiff's Amended Complaint (ECF No. 10) on the basis that the Troopers' force was not excessive or unreasonable given the circumstances at hand and even if the Troopers violated Hill's constitutional rights, those rights were not clearly established under the facts at hand. (Defs.' Mem. in Supp. at 3, ECF No. 43.) Plaintiff contends that the Troopers created "exigent circumstances" through their tactics and actions in approaching Hill's immobilized vehicle and that the Troopers lied about seeing a gun, arguing that Hill never pointed the gun at either of the Troopers. (Pl.'s Mem. in Opp'n at 2–3, ECF No. 46.) Both sides have submitted extensive memoranda supporting their respective positions, and oral argument was heard on March 29, 2023. For the following reasons, the Court will grant Defendants' Motion.

## I.    STANDARD OF REVIEW

Pursuant to Rule 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

2

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). A material fact is one that might affect the outcome of a party's case. *Id.* at 248; *Hogan v. Beaumont*, 779 F. App'x 164, 166 (4th Cir. 2019). A genuine issue concerning a material fact only arises when the evidence, viewed in the light most favorable to the nonmoving party, is sufficient to allow a reasonable trier of fact to return a verdict in the party's favor. *Anderson*, 477 U.S. at 248.

The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion. *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020). Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate." *Thompson Everett, Inc. v. Nat'l Cable Advert.*, 57 F.3d 1317, 1323 (4th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). "[T]here must be 'sufficient evidence' favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007) (citing *Anderson*, 477 U.S. at 249–50). When applying the summary judgment standard, courts must construe the facts in the light most favorable to the nonmoving party and may not make credibility determinations or weigh the evidence. *Holland*, 487 F.3d at 213.

3

## II.   BACKGROUND[1]

Viewed in the light most favorable to Plaintiff and resolving any genuine issues of material fact in favor of the Plaintiff, the undisputed facts are as follows.[2]  In the early morning hours of January 9, 2021, the Troopers were in a marked state police vehicle[3] positioned in a crossover on Interstate 64 in Goochland County monitoring traffic. (SUMF ¶ 3.)  While stationary, the Troopers initially clocked a silver Mercedes with only one illuminated headlight traveling approximately 92 miles per hour ("mph"), which then accelerated to approximately 96 mph.  (*Id.* ¶ 6.)  That vehicle was driven by Hill.  (*Id.* ¶ 36.)  The Troopers pulled out of the crossover and accelerated to meet Hill's speeding vehicle.  (*Id.* ¶ 6.)  Soon after, they observed Hill swerving lanes while maintaining a speed of approximately 96 mph.  (*Id.* ¶¶ 8–9.)  After Bone entered their location and Hill's vehicle license plate number into their Computer Aided Dispatch system, Layton activated his emergency lights to initiate a traffic stop on Hill's vehicle.  (*Id.* ¶ 10.)

---

[1] In her Memorandum in Opposition, Plaintiff asserts that there are many material facts that are in dispute. (Pl.'s Mem. in Opp'n at 3–15.)  However, as will be subsequently outlined further, these disputed facts do not create a material dispute sufficient to survive summary judgment. The Court will address these disputed facts and their materiality directly in assessing her excessive force claim. *See infra* Part III, section A.1.

[2] The Court notes that much of the undisputed facts in this case come from the Troopers' dash cam footage ("Dash Cam," ECF No. 43-1), which was viewed in its entirety by this Court. However, for clarity, the Court also cites to the Statement of Undisputed Material Facts ("SUMF") contained in Defendants' Memorandum of Support (ECF No. 43).

[3] In addition to their marked car, the Troopers wore their standard issue blue uniforms displaying badges of authority and state police patches with fully equipped gun belts. (SUMF ¶ 3.)  Layton also had a body-worn microphone.  (*Id.*)  Bone did not have a microphone.  (*Id.*)

Seconds later, Hill's vehicle lights were turned off, and his vehicle accelerated to much higher speeds than their initial pursuit speed of 96 mph. (SUMF ¶ 12.) After traveling about four miles, Hill reduced his speed to a slower pace and began merging onto the right shoulder of the interstate. (*Id.* ¶ 13.) As he began to merge right, Hill quickly performed a sharp U-turn across oncoming lanes of traffic. (*Id.* ¶ 15.) During this abrupt U-turn, Hill lost control of his vehicle and slid down the grassy embankment on the left shoulder, eventually lodging and immobilizing his vehicle into the tree line. (*Id.*) Hill's vehicle stopped facing eastbound with the passenger side of the vehicle in contact with the tree line and the driver side parallel to the interstate. (*Id.*)

At this point, the Troopers parked their patrol vehicle across both lanes of traffic, with the nose of the patrol car pointed at Hill's vehicle, using the patrol car's headlights to illuminate the accident area. (SUMF ¶¶ 16–17.) The Troopers exited their vehicle with their guns drawn and approached Hill's vehicle in a "triangulating" manner. (*Id.* ¶ 19.) Bone approached Hill's vehicle from the rear angle on the driver side, and Layton approached from the front angle on the driver side. (*Id.*)

As the Troopers approached the vehicle, Bone gave three loud commands of "get out of the car now." (Dash Cam at 4:47–4:52.) Hill's driver-side window was down, and Hill can be viewed manipulating the steering wheel while his vehicle's tires spin. (*Id.* at 4:45–4:50.) Upon further approach, Layton began giving the primary verbal commands after Bone asked Layton "you got him?," which signaled to Layton that he should take responsibility for the primary commands, and Bone responded "I got you." (SUMF ¶ 23.)

The following verbal exchange can be heard on the dash cam video:

Layton: PUT YOUR HANDS UP![4]

Layton: LET ME SEE YOUR HANDS![5]

Bone: PUT YOUR HANDS UP![6]

Hill: My door doesn't open.[7]

Bone: PUT YOUR HANDS UP![8]

Hill: My door doesn't open.[9]

At this point, Hill's hands can be seen in front of his face, inside the vehicle. (Dash Cam at 5:02.) Layton then commands Hill to put his hands outside the vehicle. (*Id.*) The following exchange then occurred:

Layton: PUT YOUR HANDS OUT THE DOOR DO IT NOW![10]

Layton: PUT YOUR HANDS OUT THE DOOR![11]

At this time, Hill's left arm can then be seen extending outside the vehicle; Hill's right hand is not visible. (*Id.* at 5:06.)

Layton: HEY PUT YOUR HANDS OUT THE DOOR, STOP MOVING![12]

Layton: PUT YOUR HANDS OUT THE DOOR![13]

---

[4] (Dash Cam at 4:57.)
[5] (Dash Cam at 4:59.)
[6] (*Id.* at 5:00.)
[7] (*Id.* at 5:01.)
[8] (*Id.*)
[9] (*Id.* at 5:02.)
[10] (*Id.* at 5:04.)
[11] (*Id.* at 5:06.)
[12] (*Id.* at 5:08.)
[13] (*Id.* at 5:10.)

Layton: PUT YOUR HANDS OUT THE WINDOW![14]

Layton: PUT YOUR HANDS OUT THE WINDOW![15]

Layton: HEY HE'S REACHING, REACHING, REACHING![16]

Bone: STOP REACHING, HE'S GOT A GUN![17]

Layton: HE'S GOT A GUN![18]

At this point, Hill's left hand is no longer out of the window and both of his hands can be seen moving towards the center of the vehicle. (*Id.* at 5:15–5:16.)

Immediately, both Troopers nearly simultaneously shouted "GUN!" and discharged their firearms. (*Id.* at 5:16.) Based on the dash cam video, Bone initially fired his weapon twice in rapid succession. (*Id.*) Layton fired once, but then can be heard attempting to clear a jam in his firearm. (*Id.*) Bone says "GUN!" again, immediately followed by a third shot and Bone shouting "GUN!" once again. (*Id.* at 5:17–5:19.) The entire sequence involving the Troopers discharging their weapons occurred within a matter of seconds. (*Id.* at 5:16–5:19.) Bone can then be heard saying, "He's got a gun in his hands," followed by Layton saying, "Yeah, I got you. Hey, drop the gun!" (*Id.* at 5:22–5:24.)

Bone then called for EMS. (Dash Cam at 5:26–5:35.) The Troopers can be heard coordinating to secure the scene and separate Hill from the possible weapon. (*Id.* at

---

[14] (*Id.*)
[15] (*Id.* at 5:13.)
[16] (*Id.* at 5:15.)
[17] (*Id.* at 5:16.)
[18] (*Id.*)

5:36–5:45.) Based on the exchange heard through Layton's body-worn microphone, the

Troopers could no longer see the gun at that point. (*Id.*) Bone opened the driver's side

door, but still could not see the gun, however, he could see that Hill's body was slumped

over and not moving. (SUMF ¶ 31.) While both Troopers were monitoring Hill for

movement, Bone then moved around the rear of Hill's vehicle to the passenger side and

saw a handgun on the front passenger seat, beneath Hill's slumped-over body. (Dash

Cam at 6:48; *see also* Ex. 6 to Defs.' Mem. in Supp. at 1–5, ECF No. 43-6.)

At this point, Bone told Layton to holster his weapon and help him remove Hill

from the vehicle. (Dash Cam at 6:50–7:00.) Both Troopers worked to pull Hill out of the

vehicle and placed him on the ground to check for vital signs. (SUMF ¶ 35.) They then

placed Hill in a modified recovery position and determined he had no pulse. (*Id.*) Bone

then asked Layton, who had some medical experience as an EMT, if they should attempt

cardiopulmonary resuscitation ("CPR") on Hill, and Layton responded that due to Hill's

neck wound, CPR would only exacerbate his blood loss. (*Id.*) Both Troopers then waited

for additional units to arrive. (*Id.*)

Forensic agents with the Virginia State Police eventually recovered a .40 caliber

Smith & Wesson SD40 semi-automatic pistol from the front passenger seat of Hill's

vehicle. (Ex. 6 to Defs.' Mem. in Supp. at 1–5.) Additionally, a loaded magazine was

discovered in the floorboard of Hill's vehicle as well as multiple loose .40 caliber

cartridges. (Ex. 6 to Defs.' Mem. in Supp at 1–4, ECF No. 43-7; *see also generally* Ex. 6

to Defs.' Mem. in Supp at 1–5, ECF No. 43-8.)

## III.   DISCUSSION

### A. Qualified Immunity Standard

Plaintiff alleges that the Troopers used excessive and unreasonable deadly force against Hill in violation of his rights under the U.S. Constitution.  (Pl.'s Mem. in Opp'n at 19.)  The Troopers argue that the force used was not excessive or objectively unreasonable under the circumstances and that the Troopers are entitled to qualified immunity.  (Defs.' Mem. in Supp. at 14.)  Because the determination of whether the Troopers violated Hill's constitutional rights is a component of the qualified immunity analysis, the Court will analyze both arguments under the rubric of its qualified immunity analysis below.

"'Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'"  *Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 898 (4th Cir. 2016) (quoting *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)). This protection "'balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'"  *Yates v. Terry*, 817 F.3d 877, 884 (4th Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  To determine whether an officer is entitled to qualified immunity, courts engage in a two-step inquiry.  "The first step is to determine whether the facts, taken in the light most favorable to the non-movant, establish that the officer violated a

9

constitutional right.  At the second step, courts determine whether that right was clearly established."  *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

As to the first step of the qualified immunity analysis in the present case, Plaintiff alleges that the Troopers violated Hill's Fourth Amendment right to be free from unreasonable seizures.  *See* U.S. Const. amend IV.  The Fourth Amendment prevents "police officers from using excessive force to effectuate a seizure."  *Yates*, 817 F.3d at 884 (citing *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003)); *see Graham v. Connor*, 490 U.S. 386, 395 (1989).  A "claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of [a] person" is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard."  *Armstrong*, 810 F.3d at 899 (quoting *Graham*, 490 U.S. at 388).  An officer may employ force during his or her duties, so long as the force is reasonable under the circumstances.  *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).  Additionally, a reasonable officer may use deadly force "[w]here the officer has probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others."  *Id.* at 11.

In determining the reasonableness of force, courts are required to carefully balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (quoting *Garner*, 471 U.S. at 8).  To accomplish such balancing, a court "focus[es] on the facts and circumstances of each case, taking into account 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or

10

others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"

*Yates*, 817 F.3d at 885 (quoting *Graham*, 490 U.S. at 396); *see also Armstrong*, 810 F.3d

at 899.  Courts must consider the reasonableness of the force employed "'in full context,

with an eye toward the proportionality of the force in light of all the circumstances.'"

*Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Waterman v. Batton*, 393 F.3d

471, 481 (4th Cir. 2005)).  The United States Court of Appeals for the Fourth Circuit has

recognized that "'police officers are often forced to make split-second judgments—in

circumstances that are tense, uncertain, and rapidly evolving—[and courts should] take

care to consider the facts from the perspective of a reasonable officer on the scene, and

avoid judging the officer's conduct with the 20/20 vision of hindsight.'"  *Cooper v.*

*Sheehan*, 735 F.3d 153, 158–59 (4th Cir. 2013) (quoting *Clem v. Corbeau*, 284 F.3d 543,

550 (4th Cir. 2002)).  Ultimately, "the question of whether the officer's action were

reasonable is a question of pure law."  *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir.

2011).

Often referred to as the "clearly established" prong, the second step of the

qualified immunity analysis is "a test that focuses on the objective legal reasonableness

of an official's acts."  *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982).  "A clearly

established right is one that is 'sufficiently clear that every reasonable official would have

understood that what he [wa]s doing violates that right.'"  *Mullenix v. Luna*, 577 U.S. 7,

11 (2015) (per curiam) (quoting *Reichle v. Howards*, 556 U.S. 658, 663 (2012)).  To

determine whether a right is clearly established in this Circuit, the Court "'need not look

beyond the decisions of the Supreme Court, [the Fourth Circuit] court of appeals, and the

highest court of the state in which the case arose' to determine whether a reasonable officer would know that his conduct was unlawful in the situation he confronted." *Yates*, 817 F.3d at 887 (quoting *Wilson v. Kittoe*, 337 F.3d 392, 402–03 (4th Cir. 2003)).  An official violates a clearly establish constitutional right when, "'in light of preexisting law[,] the unlawfulness' of the [official's] actions is apparent." *Iko v. Shreve*, 535 F.3d 225, 237–38 (4th Cir. 2008) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The "clearly established" inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier*, 533 U.S. at 201).  There need not be a case "directly on point" in order for an officer to know that his or her conduct violates a clearly established right, however, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citing *Anderson*, 483 U.S. at 640; *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Troopers first argue that Plaintiff's excessive force claim fails "because the undisputed facts establish that the Troopers reasonably feared for their lives when Hill failed to comply with commands to show his hands, reached into the vehicle console, and pointed a gun at Trooper Layton." (Defs.' Mem. in Supp. at 14.)  Second, the Troopers assert that even if it is accepted as true that Hill did not point a gun at the Troopers, the use of deadly force was still objectively reasonable under the circumstances. (*Id.*) Lastly, the Troopers contend that Plaintiff cannot point to any clearly established right that the Troopers violated. (*Id.*)

In response, Plaintiff asserts that the Troopers' use of deadly force was excessive and unreasonable because Hill was "not at risk of fleeing," "was not an imminent threat" to the Troopers' safety, and the Troopers had no indication Hill was armed. (Pl.'s Mem. in Opp'n at 19.)  Additionally, Plaintiff argues that Hill did not have the gun in his hand at the time of the shooting and that it was the Troopers' actions of approaching Hill's vehicle with guns drawn that created the exigent circumstances which led to Hill's death. (*Id.* at 19–20.)  Finally, Plaintiff contends that the Troopers removed Hill from his vehicle in an effort to "intentionally and in bad faith" destroy evidence which would have demonstrated Hill did not possess the handgun. (*Id.* at 28.)  Accordingly, Plaintiff asserts that the Troopers are not entitled to qualified immunity because the Troopers' conduct was unlawful and violated Hill's clearly established rights. (*Id.* at 19.)

The Court will address each of the Troopers' and Plaintiff's responsive arguments in turn.

### 1. Excessive Use of Force

To determine whether an officer's actions are objectively reasonable, "[t]he focus, of course, is on what the police officer reasonably perceived at the time that he acted and whether a reasonable officer armed with the same information, would have had the same perception and have acted in like fashion." *Lee v. City of Richmond*, 100 F. Supp. 3d 528, 541 (E.D. Va. 2015) (citing *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994)). As previously noted, in determining whether an officer acted reasonably, the court should consider, "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or

attempting to evade arrest by flight.'" *Yates*, 817 F.3d at 885 (quoting *Graham*, 490 U.S. at 396).  Considering these factors, the Troopers' actions were objectively reasonable because other officers, armed with the same information the Troopers had, would have perceived Hill as a threat to the officer's safety.

<u>a. Severity of the Crime at Issue</u>

With respect to the first factor, "severity of the crime at issue" weighs in the Troopers' favor.  Plaintiff argues that this factor does not weigh in the Troopers' favor because Hill was "not suspected of committing a violent crime" and could only be charged with traffic infractions when the Troopers attempted to initiate a traffic stop. (Pl.'s Mem. in Opp'n at 24–25.)  The Court agrees with Plaintiff that Hill was initially only being investigated for reckless driving under Virginia Code § 46.2-852 and 862, as he was traveling well above the posted speed limit, which is not necessarily a violent offense.  (SUMF ¶ 6.)  However, alleging that Hill only committed traffic infractions does not fairly characterize Hill's actions.  Seconds after the Troopers activated their emergency lights and siren to initiate a traffic stop, Hill turned off his vehicle's lights and accelerated to a significantly high rate of speed.[19]  He then led the Troopers on a dangerous, high-speed chase for approximately four miles, clearly giving the Troopers probable cause that Hill was committing felony eluding arrest under Virginia Code §

---

[19] While it is not explicitly clear what speed Hill's vehicle ultimately reached, it is evident from the dash cam footage that Hill's vehicle was traveling at a much faster and dangerous speed than when the Troopers first began to follow Hill's vehicle.

46.2-817(B).[20]  After the high-speed chase, Hill abruptly attempted a sharp U-turn across

oncoming lanes of traffic before he crashed into the grassy embankment of the median.

(SUMF ¶ 15; Dash Cam at 4:32–4:40.)  Hill's actions were highly dangerous to himself,

the public, and the Troopers.  (*See* Ex. 17 to Defs.' Mem. in Supp., Dep. Tr. of Pl.'s

Expert Kenneth Miller ECF No. 44-17 (Plaintiff's expert agreed that Hill's actions in

evading the Troopers at excessively high speeds was dangerous and noncompliant).)  The

Court agrees that this factor alone is not enough to justify the Troopers' use of deadly

force in this case, but in the totality of the circumstances analysis, this factor weighs in

the Troopers' favor.

<u>b. Immediate Threat to Safety</u>

As to the second factor, immediate threat to the Troopers' safety, Plaintiff asserts

two main contentions in response to the Troopers' Motion.  First, Plaintiff alleges that the

Troopers cannot show at this stage of the proceedings that Hill actually held the gun, and

therefore, Hill could not have pointed the gun at the Troopers and posed a threat to their

safety.  (Pl.'s Mem. in Opp'n at 19.)  Second, Plaintiff asserts that because Hill was

immobilized and stuck in his wrecked vehicle, he posed no threat to the Troopers.  (*Id.* at

20–22.)  The Court disagrees with both of Plaintiff's contentions.

---

[20] Virginia Code § 46.5-817(B) states:

> Any person who, having received a visible or audible signal from any law-
> enforcement officer to bring his motor vehicle to a stop, drives such motor vehicle
> in a willful and wanton disregard of such signal so as to interfere with or endanger
> the operation of the law-enforcement vehicle or endanger a person is guilty of a
> Class 6 felony.

As to Plaintiff's first argument, even though a firearm was recovered from the passenger seat, the Court acknowledges that the fact of whether Hill actually held the gun is in dispute, precluding a definitive finding at this stage that Hill pointed the gun at either of the Troopers. However, the key inquiry is not simply whether Hill in fact pointed the gun at Layton, but rather, the inquiry is whether the Troopers reasonably perceived under the circumstances that Hill's actions constituted an immediate threat to the Troopers' or the public's safety. The Court concludes that the Troopers' perceptions that Hill posed an immediate threat to their safety at the time they employed deadly force were objectively reasonable under the circumstances.

The Troopers assert that *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996) and *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991) establish that the Troopers' conduct was reasonable under the circumstances. In *Elliott*, a police officer named Jason Leavitt stopped a motorist, Archie Elliott, on suspicion of driving under the influence. 99 F.3d at 641. Elliott admitted to Leavitt that he had been drinking and also failed several field sobriety tests. *Id.* Leavitt called for backup, handcuffed Elliott, and advised Elliott that he was under arrest for driving under the influence. *Id.* Leavitt searched Elliott and did not find a weapon. *Id.* Once another officer arrived on scene with Leavitt, they placed Elliott in the front passenger seat of Leavitt's patrol car with the seatbelt fastened, the door closed, and the window rolled up. *Id.* The officers were talking by the passenger side of Leavitt's patrol car when "Leavitt noticed a movement and looked to find Elliott with his finger on the trigger of a small handgun pointed at the officers." *Id.* at 642.

Leavitt yelled, "GUN!," and ordered Elliott to drop it. *Id.* After Elliott did not respond, Leavitt and the other officer discharged their weapons, killing Elliott. *Id.*

On appeal in that case, the appellees argued that Elliott did not pose a "real threat" to the officers, noting that his hands were handcuffed, he was placed in the front passenger seat with the seatbelt fastened and the window up, and the officers were outside of the patrol car at the time of the shooting. *Id.* The Fourth Circuit rejected Appellee's position and held that based on the "uncontroverted evidence that immediately before firing, Leavitt and Cheney confronted an intoxicated individual pointing a gun at them only a few feet away . . . ." *Id.* "The critical point . . . is precisely that Elliott was 'threatening,' threatening the lives of Leavitt and Cheney. The Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists." *Id.* at 643.

In *Hensley on behalf of North Carolina v. Price*, the Fourth Circuit explained the import of its holdings in *Slattery* and *Anderson*:

> In both cases, once the officer issued a verbal command, the character of the situation transformed. If an officer directs a suspect to stop, to show his hands or the like, the suspect's *continued movement* will likely raise in the officer's mind objectively grave and serious suspicions about the suspect's intentions. Even when those intentions turn out to be harmless in fact, as in *Anderson* and *Slattery*, the officer can reasonably expect the worst at the split-second when he acts.

876 F.3d 573, 585 (4th Cir. 2017) (citing *Slattery*, 939 F.2d 213; *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001)) (emphasis added). As pointed out again by the Fourth Circuit in *Knibbs v. Momphard*, both *Anderson* and *Slattery* involved "an officer's reasonable— but ultimately incorrect—belief that an individual possessed a firearm and was about to

use it." 30 F.4th 200, 220 (4th Cir. 2022). "Most importantly, the suspects in those cases made furtive movements toward a perceived firearm while disobeying the officer's command not to do so. Such actions, [the Fourth Circuit] held, would rightfully cause a reasonable officer to fear that the suspect intended to cause imminent deadly harm." *Id.*

The Court finds these holdings instructive in determining that the Troopers reasonably perceived Hill posed an imminent threat to the Troopers' safety. Based on Fourth Circuit precedent, the Troopers do not need to definitively show that Hill was holding or pointing a gun at them to establish that they reasonably perceived Hill posed a threat to their safety. It is enough for the Troopers to show that Hill was actively disobeying their commands and reaching for what they perceived was a handgun.

Here, the Troopers exited their patrol car and approached Hill's vehicle with guns drawn immediately after Hill had led them on a high-speed chase. According to the dash cam footage, the Troopers can be clearly heard giving multiple commands for Hill to show his hands as they approached his vehicle. (Dash Cam at 4:54–5:01.) Although Hill briefly complied by placing his hands in front of his face, he did not comply with the Troopers' next commands to place his hands outside of his driver's side window. (*Id.* at 5:01–5:02.) Despite multiple commands by the Troopers to show his hands and stop reaching, Hill only placed his left hand out of the window and continued reaching with his right hand toward the center console and passenger seat of the vehicle. (*Id.* at 5:03–5:04.) Both Troopers can then be distinctly heard shouting "GUN!" and "HE'S GOT A GUN!" before discharging their weapons, killing Hill. (*Id.* at 5:16–5:19.) Based on the dash cam footage, Hill "made furtive movements toward a perceived firearm while

disobeying the officer's command not to do so" and those actions would lead a reasonable officer to believe Hill posed an immediate threat. *Knibbs*, 30 F.4th at 220.

Further, this was not a situation where the officers perceived a firearm and were ultimately incorrect about its existence. A bloody handgun, a magazine, and loose ammo cartridges were recovered from both the center console and the passenger seat of Hill's vehicle. (SUMF ¶¶ 38–39.) Thus, not only did the Troopers both perceive Hill to be reaching for a handgun, but a handgun was in fact recovered from an area that was in the direction Hill was reaching. As the Fourth Circuit has made clear, "[t]he Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists." *Elliott*, 99 F.3d at 643.

Plaintiff argues that there was "a picture identified by Trooper Bone in his deposition" which shows the gun tucked between the upper and lower portions of the passenger seat. (Pl.'s Supp. Br. at 3, ECF No. 64.) Her counsel argues that this demonstrates that Hill had no intention of reaching for the gun. (*Id.*) The Court viewed all submitted picture evidence, including the specific picture identified by Plaintiff, and it is clear that the pictures show the handgun was not "tucked" into the passenger seat in any way. (*See* ECF Nos. 43-5, 43-6, 43-7, 43-8.) The picture exhibits, which consist of different angles of the same passenger seat location, show that the handgun was sitting on top of the lower portion of the passenger seat with the barrel facing the passenger seat door. (Ex. 6 to Defs.' Mem. in Supp. at 1–6, ECF No. 43-6.) There is no indication that the gun was "tucked" nor is there any allegation that the Troopers or Virginia State Police Investigators moved the gun in any way.

19

Plaintiff also asserts that because Hill was left-handed, there is no reason to believe that Hill would attempt to reach for and point a gun at the Troopers with his non-dominant hand. (Pl.'s Mem. in Opp'n at 22–23.)  However, no evidence has been adduced by Plaintiff to put into dispute that Hill would ever reach for an item with his non-dominant hand.  Regardless, "when the moving party has carried its burden . . ., its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In sum, as to Plaintiff's first argument that Hill did not actually hold or point the handgun at the Troopers, the Court concludes that the Troopers nonetheless reasonably perceived that Hill posed an immediate threat to their safety.  Although it cannot be found definitively at this stage whether Hill was holding the firearm, Hill was still not complying with the Troopers' commands to show his hands and stop reaching.  The Troopers also perceived that Hill was reaching for a handgun, as evidenced by both Troopers shouting "GUN!" simultaneously, and a handgun was actually recovered from the passenger seat of Hill's vehicle.  Therefore, not only were the Troopers' perceptions that Hill was reaching for a gun reasonable based on Hill's conduct, but the Troopers proved to be correct about the gun's existence.

As to Plaintiff's second argument, that Hill did not pose a threat because he was immobilized in a wrecked vehicle, the Court also finds this argument unavailing.  The simple fact that Hill was in an immobilized vehicle is not determinative of whether he posed a threat to the Troopers' safety or not.  Just as in *Elliott*, the uncontroverted

20

evidence is that moments before the Troopers discharged their weapons, Hill could reasonably be considered "threatening" by disobeying the Troopers' commands to show his hands and stop reaching towards the center of his vehicle. *See Elliott*, 99 F.3d at 642–43 (finding that defendant being handcuffed, in the backseat of the patrol car, and the officers being outside was not dispositive of whether defendant was threatening). Additionally, the Troopers approached the vehicle moments after Hill had led them on a dangerous, four-mile high-speed chase. Even though Hill's vehicle was immobilized, Hill's non-compliance under those tense circumstances, coupled with the Troopers' perceptions that he was reaching for a gun, indicates that they reasonably believed Hill posed an immediate threat to their safety.

Therefore, under the circumstances of this case, the Troopers reasonably perceived Hill posed a serious threat to their safety and this *Graham* factor weighs in favor of the Troopers.

### c. Actively Resisting or Evading

The last *Graham* factor, whether Hill was actively resisting or attempting to evade arrest, again favors the Troopers. The dash cam unequivocally shows that Hill did not reduce his speed once the Troopers activated their emergency lights and siren. Instead, he led the Troopers on a high-speed chase with his vehicle's lights off and attempted a dangerous U-turn across oncoming lanes of traffic before wrecking his vehicle into the grassy embankment. (Dash Cam at 3:50–4:40.) Although Plaintiff argues that Hill was immobilized and could not flee when the Troopers began approaching his vehicle with guns drawn, there was no definitive indication to the Troopers that Hill was actually

21

unable to flee until they reached his vehicle. As the Troopers approach, there were indications that Hill was still attempting to manipulate the steering wheel and his tires were spinning as he attempted to move his vehicle. Moreover, Hill was actively resisting the Troopers' commands as they approached his vehicle. It is clear that Hill was resisting the Troopers' attempts to detain him.

Based on the foregoing analysis of the *Graham* factors when measured against the Troopers' use of force against Hill, the Court concludes that the Troopers' use of force was objectively reasonable in light of the totality of the circumstances in this case. Courts have the benefit of reviewing by the coolness of the evening what officers do by the heat of the day. The Fourth Circuit has recognized that police officers are required to make split-second decisions in circumstances that are "tense, uncertain, and rapidly evolving," and courts should "'take care to consider the facts from the perspective of a reasonable officer on the scene and avoid judging the officer's conduct with the 20/20 vision of hindsight.'" *Cooper*, 735 F.3d at 158–59. The Court recognizes that any loss of life, regardless of the circumstances, is tragic. However, the Troopers reasonably believed that Hill posed a danger in disobeying the Troopers' commands and reaching towards what they perceived to be—and actually turned out to be—a handgun. Therefore, the Troopers did not employ excessive force against Hill in violation of his constitutional rights.

## 2. Clearly Established Law

Alternatively, even if the Troopers used excessive force, they would still be entitled to qualified immunity because they did not violate a clearly established

constitutional right. As discussed previously, the "salient question" in determining whether a rule is clearly established "'is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). At the time of the events in question, the state of the law did not provide the Troopers with "fair warning" that their conduct violated a constitutional rule.

Moreover, the United States Supreme Court has consistently reiterated that courts should "not define clearly established law at a high level of generality" and that "[s]pecificity is especially important in the Fourth Amendment context." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (cleaned up). "To hold that a right is clearly established the Supreme Court has cautioned that we should do so only in obvious case[s] exhibiting violations of the core of the Fourth Amendment." *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 222 (4th Cir. 2018) (internal quotations and citations omitted).

Here, Plaintiff has not demonstrated that a reasonable officer would have understood, based on the information and knowledge the Troopers possessed, that firing upon a non-compliant suspect who is reaching for what the Troopers believe is a firearm would constitute a violation of the Fourth Amendment. As the Court has already explained, construing all facts in the light most favorable to Plaintiff, it cannot be definitively established on the record at hand that Hill held or pointed the gun at the Troopers. However, even if Hill did not point the gun at the Troopers, no reasonable officer would have understood that firing upon a suspect who was evading arrest, actively

23

disobeying commands, and reaching for what could be and was perceived as a weapon inside the vehicle would be unreasonable.

Plaintiff raises numerous arguments to suggest that the Troopers improvidently chose improper tactics by approaching Hill's vehicle with guns drawn and created the exigent circumstances which led to Hill's death in doing so. First, Plaintiff asserts that the Troopers did not follow Virginia Code § 19.2-83.5 or Virginia State Police policy when they approached Hill's vehicle with guns drawn. (Pl.'s Mem. in Opp'n at 20.) Second, Plaintiff contends that Bone should have been aware that continuing to shoot Hill even after he was no longer a possible threat was unreasonable. (*Id.* at 22.) Lastly, Plaintiff asserts that the Troopers "destroyed evidence that would determine that [] Hill did not have a gun in his hand." (*Id.* at 27.)

As to Plaintiff's first argument, Virginia Code § 19.2-83.5, titled "Use of deadly force by a law-enforcement officer during an arrest or detention," states in pertinent part:

> B. In determining if a law-enforcement officer's use of deadly force is proper, the following factors shall be considered:
>
> 1. The reasonableness of the law-enforcement officer's belief and actions from the perspective of a reasonable law-enforcement officer on the scene at the time of the incident; and
>
> 2. The totality of the circumstances, including (i) the amount of time available to the law-enforcement officer to make a decision; (ii) whether the subject of the use of deadly force (a) possessed or appeared to possess a deadly weapon and (b) refused to comply with the law-enforcement officer's lawful order to surrender an object believed to be a deadly weapon prior to the law-enforcement officer using deadly force; (iii) whether the law-enforcement officer engaged in de-escalation measures prior to the use of deadly force, including taking cover, waiting for backup, trying to calm the subject prior to the use of force, or using non-deadly force prior to the use of deadly force; (iv) whether any conduct by the law-enforcement officer prior

24

to the use of deadly force intentionally increased the risk of a confrontation resulting in deadly force being used; and (v) the seriousness of the suspected crime.

Based on the statute's language, Plaintiff and her expert, Kenneth Miller, contend that the Troopers should have been aware that their use of deadly force would be excessive under the circumstances. (Pl.'s Mem. in Opp'n at 25.) They argue that the Troopers should have additionally been aware of this standard because the Virginia State Police incorporated this standard into their deadly force training. (*Id.*)

As a threshold matter, the statute at issue did not take effect until March 1, 2021, pursuant to Virginia Constitution Article IV, § 13. Thus, because the events in question took place nearly two months before the statute at issue took effect, the statute's language could not clearly establish that the Troopers' conduct was unreasonable on the day in question. Further, Plaintiff's expert opining that the Troopers simply chose inferior tactics or did not follow the Virginia State Police training does not necessarily create a dispute of material fact.[21] For the clearly established analysis, the question is not whether the Troopers' conduct was the "best" choice under the circumstances, but instead, the question is whether their conduct was constitutional.

Plaintiff's main contention is that the Troopers' use of improper tactics created "exigent circumstances" which unnecessarily escalated the situation. (Pl.'s Mem. in Opp'n at 19–20.) However, the Supreme Court has not held that a reasonable use of

---

[21] Plaintiff's expert also opined that Virginia Code § 19.2-83.5 should have placed the Troopers on notice, however, as mentioned previously, that statute was not in effect at the time of the traffic stop. (Pl.'s Expert Report at 6, ECF No. 50-1.)

force can be made unreasonable by virtue of an earlier Fourth Amendment violation or violation of any other law. *Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 426–27 (2017) (finding that the United States Court of Appeals for the Ninth Circuit's "provocation rule," which used another constitutional violation to manufacture an excessive force claim where one would otherwise not exist, had no basis in the Fourth Amendment); *see also City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (declining to decide whether "recklessly creating a situation that requires deadly force can itself violate the Fourth Amendment"). The Fourth Circuit has held that "*Graham* requires [courts] to focus on the moment the force was used; conduct prior to that moment is not relevant in determining whether an officer used reasonable force." *Elliott*, 99 F.3d at 640 (citation omitted). Plaintiff's "suggestion that the officers might have responded differently is exactly the type of judicial second look that the case law prohibits." *Id.*; *see also Anderson*, 247 F.3d at 131 (finding appellant's argument that the officer should have taken cover was irrelevant); *Greenridge*, 927 F.2d at 791–92 (finding appellant's argument that the officer allegedly violated standard police procedure by not employing proper backup and not using a flashlight irrelevant).

In sum, Plaintiff's argument that the Troopers employed excessive force by virtue of using improper tactics that created exigent circumstances is without merit. Simply contending that the Troopers should have employed better tactics is the exact course of review that the Fourth Circuit has cautioned courts not to embark on. Therefore, the Court concludes that there was no clearly established law putting the Troopers on notice

that their decision to approach Hill's vehicle with guns drawn was unreasonable under the Fourth Amendment.

As to Plaintiff's second argument, that Bone shooting Hill multiple times after he was no longer a threat was clearly established as unreasonable, the Court concludes that the record does not support Plaintiff's claim. Plaintiff cites to *Brockington v. Boykins*, 637 F.3d 503, 507 (4th Cir. 2011) to assert that Bone's conduct of shooting one additional shot was clearly unreasonable. In *Brockington*, an officer confronted a suspect on the backyard steps of a vacant house. *Id.* at 505. The officer fired his handgun twice, striking the suspect in the hand and the abdomen. *Id.* The suspect then fell off the stairs on a cement landing below and was unable to get up or otherwise defend himself. *Id.* The officer walked over and then stood directly over the suspect and fired at least six shots at close range. *Id.* After the officer fired a total of nine shots, the suspect fled the scene. *Id.* At no point was the suspect armed. *Id.*

The facts in *Brockington* differ substantially from the case at hand. First, there were only four shots fired by the Troopers in this case and those shots came within mere seconds of each other. (Dash Cam at 5:16–5:19.) Bone's final third shot came less than two seconds from his first shots. (*Id.*) There was no clear break in the sequence of events where the suspect no longer posed a threat such as in *Brockington*. *Brockington*, 637 F.3d at 507 (finding that there was a "clear break" in the sequence of events that occurred between the first array of shots and the second array of shots, which occurred as the suspect had already been subdued). Additionally, Hill was in possession of a firearm and the Troopers perceived that he was reaching for his firearm and intended to use it,

27

whereas the suspect in *Brockington* was unarmed.  Thus, based on the record at hand, the Court finds that Bone's one additional shot was not unconstitutional excessive force.

Lastly, Plaintiff argues that the Troopers removed Hill from his vehicle "intentionally and in bad faith" to purposefully destroy any evidence that Hill was not holding the firearm.  (Pl.'s Mem. in Opp'n at 27–28.)  The Court concludes that this assertion is wholly unsupported by the record.  Plaintiff asserts that this can be inferred because "[p]rimer residue samples were collected from Hill at the scene, however, the results were not submitted to the lab for testing due to Bone and Layton both touching Hill when they removed him from the vehicle."  (*Id.*)  This conclusory allegation cannot create a genuine dispute of material fact.  According to the dash cam footage, there is no indication whatsoever that the Troopers removed Hill in an attempt to spoil or destroy evidence that could be used in a subsequent civil lawsuit.  (Dash Cam at 6:30–7:50.)  Plaintiff proffers no evidence to bring the Troopers' intentions in removing Hill from the vehicle into question.  Simply stating conclusively that the Troopers removed Hill with bad intentions is not enough.  Therefore, the Court finds that this argument has no merit.

Therefore, as an alternative holding to the Court's finding that the Troopers are entitled to qualified immunity because they did not use excessive force against Hill, the Troopers are also entitled to qualified immunity because they did not violate a clearly established constitutional right.  As such, Defendants' Motion for Summary Judgment will be granted on both prongs of the qualified immunity analysis.

Plaintiff's Amended Complaint also contains counts for state law violations including gross negligence, assault and battery, and wrongful death.  (Am. Compl. at

28

¶¶ 83–113.)  Because the state-law tort claims will fail or proceed with the success of

Plaintiff's federal excessive force claim, the Court's finding that the Troopers are entitled

to qualified immunity precludes her state-law tort claims from moving forward.  *See*

*Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 111 (4th Cir 2017).  "State-law

claims that arise from the officer's use of force, such as battery, are subsumed within the

federal excessive force claim."  *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994).

Accordingly, because qualified immunity applies and the state-law claims cannot move

forward, Plaintiff's Amended Complaint will be dismissed with prejudice.

### IV.   CONCLUSION

The events that took place on January 9, 2021, were devastating and tragic, and

the Court recognizes the public's sensitivity to issues of law enforcement and the use of

force.  However, under the circumstances the Troopers faced, their conduct was not

excessive as a matter of law, and the state of the law regarding the issues presented is

clear.  Therefore, for the foregoing reasons, the Court will grant Defendants' Motion for

Summary Judgment.  An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: May 30, 2023
Richmond, Virginia